UNITED STATES BANKRUPTCY COURT
DISTRICT OF THE VIRGIN ISLANDS

IN RE:                            . Case No. 06-30007, 06-30008,
                                  .          06-30009
                                  .
INNOVATIVE COMMUNICATION CO.  .
LLC, EMERGING COMMUNICATIONS, . USX Tower - 54th Floor
INC. and JEFFREY PROSSER,     . 600 Grant Street
                              . Pittsburgh, PA 15219
              Debtors.   .
                              . January 24, 2007
. . . . . . . . . . . . . . . . 11:11 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:              Richards, Layton & Finger, P.A.
                              By:  DANIEL J. DeFRANCESCHI, ESQ.
                                   (telephonically)
                                   JASON M. MADRON, ESQ.
                                   (telephonically)
                              One Rodney Square
                              920 N. King Street
                              P.O. Box 551
                              Wilmington, DE 19899

                              Dudley Clark & Chan
                              By:  CAROL ANN RICH, ESQ.
                              (via video conference)
                              9720 Estate Thomas-Havensight
                              Charlotte Amalie
                              St. Thomas 00802, U.S.V.I

Audio Operator:               Cathy Younker

Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311   Fax No.   (609) 587-3599**

APPEARANCES (Cont'd.)

For the Debtors:              Shearman & Sterling, LLP
                             By:  SCOTT C. SHELLEY, ESQ.
                                  (telephonically)
                                  DOUGLAS BARTNER, ESQ.
                                  LYNETTE KELLEY, ESQ.
                             599 Lexington Avenue
                             New York, NY  10022

                             Orrick, Herrington &
                              Sutcliffe, LLP
                             By:  LANNY DAVIS, ESQ.
                                  (telephonically)
                             Washington Harbour
                             3050 K Street, N.W.
                             Washington, DC  20007

For Greenlight:              Skadden, Arps, Slate, Meagher
                              & Flom, LLP
                             By:  GREGG M. GALARDI, ESQ.
                                  MATTHEW P. WARD, ESQ.
                                  (telephonically)
                                  MARK DESGROSSEILLIERS, ESQ.
                                  (telephonically)
                                  THOMAS J. ALLINGHAM II, ESQ.
                                  (telephonically)
                             One Rodney Square
                             P.O. Box 636
                             Wilmington, DE  19899

                             ANDY WEINFELD
                             (telephonically)

For RTFC:                    Fulbright & Jaworski L.L.P.
                             By:  WILLIAM R. GREENDYKE, ESQ.
                                  TOBY L. GERBER, ESQ.
                                  JOHN CORNWELL, ESQ.
                                  (telephonically)
                             1301 McKinney, Suite 5100
                             Houston, Texas 77010-3095

For RTFC:                    Harris Wiltshire & Grannis, LLP
                             By:  KENT D. BRESSIE, ESQ.
                             1200 18th Street, N.W.
                             Suite 120
                             Washington, DC  20036

APPEARANCES (Cont'd.):

For RTFC:                          Monzack and Monaco, P.A.
                                   By:  FRANCIS A. MONACO, JR., ESQ.
                                        (telephonically)
                                        KEVIN MANGAN, ESQ.
                                        (telephonically)
                                   400 Commerce Center
                                   Twelfth & Orange Streets
                                   Wilmington, DE  19899

                                   Hunter, Cole & Bennett
                                   By:  RICHARD H. HUNTER, ESQ.
                                        (telephonically)
                                   Christiansted, St. Croix,
                                   U.S. Virgin Islands

                                   Moore, Dodson & Russell, P.C.
                                   By:  J. DARYL DODSON, ESQ.
                                        (telephonically)
                                   5035 (14A) Norre Gade, Suite 1
                                   P.O. Box 310
                                   Charlotte Amalie, St. Thomas
                                                  00804-0310

                                   FRANK VAUGHAN
                                   (telephonically)

For the U.S. Trustee:              Office of the U.S. Trustee
                                   By:  WILLIAM K. HARRINGTON, ESQ.
                                        (telephonically)
                                   J. Caleb Boggs Federal Building
                                   844 King Street
                                   Suite 2313
                                   Lockbox 35
                                   Wilmington, DE  19801

For Jeffrey Prosser:               JOEL H. HOLT, ESQ.
                                   (telephonically)
                                   2132 Company Street
                                   Suite 2
                                   Christiansted
                                   St. Croix, USVI  00820

                                   Phillips, Goldman & Spence, P.A.
                                   By:  LISA McLAUGHLIN, ESQ.
                                        (telephonically)
                                   1200 North Broom Street
                                   Wilmington, DE  19806

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.):

| | |
|---|---|
| For Jeffrey Prosser: | Shulman, Rogers, Gandal, Pordy & Ecker, P.A.<br>By:  MICHAEL J. LICHTENSTEIN,ESQ.<br>11921 Rockville Pike<br>Rockville, Maryland 20852-2743 |
| | Robert F. Craig, P.C.<br>By:  ROBERT F. CRAIG, ESQ.<br>1321 Jones Street<br>Omaha, NE  68102 |
| For D.E. Shaw: | Kasowitz, Benson, Torres & Friedman LLP<br>By:  DAVID ROSNER, ESQ.<br>     (telephonically)<br>     JEFFREY GLEIT, ESQ.<br>     (telephonically)<br>1633 Broadway<br>New York, NY  10019 |
| For U.S. Dept. of Justice: | Office of the U.S. Trustee<br>By:  GUY G. GEBHARDT, ESQ.<br>75 Spring Street, SW<br>Room 362<br>Atlanta, GA 30303 |
| For PSC: | JEFFERY MOOREHEAD, ESQ.<br>(telephonically)<br>U.S. Virgin Islands |
| For Fir Tree: | BRIAN MEYER<br>(telephonically) |
| For CenterBridge: | Paul, Weiss, Rifkind, Wharton & Garrison<br>By:  JEREMY GLADSTONE, ESQ.<br>     (telephonically)<br>1285 Avenue of the Americas<br>New York, NY  10019 |

**INDEX**                                                                5

**<u>WITNESSES FOR GREENLIGHT</u>**                                **<u>Page</u>**

JAMES CARROLL
     Cross Examination by Mr. Lichtenstein            12
     Redirect Examination by Mr. Galardi             20


**<u>EXHIBITS</u>**                                       **<u>ID.</u>**   **<u>EVID.</u>**

83   ICC's/LLC's answers to interrogatories               27
84   Mr. Prosser's first answer to interrogatory          27
85   Mr. Prosser's supplement to that interrogatory       27

6

1           THE COURT:  These are the matters of Emerging

2   Communications, Innovative Communication and Jeffrey Prosser,

3   30006, 30007, 008 and 009 pending in the District of the Virgin

4   Islands.  This is the continuation of an evidentiary hearing

5   from last week.

6           The participants I have listed by phone Daryl Dodson,

7   Frank Vaughan, Richard Hunter, John Cornwell, Francis Monaco,

8   Kevin Mangan, William Harrington, Robert Craig, Jeremy

9   Gladstone, Gregg Galardi, Thomas Allingham, Mark

10  Desgrosseilliers, Matthew Ward, Andy Weinfeld, Ann

11  DeFranceschi, Jason Madron and Douglas Bartner, Scott Shelley,

12  Michael Lichtenstein, Joel Holt, Lisa McLaughlin, David Rosner,

13  Jeffrey Gleit, Brian Meyer, Lynette Kelley and Lanny Davis.

14          I'll take entries in the Virgin Islands, please.

15          MS. RICH:  Good afternoon, Your Honor, Carol Rich on

16  behalf of the corporate debtors.

17          MR. DODSON:  Good afternoon, Your Honor, Daryl Dodson

18  on behalf of the RTFC.

19          MR. MOOREHEAD:  Good afternoon, Your Honor, Jeffrey

20  Moorehead on behalf of the PFC appearing by telephone.

21          THE COURT:  I'm sorry, sir, there was someone else

22  speaking at the same time.  Would you enter your appearance

23  again, please?

24          MR. MOOREHEAD:  Judge, Jeffrey Moorehead by telephone

25  on behalf of the Virgin Islands Public Services Commission.

**J&J COURT TRANSCRIBERS, INC.**

1             THE COURT:  Okay.

2             MR. MOOREHEAD:  I was unable to catch a flight this

3 morning to be in St. Thomas.

4             THE COURT:  Okay.  Are we not able to connect -- I'm

5 not sure, I'll have to check.  Can we not connect two videos?

6 Can we do the video from St. Thomas and St. Croix at the same

7 time?  We can.

8             MR. MOOREHEAD:  I don't know, Your Honor.  I'm in my

9 office.

10             THE COURT:  Mr. Moorehead, I think we have the

11 capability of doing video from St. Thomas and St. Croix to

12 here, so if that's something that you want us to look into, I

13 believe we can make that possible.

14             MR. MOOREHEAD:  Thank you.  Thank you very much.

15             THE COURT:  One second.

16             What I'm being told is that we may have a feed issue

17 because we have to split the band width to the two locations,

18 but, frankly, I don't think that that should be an issue

19 overall.

20             If you want to do it, Mr. Moorehead, the next time we

21 have these from a remote location I'll check, but we can try

22 it.

23             MR. MOOREHEAD:  Thank you, Your Honor.

24             THE COURT:  Okay.

25             MR. BARTNER:  Good morning, Your Honor, Douglas

**J&J COURT TRANSCRIBERS, INC.**

1    Bartner from Shearman & Sterling with Lynette Kelley, co-

2    counsel to the corporate debtors.

3        MR. LICHTENSTEIN:  Good morning, Your Honor, Michael

4    Lichtenstein and Robert Craig for Jeffrey Prosser.

5        MR. GERBER:  Good morning, Your Honor. Toby Gerber

6    and William Greendyke of Fulbright and Jaworski for the RTFC

7    along with Kent Bressie of Harris, Wiltshire and Grannis, also

8    on behalf of the RTFC.

9        THE COURT:  Is there something we can do about the

10   feedback?

11       Good morning.

12       MR. GALARDI:  Good morning, Gregg Galardi on behalf

13   of Greenlight, Your Honor.

14       MR. GEBHARDT:  Good morning, Your Honor, Guy

15   Gephardt, Assistant United States Trustee.

16       THE COURT:  Okay, where were we?  Mr. Bartner?

17       MR. BARTNER:  Your Honor, good morning again.

18       Where we were was Mr. Lichtenstein was in the middle

19   of cross examining the expert that Greenlight had, Mr. Jim

20   Carroll.

21       Before we started, perhaps Your Honor had asked us to

22   think about a few things, which we have, and there's one other

23   report where we were on those.

24       The parties have agreed that we would continue

25   subject to Your Honor's desire today with closing arguments.

1   We discussed post trial briefs.  I believe RTFC and Greenlight

2   would like to dispense with them.  The debtor is fine with

3   that, but if the Court believes it would be helpful in reaching

4   a conclusion to have us do post trial briefs, we're happy to do

5   that as well.

6            THE COURT:  All right.

7            MR. BARTNER:  Okay?  So, I don't think I had anything

8   else, Your Honor.  Just pick it up with Mr. Lichtenstein?

9            MR. GREENDYKE:  Judge, Bill Greendyke on behalf of

10  the RTFC.  I think we would prefer, as he said, to argue today

11  and would not, unless the Court orders otherwise, utilize post-

12  hearing briefs in order to argue the case.  We think we're

13  going to have enough time today to do everything we need to do.

14           After conversations with Shearman & Sterling, I

15  alluded last time we were here to a Virgin Islands statute and

16  highlighted a couple provisions of the statute.  I think

17  there's 20 sections in the statute.  I handed the Court a copy

18  of it, which included both a hard-bound book version as well as

19  a copy of a pocket part.

20           One of the last sections of the statute was a section

21  that I did not argue to you, because it honestly doesn't

22  support my case and I didn't recall that it existed.  But as

23  indicated by the debtor, it does exist, and the Court needs to

24  be aware of it in terms of thoroughness and completeness.

25           Section 20 of the statute, and I'm referring to three

1  V-I-C, Section 717 which deals with the retirement personnel

2  and basically statutory guidelines for how the GERS does its

3  business.  Provides that the board of trustees -- and I'm

4  quoting, reading from the statute, Section 20.  "The board of

5  trustees may administer the investment portfolio programs of

6  the system, including the alternative investment programs," and

7  it's later defined by the statute.  "The maximum amount which

8  may be invested in the alternative investment program is no

9  more than five percent of the total amount of the available

10  investment portfolio."

11         And then it defines alternative investments to be,

12  for lack of a better term, just about everything under the sun,

13  whether it's hedge funds or private equity, special situations,

14  oil and gas, agriculture, real estate.  I mean, all kinds of

15  stuff.

16         The sections that I alluded to earlier in my argument

17  were maybe like two and three or three and four of the statute

18  that talks about what they principally can invest in, and it is

19  as I said.  They can invest -- other than through this

20  alternative investment program, in stocks that are not listed

21  on the nationally recognized exchange.  They have limitations

22  on the amount of stock that can be invested or amount of GERS

23  portfolio that can be invested in any particular company, which

24  I think is one percent.

25         After looking over the statute again, and I think I

1 qualified my comments last Friday, I'm not a VI lawyer.  I've

2 not researched this extensively.  I think the GERS board has

3 the discretion to vote, to alter any of these guidelines by as

4 much as 25 percent, but we're still dealing with one percent,

5 two percent and five percent, as in the case of this

6 alternative investment program.

7        We wanted the Court to be aware of that.  I failed ti

8 disclose that -- failed to mention it to the Court.  I frankly

9 didn't recall it and wanted you to know that there -- it's a

10 very board statute, and there's lots of opportunity.  We will

11 believe that it does not enable the GERS to do what the debtor

12 thinks the GERS can do because of the cap, the five percent

13 cap.

14        My understanding, and I don't know -- my impression

15 on information and belief is that the total portfolio or size,

16 if you will, capitalization of the GERS is in the 1.3 billion.

17 Five percent of that is going to be in the $65 million range.

18 That's nowhere near -- that's one-tenth of the money we're

19 talking about in terms of the debtors and the letters that have

20 been presented or argued to the Court.

21        So, with that, thank you.

22        THE COURT:  All right.

23        Any other preliminary matters before we recall Mr.

24 Carroll?

25        Okay, Mr. Carroll.

Carroll - Cross/Lichtenstein                    12

1          COURT CLERK:  Would you like the witness sworn?

2          THE COURT:  Yes, please.

3                JAMES CARROLL, WITNESS, SWORN

4          MR. LICHTENSTEIN:  Good morning, Your Honor.

5          THE COURT:  Good morning.

6                       CROSS EXAMINATION

7  BY MR. LICHTENSTEIN:

8  Q    Mr. Carroll, good morning.  Michael Lichtenstein for the

9  debtors.

10       Mr. Carroll, I take it you haven't discussed your

11  testimony with anybody since you left the stand last week; is

12  that correct?

13  A    I have not.

14  Q    Mr. Carroll, I'd like to talk today a little bit about the

15  report that you filed.  It was the three-page -- three or four-

16  page report.  Do you happen to have a copy of the exhibits with

17  you?

18  A    I don't have anything in front of me, no.

19          MR. LICHTENSTEIN:  Your Honor, I'm not --

20          THE COURT:  I think you all left -- counsel left

21  boxes of exhibits and --

22          MR. LICHTENSTEIN:  I think they may be in the

23  cabinet, Your Honor.

24          I think I only see the debtor's exhibits, Your Honor.

25          THE COURT:  I can make a copy of the one that was

Carroll - Cross/Lichtenstein                    13

1  filed if that would be of assistance.

2        MR. GALARDI:  Your Honor, we did leave the binders

3  here with all of the Greenlight exhibits, so they should have

4  been someplace.  I might --

5        MR. LICHTENSTEIN:  Thank you.

6        THE COURT:  Are your boxes missing?

7        MR. GALARDI:  No, I have my boxes, but the exhibits

8  were kept separately, Your Honor.

9        THE COURT:  Oh.

10       MR. GALARDI:  And they were all over there when we

11 left the court, the binders.

12       THE COURT:  Did you get your exhibits?

13       MR. LICHTENSTEIN:  These are the ones, yes.

14       THE COURT:  I'm having a copy made of the one that

15 was handed up to the court

16       MR. GALARDI:  I think Mr. Lichtenstein is going to be

17 asking more about the thicker exhibits, if I'm not mistaken,

18 the Consolidated reports or just his resume?

19       Oh, just his report?  I thought you asked about the

20 exhibits.

21       MR. BARTNER:  Your Honor, I should have started by

22 apologizing for being a few minutes late.  We flew in this

23 morning.  There was some weather and traffic control issues, so

24 apologies.

25       THE COURT:  It's no problem.  I understood that there

J&J COURT TRANSCRIBERS, INC.

Carroll - Cross/Lichtenstein                          14

1  might be some difficulty this morning, and I guess there was a

2  lineup getting into the building as well through security this

3  morning.

4          Fire drills on one end, problems getting in on the

5  other.

6          (Off the record discussion among court personnel)

7          THE COURT:  Mr. Lichtenstein, I've made a copy of the

8  curriculum vitae and the exhibit that is the three-page report.

9  I don't suppose you want the electronic filing notice with it.

10  Okay.

11         MR. LICHTENSTEIN:  Thank you, Your Honor.

12  BY MR. LICHTENSTEIN:

13  Q    You have the report in front of you, Mr. Carroll?

14  A    Yes, I do.

15  Q    Do you mind looking at the third page of the report, and

16  there's a title there that says, "Adequacy and Accuracy of

17  Financials".  Do you see that?

18  A    Yes, I do.

19  Q    Now, that is a misnomer, is it not?  That title?

20  A    I'm not sure of the question.

21  Q    Well, in actual fact, isn't it true that with respect to

22  the audited financial statements the only concern you have is

23  with the adequacy of the disclosure?

24  A    No, that's not true.  The --

25  Q    That's not true that the only concern you have is with the

Carroll - Cross/Lichtenstein                    15

1  adequacy of the disclosure?

2  A    No, I'm concerned with the accuracy of the disclosure as

3  well.

4  Q    Do you remember that you were deposed last week?

5  A    Yes.

6  Q    And you answered questions under oath at that deposition,

7  right?

8  A    Yes, I did.

9  Q    And I assume you told the truth when you were testifying

10  under oath; is that correct?

11  A    That's correct.

12  Q    Now, do you recall that you were asked a question, and I'm

13  looking at Page 91 of your deposition, "What other concerns do

14  you have, other than the adequacy of disclosure"?

15       Answer, "In the statements."

16       Mr. Galardi, "Objection."

17       Question, "Correct."

18       Answer, "Nothing."

19       Do you recall that last week you said that the only

20  concern you had was the adequacy of the financial statements?

21  A    I stand by my report, so if I misunderstood you to say

22  that -- I don't take back what I wrote in this report.  If I

23  took what you were saying, do I have anything other than the

24  adequacy, I -- the only thing I can assume is that I must have

25  assumed you were talking about the way my report was captioned.

**J&J COURT TRANSCRIBERS, INC.**

Carroll - Cross/Lichtenstein                    16

1  Q    Now, you're not suggesting in your report that the

2  financial statements are mis-stated; isn't that correct?

3  A    That's correct.

4  Q    And you're not suggesting that the financial statements

5  are improperly stated in any way; isn't that correct?

6  A    Except for what I talked about with the adequacy and the

7  accuracy of them with the related disclosures.

8  Q    And with respect to related party transactions, you don't

9  believe that the financial disclosures are materially mis-

10 stated in their conclusions either, do you?

11 A    What I said was the related party descriptions and the

12 disclosure were inadequate.  I don't believe the end result for

13 the balance sheet is materially mis-stated I believe is what

14 I've said.

15 Q    Let me recall for you your testimony at the deposition and

16 tell me if you stand by that testimony.

17      "The financial statements, as I pointed out before, I

18 don't believe are materially mis-stated in their conclusions as

19 it relates to the related party transactions."

20      Do you recall making that testimony?

21 A    Yes.

22 Q    And was that accurate when you made that testimony?

23 A    And I believe that's what I've just tried to testify to.

24 Q    Mr. Carroll, I'm just asking you if it was accurate when

25 you made that testimony.

Carroll - Cross/Lichtenstein                    17

1          THE COURT:  Don't argue with the witness, please.  He

2   has not made an inconsistent statement.  He just said it's

3   accurate now, and that's just what he's testified to.

4   BY MR. LICHTENSTEIN:

5   Q    I'm sorry, so you said it was accurate?

6   A    Yes.

7   Q    Now, it's true, is it not, that you think that the

8   footnote disclosure is inadequate because it doesn't state that

9   the notes receivable from shareholder will not be repaid,

10  right?

11  A    That's correct.

12  Q    And you concede, however, that the fact that the financial

13  statements did not show the related party transactions accruing

14  interest would lead one to believe -- wonder whether or not

15  they are collectable; isn't that right?

16         THE COURT:  Wait, I'm sorry.  That went too fast for

17  me.

18         MR. LICHTENSTEIN:  Let me repeat the question.

19  BY MR. LICHTENSTEIN:

20  Q    You believe that the fact that the financial statements

21  did not show that the related party transactions are accruing

22  interest would lead a believe -- would lead a reader to believe

23  -- wonder whether or not they are collectable.

24  A    It's an inconsistency.  It would create that doubt in

25  one's mind, yes.

**J&J COURT TRANSCRIBERS, INC.**

Carroll - Cross/Lichtenstein                    18

1  Q    Now, you've heard the testimony of Mr. Prosser and Mr.

2  Lubana, and you know that they've characterized these as

3  advances; isn't that correct?

4  A    That's true.

5  Q    And you believe that these should be distributions; is

6  that correct?

7  A    Yes.

8  Q    It's true, is it not, that there's no particular rule you

9  can cite to that would require these to be defined as

10 distributions rather than advances.  Isn't that correct?

11 A    That's true.

12 Q    And there's no particular GAP requirement or definition

13 that you're aware of or could point to that would require these

14 be defined as distributions; is that correct?

15 A    The GAP rules are for the underlying transaction and not

16 just the words alone, so it would have to go to the underlying

17 transaction and the treatment of the transaction.

18 Q    And so with respect to whether it's called an advance or

19 distribution there is no GAP rule that you could point to; is

20 that correct?

21 A    Yes.

22 Q    And so the characterization as a distribution rather than

23 an advance is your subjective view; isn't that correct?

24 A    It's my review of the transaction.

25 Q    And it's your subjective view; isn't that correct?

**J&J COURT TRANSCRIBERS, INC.**

Carroll - Cross/Lichtenstein                    19

1    A    It is my opinion, yes.

2    Q    Now, is it correct that the balance sheet will state the

3    same net equity position whether or not you call these related

4    transactions advances or distributions?

5    A    I believe that's true.

6    Q    And it's true, is it not, that there'd be no net effect on

7    the balance sheet whether you call these transactions, advances

8    or distributions?  Isn't that correct?

9    A    Yes.

10    Q    And you agree, do you not, that these related party

11    transactions should not be reflected as an asset on the balance

12    sheet?

13    A    They should not be reflected as an asset on the balance

14    sheet given the fact that they're not to be repaid, yes.

15    Q    Mr. Carroll, do you know what an unqualified opinion is

16    when issued by a public accounting firm?

17    A    Yes, I do.

18    Q    And am I correct that an unqualified opinion means that

19    the financial statements comply with GAP?

20    A    And are fairly presented, yes.

21    Q    And it's true, is it not, that an auditor could not give

22    an unqualified opinion if the financial statements did not

23    comply with GAP?

24    A    Yes.

25    Q    And in this instance the financial statements you reviewed

Carroll - Redirect/Galardi                        20

1  prepared by BDO Seidman, they issued an unqualified opinion of

2  the ICC financial statements; isn't that correct?

3  A    Yes, they did.

4  Q    And you're not expressing an opinion here today that BDO

5  Seidman did anything wrong, are you?

6  A    No, I'm not.

7         MR. LICHTENSTEIN:  Nothing further, Your Honor.

8         THE COURT:  Redirect?

9                    REDIRECT EXAMINATION

10 BY MR. GALARDI:

11 Q    Mr. Carroll, you've heard testimony from Mr. Prosser while

12 you were here at the last hearing that these were not to be

13 repaid because of a future merger transaction; is that correct?

14 A    That's true.

15 Q    Now, if that merger transaction were not to ever occur,

16 how would you have reflected that in the financial statements?

17 What change would that have on your view?

18 A    At the time they reported his assets, because of

19 supposedly this future merger transaction, I would have

20 recorded it as a distribution to the shareholders.

21 Q    Okay, and when Mr. Lichtenstein asked you about whether

22 you would get an unqualified opinion, are you familiar with

23 what information was actually given to BDO Seidman at the time

24 that it gave that unqualified opinion?

25 A    No, I'm not.  I don't know what the relationship between

1  Seidman and the company was at that time.

2  Q    And I believe your testimony is that the financials do not

3  fairly represent the underlying transaction; isn't that

4  correct?

5  A    That's true.

6  Q    Okay, and that's based on what, exactly?

7  A    The transaction itself is mis -- I don't think it's

8  disclosed properly, but that transaction should have disclosed

9  the collectability of the issue, should have disclosed more

10  specifics on where the advances were going, what other items

11  and ultimately should have stated the stockholders' equity

12  differently than it was presented.

13  Q    And as you sit here today, had that information been given

14  to BDO Seidman, do you have an opinion of whether it would have

15  given a qualified or an unqualified opinion?

16          MR. LICHTENSTEIN:  Your Honor, I object to that

17  question, since there's no evidence as to -- he just testified

18  he doesn't know what BDO Seidman had, so I'm not sure how he

19  can respond to that question.

20          THE COURT:  Sustained.

21          MR. GALARDI:  Okay.  No further questions, Your

22  Honor.

23          MR. GREENDYKE:  We have no questions, Your Honor.

24          THE COURT:  Recross?

25          MR. LICHTENSTEIN:  No, Your Honor; although, I would

1  at this time renew my request that this Court not qualify Mr.

2  Carroll as an expert and move to strike his testimony as an

3  expert.

4          THE COURT:  On the grounds?

5          MR. LICHTENSTEIN:  Your Honor, on the grounds -- I

6  think several grounds.  Number one, I think that -- as I stated

7  before and went through the voir dire, I don't think that he's

8  qualified.  He has never signed off on an audited financial

9  statement.  He hasn't been a CPA for 15 years, he hasn't worked

10  for 20 years.

11         Number two, Your Honor, I believe that there's an

12  issue here with respect to his credibility, given that he's

13  Skadden Arps witness.  He testified that I think five out of

14  the six current assignments he has, either he's hiring Mr.

15  Galardi's firm or Mr. Galardi has hired his firm.  I think that

16  impacts on his credibility.

17         Number three, Your Honor, I don't think that his

18  opinions assist this Court in any way in terms of being an

19  expert.  He has two opinions, one of the opinions is how the

20  shareholders should have treated this transaction, and he

21  testified based on Mr. Prosser's testimony that he agrees with

22  the way that Mr. Prosser treated these transactions.

23         And number two, with respect to the adequacy of the

24  financial statement his testimony is that an unqualified

25  opinion was issued, and Your Honor, I don't think -- and BDO --

1 and that that means that it complies with GAP.

2          And so when you take all that into account, Your

3 Honor, I don't believe that under Rule 702 he should either be

4 qualified and -- under <u>Daubert</u> or in any way assists this Court

5 in determining anything with respect to these hearings.

6          MR. GALARDI:  Your Honor, just briefly.  Let's start

7 with the qualified.

8          First of all, the uncontested testimony is Mr.

9 Carroll is a CPA.  There's an educational specialization.  And

10 he has performed audits.

11          The second is his experience goes to show that he has

12 reviewed financial statements, is a more than average reader of

13 financial statements, has done tax reports, and he's given two

14 opinion, one is from the reader of a financial statement, what

15 his view is of fairly presentation, and two, with respect to

16 the transaction whether or not the debtor should have declared

17 income.

18          I disagree with Mr. Lichtenstein's characterization

19 of the testimony being that Mr. Prosser, in fact, is

20 consistent, but I will leave that to certain other exhibits,

21 and we will finish that.

22          But I think that first of all, as to the

23 qualifications, his familiarity with financial statements, his

24 familiarity with doing tax transactions, that's been

25 established.  It may go to the weight that Your Honor gives it.

24

1   This is not a jury trial.  Your Honor can give it what weight.

2          As to the relevance of the testimony I think that the

3   only challenge that has been really made is not to the

4   testimony with respect to the tax reports, which we can differ

5   on what that testimony was, and Your Honor will review the

6   record, but it clearly goes to the veracity and the debtor's

7   ability to file and to take these transactions properly

8   accounted.

9          With respect to the BDO Seidman and the report, Your

10  Honor, I think the testimony is, again, relevant and pertinent

11  because of the fact that, one, BDO did not show -- and I will

12  have a Supreme Court case for Your Honor to show that that is,

13  in fact, the best evidence against BDO and the debtors.

14         THE COURT:  I'm sorry, that BDO didn't -- I didn't

15  hear you.

16         MR. GALARDI:  Did not show --

17         THE COURT:  Oh, isn't here.

18         MR. GALARDI:  -- and give a report to come in -- to

19  do it, and there's a Supreme Court case on point about the

20  silence being the most convincing character.  Mr. Carroll has

21  been -- dealt with the information.

22         With respect to the other evidence on the income tax

23  returns, again, Mr. Carroll has offered an opinion as to what

24  should have been declared.  There is an inconsistency with

25  whether it's 2 or 14 million dollars.  So, there is a relevance

**J&J COURT TRANSCRIBERS, INC.**

25

1  to that.  It is pertinent to the fact, and it does raise an

2  issue, again, as to the veracity.

3        So, we would say, one, Mr. Carroll is qualified, that

4  Your Honor consider the evidence, Your Honor is the trier of

5  fact here, so you can determine yourself whether it's useful or

6  not, and to the extent it is useful, you can give it whatever

7  weight.

8        So, Your Honor, we would move for, again, your

9  consideration of that evidence.

10       THE COURT:  Yes, I think the testimony indicates that

11 the witness is qualified to offer the opinions that he has

12 expressed.  And I agree that it is a matter of weight to be

13 afforded to testimony and not a matter of qualifications.

14       So, I am not going to strike the testimony on that

15 basis, and I indicated that I would carefully consider the

16 witness's opinions in light of the qualifications as they have

17 been put on the record, and I will do that.

18       So, I will not strike the testimony.

19       Did you indicate, Mr. Lichtenstein, that you have no

20 further questions for the witness?

21       MR. LICHTENSTEIN:  Yes, Your Honor.

22       THE COURT:  I'm sorry -- I can't recall which of you

23 examined this witness, I'm sorry?

24       Ms. Kelley, Mr. Gebhardt, do you have any questions

25 for the witness?

**J&J COURT TRANSCRIBERS, INC.**

1           MS. KELLEY:  No, we don't, Your Honor, thank you.

2           THE COURT:  All right, you're excused, sir.  Thank

3 you.

4           May he return to Massachusetts and go home?  Do you

5 need him?

6           MR. GALARDI:  Wherever he's going, Your Honor, I

7 don't think it might be Massachusetts.

8           THE COURT:  Oh, I'm sorry.  Not Massachusetts?

9 Wherever you'd like to go, if you can get out ahead of the

10 storm, you may want to do it.  I understand we're headed for

11 three inches of snow or something, so if you'd like to leave,

12 you're free to do so.

13          All right, Mr. Galardi, any other witnesses?

14          MR. GALARDI:  No other witnesses, Your Honor.  I

15 would just like to complete the introduction of the evidence

16 that I had.  I missed three numbers --

17          THE COURT:  All right.

18          MR. GALARDI:  -- and then I wanted to do --

19          Your Honor, with respect to the evidence and the

20 exhibits that we have submitted to Your Honor I had forgotten

21 that there was one further supplement.

22          There's a G-83, G-84 and G-85.  Those are

23 respectively ICC's/LLC's answers to interrogatories, 84 is Mr.

24 Prosser's first answer to interrogatory, and 85 is Mr.

25 Prosser's supplement to that interrogatory.  I would move that

1  into evidence.  I just left that off my list of documents.

2            THE COURT:  Any objections?

3            MS. KELLEY:  No objections, Your Honor.

4            THE COURT:  All right, 83, 84 and 85 are admitted.

5            MR. GALARDI:  Your Honor, with respect to what I

6  alluded to, I would also like to move into admission -- into

7  evidence, sorry, G-68, 69 through 75, but Your Honor, with

8  respect to those no exhibits were included.  I have the

9  redacted versions here.  They are Mr. Prosser's tax forms.

10            Since I do not have the unredacted forms, I would

11  move into admission the redacted tax forms.

12            MR. LICHTENSTEIN:  Your Honor, we object to that.

13  That's an incomplete exhibit.  I don't know that it is what it

14  professes to be.  Mr. Prosser was on the stand.  I don't

15  believe he showed them to him.  I don't even know what it is.

16  I don't have them.

17            MR. GALARDI:  Your Honor, they were actually provided

18  by Mr. Craig in the time of his deposition.  They are the '98

19  through 2004 federal income tax forms.  They are the forms that

20  I requested the unredacted versions for, and I will be

21  following up on the Supreme Court case that says when you've

22  given notice of this and the best evidence to refute my

23  evidence and the inference from Mr. Carroll is in their control

24  and they don't do it, you draw the inference against them.

25            So, I think I am entitled to admit the unredacted

1  forms.  The redacted forms that were given to me by Mr. Carroll

2  -- I mean, by Mr. Craig under oath and sworn to in the

3  interrogatories by Mr. Prosser.

4         THE COURT:  All right, so these are documents that

5  were sworn to by Mr. Prosser as his redacted versions of his

6  tax returns for what period of time?

7         MR. GALARDI:  It is 1999, 1999, 2000, 2001, 2002,

8  2003.  And the only thing I have for 2004 is the itemized

9  deductions, but I would put that in as an incomplete 2004.  If

10  I had -- and, again, I understand Mr. Lichtenstein has said I

11  didn't comply, but I think that we have a basis to put in the

12  redacted forms.

13         MR. CRAIG:  Your Honor, a couple of comments.  First

14  of all, Mr. Prosser -- the case against Mr. Prosser for

15  conversation was closed two weeks ago.  That's one point.

16         The second point is that these redacted tax returns

17  were provided during expedited discovery that dealt with the

18  single issue of venue.  And because of that the issues that

19  were addressed in those tax returns, the data that had to do

20  with venue were provided to Greenlight.  But issues concerning

21  personal income and tax treatment, etcetera, were not at all

22  relevant to the very limited scope of discovery, and that's why

23  they have these redacted tax returns.

24         And there's been no request, formal request, for

25  anything more since that time.  And so I just wanted you to

1  have a context, Your Honor, of why they have these.

2         MR. GALARDI:  Your Honor, I do not disagree that they

3  were provided in another context.  They are tax forms that have

4  his signature.  They were verified in discovery.  They are --

5  and we're not opening the conversion case.  Your Honor said it

6  wasn't going to open.  But Mr. Carroll did testify that he

7  would have assumed that we would have found income on the EMCOM

8  report which we put in 2004, and there was no income.

9         He said that he would expect to have found income

10 with respect to the years that Mr. Prosser received advances,

11 again, in the context of the trustee motion and his opinion.

12 And he sad on the witness stand that he would have expected it

13 to be X dollars.  And based on his review of Mr. Prosser's

14 deposition, which I id ask him what the redacted numbers were

15 for a certain of these years, Mr. Prosser said they were one to

16 two million dollars.

17        So, that's an inconsistency, and Mr. Carroll's

18 testimony is that it should have been a larger number based on

19 the advances.  I think it's relevant to the trustee motion, and

20 I would move its admission.

21        THE COURT:  Okay, you've lost me, because I haven't

22 seen any of these documents.  So, I don't have a clue how they

23 relate.

24        Are you telling me that in the redacted 2004 tax

25 return of Mr. Prosser that there is a number shown for what

30

1  he's reporting his income, and that that number is inconsistent

2  with his testimony?  And you want the 2004 return introduced

3  because it is an inconsistent statement of a party in the case.

4          MR. GALARDI:  Yes, Your Honor.  With respect to 2000

5  -- let me give -- the deposition I asked Mr. Prosser about his

6  income for 2004, 2003.  He could recollect that the number --

7  this form has a blank in it.

8          I asked him what's the size of that number in round

9  numbers.  He gave me a number.  It was one to two million

10  dollars for those two years.

11          That's the statement that he said on the stand.

12          THE COURT:  In income.

13          MR. GALARDI:  In income.  What Mr. Carroll has said

14  in the opinion is that that number should have been larger

15  based on the advances.  It's not an inconsistent statement with

16  respect to Mr. Prosser.  Mr. Prosser has maintained that the

17  one to two is proper.

18          What Mr. Carroll has said is it wouldn't be a proper

19  number.  That's -- and we can't find out the answer because Mr.

20  Prosser has not produced an unredacted form in response to Mr.

21  Carroll's report.

22          THE COURT:  Okay, so you're suggesting that the

23  problem is that for purposes of whether or not Mr. Prosser is

24  carrying out his fiduciary duty to this estate in looking at

25  the trustee motion, that as a controlling officer, director of

**J&J COURT TRANSCRIBERS, INC.**

31

1  the debtor's estates, he is not reporting income either on the

2  corporate returns where the corporation is supposed to report

3  the income, or on the check-the-box corporation on his own

4  return, because there is no information on the returns that

5  have been provided to indicate that that income has been

6  reported.

7          Mr. Carroll suggests that it should be reported, and

8  you don't have any evidence that it has been reported, despite

9  Mr. Prosser's testimony.

10          MR. GALARDI:  Correct, Your Honor, and in --

11          THE COURT:  And the tax returns show a blank space.

12          MR. GALARDI:  Shows a redacted space that was asked

13  about in a deposition, but the number is inconsistent with Mr.

14  Carroll's report of what should have been included somewhere in

15  the debtor's tax returns.

16          THE COURT:  Well, how can it be inconsistent if it's

17  redacted?

18          MR. GALARDI:  Because Mr. Prosser gave a number, even

19  though redacted.  He wouldn't exactly it was X.  But he gave a

20  range.

21          THE COURT:  He said it was one to two million.

22          MR. GALARDI:  Exactly.  And that number is

23  inconsistent with what Mr. Carroll testified based on the

24  audited financials of 14 minus 2 should have been 12 or 11.

25  That's nowhere to be found.  So, it goes to the trustee motion

1   in the irregular reporting of financials.

2              THE COURT:  Okay, well, it does for the period of

3   time that Mr. Carroll had the information with respect to

4   EMCOM, but that, as I understood it, was only one tax year.

5              MR. GALARDI:  EMCOM was 2004.  That's already been

6   admitted.  They did not object to that, Your Honor.

7              THE COURT:  Right, but that's the only -- as I -- if

8   I recall Mr. Carroll's testimony correctly, that was the only

9   tax report that he actually saw.

10             MR. GALARDI:  Well, he actually saw all of the

11  redacted forms, as he testified to, and then when I --

12             THE COURT:  Of Mr. Prosser.

13             MR. GALARDI:  Of Mr. Prosser's redacted form.

14             THE COURT:  Yes, the corporation.

15             MR. GALARDI:  For the corp -- for EMCOM, yes.  Mr.

16  Prosser checked the box, '98 through 2000 are for Mr. Prosser

17  personally and for ICC/LLC.  Mr. Prosser's testimony in his

18  deposition is that he could recall 2004 and he could recall

19  2003.  2004 he could estimate what 2005 was going to be, and

20  with respect to 2004, the number that he gave, especially when

21  you look in light of he EMCOM, is a number far smaller than

22  what's in the financials and what Mr. Carroll would testify.

23             To make it simpler, Your Honor, I think what we can

24  simply do is seek to move -- to admit the 2003 and 2004

25  redacted versions for the purposes of Mr. Carroll's testimony

33

1  with respect to those years and leave it at that.  I don't need

2  to go back to the other ones if that makes it simpler.

3           THE COURT:  What exhibits are those?

4           MR. GALARDI:  Those would be Exhibit G-73 and G-74.

5           MR. LICHTENSTEIN:  Your Honor, may I address the

6  Court?

7           THE COURT:  Yes.

8           MR. LICHTENSTEIN:  Your Honor, I think Mr. Galardi --

9  and I'm sure this is unintentional -- is misleading the Court

10 in what's going on here.

11          Mr. Prosser was deposed.  He testified that his net

12 income was one or two million dollars.  He's testified several

13 times that his net income was not $13 million, that the

14 expenses and his income that he takes together is 13 or 14

15 million dollars.

16          Mr. Galardi cross examined him about that several

17 times in court, and his testimony was consistent, and he

18 explained to the Court -- in fact, I went through it with Mr.

19 Carroll, that the $14 million consisted of expenses for Belize

20 Telecom, for legal fees, etcetera, and that his income, net

21 income, that his -- like his salary was $2 million.

22          What Mr. Galardi -- and Mr. Galardi has moved that

23 deposition into testimony.  What Mr. Galardi's now trying to

24 do, Your Honor, is take redacted tax returns that don't show

25 any information and tell Your Honor that Your Honor can infer

**J&J COURT TRANSCRIBERS, INC.**

1   from those tax returns the fact that they're redacted, that

2   somehow they're inconsistent with his testimony.

3          Well, first of all, Your Honor, that's not true,

4   because Mr. Prosser testified that that's not the way they were

5   reported.

6          Second of all, Your Honor, Mr. Galardi did not make

7   any document request.  What he did is, a couple of days before

8   the hearing sent an email saying he'd like the tax returns.  He

9   did not comply with the rules.  And as I told Your Honor last

10  time, he's not even entitled to those tax returns.  He's only

11  entitled, if he follows the rule, to last year's tax return,

12  and he's now somehow trying to say that that's evidence that

13  his expert was prejudiced 'cause he couldn't look at the tax

14  returns and wants Your Honor to admit redacted tax returns and

15  allow him to argue that those are inconsistent somehow with Mr.

16  Prosser's testimony.

17         Number one, it would be highly prejudicial.  Number

18  two, there's no actual basis for it.  If he wants to argue

19  about what Mr. Prosser testified in his deposition, he's

20  welcome to do that, because he's admitted that as an exhibit.

21         Your Honor, there's no basis for admitting these

22  redacted tax returns.

23         THE COURT:  I'm afraid I'm not seeing the basis for

24  the redacted tax returns for this reason.  Number one, I think

25  that the purpose for which they were provided, i.e., for the

1  venue issue, with the numbers taken out, the reason the numbers

2  were taken out at that time was because they were not material

3  for the purpose for which they were provided.

4         To the extent that Mr. Prosser's testimony is viewed

5  as somehow inconsistent with what Mr. Carroll envisioned should

6  be the reporting requirements for the tax information, I'm not

7  sure that the redacted returns are in fact inconsistent,

8  because I don't know what the redaction is.  And so, I don't

9  know how you can make an inference that when a number is

10  crossed off and you can't see the number, that it's

11  inconsistent with the witness's testimony.  The witness did say

12  that it reports the information on his tax return.  He was very

13  clear about that.  The numbers are not clear, but he was clear

14  that he reports it.

15         The problem is we don't know whether he reports it as

16  a matter of fact on the return itself, 'cause we don't have the

17  numbers that show up on the return.  I don't think the returns

18  are helpful in that respect.

19         Okay, so G --

20         MR. GALARDI:  Suggest G-82, 3 and 4, which I think

21  there are no objections to the interrogatories.

22         THE COURT:  They were admitted, but 73 and 74 will

23  not be.

24         MR. GALARDI:  Okay.  Thank you, Your Honor.

25         THE COURT:  Is that all your exhibits then?

1              MR. GALARDI:  That is all my exhibits, Your Honor.

2              THE COURT:  Okay, Mr. Greendyke, any further

3    witnesses from the RTFC?

4              MR. GREENDYKE:  No, Judge.  No further evidence.

5              THE COURT:  Any further exhibits?

6              MR. GREENDYKE:  No, Judge.  We discussed those last

7    year.

8              THE COURT:  Does the U.S. Trustee have any witnesses

9    or any further exhibits?

10             MR. GEBHARDT:  May it please the court, Guy Gephardt,

11   Assistant United States Trustee.  Your Honor, when we made our

12   opening statement last Friday we said that when we presented

13   our case we would ask the Court to take judicial notice of

14   certain items in the record, and I'm prepared to do that now.

15             Our case is the debtors have made virtually no

16   progress since the involuntary cases were filed almost a year

17   ago and have failed to meet time tables and deadlines.

18             The U.S. Trustee respectfully asks the Court to take

19   judicial notice of the following pleadings, orders and

20   transcripts in these cases.  The debtor's motion to dismiss the

21   involuntary petition.  That would be Delaware Emerging Docket

22   number 40 and Innovative Docket number 41, contain a

23   description of the relationships between and among their

24   creditors which, with respect to the RTFC, began in 1987.

25             The litigation which has ensued in the Delaware

                    **J&J COURT TRANSCRIBERS, INC.**

1  Chancery Court began a number of years ago and is described in

2  the debtor's statement of financial affairs, Page 4.  That's VI

3  Emerging Docket number 36, and Innovative Docket number 37.

4  The disputes pending before this Court are not recent ones.

5        During April 2006 the debtors, Greenlight and RTFC,

6  entered into a settlement agreement, and the settlement

7  agreement is under seal.  I would ask the Court to take

8  judicial notice of that.

9        On July 19, 2006 the debtors filed status reports,

10 Delaware Emerging Docket number 130, and Innovative Docket

11 number 132 with supplements, Docket numbers 134 and 136,

12 respectively, indicating they were on the verge of entering

13 into a definitive commitment with one or more financial

14 institutions in the next few days and indicating their intent

15 to go forward with the hearing set for July 26, 2006.

16        On July 31, 2006 the debtors filed their voluntary

17 cases in the United States Virgin Islands and on September 25,

18 2006 filed joint motions to assume the settlement agreement.

19 That's VI Emerging Docket number 23, amended at 82, and

20 Innovative Docket number 24, amended at 81.

21        On September 29, 2006 the Court entered an order

22 scheduling the debtors' motions and further ordered that on or

23 before November 3, 2006 the debtors were to file and serve an

24 amended motion with exhibits that would establish that the

25 debtors had a transaction in place, including binding

**J&J COURT TRANSCRIBERS, INC.**

1 commitments and other items.  That's VI Emerging Docket number

2 29 and Innovative number 30.

3        On November 7, 2006 the Court denied the debtors'

4 request to assume the settlement agreement due to the

5 impossibility of performance.  That's VI Emerging Docket number

6 99 and Innovative Docket number 96.  At a hearing held on

7 December 4, 2006 the Court suggested the appointment of a

8 Chapter 11 trustee might be appropriate in these cases.  That's

9 Virgin Islands Emerging Docket number 198 and Innovative Docket

10 number 188, and the transcript Pages 81, 82.

11        On December 22, 2006 the debtors filed emergency

12 motions for the withdrawal of the reference.  That's VI

13 Emerging Docket number 231 and Innovative Docket number 221

14 which the District Court denied.

15        Upon information and belief the debtors have yet to

16 obtain a binding commitment letter from a prospective lender or

17 purchaser.

18        Your Honor with respect to our case regarding impasse

19 and delay, we would ask the case be -- the Court to take

20 judicial notice of the following documents in the record.  Also

21 these exhibits and docket numbers support United States

22 Trustee's argument regarding the level of acrimony between and

23 among the parties in this case, as well as the creditors' lack

24 in faith in debtors' management.

25        These items are as follows: the motion to dismiss the

1    involuntary petition -- and these are Delaware dockets -- this

2    is the Delaware docket, Your Honor.  The motion to dismiss

3    involuntary petition, Emerging Docket number 40, Innovative

4    Docket 41.  The response to debtors' motion to dismiss the

5    involuntary petitions which the Rural Telephone Finance

6    Cooperative filed, Emerging 108, Innovative 110, the brief in

7    opposition to the motions to dismiss the involuntary petitions,

8    Delaware Emerging Docket 109, Innovative 111, the objection and

9    reservation of rights with respect to the motion of Innovative

10   Communications Company, et al., Delaware Emerging Docket number

11   142, Emerging 144, the supplemental objection to the motion of

12   Innovative Communications for entry of an order approving the

13   terms and conditions of the settlement of claims.  That is

14   Emerging Docket number 151, Innovative Docket number 153.

15          Your Honor, the following docket entries are in the

16   Virgin Islands cases: the preliminary objection to the joint

17   motion of the debtors for determination that exclusive periods

18   have tolled, or in the alternative to extend the exclusive

19   periods, Emerging number 136, Innovative 133; the amended

20   objection to the joint motion of the debtors for a

21   determination that the exclusive periods have been tolled, or

22   in the alternative to extend the exclusive periods, Emerging

23   155, Innovative 152; motion for relief from stay under Section

24   362, Emerging number 163, Innovative 158; joint motion for

25   sanctions for violation of the automatic stay or tho show

1   cause, Emerging 165, Innovative 160; the transcript of December

2   4, 2006 hearing before this court, Emerging 198, Innovative

3   188; the emergency motion for withdrawal of the reference,

4   Emerging 231, Innovative 221; the preliminary objection to the

5   debtors' joint motion to withdraw the Chapter 11 cases to the

6   District Court, Emerging 236, Innovative 227; the RTFC

7   preliminary response to the joint motion to show cause,

8   Emerging 242, Innovative 232; the joinder in support of the

9   motion of the United States Trustee for entry of an order

10   appointing a Chapter 11 trustee, Emerging 256, Innovative 246;

11   the objection to debtors' joint motion for entry of an order

12   appointing a responsible officer, Emerging 258, Innovative 248;

13   the brief of the RTFC in support of its motion for relief from

14   stay under Section 362, Emerging 262; the amended notice of

15   debtors' witness and exhibit list for hearing on the RTFC's

16   motion for relief from stay under Section 362 and Debtors'

17   Exhibit D-6, Emerging number 280 and 281.

18          Those are the items we would ask the Court to take

19   judicial notice of, Your Honor, and we would reserve our other

20   comments for our argument.

21          THE COURT:  All right, they all appear to be

22   documents that have been filed of record in these bankruptcy

23   cases.  Is there any objection to my taking judicial notice of

24   the filing of these documents?

25          MR. BARTNER:  No objection, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. GALARDI:  No objection, Judge.

2          UNIDENTIFIED SPEAKER:  No objection.

3          THE COURT:  They are all -- I take judicial notice of

4  the filing of all the recited documents.

5          MR. GEBHARDT:  Thank you, Your Honor.

6          THE COURT:  These are the same exhibits that you've

7  listed in your pre-trial submission, correct?

8          MR. GEBHARDT:  That's correct, Your Honor.

9          THE COURT:  All right, 'cause I don't think I got all

10 the -- I don't type numbers very well, and I'm not sure that I

11 got all the exhibit numbers typed correctly, so I just want to

12 make sure that I have the reference to them.  Thank you.

13         All right.  Anything further by way of evidence?

14         MR. GEBHARDT:  Nothing by way of evidence, Your

15 Honor.

16         THE COURT:  All right.

17         MR. GEBHARDT:  Thank you, Your Honor.

18         THE COURT:  Anything further from the corporate

19 debtors?

20         MR. BARTNER:  No, Your Honor.

21         THE COURT:  From Mr. Prosser.

22         MR. LICHTENSTEIN:  No, Your Honor.

23         THE COURT:  All right, why don't we start then with

24 the debtors' arguments on the responsible officer motion, or do

25 you want the --

42

1          MR. BARTNER:  Your Honor, maybe -- they're sort of

2   bound up in a way --

3          THE COURT:  All right.

4          MR. BARTNER:  -- and we've prepared our closing

5   arguments as such.  It would seem to make sense to me, given

6   that it is the U.S. Trustee's motion on the appointment of the

7   trustee joined in by RTFC and Greenlight, that perhaps the U.S.

8   Trustee ought to begin.

9          THE COURT:  That's fine.

10         Mr. Gephardt?

11         MR. GEBHARDT:  Yes, Your Honor.

12         THE COURT:  Would you folks like a brief recess

13  before you start?  Are you in need of a small bathroom break?

14  Yes?  Take a five-minute recess?

15         All right, we'll take a five-minute recess and then

16  start.  Okay.

17                      (Recess)

18         THE COURT:  Mr. Gephardt.

19         MR. GEBHARDT:  May it please the Court, Guy Gephardt,

20  Assistant United States Trustee.  Your Honor, the United States

21  Trustee submits that cause exists in these corporate cases that

22  compel the Court to order the appointment of a Chapter 11

23  trustee.

24         The record shows that the cases have suffered from

25  delay and have reached an impasse.  The delay and impasse, we

**J&J COURT TRANSCRIBERS, INC.**

43

1    submit, is cause for the appointment of a Chapter 11 trustee

2    under Section 1104A1.  The appointment of a Chapter 11 trustee

3    will end the delays and break the gridlock, therefore, being in

4    the best interest of creditors, equity security holders and

5    other interests of the estate, a ground for the appointment

6    under Section 1104A2.

7          Your Honor, the parties have made virtually no

8    progress in these cases since the involuntary cases were filed

9    almost a year ago.  The record shows that the debtors have

10   failed to meet time tables and deadlines.  The U.S. Trustee had

11   asked the Court to take judicial notice of those pleadings

12   which indicated the delay and gridlock, and we had -- we have

13   done that earlier.

14         Upon information and belief the debtors have yet to

15   obtain a binding commitment letter from a prospective lender or

16   purchaser.

17         Further, Your Honor, the review of the record in

18   these cases shows delay.  The parties have filed well over 400

19   motions, objections and other pleadings in these cases to date,

20   in both the involuntary and voluntary cases, yet there's been

21   no movement.  The ball has not been advanced.

22         The record in these cases shows that the corporate

23   debtors' management has lost the trust completely of its major

24   creditors.  The cases have reached an impasse, and they require

25   the appointment of an independent fiduciary to break the

44

1 gridlock and move them forward.

2      We had asked the Court to take judicial notice of the

3 pleadings which illustrated the level of acrimony between and

4 among the parties in this case, as well as the lack of faith in

5 debtors' management.

6      Your Honor, Section 1104A states, "The Bankruptcy

7 Court shall order the appointment of a trustee at any time

8 after commencement of the case but prior to confirmation of a

9 plan on request of a party in interest or the United States

10 Trustee and after notice of a hearing: (1) for cause, including

11 fraud, dishonesty, incompetence or gross mismanagement of the

12 affairs of the debtor by current management either before or

13 after the commencement of the case or similar cause, but not

14 including the number of holders of securities of the debtor or

15 the amount of assets or liabilities of the debtor; (2) if such

16 appointment is in the interest of creditors, any equity

17 security holders and other interests of the estate without

18 regard to the number of holders of securities of the debtor or

19 the amount of assets or liabilities of the debtor."

20      Your Honor, we believe that Subsection 1 addresses,

21 as it does, management's pre and post petition misdeeds,

22 mismanagement and other cause, and Subsection 2 provides the

23 Court with even wider flexibility and discretion to appoint a

24 trustee even absent a finding of wrongdoing or mismanagement.

25 Where the Court finds either that cause exists or that the

**J&J COURT TRANSCRIBERS, INC.**

1   appointment is in the interest of the parties, creditors or

2   other parties, an order for the appointment of a trustee is

3   mandatory.

4          These cases are in our brief which we filed asking

5   for the appointment, Your Honor.  They are In Re: Bellevue

6   Place Associates, The Official Committee of Asbestos, The

7   Sealed Air Corp, W.R. Grace.

8          The categories in 1104A cover a wide range of conduct

9   and are illustrative and not exclusive.  Our citation to that

10  is again in our pleading, In Re Marble quoting the committee of

11  Dalkon Shield claimants, VAH Robbins.

12         The determination of whether cause exists is taken on

13  a case-by-case basis taking into account all relevant factors.

14  That was the court in Sharon Steel.  We believe one of the

15  factors the Court should consider as cause is the delay and

16  acrimony in this case.

17         The delay and impasse are cause for the appointment

18  of a Chapter 11 trustee.  Despite numerous attempts, the

19  debtors have been unable to comply with the terms of the

20  settlement agreement.

21         Your Honor, we believe that the appointment of a

22  trustee is in the best interest of the estate and its

23  creditors.  Section 1104A2 of the Bankruptcy Code provides an

24  additional basis for the appointment of a Chapter 11 trustee.

25  Courts have construed this section, A2, to provide a very

1 flexible standard.  Again, our brief cites <u>Sharon Steel</u> for

2 this proposition.

3        The Court in <u>Marble</u> applied this flexible standard

4 and affirmed the District Court's appointment of a trustee in a

5 case where the level of acrimony found to exist certainly made

6 the appointment of a trustee in the best interest of the

7 parties and the estate.  The Court concluded that the parties'

8 sharp divisions on many issues supported the District Court's

9 exercise of discretion in appointing a trustee.

10        Other courts have considered the following factors in

11 determining whether the appointment of a trustee is in the best

12 interest of the parties under 1104A2: the trustworthiness of

13 the debtor, the debtor's past and present performance and

14 prospects for the debtor's rehabilitation, the confidence or

15 lack thereof of the business community and of creditors in

16 present management and the benefits derived by the appointment

17 of a trustee balanced against the cost of the appointment.

18        Here an analysis of the relevant facts clearly

19 demonstrate that the appointment of a Chapter 11 trustee is in

20 the best interest of parties and the debtors' estates as well

21 as the debtors' creditors.

22        The debtors' creditors have demonstrated they have no

23 trust in the management of the debtor, and as noted by the

24 Court, if these cases stay in their current posture, there is

25 no prospect for the debtors' rehabilitation.

1          The debtors' creditors have alleged that the debtors

2   have consistently placed the interests of management and equity

3   ahead of interests of creditors, in violation of their

4   fiduciary duties.  The debtors' creditors allege that the

5   numerous delays encountered in this case stem not from the

6   debtors' inability to structure a deal, but from the debtors'

7   continuing attempts to structure a transaction wherein control

8   and/or equity is preserved for debtors' management.

9          While it is understandable that parties engaged in

10  contentious litigation for the better part of a decade would

11  potentially dislike one another, the level of distrust

12  exhibited by the parties in this case seems to permeate every

13  action and has prevented the debtors from making progress.

14  While some level of animosity is to be expected in these

15  circumstances, clearly these cases have been paralyzed, Your

16  Honor.

17         This paralysis, combined with the allegations of the

18  debtors' creditors, are sufficient justification for the

19  appointment of a Chapter 11 trustee.  We believe it's warranted

20  therefore under Section 1104A2 of the Bankruptcy Code in order

21  to break the gridlock, break the impasse and move the ball

22  forward.

23         Here, as in the <u>Sharon Steel</u> case, the cost of

24  appointing a trustee would be trivial when compared to the

25  enormous benefit to be achieved from jump-starting the sale

48

1 process and re-establishing the trust and confidence in

2 management.

3         The appointment of a trustee would not necessarily

4 eliminate the continuity of operational management.  The Court

5 in <u>W.R. Grace</u> noted that an appointed trustee may make the

6 rational decision to retain current management for the purposes

7 of continuing operations, but the trustee would oversee the

8 activities of management.

9         In this case, Your Honor, the operational companies,

10 as the Court has noted, are not in bankruptcy.  A trustee would

11 evaluate these cases and would decide whether or not to replace

12 operational management or could very well leave operational

13 management alone.

14         As the Court is well aware, in cases of this size it

15 is the exception, not the rule -- it is the exception where

16 operational management is removed by a Chapter 11 trustee.

17         Further, Your Honor, the duties of a trustee are set

18 forth in the code.  If the debtors disapprove of something the

19 trustee is doing or something that the trustee wants to do,

20 they can always bring notice to you before the Court for

21 adjudication.

22         Your Honor, the United States Trustee respectfully

23 submits that cause exists in these cases to compel the

24 appointment of a Chapter 11 trustee.  The major creditors

25 support the appointment of a trustee.  The cases have been

49

1  subject to delay, and we have reached an impasse.  An

2  independent fiduciary will be able to break this gridlock, move

3  the cases forward and protect the interests of, not only

4  creditors, but also equity and other parties in interest.

5         I can proceed with our argument, Your Honor, against

6  the appointment of a responsible person at this time or I can

7  reserve that until later as the Court would --

8         THE COURT:  You might as well do that --

9         MR. GEBHARDT:  Okay.

10        THE COURT:  -- because I really think they're kind of

11 flip sides of the same coin at this point.

12        MR. GEBHARDT:  I'll be happy to do that, Your Honor.

13        At a previous hearing on the -- when the motion to

14 appoint a responsible person was discussed, the Court commented

15 that recently in the LeNature case the court in this district

16 had appointed a responsible person.

17        Your Honor, we submit that case -- the facts of that

18 case are easily distinguishable from those before the Court

19 today.  The individual who was appointed a responsible party in

20 the LeNature case was a custodian who had -- in possession, a

21 custodian in possession who had been appointed by the Chancery

22 Court in Delaware.  He was already in place.

23        Here there's no custodian or responsible party

24 already in place.  In the LeNature case the Court was

25 attempting to work in harmony with the decisions of the

1  chancery court in Delaware.

2          In the cases -- the corporate cases before the Court,

3  Your Honor, the creditors and the United States Trustee oppose

4  the appointment of a responsible person.

5          Your Honor, the appointment of a responsible officer,

6  responsible person is a very important issue to the United

7  States Trustee.  We believe as a matter of law the Court does

8  not have the authority to appoint a responsible officer under

9  105A of the Bankruptcy Code.  If the debtor in possession

10 decides to hire an individual to negotiate with creditors and

11 spearhead the sale of the debtors' assets, they can do so now

12 in the ordinary course of business.

13         If they feel like they need to go to the Court to ask

14 permission to use cash collateral, to ask permission to pay

15 such a person, certainly they can do that, but we submit there

16 is no authority under the Bankruptcy Code as a matter of law

17 for the Court appointing a responsible person.

18         We believe, Your Honor, there are several reasons why

19 a Chapter 11 trustee is preferable to the appointment of a

20 responsible officer.  A responsible officer would add another

21 set of professional costs to the estate and would be perceived

22 by the debtors' creditors as nothing more than a rubber stamp

23 for the debtors' current management.  Current management would

24 remain responsible for the operation of the debtors' company in

25 the course of the case.

1        The responsible officer would report to the board of

2   directors and would not be independent.  If the responsible

3   officer would report to the Court we would have something that

4   the Bankruptcy Code does not contemplate.  A Chapter 11 trustee

5   however, is an independent fiduciary who will look after the

6   interests of all parties, creditors, equity and other parties

7   in interest.

8        As we have noted, Your Honor, the board of directors

9   has the authority in the ordinary course of business to change

10  its management or hire someone to negotiate with creditors and

11  prospective purchasers.  The debtor can do that now.

12       As previously noted by the Court and the United

13  States Trustee in her argument, the primary goal to be achieved

14  by the appointment of an independent fiduciary in these cases

15  is to break the gridlock caused by the acrimony between the

16  parties and to prevent future delays caused by such acrimony.

17       The appointment of a responsible officer, which is

18  adamantly opposed by the debtors' creditors and the United

19  States Trustee, will do nothing to alleviate the concerns of

20  the debtors' creditors, and thus the appointment of a

21  responsible officer will do nothing to end the gridlock caused

22  by the parties' distrust of one another.

23       The appointment of a Chapter 11 trustee, however, is

24  supported by the major creditors, and on the record I believe

25  in the December 4th hearing, also supported by the preferred

1   shareholders or counsel for the preferred shareholders.

2          In conclusion, Your Honor, we do not believe the

3   responsible officer is an option.  It is not authorized by the

4   Code.  A Chapter 11 trustee is.  A Chapter 11 trustee's duties

5   are clearly defined, and we believe that this case requires an

6   independent fiduciary to move the ball forward, break the

7   impasse, break the gridlock and preserve the assets of this

8   estate to benefit, not only creditors, but also equity and

9   other parties in interest.

10          Thank you, Your Honor.

11          THE COURT:  Thank you.

12          THE COURT:  Mr. Greendyke.

13          MR. GREENDYKE:  Thank you, Judge.

14          Bill Greendyke for the RTFC.  Judge, last Friday

15  morning in opening statements I started out by outlining for

16  the Court the matters that were pending and were set for

17  hearing originally last Friday.  Those matters, as you know,

18  are the conversion motion that we tried earlier in the month

19  that's still pending under advisement before the Court.

20          We also have our 362, RTFC's 362 motion that's

21  pending.  The Court has made some on-the-record comments about

22  that, that I alluded to last Friday to the effect that a

23  trustee, the appointment of a trustee would be perhaps one of

24  the best forms of adequate protection.

25          We also have pending the exclusivity motion that we

J&J COURT TRANSCRIBERS, INC.

53

1 talked about, I think, last Friday as well as several earlier

2 hearings throughout the prior year.

3        One of the things that I want to allude to in

4 connection with the exclusivity motion that is, I think,

5 appropriate, this case and the way these hearings -- the way

6 these motions have sort of come together in today's hearing,

7 we've kept a number of matters under advisement.  Some have

8 been moved along, such as exclusivity, but it's easy for us, as

9 lawyers, and hopefully not as easy for the Court to forget the

10 things that we talked about, the things that were shown to the

11 Court, the things that we've in effect relied upon as we've

12 moved almost like a rugby game to this hearing today.

13        In the hearings on exclusivity in early December we

14 had a great deal of testimony about the debtors' efforts to

15 value and then market the company.  We had letters of intent

16 that the Court saw, and we had testimony from the debtors'

17 hired experts about how they marketed it and the manner in

18 which they marketed it, and I what I want to reflect upon at

19 some point later in my argument is that you saw and I think

20 made findings with regard to empirical value, which you saw

21 happen in front of you, what the debtors told you they had done

22 in the course of the case.

23        So, we have the exclusivity motion that don't want to

24 forget about.  We also have today's responsible officer motion,

25 the U.S. Trustee's motion to appoint a trustee in the corporate

54

1  cases.  Obviously we agree and have joined in the relief

2  requested by the U.S. Trustee in connection with the U.S.

3  Trustee's motion to appoint a trustee, and we also object to

4  and think the Court should deny the debtors' motion to appoint

5  a responsible officer.

6        Many issues exist in this case and play into these

7  five matters that I've just described.  The parties, as the

8  Court I think has paraphrased, don't get along.  The U.S.

9  Trustee calls it acrimony.  There's no adequate protection for

10 the interests of the RTFC and Greenlight in connection with the

11 funds that would flow out of New ICC to fund any of these

12 debtor estates from Mr. Prosser.

13       There's no progress, as the U.S. Trustee has

14 eloquently highlighted.  They call it delay, he calls it lack

15 of progress.  Your words a couple of weeks ago were the debtors

16 are out of wiggle room.  They tried one thing and then another,

17 and it's to the point -- I think your comment was, you know,

18 where are we going to go now?  You're sort of out of options.

19       The debtors told you last -- Mr. Prosser told you

20 last Friday on the stand that they've had a data room available

21 since June of 2006 and still there's no over-the-bar type

22 offer, there's no offer that's binding in any way.  There's

23 really no hot prospect in any way.

24       The next point is the administrative insolvency.  I

25 think the Court has recognized early on that there's a

**J&J COURT TRANSCRIBERS, INC.**

1  fundamental problem with these debtors don't have money, these

2  debtors have no employees, these debtors have no bank accounts.

3  We don't have the exhibits to this effect, but I think at any

4  point in the proceeding this Court or any other court can take

5  judicial notice of what's been filed before you.  It's my

6  understanding that last night late or early this morning

7  amended operating reports were filed that -- where once there

8  were numbers with regard to the corporate debtors, there are

9  now zeroes.

10      There are no funds attributable to these debtors

11 because, I guess, they're not borrowing.  I haven't fully

12 analyzed them.  I haven't seen them.  I don't want to

13 misrepresent anything to the Court.  But they've changed the

14 monthly operating reports that they had previously filed in

15 order to survive your show cause order with respect to the

16 January 12th hearings.

17      There is, as you -- as we've argued, and I think the

18 Court has recognized, no legal way of getting money to the

19 debtor.  It's advances, it's contra equity accounts.  It's

20 whatever you want to call it, but there's no good way of

21 getting it done.

22      The debtors have filed a motion, I don't think in

23 response to our brief, but late last week we all filed papers,

24 the debtors and us, and I think Greenlight as well, talking

25 about the ability of funds to move in a manner that would

1   enable these debtors to survive a Chapter 11 process.

2        And the primary argument the debtors make in their

3   motion to allow this to occur is for you to either use 105,

4   which we all think is not a really good argument, or 363 of the

5   Bankruptcy Code, saying in effect, we've been doing this

6   forever, RTFC knew about this for years and years back in 2000

7   or 2001.  They had folks on the board of Vitelco or New ICC and

8   -- as their argument goes, they knew about it then, they didn't

9   complain about it, it can't be bad now, it's the ordinary

10  course of business.

11       Our argument to you is that the ordinary course of

12  business is not the same as business as usual.  And what the

13  debtors are asking you is this is business as usual, it's okay.

14  The problem is it doesn't really comport with the law anymore.

15       363 of the Bankruptcy Code, obviously, as we all

16  know, allows the debtor to use property of the estate in the

17  ordinary course of business.  We're not talking about property

18  of the estate, we're talking about property of a judgment

19  debtor that we have liens against, we have judgments against --

20  or Greenlight has judgments against, and that's the property

21  that's being dissipated.

22       The way it's being dissipated is your debtors are

23  incurring a liability, or at least until this morning when they

24  changed the monthly operating reports, incurring an obligation

25  on their behalf that they can't repay.

**J&J COURT TRANSCRIBERS, INC.**

1          Section 363B and C allow the debtor or the trustee to

2   use property of the estate.  Section 363D, as in David, says,

3   "The trustee may use, sell or lease property under Subsection B

4   or C of this section only," number one, this is a brand new

5   amended provision of the statute, "in accordance with

6   applicable non-bankruptcy law that governs the transfer of

7   property by a corporation or trust that is not a money business

8   or commercial corporation or trust, and to the extent not

9   inconsistent with any relief granted under C, D, E or F of

10  Section 362."

11         If I go back up to one, it basically says no matter

12  what 363 says, whatever you say they can do, or whatever 363

13  purports to authorize by statute it can't be in contravention

14  of non-bankruptcy law.  That's a recent amendment.  That's

15  meant to say nothing we said in 363, we being Congress said in

16  363 is meant to preempt state law with regard to the propriety

17  of transactions.

18         So, these transactions that they're asking you to

19  bless under 363 can't be blessed, because Congress says they

20  can't be blessed because of it's an illegal dividend, it's an

21  illegal dividend.  If it's a loan that's not going to be

22  repaid, I don't know that corporations make gifts, other than

23  to charitable entities or for charitable purposes.

24         If ICC is making gifts to New -- or to ICC/LLC or to

25  Emerging, we don't agree with that.  We don't think the Court

1  can approve that.

2         Further, the argument that Mr. Prosser made was that

3  RTFC knew about all this back in 2000 and allowed it to occur.

4  Number one, this is 2007 and not the year 2000.  Number two, in

5  2000 the debtors were not in bankruptcy.  In 2000 the debtors

6  were paying RTFC and they had no Greenlight debt, as far as I

7  know.  And last, they were not trying to discount our debt by

8  scores if not hundreds of millions of dollars.

9         This issue of loans or dividends from ICC presents a

10  conflict for Mr. Prosser and the debtors.  And I tried to

11  highlight to that to the Court in my cross examination of Mr.

12  Carroll, and I think the Court's well aware of what the issues

13  are.

14         But the question is who decides if these advances or

15  these contra equity accounts or these dissipation of funds are

16  wrong or not?  Who decides --

17         THE COURT:  Or -- I --

18         MR. GREENDYKE:  Are wrong or incorrect or illegal or

19  not.  Who decides if these advances should stop?  Who decides

20  if the debtors have any liability to anybody for these advances

21  from New ICC?  Who decides whether to sue for illegal dividends

22  or for fraudulent transfers depending upon which creditor

23  interest -- whether it's the debtors or whether it's New ICC

24  you're trying to represent?  The interests of New ICC are

25  represented by RTFC and Greenlight as its creditors.  That's

1    where the fiduciary obligation is.

2         The only person who's going to make that decision is

3    Jeffrey Prosser, and that's why there's a conflict.  That's why

4    there's a problem with regard to control.

5         The plan that was filed by the debtors is another

6    issue that's come about, and I know there was a lot of

7    discussion among the lawyers in the court about this.  Mr.

8    Bartner has consented, I think, or stipulated, I believe, on

9    the record last Friday that the plan is not confirmable.

10        And my point is not to argue to you about non-

11   confirmability or not.  My point -- my argument to the Court is

12   that the plan is something more than in and of itself a bad

13   faith approach.  It shows you the whole structure and process

14   with regard to Mr. Prosser being in control.

15        Mr. Bartner says the plan is a runway.  "It's our

16   best offer," "our first offer," whatever it might be, however

17   you want to characterize it.  It's not just a runway.  It's a

18   picture window.  You stand in front of a picture window and you

19   watch the valley in front of you, but if you stand back a

20   little bit you also see a reflection of what's behind you.  And

21   it reflects what's going on in Mr. Prosser's mind, it reflects

22   the history of these cases that Mr. Gephardt described to you,

23   and it reflects what's in store for us in the future as we look

24   out across the valley, because it tells us what's in his mind.

25        It tells us that we're going to discharge the debt of

1  a third party, non-debtor, which is ICC.  That non-debtor

2  judgment debtor owes RTFC $525 million plus interest today.  It

3  owes Greenlight somewhere between 90 and maybe 130 million

4  dollars.  That's a lot of debt.  And in order to pay off those

5  debts it's going to have to also, to monetize Vitelco, pay off

6  the RUS, a government agency, and its preferred shareholders.

7  So, we're talking about, again -- as I mentioned to you back in

8  December, maybe $800 million worth of debt.  That's what the

9  plan purports to do.

10         It would allow exemptions, all kinds of exemptions

11 for Mr. Prosser.  It would allow property that we otherwise

12 would have a lien upon to remain with the estate for

13 disposition in accordance with the terms of the plan or the

14 wishes of Mr. Prosser.  It provides for deemed consolidation

15 and the release of all the intercompany claims that I just

16 spent a great deal of time telling you are problematic, that

17 are something that needs to be resolved.

18         So, at some point Mr. Prosser is in charge of this

19 whole evaluation process, and he's in charge of this plan

20 process.  And we think the plan itself is a perfect reflection

21 of why this can't work the way it is and why control needs to

22 change in the way in which Mr. Gephardt has suggested.  I don't

23 think -- RTFC says that a confirmable plan cannot be proposed

24 by Mr. Prosser.

25         Now, I talked about the exclusivity hearing.  One of

61

1  the things -- one of the issues in this case that the Court has

2  often highlighted upon and come back to is value.  And I think

3  that sometimes you have suggested, well, maybe we just need to

4  have a valuation hearing.  My argument to the Court is we've

5  already had a valuation hearing.

6          On December the 11th -- and I refer to the

7  transcript, and the numbers are confusing, because they're

8  mirror images of each other -- but Page 218 of the transcript,

9  Line 19 through Page 219, Line 18 is the discussion you had

10 with Mr. Shelley of Shearman & Sterling and me about value, and

11 that was connection with the 362 motion that was set for

12 preliminary hearing, that's currently under advisement with the

13 Court, and that dove-tailed into the exclusivity hearing.

14         One of your statements, and I quote, is, "What more

15 is there with respect to value?" questioning Mr. Shelley.  And

16 the last line, Line 18 of Page 219, you say to everybody in the

17 courtroom, "It's offensive."  And I paraphrase, but basically

18 what I think the Court meant was there is no issue with regard

19 to value.  Any further delay or restriction with regard to

20 value is offensive, because we've already heard what you've had

21 to say.

22         And indeed, the Court's reflection, I think, was

23 ratified by Mr. Bartner.  Page 220, Line 9 of the same

24 transcript of December 11th he says, I quote, "We stand by Mr.

25 Michaelis' testimony.  We must not forget Mr. Michaelis'

**J&J COURT TRANSCRIBERS, INC.**

1  testimony."  This is me talking, not Mr. Bartner.

2         He said that he used a seven and a half to eight and

3  a half times EBITDA factor to determine value for which to

4  pitch these properties.  If we look at $77 million of EBITDA

5  for the entire enterprise, not just New ICC and not just

6  Vitelco, but all of the stuff below New ICC, you come up with a

7  range of $577 million to $654 million, which lo and behold, is

8  right in the middle of all the offers that you saw.

9         And his testimony is supported by the yellow lies

10 that the Court candidly has -- not refused to take as value

11 evidence, but I'm refreshing the Court's memory about what

12 happened on December the 11th and the Court's comments with

13 regard to where we were with regard to value.

14         Remember that that $577 million to $654 million worth

15 of value using their formula is -- has to be as a gross number,

16 and it has to accommodate the RUS debt of $65 million and the

17 preferred debt of $85 million.

18         So, off the top we have 150 million before we have

19 any money to play with by the debtors.  That's why we say,

20 given the current state of events and the current state of the

21 law and the current state of the history of the law of this

22 case is that Mr. Prosser's going to be out of the money.  And

23 that's what presents the conflict that the Court needs to deal

24 with.

25         We argue to you that the response of the debtors to

63

1  these issues that we've confronted them with is not only to

2  fight the issues, which they've done well, but to create some

3  more.  Part of what Mr. Gephardt talked about in describing the

4  acrimony between the parties is the flurry of pleadings that

5  have gone back and forth.  We think -- we argue that the

6  debtors' attempt to blame us or others for delay and their

7  failure to sell the property or refinance the property or to

8  keep, adhere to or comply with the deadlines that the Court has

9  set upon them.

10        The sanctions motion is one of the most frivolous

11 things that I think I've ever seen.  It's been argued to you

12 through our litigators with regard to discovery disputes, I

13 think the Court has some idea.  You denied it once for

14 procedural grounds.  We intend to try it.  We think it is

15 frivolous.  I don't mean to argue it today, other than to say

16 it is an indication of something we think is very indicative of

17 the way these cases should not be handled, the way we are doing

18 anything but trying to move the ball down the road.

19        The debtors move from tactic to tactic, as you have

20 mentioned in court.  They've run out of wiggle room, because

21 they've exhausted all their opportunities to either refinance

22 or seek an equity partner or to sell or to do anything with the

23 property.  We don't know where the folks who signed those LOI's

24 are.  We don't know what they're doing.  All well get is an

25 occasional letter, a copy of a letter from the VI.  We've not

64

1  seen anybody from the VI who's come to you to tell you, "I

2  personally represent XYZ agency or I'm the governor of the

3  Virgin Islands, and I'm interested in buying Vitelco or any of

4  the other companies".  All we have are hearsay indications and

5  not very concrete indications at that.

6       The assumption motion's been denied.  You gave them a

7  chance to try and assume the terms and conditions and that's

8  been denied because of impossibility of performance.  There is

9  no new assumption motion.  Our legal argument is that it's

10  incapable of assumption at this point.  It's incapable of cure

11  at this point.  It's gone.  We think that's, again, the law of

12  the case.

13       The debtors filed a claim objection.  We've talked at

14  long length about the RTFC claims, the RTFC judgments, the

15  stipulation of claims, and the debtors have talked at long

16  length about the 402 and the terms and conditions and what to

17  do with us about that.  It was the object of all the pleadings

18  between November 7th, when the assumption motion was denied,

19  and the beginning of the case.

20       The claim objection purports to deny our claim or

21  reduce our claim to the levels contemplated by the terms and

22  conditions, which again we think is a frivolous legal argument

23  at this point.

24       Then, not withstanding your admonishments in open

25  court months before to not come to me with a proposal to undo

65

1 the terms and conditions and the consideration for the terms

2 and conditions that even levered you into the 402 discount

3 option, they file claims to say in the alternative we're going

4 to avoid the judgments on the basis of 547 or 548.  They're

5 either preferences or the fraudulent transfer.

6          I can't believe that that's happening.  We will

7 defend that in due course, in due time line, but again, that's

8 another indication of what's happened to try and slow this down

9 and deter us, notwithstanding what the Court's arguments have

10 been.

11          The responsible officer motion.  There's no law that

12 supports the appointment of a responsible officer instead of a

13 trustee or some other authorized entity when the creditors of

14 the case and the U.S. Trustee object.  Again, we think that's a

15 waste of time.

16          The motion to withdraw the reference to the district

17 court was another, we think, waste of time and dilatory if not

18 strategic tactic filed just before Christmas, as I recall, to

19 try and change the playing field, notwithstanding the great

20 deal of personal involvement and effort and time that this

21 Court has put in this case.

22          Our job as lawyers is to make things simple for you.

23 And I have to tell you it seems like really what we've done is

24 to point a wood chipper at you and start beating logs into the

25 wood chipper.  This has not been a simple case when it really

1  should be a simple case.  And our position really -- RTFC's

2  position has never really changed.   Months ago I told you

3  every hearing from here on out is going to be about control.

4  And it still remains the same.

5       All these motions are about control and what to do

6  with control.  I think control should change, and that is the

7  simple point that we want to bring to you today.  Everything we

8  have done has been about control.

9       Why should control change?  Number one, delay.  We've

10  been here for a year, as Mr. Gephardt says, and there's no

11  progress.  This delay highlights the value, and intuitively

12  I've argued to the Court that if the value was there, something

13  would be happening.  The value is not there and nothing is

14  happening, because a value is not there.  Another reason why

15  nothing is happening, because the value is not there.

16       THE COURT:  Excuse me.  Did we lose the people in the

17  Virgin Islands or just on the call?

18       MS. RICH:  I think we're still here, Your Honor.

19  This is Carol Rich in the Virgin Islands.

20       THE COURT:  Okay, we're just going to take a pause or

21  refresh for a few minutes while we try to re-connect the

22  telephone then.  Thank you.

23       MS. RICH:  Thank you.

24       THE COURT:  Parties back on the phone?

25       MR. MOOREHEAD:  we are.   Thank you very much, Your

1  Honor.

2            THE COURT:  Back in the Virgin Islands?

3            MS. RICH:  We're here, Your Honor.

4            THE COURT:  Okay, thank you.

5            All right, Mr. Greendyke.  Sorry.  Go ahead.

6            MR. GREENDYKE:  Before I was interrupted by the

7  technical difficulties, my point was our position RTFC's

8  position has never changed.  Our position is control in this

9  case should change.  Why?  Because of delay.  As Mr. Gephardt

10 highlighted, we've been here for a year.  There's been no

11 progress.  This delay highlights the findings the Court I think

12 can make and should make with regard to value.

13           The value of the property is not sufficient to do

14 what Mr. Prosser wants to do, which in turn highlights the fact

15 that he has a conflict in management of this case.  He is

16 incapable of managing the case given where we are with regard

17 to the debts and the value and the amount of time that's

18 transpired.

19           Third -- second, really, why.  Administrative

20 insolvency.  This highlights the fact that there is a lack of

21 adequate protection and that there are conflicts with regard to

22 the manner in which transactions or transfers of funds have

23 occurred from the non-debtor New ICC to either Mr. Prosser or

24 to Emerging or to ICC/LLC.  We can't do it the way in which

25 they want to do it, notwithstanding how they're booking it.

1  It's not a loan that's going to be repaid, which is wrong with

2  regard to the debtors, and it's wrong with regard to New ICC.

3         It can't be a dividend, because ICC is, by state law,

4  incapable of making a dividend because of the lack of value and

5  because of the way their balance sheets read.  It can't work

6  that way.

7         We don't know, and we don't have an opinion with

8  regard to the tax consequences of these transfers to the

9  debtors and to Mr. Prosser, but my guess is and my instinct is

10 that there's a problem with regard to that.

11        Thirdly, impossibility of any progress in the absence

12 of some change in control.  This again highlights value, it

13 highlights the debts, and it highlights the conflicts that we

14 argue exist between Mr. Prosser and his creditors and Mr.

15 Prosser and his fiduciary duty with regard to the estates.

16        1129A10 issue.  If all the debt is sitting on this

17 side of the room and it is as big as we say it is, and right

18 now it is, there's no way, given the value that we have, that

19 he can confirm a plan over our objection.  It just can't happen

20 as a matter of law.

21        THE COURT:  We did -- are we back on the telephone?

22 Did we lose you again?

23        UNIDENTIFIED SPEAKER:  We're still here with Court

24 Call, Your Honor.

25        THE COURT:  You're still there?  Okay.  And in the

**J&J COURT TRANSCRIBERS, INC.**

1  Virgin Islands, are you still there?

2           MS. RICH:  We're here, Your Honor.

3           THE COURT:  Okay.  I think we're back on.  Thank you.

4           MR. GREENDYKE:  We think, given our jobs to highlight

5  for you how to simplify these cases, that only the appointment

6  of a trustee can solve all these issues that I detailed for you

7  before I started talking about simplification.

8           It is simply the best and what's best for all these

9  estate.  With the third party at the helm in complete control,

10 conversion motion goes away, responsible officer motion goes

11 away and the exclusivity motion doesn't matter anymore, really.

12 It solves the administrative insolvency problem and the

13 adequate protection problem, because I told you last Friday if

14 you appoint a trustee we will support a trustee, and we will

15 negotiate with a trustee, a funded trustee, and his

16 professionals or her professionals in order to get this ball

17 rolling and to get on down the road in this case.

18          We don't feel the same way about a responsible

19 officer party.  We don't feel that a responsible officer would

20 adequately protect us the same way a trustee would, the same

21 way the Court suggested a trustee would.

22          The appointment of a trustee would solve the problem

23 with regard to the funding motion and would solve the problem

24 that you have with regard to what to do with the 362 motion.

25 It would solve the problem that we currently have of no

1  progress in the case, because it would give us hope for

2  progress in the future, because we'd have a disinterested third

3  party governing the debtors who are now in bankruptcy.

4         The trustee will be able to address claims, the

5  trustee will be able to address dividends, the trustee will be

6  able to address advances, loans and the salaries of the

7  parties.  There will not be a change in control problem with

8  regard to the appointment of a trustee.  And I know that's

9  something that in the past has been argued to the Court and we

10  expect will be heard in greater detail.

11        We have a regulatory lawyer with us.  If we delve

12  into an argument in substantial detail with either Mr.

13  Moorehead or anybody else with regard to this change in control

14  issue I would like to defer and reserve the ability to respond

15  to that to Mr. Bressie, because he knows a lot more about it

16  than I do.  He is the expert.

17        But basically the bottom line is nothing in the

18  Bankruptcy Code gives way to any type of state entity with

19  regard to how you administer your case.  While 362 might have a

20  provision that says police powers of the states get to be

21  exercised and it's not a violation of the stay, there is no

22  exception with regard to 1104 and the appointment of a trustee.

23  You get to do what you want to do because Congress and the

24  constitution say the supremacy clause trumps state law with

25  regard to this type of issue.  And there is no countervailing

1  policy, there is no countervailing authority, there is no

2  authority that says otherwise with regard to how this is

3  handled.

4        It's not the same as a sale of the assets that needs

5  to be subject to state law.  It's not the same as a sale.  It's

6  different, and we argue that there is no change of control

7  implication, in part because of the way the Bankruptcy Code

8  reads, but also because of the way the FCC and other state,

9  public utility or public service commission laws read.  No one

10 -- no other state entity has made a challenge or survived a

11 challenge.  There's no authority that says that this is a

12 change of control.

13       In sharp contrast, and again, as Mr. Bressie can

14 detail for you in much greater detail, there is no law with

15 regard to responsible authority and the impact or the reaction

16 of the FCC or local public utility commissions or service

17 commissions with regard to a responsible officer.  No one knows

18 what it is, because the law doesn't define what it is, and it

19 only happens when parties consent.  Therefore, there's no game

20 plan.  There's no rules.  There's no nothing with regard to a

21 responsible officer or responsible party, and that's why we

22 think that's a bad decision, it's a bad suggestion by the

23 debtors and a bad decision by the Court.

24       With regard to a trustee, Mr. Prosser testified in

25 response to Mr. Gerber's questions.  If you appoint a trustee,

1 he testified, he promised you that he would cooperate with a

2 trustee.  That maintained the continuity that I think the Court

3 is interested in, in connection with whatever you do today.

4     Obviously this is not working the way it's working

5 now.  We're suggesting the appointment of a trustee is

6 appropriate.  Mr. Prosser has told the Court under oath, and we

7 assume he's telling the truth, that if you appoint a trustee he

8 will help.  It's in his interest, if he thinks he has an equity

9 interest, to help to try and maximize value.  It's in

10 everybody's interest to have a trustee in place to oversee that

11 on a statutory framework basis to make sure that the law is

12 abided by and the rights of all the parties are protected in a

13 very circumspect way.

14     That's why we say to you, Judge, the best solution to

15 simplify all this is to grant the U.S. Trustee's motion, the

16 one in which the RTFC and Greenlight have joined in, appoint a

17 trustee and deny the responsible officer motion.

18     Thank you.

19     THE COURT:  Mr. Galardi.

20     MR. GALARDI:  Your Honor, we agree with the U.S.

21 Trustee and RTFC, so what I'll try to do is just fill in some

22 holes with respect to that.

23     First, Your Honor, with respect to LeNature's that

24 was mentioned by the U.S. Trustee, importantly, I think, Your

25 Honor should know that on January 9th Chief Judge McCullough

**J&J COURT TRANSCRIBERS, INC.**

1 appointed a trustee as opposed to a responsible person, in part

2 because how you would define the tasks of what a responsible

3 person would do became itself a difficult task, which I think

4 is a lesson to be learned for this case.  Because the

5 difference between a responsible officer and a trustee, as I

6 think has been outlined by both the U.S. Trustee and Mr.

7 Greendyke, the responsible officer is essentially a concession

8 by the debtors that a sale process needs to be led by somebody

9 else.  There's a conflict.  There's an issue.

10       It was at Your Honor's suggestion to try to get

11 people on the same page, but as I think the testimony has come

12 out over December and January, there are many more issues that

13 have to be confronted than the sale process, and indeed, to a

14 large extent the sale process is in fact dead as we sit here

15 today.

16       Your Honor may recall when -- I think this goes to

17 exclusivity, exclusivity the first round we argue expired on

18 November 28th or 29th.  They asked for 60 days.  They came in

19 on December 4th.  We had a preliminary hearing.  Your Honor

20 listened and said, "Well, let's come back on January 9th or

21 January 12th, and I better have something in hand.  I don't

22 care about the holidays."

23       Well, we came back, and we didn't have anything on

24 hand.  We heard about the government, we heard about the

25 governor, we heard about the GERS, but we didn't have anything

74

1  in hand.

2         So, we extended it two weeks.  So, we extended it two

3  weeks.  Well, as we sit here today, Your Honor, we have

4  absolutely nothing in hand.  If they had been granted the

5  extension originally, we would have had an extension of

6  exclusivity to five days from now.  So, they file a plan as

7  their chance.

8         On information and belief the governor announced that

9  he doesn't support the bond issuance in the last two days, and

10 all we have is one letter of intent and no plan -- and a plan

11 that says they're going to try to pay us off by the end of

12 2007.

13        So, Your Honor, we have made absolutely no progress

14 to date, and a responsible officer -- I don't even know what

15 the responsible officer would do other than possibly pursue the

16 Guadalupe and the other transaction that's three steps removed,

17 four steps removed at least from these entities.

18        So, we think that the responsible officer motion

19 should be denied.

20        In addition, Your Honor, they've come in, and I think

21 Mr. Greendyke has pointed this out, seeking 363 relief.  There

22 is no payments, there is no assets in the estate.  Their motion

23 concedes again that we will hear sometime either February or

24 March that it's New ICC to fund.  I think Mr. Greendyke is

25 absolutely correct.  363 does not allow it if it's illegal, and

1    the testimony is whether you call it a dividend -- it's not a

2    loan.  They haven't sought to pay this pursuant to a loan, 364.

3    So, it's a gift.

4            And so, Your Honor, I would ask Your Honor to look at

5    the Virgin Islands law on both dividends and on fraudulent

6    conveyances.  Title 13, in particular Sections 91 through 118,

7    say you can't make illegal dividends.  It's very much like

8    Delaware law.  You don't have the capital.

9            And the Virgin Islands law, Title 28, Sections 171

10   through I think it's 179 and again at 201 to 212 --

11           THE COURT:  What were the Title 13 sections?  I'm

12   sorry.

13           MR. GALARDI:  I'm sorry, the Title 13 sections begin

14   at 91 where it goes to stock issuance, and it goes to 118 on

15   the liability of directors and officers for unlawful dividends.

16           THE COURT:  Okay, thank you.

17           MR. GALARDI:  And then with respect to the Virgin

18   Islands law, first the Virgin Islands tries to incorporate the

19   Uniform Fraudulent Conveyance Act, and then there are separate

20   other sections.  Importantly from Greenlight's perspective,

21   Your Honor, we can -- and New York law, we will argue, does the

22   same thing -- we can, as a pending litigation, pending as of

23   1998, go back and undo all of these transactions if we're not

24   paid in full, and that's our intention to do so.

25           So, we believe that they're at least fraudulent

76

1  conveyance and/or illegal dividends that they're being funding,

2  and they're not making loans they admit, they don't even use a

3  predicate.  So, we think that the responsible officer motion

4  should be denied, first because there's really nothing left for

5  that person to do at this stage.  Maybe we can jump-start a

6  sale process, but a trustee can do that.

7         There is no money to pay.  The RTFC and Greenlight

8  will not consent to any funds being set up -- sent upstream, so

9  we're going to be in another litigation if a responsible

10  officer -- and if it means that New ICC may be in bankruptcy,

11  it may be in bankruptcy too, because there seems to be no

12  stopping Mr. Prosser from using the funds of a non-debtor to

13  pay advances -- whatever you want to characterize those -- to

14  debtors and to avoid the obligations to the creditors of New

15  ICC.

16         So, Your Honor, though you have authority to appoint

17  -- to approve a CRO, this is not a CRO.  This is a court-

18  appointed person, and we don't think you have authority under

19  105 or 363 to grant the motion for a responsible officer.

20         Now, with respect to the conversation, the trustee

21  motions, Your Honor, we believe that the evidence does, in

22  fact, show gross management, failure to file reports and

23  schedules, continuing losses not likely to be rehabilitated.

24  And, Your Honor, at the very least the testimony is that there

25  are factual issues on all of these points.

1          For example, we've spent a lot of time on these

2    intercompany transfers, advances.  The deposition testimony of

3    Mr. Prosser was first that they were debts to be repaid, and he

4    gave an answer in the deposition testimony that they would, in

5    fact, be repaid if he could only sell the downstream entities.

6          Then we get to Mr. Lubana and Mr. Prosser's

7    testimony, "Oh, there was never an intention to repay these."

8    Then we get the testimony most recently, "Well, there was never

9    an intention to pay these if we did a merger activity."

10         Well, the problem is we now have a bar date that has

11   passed where New ICC is not scheduled, we have the 30 days

12   since the bar date has passed where the debtors didn't file

13   even contingent or disputed claims, and we have now an issue as

14   to whether there are debts there or not, and no one to be able

15   to investigate whether this is proper or not, whether these are

16   obligations owed.

17         There were clearly notes in the fist instance, they

18   were clearly assets.  So, we have a combination of debts that

19   we think may -- I hope that they turn out to be gifts, but if

20   they're not gifts then there's debt out there.  And there is no

21   person -- the clear testimony has been Mr. Prosser is in

22   control of all of these entities.  He testified he was in

23   control of all of these entities, General Ebbesen in his

24   deposition testified that he's in control of all of these

25   entities, and the Court of Chancery for the State of Delaware

1  found that he was in control, and to the extent there was a

2  board, the board was conflicting.

3        And Mr. Prosser's testimony, again not controverted,

4  is that the board of New ICC, which has now been formed, that

5  -- the committee, the subcommittee to determine about the

6  advances, are exactly the same people who were found to be

7  beholden to Mr. Prosser and therefore conflicted and breached

8  their fiduciary duties to Greenlight originally and are

9  breaching their fiduciary duties as we sit here today by making

10  the advances.

11        So, Your Honor, we believe the cause is ample for

12  appointing a trustee.  The fact of the matter is there is

13  delay.  There is an admittedly unconfirmable plan on file.

14  There is the failure to file timely reports and schedules, and

15  then once they file them, as Mr. Greendyke alluded to, we now

16  have new operating reports this morning to reflect the

17  testimony and the mistakes they made the first time.

18        So, again, the distrust, the inability, the

19  irregularity of the financial reports, all of those things

20  continue, and they will not stop until there is a trustee

21  appointed.

22        Sure, would the creditors have liked to take control

23  of this case and direct this and maybe get Mr. Prosser out of

24  there entirely?  Yes.  But Your Honor pointed out that you

25  don't want to give control to Greenlight and RTFC.  You don't

1  want to give control to Mr. Prosser.  So, the question is

2  what's the proper compromise position?  Again, I think Mr.

3  Gerber brought out the testimony, and I believe I brought out

4  the testimony that if you appoint a person, it should be a

5  trustee, but a trustee doesn't have to replace operational

6  management and certainly not at the non-debtor subsidiaries.

7  And Mr. Prosser, who was under the impression that he

8  automatically steps out, as Your Honor knows, that's not the

9  law.

10         The U.S. Trustee who appoints a Chapter 11 trustee,

11  if they believe that there is value and that Mr. Prosser serves

12  a value or that the operational employees serve a purpose to

13  maximize value, we can maintain that.  And I think what the

14  RTFC and Greenlight has said is once there is a trustee who

15  makes such a recommendation to us, we will be -- we will

16  consider whether such funding is appropriate.  We will do it on

17  commercial terms.  We will understand what is going on.  But

18  until that happens, the animosity, the acrimony and the

19  fighting will continue.

20         So, we think today is a very important hearing, and

21  the decision is critical, because it will shape the rest of

22  these cases.  It will determine today whether the fighting

23  begins or at least subsides for the near future.

24         The exclusivity, if it is terminated, Your Honor, we

25  would file a competing plan.  We will have the value fight that

1  Your Honor has talked about.  If a trustee is appointed, Your

2  Honor, yes, exclusivity terminates, but we can discuss with the

3  trustee whether or not there is a need for a competing plan.

4  Let that trustee have funds to make an unbias, unconflicted

5  decision.

6          With respect to the conversation motion, Your Honor,

7  we think we have demonstrated grounds why Mr. Prosser's case

8  lacks an ability to rehabilitate.

9          MR. LICHTENSTEIN:  Your Honor, forgive me for

10 interrupting, but I thought we were not arguing the

11 conversation motion today.  Your Honor said a couple of times

12 we're done with it.

13         THE COURT:  No, I don't think we've had closing

14 arguments on the conversation, did we?

15         MR. GALARDI:  I didn't think so, either.

16         MR. LICHTENSTEIN:  I thought Your Honor said that we

17 did have closing arguments.  I think it's on the record.  We

18 did have closing arguments.  To my recollection you said we

19 weren't going to talk about it anymore.

20         THE COURT:  Okay, I apologize.  I did not think we

21 did the closing arguments.  If we did then I've just simply

22 forgotten them, but I don't recall having done the closing

23 arguments on the conversion.

24         MR. LICHTENSTEIN:  I thought we did, Your Honor.

25 Maybe I'm wrong.

**J&J COURT TRANSCRIBERS, INC.**

81

1           THE COURT:  Well, somebody have a transcript and go

2    back and look?

3           MR. GALARDI:  Your Honor, I thought we had five

4    motions, and I still count five that includes the conversion.

5    So, I apologize.  I had not understood the closing argument.

6           THE COURT:  Well, let's defer the conversion

7    'til somebody can go back and take a look.

8           MR. LICHTENSTEIN:  That's fine.

9           MR. GALARDI:  Your Honor, so with respect to the

10   grounds again, we would ask Your Honor again to review the

11   transcript, the record, and we believe that, one, Your Honor is

12   without authority to appoint the sort of responsible person

13   that the debtors have requested.  We think that cause exists to

14   appoint a trustee and has been demonstrated by the delay, the

15   acrimony,  the history, the findings of the Chancery Court.

16          With respect to exclusivity, Your Honor, I don't know

17   whether you want to consider it mood because they filed a plan

18   and we've sought to terminate the exclusivity now with respect

19   to the solicitation period.  They haven't even filed a

20   disclosure statement.  Had Your Honor granted the relief

21   originally, it only goes to January 26th or 27th anyway, so

22   there should be another motion if there's exclusivity.  They

23   haven't filed a disclosure statement.  They can't solicit it.

24          THE COURT:  I'm sorry, but who sought to terminate

25   exclusivity?

**J&J COURT TRANSCRIBERS, INC.**

1           MR. GALARDI:  We did.  We filed a cross motion with

2    respect to -- because of the 1014 motion, Your Honor?

3           THE COURT:  Yes.

4           MR. GALARDI:  They had said that the thought it

5    hadn't even started to run, and if it ran it would be sixty

6    days more.  We in the cross motion said, Your Honor, we think

7    that it's run.

8           THE COURT:  Oh, okay.

9           MR. GALARDI:  And in addition, to the extent that it

10   hasn't run because of the 1014 stay, we would ask that it be

11   terminated for cause.

12          Your Honor, so we would again say that, you know, the

13   exclusivity motion and the solicitation period, any further

14   extension of that should not be granted, and we would ask Your

15   Honor to enter an order appointing a trustee.

16          THE COURT:  Okay, with respect to the motion that's

17   been heard, I am relatively sure that the arguments were not

18   made, because I thought I wanted to hear the rest of this

19   evidence, because I was not comfortable considering the motion

20   to convert until the rest of this proceeding was concluded.

21          MR. LICHTENSTEIN:  I could be wrong, Your Honor, as I

22   said.  I recall that we had a discussion, simply that the

23   evidence was done, and I thought that we argued closing, but I

24   -- honestly, there have been so many hearings, maybe I'm wrong.

25          THE COURT:  Well, and that might be my problem, too,

1  Mr. Lichtenstein.  Definitely the evidence was closed.  I have

2  no dispute with that fact, but I did not think the arguments

3  had been done.  So, did anybody get a transcript from what, two

4  weeks ago?

5          MR. SHELLEY:  Your Honor, this is Scott Shelley from

6  Shearman & Sterling.

7          THE COURT:  Yes, sir.

8          MR. SHELLEY:  Page 261 of the January 9th transcript

9  is the start of closing arguments.

10          THE COURT:  It is?  Okay, thank you.

11          All right, then I guess it was argued.

12          Ms. Kelley?

13          MS. KELLEY:  Thank you, Your Honor.

14          Your Honor, at many of these hearings, really at each

15  hearing, on the many motions that have come before the Court

16  we've heard very similar rhetoric from the creditors, and we've

17  heard it so many times that one could think there was evidence

18  in the record to support some of these statements, but I think

19  the Court will find that for many of them there simply is not.

20  And the creditors, as well as the U.S. Trustee, have had the

21  opportunity to put on evidence now to support these wide-

22  ranging allegations.

23          And the debtors feel strongly that when the Court

24  looks at this you will see that they have failed to meet the

25  very high standard of clear and convincing evidence necessary

1    to appoint a trustee in these cases, or for that matter to

2    obtain the wide range of relief that they have also been

3    requesting, but which we have argued about at the previous

4    hearing.

5            We have heard repeatedly that control needs to change

6    or that there is some sort of conflicts.  Again, the evidence,

7    if you look at the evidence in detail, there is nothing

8    affirmative put forward that would support this as a matter of

9    clear and convincing evidence.

10           Today we started to hear additionally about illegal

11   dividends and administrative insolvency.  Your Honor, we did

12   file the motion that the Court had requested us to file

13   regarding the funding.  And there hasn't obviously been a

14   hearing on that motion.  It was not on for hearing today.  The

15   RTFC has also filed a brief on that subject, and in due course

16   evidence, as necessary, will be presented, and that can be

17   heard.

18           But to talk about illegal dividends as if that is a

19   foregone conclusion, when this matter is not only not before

20   the Court, but there is simply no evidence of this in the

21   record, is inappropriate.  And the Court should not simply

22   begin from that starting point, assuming this can't be paid

23   for.

24           THE COURT:  Well, I'm not starting about the -- or

25   from the point at which I'm making the conclusion that there

1  are illegal dividends.  But I am starting from a point that in

2  looking at the schedules and in hearing the evidence,

3  specifically from Mr. Prosser and from the CFO of New ICC, both

4  of whom I credit in this respect.  Neither of the debtors have

5  any employees, have any operating assets.  Emerging owns stock

6  and it owns the property that it uses when employees come into

7  town in lieu of putting up those employees in a hotel, but for

8  which doesn't charge rent and doesn't get any income.

9       So, from an administrative insolvency viewpoint,

10  right now it appears that unless these debtors can figure out

11  some source of income, they are administratively insolvent.

12  That seems to be the case.

13       The stock is encumbered by perfected liens, so I am

14  not sure how I can draw any conclusion other than the fact that

15  they're administratively insolvent.

16       Now, that doesn't mean, although you'd think it would

17  mean, it doesn't mean I think in these cases, given the very

18  unusual structure of these corporations in the setting in which

19  these cases find themselves, that they still may not be able to

20  confirm a plan, because assuming that you can get enough value

21  out of those stock assets -- the assets represented by the

22  stock, the operating entities -- that there is enough value

23  over and above the liens to pay off the debt and return

24  something to other creditors besides the lienors.  There may

25  very well be enough to confirm a plan at this level.

**J&J COURT TRANSCRIBERS, INC.**

1          It's a highly unusual circumstance, but I do have to

2   start from the premise that right now on these books and

3   records these cases are administratively insolvent.  I'm not

4   sure how you get around that premise.

5          MS. KELLEY:  Well, Your Honor, I understand what Your

6   Honor is saying.  I think the RTFC is taking that a step

7   further and saying therefore, for example, a responsible

8   officer cannot be appointed or a trustee is the only option.

9   And we do not believe that those conclusions the RTFC is asking

10  the Court to draw flow from the lack of employees or cash on

11  hand at the level of the debtors.

12         And I will talk further in a few minutes about the

13  funding of expenses, but I wanted to mention that point at the

14  beginning.

15         There was another point that was mentioned with

16  respect to valuation, and that perhaps a valuation of New ICC

17  had already somehow taken place or -- of Emerging's assets,

18  which obviously is the stock of New ICC.

19         And I just wanted to remind the Court, as the Court

20  has mentioned at several previous hearings, I believe on

21  January 9th the Court said that we would need to have valuation

22  testimony in due course regarding that issue.  And at the last

23  hearing in fact at Page 278 the Court said that we don't know

24  what the value is at this time.  We have a bid and ask.

25         THE COURT:  Well, for relief from stay purposes.  For

1    relief from stay purposes, valuation has to be looked at for

2    the purpose for which it's proffered.  And what I think I said

3    was for the purpose of the relief from stay hearings the fact

4    that the debtors have offers and the fact that the debtors have

5    put forth a, from a business offer to sell perspective, what it

6    thinks a fair capitalization of its earnings is for purposes of

7    getting offers in the door is not the means all and end all for

8    purposes of relief from stay.

9        It certainly is sufficient for purposes of

10   determining what the debtor's valuing its assets for in terms

11   of looking for a refinance or for purposes of looking for a

12   sale or for some other purposes. but valuation in the

13   Bankruptcy Code has different meaning at different times.  And

14   so that's what I was attempting to say.

15       So, these comments about valuations cannot be taken

16   out of context, and I want to make it very clear on this

17   record, the purpose for which I'm looking for some, you know,

18   bricks and mortar type of valuation is a relief from stay

19   hearing.

20       All I was saying at that time was I'm not certain

21   that for the relief from stay hearing I have the sufficient

22   evidence of that type of value to determine that relief from

23   stay may be appropriate, but I think that there is enough

24   evidence of record, even from the debtor's perspective, to

25   convince me that some form of adequate protection is necessary.

**J&J COURT TRANSCRIBERS, INC.**

1  That's all.

2         Now, if that's what you're saying, then I apologize,

3  but that wasn't what I was hearing you say.

4         MS. KELLEY:  I think I may be agreeing with you, Your

5  Honor, that the -- any valuation evidence that is in the record

6  is specific to various issues.

7         THE COURT:  Okay.

8         MS. KELLEY:  And my point was really that when we're

9  talking about valuation or when we're talking about, for

10 example, whether a dividend by New ICC, a non-debtor is illegal

11 or the value of New ICC or whether it has sufficient assets to

12 be making a dividend, all issues which are not before the Court

13 today, and I don't know if they would ever be before the Court,

14 but certainly the valuation discussions that have -- that are

15 in the record to date do not address that issue.

16        And if that issue were to be reached at some point,

17 certainly there would have to be proper valuation evidence.

18        THE COURT:  But I think there is evidence with

19 respect to that issue, because the Virgin Islands statute talks

20 in terms of capitalization of the corporation, and there's

21 plenty of evidence about valuation -- or pardon me, the

22 capitalization.  That's -- Mr. Prosser spent several hours on

23 the stand talking about the capitalization of the enterprise.

24        MS. KELLEY:  Well, Your Honor, I think that the

25 market value of New ICC would have to be considered in order to

89

1  even begin to make that determination of whether New ICC could,

2  in fact, issue a dividend, and we have not had testimony from

3  an expert on that issue.  And so the debtor's argument would be

4  that you'd have to consider the market value of New ICC and

5  whether that exceeds its capital.

6          And again, New ICC is a non-debtor, and clearly this

7  issue isn't before the Court today, and it remains to be seen

8  whether it will be before the Court in some further hearing.

9          THE COURT:  Frankly, the dividend issue at the moment

10 is the least of my worries.  The concern that I have is that

11 these debtors, but for whatever you want to call this transfer

12 of money from New ICC into the debtors seems to be the only

13 source of money that the debtors have.  The debtors do incur

14 expenses and the debtors have no other source of money.

15         Now, the debtors have to reconcile that somewhere.  I

16 don't understand how New ICC is making the gift to the debtors

17 for that purpose, if it is.  That's fine, from the debtors'

18 perspective.  I don't know what that does from New ICC's

19 perspective, but for the debtors, okay.  Maybe that's okay.

20 But we need to find out what that transfer is.

21         If in fact it's a loan, the debtors haven't gotten

22 this Court's authority to get loans, either in or outside the

23 ordinary course of business, so I need a motion.  That's what I

24 think I said earlier.  If you've got some motion on record,

25 fine.  We'll hear it in February.  You know, we'll find out

1  what it's all about, and life will march forward from that

2  point on.

3         So, the dividend issue is a characterization issue

4  right now for the financial statement purposes.  It may fit

5  into the trustee motion to the extent that somebody has to

6  reconcile what these transfers within these companies and

7  accurately account for them.  And if Mr. Prosser and his staff

8  can't -- not so much can't but aren't doing it and aren't

9  willing to do it, then somebody else may need to do it.  But as

10 a matter of either accounting or tax concerns, that's well

11 beyond where this Court's going right now.

12        I'm not concerned with that specific spin on this

13 matter right now.

14        MS. KELLEY:  Thank you, Your Honor.  As I was

15 pointing out, I think the important thing to consider today is

16 whether, in fact, the standard of clear and convincing evidence

17 showing cause or that the appointment of a trustee is in the

18 best interest of the estates has been met.

19        And we believe that this has not been met and that

20 this is simply another avenue by which the creditors, as they

21 have conceded at various times, are attempting to wrest control

22 of the companies from Mr. Prosser, who we just heard the

23 creditors describe as being in control.

24        So --

25        THE COURT:  Well, there isn't any dispute that he's

1    in control.  He's admitted that he is in control.  He has

2    boards -- you know, his own testimony is essentially that to

3    the extent that there are boards -- not so much with respect to

4    audit committees, but there are boards and he has admitted on

5    his -- on the witness stand that to the extent that there is a

6    final decision to be made, he's the entity that they come to,

7    and he makes the final decision.  So, he is in control.  I

8    don't think there's an issue about that, is there?

9          MS. KELLEY:  No, he certainly is the ultimate

10   shareholder of the companies.  My point is simply that that

11   alone, obviously, does not warrant the appointment of a trustee

12   and that further evidence of cause must be shown before he

13   would be replaced with a trustee.

14         The trustee -- the U.S. Trustee argues that there has

15   been acrimony in these cases and that there has been delay.

16   Certainly there has been an acrimonious relationship among the

17   parties, but acrimony alone, dislike between the parties alone

18   does not warrant the appointment of a trustee.  Further

19   evidence must be shown that it is -- has paralyzed the cases or

20   otherwise prevented them from going forward.  We do not think

21   that that has been shown here.

22         In several hearings there has been testimony

23   regarding the work that the debtors have been doing in good

24   faith since the beginning of the cases, in fact.  Matt

25   Michaelis testified at December -- at the December 11th hearing

1 regarding the efforts of the debtors throughout the involuntary

2 and voluntary cases to achieve a sale or financing.

3          He further testified that Mr. Prosser and management

4 have been involved and working diligently toward that goal,

5 that they were committed to a closing --

6          THE COURT:  Excuse me.  Can we turn that microphone

7 up?  I know there's feedback, but I can't hear her very well.

8 She has a very soft voice, and we'll hope not to blast too

9 loud.  I'm sorry.

10          Okay, thank you.

11          MS. KELLEY:  I was trying to avoid the feedback, Your

12 Honor.

13          THE COURT:  I know.

14          MS. KELLEY:  He testified further that the -- that

15 management, including Mr. Prosser, throughout this process have

16 been committed to achieving a sale or financing as quickly as

17 possible and that there was no activity on Mr. Prosser's part

18 to obstruct the closing of any such transaction.

19          And that appears in the December 11th transcript,

20 Pages 20 to 23 and again at Page 37.

21          Mr. Michaelis's testimony, as well as Mr. Prosser's

22 testimony on December 11th also contradicts arguments that have

23 come up from time to time that the debtors have in some way

24 misled the Court about timing, and I think the Court heard

25 clearly at that hearing that the initial deal structure was a

1  simple refinancing which would not require regulatory approval

2  and that later evolved into an asset sale and then came to

3  involve an equity component.  And each of these changes added

4  levels of complexity and time, and therefore, the outlook,

5  foreclosing any transaction, had changed along with it.

6         Mr. Prosser's testimony on December 11th as well as

7  his testimony on January 9th and January 19th shows that these

8  efforts are continuing with the GERS and with the Virgin

9  Islands government, and that he and the debtors are fulfilling

10 their fiduciary duties.  And this testimony appears in the

11 December 11th transcript at Pages 98 through 101, 104 through

12 107 and 109 through 111, as well as in the January 9th

13 transcript at Page 132.

14        Mr. Prosser testified on January 19th that the

15 debtors are currently pursuing a two-part transaction, both the

16 sale of Vitelco to the GERS or the Virgin Islands government,

17 as well as the sale of Down Island Companies valued at

18 approximately $100 million.

19        And he further testified that due diligence has been

20 ongoing over the past ten days with respect to the sale of the

21 Down Island Companies.

22        As I mentioned before, Your Honor, the fact that Mr.

23 Prosser is the ultimate shareholder of these companies does not

24 mean that he has abandoned his fiduciary duties to act in

25 creditors' best interests.  And there is certainly no clear and

**J&J COURT TRANSCRIBERS, INC.**

1  convincing evidence of this in the record.

2        In fact, the debtors submit that the evidence on the

3  record shows just the opposite.  He has been working diligently

4  to obtain funding to pay the creditors.  In the January 9th

5  transcript at Page 132 he said on cross examination, in

6  responding to a question -- well, the question said, "Well, in

7  the negotiations you're currently conducting for the possible

8  sale of your business, is it your understanding that you have a

9  duty to try to maximize the value of the estate of Emerging and

10 ICC/LLC?"

11       And he responded, "Well, it is certainly my

12 understanding and my drive to be able to raise the funding

13 needed to pay off the 402 settlement agreement, yes."

14       Mr. Prosser made similar statements on January 19th.

15 Now, the theory that we've heard from the RTFC seems to be that

16 the debtors' view of intending to pay the 402 million and that

17 the debtors are entitled to pay the 402 million under the

18 settlement agreement rather than the full amount of the

19 judgments is somehow bad faith or a way to avoid paying debts,

20 but in fact, this is a good faith dispute among the parties

21 that will be resolved in the plan context.  The debtors believe

22 that they will have the ability to assume that contract, and I

23 fact they will be able to pay the creditors on an unimpaired

24 basis in the plan based on the assumption of that settlement

25 agreement.

1           So, we think that Mr. Prosser's testimony that he is

2  attempting to achieve that through a sale or refinancing shows

3  a good faith effort to meet the debts of the creditors.

4           Contrary to the argument we heard earlier today, and

5  I'm sure the Court will recall, this issue of assumption has

6  not been finally decided.  It was decided on a without

7  prejudice basis, and the debtors have leave to re-file at the

8  appropriate time when there is a transaction at hand by which

9  they can assume it or cure or in the context of a plan.  And we

10 think that we can do that.

11          The Court also said at the January 9th hearing that

12 assumption is not an issue to be decided now.  And we agree

13 with that, that it doesn't make sense to decide that in the

14 abstract, but we believe that at the end of the day we will

15 prevail on that.

16          Now, Your Honor, in response to this testimony at the

17 various hearings with respect to progress that has been made

18 and the ongoing negotiations with the GERS, the RTFC argued on

19 the 19th and mentioned again today that they have some question

20 about whether in fact the GERS deal can actually occur because

21 of Virgin Islands statutes that purportedly limit the nature of

22 investments that can be made.  I believe they also raised a

23 question as to whether the GERS had sufficient funding to do

24 this type of transaction and seemed to imply that the Court

25 should just disregard this.

**J&J COURT TRANSCRIBERS, INC.**

96

1          The RTFC did obviously correct the description of the

2    statute this morning but was still arguing that the GERS may

3    not have authority to do this transaction.

4          Your Honor, there are several letters in the record

5    from the GERS and from the Virgin Islands government that came

6    in at the December 11th and January 9th hearings in which those

7    entities expressed an interest in pursuing a transaction.  The

8    GERS obviously has no motivation to mislead the debtors or this

9    Court and presumably understands the nature of investments it

10   can make under applicable law.

11         As Mr. Greendyke acknowledged earlier, the statute

12   allows for broad types of investments.  There are alternative

13   investments listed which would include this type of private

14   equity transaction or almost any other type of transaction, as

15   he described it, and subject to some limits, and I think the

16   limit on those; although, I also am not an expert in Virgin

17   Islands regulatory law, he mentioned a five percent cap.

18         Now, there really is no -- there's no evidence in the

19   record, no one has testified at all about the size of the

20   portfolio.  Mr. Greendyke speculated as to what the size of the

21   portfolio is.  I don't know.  I know it is quite large, but

22   again, presumably the GERS knows better than anyone else what

23   sort of transactions it makes sense to pursue, and the GERS

24   board is fully aware of the limitations on it.

25         I think also we are not focusing on the possibility

**J&J COURT TRANSCRIBERS, INC.**

1  that the transaction could be structured in a way that would

2  comport with any limits that there may be under Virgin Islands

3  law or in addition that the legislature of the Virgin Islands

4  can amend the limitations of the statute in a particular

5  instance when they're approving a transaction.

6       THE COURT:  Well, Ms. Kelley, all sorts of things can

7  happen.  The problem is that so far nothing has happened.

8  That's the problem.  I mean, you know, if the GERS really wants

9  to do this, I have no doubt that they can figure out a way to

10 do it.  But sending in a half of a paragraph letter that says,

11 "G would like to deal with you," is not a commitment, and

12 that's the problem.

13      So, we're still where we were, you know, in July.

14      MS. KELLEY:  Well, it isn't a commitment, Your Honor.

15 I think progress is being made.  I believe due diligence is

16 going on and that parties are continuing to move things

17 forward.

18      Mr. Prosser testified, first of all, that as a seller

19 he is not concerned with the financial condition of the GERS

20 and he also testified that the investable funds of the GERS

21 will significantly increase as a result of a bond issuance.  I

22 note that Mr. Galardi commented earlier about something that

23 the governor may have said.  I'm unaware of that, and there's

24 no -- again, no evidence here about that.  So, I think that's

25 in the category of speculation at this point, but the debtors

1  in their negotiations are not concerned about an entity the

2  size of the GERS, a government entity managing to have the

3  wherewithal to complete a deal, if it in fact proceeds with it.

4          Mr. Prosser also testified that documents have been

5  segregated in the data room to make review by the government

6  more efficient and that he expected further progress now that

7  the new government is in place and that the debtors are pushing

8  to get consultants hired and to take this forward.

9          So, the debtors are certainly working hard at this.

10  I realize, as the Court has pointed out, the progress has not

11  been as fast as we had hoped, but there is progress being made,

12  and certainly a great deal of effort is being made.

13          Your Honor, that is really on the one hand, the

14  efforts that are being made by the debtors.  Now, with respect

15  to the delay issue that the U.S. Trustee discussed, I think we

16  have to look at the other hand as well, that there isn't

17  evidence showing that a trustee could complete the transaction

18  any faster than the debtors are attempting to do.

19          I think this is relevant in this case where delay has

20  been alleged as a cause; although, certainly under the case

21  law, as Your Honor is aware, it may not be relevant in other

22  situations where other causes are alleged, but here I think it

23  goes directly to the heart of the matter.  And the Court needs

24  to look at whether the remedy that is being proposed actually

25  fits the need.

1          Mr. Prosser testified on the 19th that in his view,

2    as the party negotiating these transactions, he thought the

3    appointment of a trustee would set back the sale process.  Now,

4    obviously it is not in anyone's best interest do to that,

5    because as the Court has acknowledged previously, there needs

6    to be a sale no matter who is pushing that forward.

7          Mr. Prosser also testified that he believed that key

8    employees may leave the operating companies as a result of

9    uncertainty or concerns they might have if a trustee were

10   appointed.  The trustee would not necessarily be able to count

11   on Mr. Prosser's assistance, either.  All of the parties -- the

12   U.S. Trustee and the creditors have argued today that business

13   would go on as usual and that the trustee appointment did not

14   necessarily mean management would be replaced.  Although this

15   may be true in the abstract, this is really disingenuous in

16   this instance.

17         First of all, it seems to fly in the face of the

18   argument that there is distrust of Mr. Prosser on the part of

19   these creditors.  And secondly, the creditors have been very

20   vocal about the fact that they want Mr. Prosser out of these

21   companies.

22         So, to now say, "Well, we might be okay with him

23   staying in there running the show if a trustee is in place at

24   the level of the debtors," we believe is not really looking at

25   the reality of the situation.  And I think, although I have not

1  looked at the transcript of the 19th, I don't think Mr. Prosser

2  was as definitive as was mentioned earlier, that yes, certainly

3  he would stay and help the trustee.  I think he was a little

4  bit more equivocal in his answer as to whether he would do

5  that.

6        THE COURT:  I think he said he would certainly

7  cooperate with the trustee.  He was not sure whether he would

8  recommend to his employees that they stay if the subject came

9  up, but the subject had not been raised with his board, I

10  believe is what he said.

11        MS. KELLEY:  Okay, well, I have not looked at the

12  transcript.

13        THE COURT:  I haven't either.  That's my

14  recollection.

15        MS. KELLEY:  I know there was some equivocation in

16  there, so I would have to look at the transcript, too, but I

17  will defer to Your Honor's recollection on that.

18        As a result of all this, Your Honor, we think there

19  are uncertainties connected to the appointment of a trustee,

20  certainly.  We think delays -- further delays could be expected

21  in the sale or refinancing efforts, because the debtors are in

22  the midst of trying to push those forward, and particularly if

23  there were a change in management and a trustee had to step in

24  and become familiarized with the business which, of course, Mr.

25  Prosser has been involved in all this time, and also to step in

1 and attempt to pick up the negotiations where they left off.

2 We think this in itself would create delays.

3        So that the trustee remedy, even if we start from the

4 standpoint that there have been delays in this process or it's

5 taken longer than desirable, the trustee would not remedy that

6 situation.  And we don't think there's been evidence to show

7 that.

8        THE COURT:  I think the problem from the creditors'

9 perspective is that they understand at this point there's going

10 to be delay, because there's no deal on the table.  So, there

11 is going to be delay.

12        The only question is who should be at the helm of

13 that delay.  And the problem is that Mr. Prosser has, despite

14 the fact that he wants to now back off his statements from the

15 Court, he has in fact told this Court on several occasions that

16 there was likely to be a deal by X date, and it hasn't

17 happened.  And it's fine to come in and say it didn't happen

18 because the parameters of that deal changed.  And I understand

19 that the parameters of deals change.

20        And as they change, different things happen and

21 different negotiating parties want different things, and so it

22 takes more time.  But the reality is that there was a deal by

23 which this debt could have been paid off within the settlement

24 terms.  Whether it would have gotten done by the initial due

25 dates or not, I don't know, but it could have been certainly

1  closer than now.

2        That deal changed.  It took more time.  It

3  transmogrified into something else.  That deal didn't work, and

4  it got transmogrified into something else.  And that deal is

5  still not done.

6        So, with Mr. Prosser at the helm negotiating three

7  different deals it's still in the course of a delay, and it is

8  a delay, and there is still nothing definitive of record.  And

9  the question, I think, from the creditor and the U.S. Trustee's

10 perspective is, is that what's going to continue to happen

11 through -- just to use the plan date -- the end of 2007 when,

12 according to the plan, Mr. Prosser will say, if something

13 hasn't happened in the meantime to get the deal done, "Okay,

14 here are the keys.  You can go try it your way now."

15       Well, that concerns me.  I am not sure that that is

16 the appropriate exercise of fiduciary duties to say that,

17 "Fine, I'll do my best until a certain date, and then fine,

18 it's all yours."

19       I just -- that really concerns me, and I think it's a

20 concern to the U.S. Trustee and it's a concern to the

21 creditors.

22       Now, the concept again of responsible officer, in

23 quotes, versus trustee, in quotes, you know, I don't have a

24 strong view about that one way or the other what the

25 designation of a person is.  I am concerned about the statutory

1  framework in which the U.S. Trustee has raised his argument,

2  because in talking about the concept of a responsible officer,

3  I suppose all along I've kind of been equating it with sort of

4  a restructuring officer, and the U.S. Trustee points out

5  appropriately, I suppose, that that's not that this motion is.

6  The debtor is asking for some kind of quasi-trustee.  And the

7  U.S. Trustee's position is that there is no court authority for

8  that.

9         The debtor, obviously -- you haven't argued this yet,

10  but I understand your position is that 105 would give me that

11  authority, especially in combination with some other sections

12  of the code.  If I have that authority, that may be a solution.

13  I don't know if I have that authority.  So, whether it's that

14  or a trustee, in my view, again, I'm not married to the term,

15  to whatever the person is called, but I am concerned that with

16  Mr. Prosser totally in charge, and he is totally in charge,

17  this is simply not going to get done.  And it's not going to

18  get done because, you know, the apples keep getting mixed in

19  with the oranges, and what we need is an apple pie, not an

20  apple and orange pie.  And that's the problem.

21         MS. KELLEY:  Well, Your Honor, I just wanted to

22  clarify before I go on.  You were referring to the end date in

23  the plan, and I mean, certainly that isn't the desired outcome

24  and isn't a matter of the debtors just throwing up their hands

25  and saying, "Well, you know, if this doesn't happen here, we'll

1 --" I mean, that isn't the direction we want to go in,

2 obviously.

3        That provision, though, was an attempt to provide

4 some finality which we have heard from the creditors they

5 wanted to see.  And so rather than have, you know, successive

6 dates and so forth or just an open-ended time frame that was

7 really an attempt.  Perhaps it wasn't the most eloquent

8 attempt, but it was an attempt to provide some sort of finality

9 and give some comfort to the creditors on that point.

10        THE COURT:  Okay.  Well, in any event, it's not a

11 plan hearing, but that -- but it's just that concept is

12 troubling to me, because if, in fact, at some point Mr. Prosser

13 is going to throw up his hands and say, "Okay, I quit," then

14 frankly, today's a better day to have, "Okay, I quit," than at

15 the end of 2007.

16        So, if it's going to be, "Okay, I quit," today's the

17 day for, "Okay, I quit."

18        MS. KELLEY:  Well, Your Honor, I think -- Mr. Prosser

19 isn't here today, but I think it would be very unlikely that

20 Mr. Prosser's view would be, "Okay, I quit."  He's extremely

21 dedicated to this and I think is very personally involved and

22 does not intend to quit this process.

23        So, again, I think the handing over the keys was

24 really a gesture to show we're willing to look at a date for

25 finality in these cases, and we understand that that's a very

1  real concept.

2       THE COURT:  All right, there are two things in the

3  evidence -- that are not in the evidence, I think, that are

4  troubling to me from the corporate debtors' perspective.  One

5  is that the -- and I'm sure I raised this.  I have not gone

6  back to look at the transcript, but I am relatively sure that I

7  raised this when the settlement proposal came up, and that was

8  that I did not want to hear from the debtors about the fact

9  that if this deal went south that somehow or other it was

10 suddenly going to be some problem and it could be set aside

11 when it was a good faith negotiation by the debtors saying,

12 "Oh, yes, we can get this deal finished by -- within a certain

13 time frame."

14      And here we are apparently now with the debtors

15 attempting to undo the deal that they bargained for because it

16 was in their best interest and the interest of the estate.  And

17 I have no evidence as to why at this point in time the

18 management of the corporate debtors who made this deal and who

19 are now attempting to get out of that same deal by filing other

20 litigation should remain in charge of negotiating the same type

21 of arrangement to pay the settlement agreement that they now

22 want to back out of.  That's number one.

23      Well, in fact, let's start with that one before I get

24 into the other one, because that was significant enough.  So,

25 let's start with that.  Is there some evidence that I'm

1  forgetting or not paying attention to that explains to me that

2  piece of this fiduciary responsibility?  How is attempting to

3  get out of that transaction at this point exercising the

4  fiduciary duties on behalf of the creditors of this estate?

5        MS. KELLEY:  Well, Your Honor, in the objections that

6  we filed to claims of Greenlight and RTFC the debtors have

7  raised as an alternative argument the possibility that if, in

8  fact, at some point when it is before the Court the settlement

9  agreement is found not to be assumable the debtors' view would

10 be that having given up substantial value, in other words,

11 having dismissed appeals, having allowed judgments to be

12 entered, if the debtors are then deprived of what we believe

13 was the quid pro quo in that settlement agreement which is that

14 the claim amount would be limited to 402, if that does not

15 occur because it is determined that the contract can not be

16 assumed then the debtors believe that it would be perhaps

17 avoidable as -- well, obviously we haven't presented evidence,

18 we haven't gone down this road yet, but under one of the

19 avenues for avoiding such contracts --

20       THE COURT:  But, who benefits from that avoidance?

21 How in the exercise of the fiduciary responsibility to the

22 creditors of the estate, who benefits from that avoidance?

23       MS. KELLEY:  Well, the estate would benefit from the

24 avoidance, Your Honor.

25       THE COURT:  Who?  Who is the estate?  It's these

1  creditors, isn't it?

2       MS. KELLEY:  Well, I don't think as a legal matter, I

3  mean they are creditors of the estate.  But, the --

4       THE COURT:  Are there any others?  I took a look at

5  the proofs of claims in these cases and it appears that these

6  are the entities that filed the proofs of claim.  So, I don't

7  understand what the avoidance actions are doing with respect to

8  the exercise of the fiduciary duties in this estate.  If, in

9  fact, the avoidance actions are to avoid the liens of the

10 creditors in the estate it would file the proofs of claim.  So,

11 I'm at a loss as to how on the one hand you're bargaining with

12 the same entities that you conveyed that -- not you -- that the

13 debtors conveyed the liens to.  Now, they're saying -- and I

14 thought, and again I haven't looked at the settlement, I

15 thought that the settlement said that the 402 was a discounted

16 payment if paid by a certain date.  I may be wrong, but that's

17 just my recollection.  And, I'm not making findings, I'm trying

18 to ask a question about fiduciary responsibility.  That's all

19 I'm trying to do.

20      So, it said that.  It may be broader than that.  But,

21 for purposes of this question let's just assume that it's under

22 some terms and conditions it provided the debtor a discount,

23 debtors a discount, to pay this judgment at a reduced amount,

24 so far the debtors have not paid that amount at a reduced

25 amount and now they want to set aside the whole transaction by

1  which they get the benefit of that reduced amount, and to avoid

2  the liens that were at issue in the first place, which I guess

3  means going back to litigation over the same issues that

4  prompted the proofs of claim being filed in the first place.

5  Where are these cases going?  What is the theory by which these

6  bankruptcies are now being filed?

7          MS. KELLEY:  Your Honor, I'll try to simplify it, I

8  don't know if I'll be successful.  But, the settlement

9  agreement, the quid pro quo of the settlement agreement is that

10  the debtors would get this reduced amount.  And, the debtors

11  then therefore, you know, abandoned their appeals, which

12  obviously they believed they had meritorious defenses and

13  appeals to these amounts, allowed the judgments to be entered

14  in the judgment amounts.  That is the basis on which we are

15  proceeding.  We believe that that is the correct amount.  We're

16  not trying to step away from the settlement agreement.

17          THE COURT:  Okay, I've --

18          MS. KELLEY:  We're not trying to undo that as a --

19          THE COURT:  Okay, I'm willing to assume for a moment,

20  just for purposes of this discussion I will assume that the 402

21  is the correct amount.  I'll just make that assumption for

22  purposes of this discussion.  Is what you're trying to say in

23  these avoidance actions that any lien above the 402 should be

24  avoided?  Or, is the purpose to say that the entire lien should

25  be avoided?

1          MS. KELLEY:  No, Your Honor, we would be trying to

2    say I think that anything above the 402 would deprive the

3    debtors of the benefit of their bargain.  So, that if the

4    debtors were not able to assume this contract that is what they

5    bargained for, and Your Honor mentioned the payment amount, the

6    payment date in the settlement agreement, we -- not to argue

7    assumption here today, and I know we're doing that on another

8    day, but we interpret that as just that, a payment date and not

9    a termination provision in the contract.  So, we regard that as

10   a curable default.  And so, we would -- where we would be going

11   is in the first instance and the plan that we had filed

12   proceeds on this basis, we would want to assume those

13   contracts.  We're not trying to get out of those contracts,

14   unwind them, undo them in any way.  If at the end of the day we

15   were unable to assume those the debtors have given up

16   substantial value in that exchange.  And so, we asserted to

17   reserve our rights in the objection that the debtors would be

18   able to consider going forward with an avoidance action if we

19   were deprived of the benefit of that bargain.  That would be

20   really the theory behind the objections.

21          THE COURT:  Okay.  Okay.

22          MS. KELLEY:  Your Honor mentioned a second question

23   that you had.

24          THE COURT:  I did.  Go ahead with the rest of your

25   argument and it'll come back to me, I was still concentrating

1  on your answer to this one.  So, go ahead.

2          MS. KELLEY:  All right, Your Honor.  Your Honor, I

3  was speaking about delay and our belief that in this case that

4  did not warrant the appointment of a trustee.  And, in addition

5  --

6          THE COURT:  Oh, that was it.  Pardon me.  While I

7  think of it I might as well ask because it has to do with

8  delay.  Okay.  I have no explanation that I can recall, again,

9  and I -- again, I apologize if there is one, but please refresh

10 my recollection if there is, for why the deal changed from a

11 lending transaction which would pay the 402 to a lending plus

12 equity piece, to a lending plus equity piece, to a lending plus

13 equity to a sale, then to a transaction with the Government of

14 the Virgin Islands.  As far as I know I don't have anybody's

15 assessment by way of evidence as to any necessity, any reason

16 that I can recall of record for why this deal changed.  Is

17 there some evidence of record?

18         MS. KELLEY:  There is evidence in the record, Your

19 Honor, in Mr. Michaelis' testimony on December 11th where he

20 traced the evolution of the deal and the changes that were

21 required as a result of expressions of interest that were

22 coming in or comments from the interested parties.  I think --

23         THE COURT:  I'm talking about from Mr. Prosser's

24 point of view.  He was the seller.  Why was he changing the

25 deal?

1          MS. KELLEY:  Well, Your Honor, I think to say he was

2    changing the deal, I don't think that really reflects the

3    testimony in the record.  I think the testimony -- and Mr.

4    Michaelis explained this at some length in the December 11

5    transcript, was that it wasn't that the debtors were behind

6    these changes it was really that the third parties that they

7    were attempting to do the deals with were requiring these

8    various changes in the deals.  Your Honor, I think if you

9    wanted a more detailed summary of it, I think maybe Mr. Bartner

10   might be able to explain it in a little bit more depth than

11   that.

12         THE COURT:  Okay, well, I'll let you finish your

13   argument, Ms. Kelley, and then I'll ask Mr. Bartner to fill me

14   in on that.  Thank you.

15         MS. KELLEY:  Okay.  Thank you.  Your Honor, I'd just

16   like to point out with respect to the appointment of a trustee

17   a few of the cases that have been cited in the papers.  We

18   think that this case based on these facts is really very

19   distinguishable from cases like Marvel Comics which were cited

20   and mentioned by the U.S. Trustee, where the cases were, in

21   fact, paralyzed by acrimony and any progress was impossible.

22   In that situation and perhaps others where this paralyzing

23   acrimony arises, there are negotiations going on among

24   different constituencies and the way the parties are lined up,

25   the acrimony sort of brings it to a standstill.  Here, really

1  the negotiations in the form of the settlement agreement have

2  really already taken place and the debtors are moving forward

3  diligently to try to fund those obligations.  So, we believe

4  that the case can be completed and can proceed despite any

5  acrimony, which, you know, we acknowledge there is obviously

6  friction among the parties, but we think we can move forward

7  despite that.  And, again, because we would be -- we would be

8  paying the creditors the full amount of the settlement we

9  believe that it would be unimpaired under the plan.  So, we

10 think that that leaves open an obvious root to completing these

11 cases despite this acrimony.

12        We think that -- oh, and I also just wanted to point

13 out that that same case, the Marvel case, does mention that

14 acrimony has to be evaluated on a case by case basis.  And,

15 there's no per se rule that where there's acrimony a trustee

16 must be appointed.  So, it really is a matter of looking at the

17 true effect of that acrimony and whether the case can go

18 forward in any event.

19        We think there are a couple of more relevant cases

20 that are cited in our papers, and one of which, G-I Holdings at

21 385 F. 3d 313 (3d Cir.) case, a trustee was not appointed in

22 that case even though there was extreme acrimony.  And, there

23 the debtor was a holding company, there was a dominant

24 shareholder.  But, the Court considered that management had

25 been in place for many years and was familiar with the

1  operations, and there was insufficient evidence to find that a

2  trustee would be helpful.  And, we think that this is a similar

3  type of situation and the Court should consider what would

4  happen if a trustee is appointed.  We do have a process under

5  way and we think it's clear that the creditors would simply

6  like to take control and remove Mr. Prosser.  And, we don't

7  think that that is warranted under the circumstances of this

8  case.

9        In addition, Your Honor, I would just mention again

10 as I did at the last hearing that we think there is potential

11 harm to the debtors because the PSC has objected and has taken

12 the position that the appointment of a trustee would constitute

13 a change of control, and that this is a risk to the Vitelco's

14 franchise.  The PSC is on the phone and may have comments along

15 these lines and the various parties have filed papers so I

16 won't delve into that in detail.  The Court has all of our

17 respective legal analysis' on this.  And, the Court raised some

18 questions about the legal position the other day.  We think

19 that whether or not the Court views the underlying position as

20 correct ultimately, there is a substantial risk to the debtors

21 and potentially additional litigation as a result of the PSC's

22 position.  And, obviously the regulator has made this very

23 clear and expressed its intent to take action.  The debtors are

24 very concerned about this, in particular I would point out that

25 the statute provides that the debtors would have to pay the

1  regulator's legal fees as one of the provisions.  And, in

2  addition Vitelco's franchise agreement provides that the

3  franchise may be terminated by the V.I. Government on two

4  year's notice and that in the event of termination the

5  Government shall expropriate the entire business plant and

6  facilities of the company.  So, that is quite extreme and a

7  substantial risk that the debtors are very concerned about.

8  So, again, regardless of the ultimate legal position, we think

9  that the risk that the regulator will take some kind of action

10  and the cost and other negative effects of this type of dispute

11  with the PSC is certainly a substantial risk and a substantial

12  problem in the appointment of a trustee.

13          Your Honor, there have been other sort of sweeping

14  allegations made I think really throughout these cases and in

15  connection with this motion, along the lines of gross

16  mismanagement and fraud and dishonesty and those sorts of

17  things.  Those are very serious allegations which the creditors

18  continue to repeat in fairly general terms.  Once again, we

19  don't think that these allegations are supported by the

20  evidence.  There is no evidence to support any allegations that

21  the debtors have been acting in bad faith, that Mr. Prosser is

22  impeding reorganization efforts or self dealing.  He has

23  consistently testified that he's willing to sell his entire

24  interest in the subsidiary.  There is no evidence and certainly

25  no clear and convincing evidence to show that has been alleged

115

1  in various of these papers that it is some desire on the part

2  of Mr. Prosser to extract money or future equity positions or

3  anything else that has been an obstacle to the transactions.

4  And, Mr. Michaelis testified that he did not see any type of

5  obstructive behavior like that on Mr. Prosser's part.

6         Most of the evidence with respect to this motion

7  seems to have focused on financial statements and Greenlight

8  has scoured several years of financial statements along with

9  the monthly operating reports, and presumable has come up with

10  anything that's in there to be found, and really the best that

11  they've come up with is it seems a few entries that they have

12  argued are either unclear or in the case of the MORs required

13  some amendment.  With respect to the testimony last week in

14  which Mr. Prosser acknowledged that certain items in the MORs

15  that were listed as expense allocations of Emerging and ICC,

16  LLC, actually reflected expenses of the subsidiaries.  And

17  those items have now been corrected, and that is reflected in

18  the newly filed amended MORs that we have filed.  So, you know,

19  we've followed up and taken action to correct that and we think

20  that the current MORs accurately reflect that.

21         The major other issue that has been focused on seems

22  to be the 156 million dollar note from Shareholder and the

23  treatment of this amount in the financial statements.  There --

24  I won't go through all the explanations again because the Court

25  has heard it several times now, Mr. Prosser testified on

1  January 9th and January 19th, and Mr. Lubana also testified on

2  January 9th.  And, the testimony shows that this was an

3  accounting mechanism that was used to allocate expenses from

4  new ICC, that were paid by new ICC, to the debtors in order to

5  reflect the fact that these were not truly expenses of new ICC,

6  they were properly attributable to those debtors.  And, these

7  included Mr. Prosser's salary and certain legal expenses of the

8  debtors and their subsidiaries.  Mr. Prosser testified that he

9  reports any amounts that are allocated personally to him as

10  income on the recent tax returns that he could recall, and that

11  amounts allocated to ICC, LLC appear on a schedule to his tax

12  returns.  There was a lot of testimony about things that we

13  think are really irrelevant to this as well on cross

14  examination of Mr. Prosser.  For example, the size of his new

15  house and a number of other things.  And, those things, while

16  they clutter up the record they have not been linked to

17  anything, there is basically I would classify it as innuendo.

18  Nothing has really been shown here when you look at the

19  evidence that anything is untoward in this accounting

20  calculation.  Mr. Prosser testified that the RTFC has been

21  aware since 1998 of this mechanism of the note from

22  Shareholder, and that it was not intended to be paid except

23  through a subsequent merger, and that the RTFC had board

24  members on the board for 14 years.  The financials of new ICC

25  were audited by Grant Thornton, by Deloitte & Touche, and now

1 by BDO.  And, they have all signed off on the information

2 regarding this contra-equity account.

3          So, against all that explanation and that evidence,

4 again, which shows nothing untoward about this other than a

5 question on the part of, that Greenlight is raising, Greenlight

6 has submitted evidence of a purported expert who basically said

7 that while he would do it a different way, he would account for

8 this on the books in a different way, he was not criticizing

9 what BDO Seidman did.  Now, as the Court has heard the witness

10 Mr. Carroll is not currently a practicing accountant, he hasn't

11 conducted an audit in 20 years.  He was only a supervisor at

12 Deloitte & Touche many, many years ago.  Never himself signed

13 an audit.  And, is closely linked to counsel for Greenlight and

14 therefore not absolutely an independent third party.  And, he

15 stated that it's his opinion that the disclosures in the

16 financial statements of new ICC would be clearer if certain

17 terms were changed.  I believe his report said if the term

18 "Shareholder receivable" would change 'cause that might mislead

19 someone into thinking there was a repayment involved.  And, if

20 there had been a specific footnote included saying the amounts

21 were not intended to be repaid.  He also admitted there was no

22 net effect on the financial statements.  There was no net

23 effect on the equity position that would be reflected there.

24 And, that this is really a matter of his judgment that he

25 thinks they would be more fairly described if this were the

1  case.  Now, although there was some testimony as well that the

2  idea of fair disclosure doesn't depend as an auditing matter on

3  who the audience is for the disclosure, for purposes of

4  determining whether any lack of clarity here in the financial

5  statements constitute cause for appointing a trustee, we think

6  it's appropriate for the Court to look at, well, what was done

7  with these financial statements?  This was a private company,

8  the only one really looking at the financial statements was the

9  RTFC who obviously was involved in the initial loan

10  transaction, knew about the initial notes and had members on

11  the board, and was aware of this accounting mechanism.  And, we

12  think, you know, although that might not be the way that you

13  would present your financials if you were a big public company

14  going out to the capital markets, Mr. Prosser testified that

15  they did not use these financials to raise money from public

16  capital markets or send out to other lenders.  So, even if

17  technically something could have been clearer, really the

18  bottom line is it did not effect the bottom line.  And, that is

19  really based on the testimony of Mr. Carroll.  These facts we

20  believe do not show gross mismanagement or anything of the

21  sort.  And, the case law which we've cited in our papers shows

22  that that type of thing needs to be extreme.  And, in fact,

23  I'll just -- Sharon Steel was mentioned earlier, and of course

24  in that case you had a situation where a debtor was engaging in

25  systematic syphoning of a debtor's assets, removing property of

1  the estate, executing improper and preferential transfers on

2  the eve of filing.  That type of thing, it was clear and

3  convincing, it was itemized, it was shown it was very extreme

4  and there were real issues there, not just a potentially murky

5  accounting entry that one former accountant believes could have

6  been stated more clearly.  And, that is really what we have at

7  the end of this day with this evidence.

8         We've cited other cases in our brief going to the

9  point that there is generally some degree of -- well, in this

10  case, <u>Schuster v. Dragon</u>, the Court calls it incompetence or

11  mismanagement.  In most businesses that have been forced to

12  seek Chapter 11 protection you're apt to find something that

13  maybe isn't ideal.  But, there has to be something more

14  aggravated than simply mismanagement in order to appoint a

15  trustee.  And, we think that's a very important point here.

16  Going through every one of these pieces of paper and looking

17  for inconsistencies is apt to turn up something, but we don't

18  think that those things that have been pointed to by the

19  creditors in this case rise to the level that would require the

20  appointment of a trustee.  And, again, where things have been

21  pointed out such as errors in the monthly operating reports the

22  debtors are certainly eager to correct them and make them

23  clearer or do whatever this Court thinks is appropriate in

24  those instances.

25         Your Honor, I'd like to just move for just a moment

1   to the discussion of responsible officer.  We think that in

2   addition to the trustee not being necessary or appropriate in

3   this case, we think in contrast a responsible officer is

4   appropriate and would be, in fact, very helpful.  As I've

5   mentioned there are some risks attendant to the appointment of

6   a trustee and we think that the appointment of a responsible

7   officer would avoid those risks.  It would certainly, the PSC

8   has taken the view that it would not object to the appointment

9   of a responsible officer, does not believe it would have the

10  same impact.  We also think the responsible officer, given that

11  he or she would be working along with the debtors' management,

12  would be able to assist in completing a transaction without the

13  delay or the, really the starting over that we think would have

14  to happen with the appointment of a trustee.

15          I should comment that the debtors have asked for the

16  appointment of a responsible officer because we think it would

17  provide further transparency and, again, finality, some sense

18  that this will move forward to an ending point.  The

19  responsible officer will be able to come to the Court and

20  recommend what should be done and that the responsible

21  officer's opinion on that score will be the final one.  This is

22  not a concession on the debtors' part that we would think a

23  trustee should be appointed or that someone needs to step in,

24  we are attempting to facilitate the process and to in essence

25  share control of this process with an independent third party.

1          Mr. Prosser has testified that he has no personal or

2    business relationship with the candidates that we have

3    proposed, and that he's open to discussing any other qualified

4    candidates, and has made efforts to discuss this with

5    Greenlight and RTFC.  The responsible officer would have

6    fiduciary duties and, of course, if necessary the debtors could

7    amend their bylaws to give effect to those duties and to

8    appoint the responsible officer.  So, we would do whatever

9    needed to be done in order to make that happen.

10          We think that the Court does have authority to do

11   this under Section 105 as well as Section 363, as we have

12   mentioned previously and set forth in our papers.  Some Courts

13   have also said that really this is also -- there's also

14   authority under 105 and 1107(a), but either way we think

15   clearly Courts have appointed responsible officers in the past.

16   There is an inherent equitable power that the Court has in

17   order to protect the debtors' ability to reorganize.  And, the

18   Court does have the equitable power to make orders regarding

19   the debtors' management, the management of the debtors, in

20   order to facilitate that.  And so, we think some combination of

21   those sections is where the power lies to do that.  It's

22   clearly an equitable power.  And, we would say 105 in addition

23   to those other provisions would give the Court that power.

24   And, as I say, cases have relied on that.

25          Because of the unique circumstances of this case, as

1  we discussed previously, this wouldn't be strictly speaking a

2  payment out of estate assets, and therefore it doesn't fit

3  neatly as the Court has acknowledged within 363.  It would be

4  paid, obviously, by new ICC in the ordinary course of its

5  business as it has been paying the professionals.  I should

6  note, however, that with respect to the earlier discussion

7  about whether new ICC is making gifts to the debtors or not,

8  although the motion that we previously filed regarding the use

9  of cash and payments is not before the Court today, we do not

10  believe it's a gift.  The Court should keep in mind I think

11  that the debtors here guaranteed the debts of new ICC.  New ICC

12  was actually the borrower under the loans from the RTFC.  And,

13  ICC, LLC and Emerging guaranteed those debts even though

14  obviously they do not have cash assets of their own.  I mean,

15  where they have the wherewithal to guarantee anything is really

16  going back to new ICC.

17       In addition, new ICC is getting a substantial benefit

18  by the fact that ICC, LLC and Emerging are in bankruptcy and

19  new ICC is not.  I mean, new ICC, the operating company, is

20  continuing to operate, and the RTFC, its lender is pursuing the

21  parent companies for repayment of those debts, and those

22  companies are in bankruptcy.  So, new ICC is getting a benefit

23  from the continued pursuit of these cases by the debtor

24  entities.  And, it's appropriate for new ICC to be making these

25  payments.  That said, you know, any third party could make

1  payments on behalf of the debtors and that wouldn't be anything

2  -- there would be nothing wrong with that if a third party non-

3  debtor chose to make those payments.  But, in this case it's

4  particularly appropriate given the relationship among those

5  parties.  And so, we would propose, again, I know that part of

6  this is not before the Court today, but I just wanted to

7  explain to the Court our thinking along those lines.

8                         (Pause)

9         MS. KELLEY:  Your Honor, I think that really

10 completes my argument at this point and I'd refer the Court,

11 you know, to our papers on some of the specific cases.  Unless

12 the Court had any questions?

13        THE COURT:  No, that's all.  Thank you.

14        MS. KELLEY:  Thank you.

15        THE COURT:  Mr. Bartner, do you want to just finish

16 that one little piece for me?

17        MR. BARTNER:  Be glad to, Your Honor.  I do have a

18 recollection of Mr. Michaelis' testimony and I'll try to relate

19 it faithfully.  I took him through the direct so I do have

20 recollection.  And, he testified that over the course of the

21 summer the attempt was to raise financing from the bank that

22 we've been referring to.  And, toward the end of that process

23 as it became closer to the deadline it became clear the bank

24 was going to require another piece, another either equity or

25 subordinated debt piece to come in to support a loan in amounts

1  that they should to pay the 402.

2         As then -- and now we're getting into post-July 31st

3  time frames as well -- as he was tasked -- as his firm was

4  tasked with the responsibility to explore the marketplace to

5  find those funds it became hard to do without some greater

6  commitment to sell the company.  It became clear to Mr.

7  Michaelis, I think he said, that a sale to a private equity

8  firm, versus a small slice of equity to come in was a way to

9  go.  Mr. Prosser up to that point hadn't been contemplating,

10 perhaps hadn't been willing to sell the company, but was

11 persuaded by his advisors, by the facts as they developed, to

12 sell the company, and I think Mr. Michaelis testified that Mr.

13 Prosser was now at this time frame -- again, we may be into

14 August, September -- willing to sell the company, and explored

15 a full sale.  And, that generated interest.  As Your Honor

16 knows we presented letters, etcetera.  And, it presented

17 interest to the point where one particular entity, as Mr.

18 Michaelis testified, came out in front to, sort of was selected

19 to lead that effort.  And, that negotiation advanced and went

20 forward to the point where the Court asked or required that the

21 debtors provide a firm commitment in the November time frame.

22 Leading up to the November 27th hearing.  And, Mr. Michaelis, I

23 think again, took the Court through kind of that process, the

24 diligence process, the opening issues, resulting, of course, in

25 our getting up to the five yard line, if you will, but not

1  getting to the point where we had a commitment.  And,

2  ironically that resulted in the Government emerging as an

3  interested party when it became clear that a possible foreign

4  buyer was coming in to the Virgin Islands and so on and so

5  forth.  And, we have talked about the data room being available

6  from June but the Government, the GERS, or any representative

7  of them had never been in the data room up until the point

8  post-November, I think it was 7th where we had the telephonic

9  hearing where the Government first emerged as an interested

10 party.  So, Your Honor, that's my recollection.

11          THE COURT:  All right.  Thank you.

12          MR. BARTNER:  And then, one other supplement if I

13 may, Your Honor?  Again, we have filed a motion for the

14 appointment of a responsible officer, following up really on

15 comments Your Honor made about the possible appointment of a

16 third party trustee, you didn't care what the name was.  In

17 fact, Your Honor threw us out of the courtroom at one point to

18 go talk in a conference room about what that might be.  And, I

19 came back and reported on behalf of Greenlight, RTFC, and the

20 debtors that we had -- although subject to client's approval,

21 etcetera -- kind of an outline of what that might be.  That

22 didn't get done for whatever reasons, but every element of the

23 motion for the appointment of responsible officer I think is

24 consistent with where the report was.  In other words, we're

25 not trying to do anything other than what was agreed to in the

126

1  conference room in terms of transparency and control.  If Your

2  Honor thought that there was a statutory impediment -- and we

3  don't think -- but if Your Honor thought there was a statutory

4  impediment to the responsible officer and so directed we would

5  be happy to recast the motion as hiring a CRO but giving the

6  same transparency and control to the extent we can to the

7  creditors and whatever authority we can divest from Mr. Prosser

8  into this person, and we would do it.  So, anyway, we're not

9  married to, again, the exact technique, ie. the appointment of

10 responsible officer under 105.  If Your Honor thought a CRO was

11 a better way to go we could certainly do that.  Thank you, Your

12 Honor.

13        THE COURT:  All right.  Thank you.  Why don't we take

14 another five-minute break just to walk around.  It's getting a

15 little bit warm and stuffy and probably it would be a good

16 idea, and then I'll hear from you, Mr. Lichtenstein.  Okay.

17 Thank you.

18        MR. LICHENSTEIN:  Thank you, Your Honor.

19                    (Recess)

20        THE COURT:  Mr. Lichenstein.

21        MR. LICHENSTEIN:  Your Honor, being a Shakespeare fan

22 I'm going to follow the Brevity of the Soul of Wit theory

23 today.  And, I think Your Honor has heard obviously from lots

24 of people and what I'd like to try and do is address some of

25 the comments, a couple of the comments that the Court made, and

1 then just focus my comments really very briefly because I think

2 the Court has really heard all the evidence and everything

3 there is to say.

4      One comment the Court discussed was this notion as to

5 whether Mr. Prosser in his plan was suggesting I quit and I'm

6 not going to be here. And, I wanted to clarify, I think Ms.

7 Kelley has taken care of both of these but I just wanted to

8 reiterate, that much like Mr. Bartner talking about the

9 responsible officer motion being a reaction to sitting with the

10 other side and trying to figure out parameters, is really a

11 response to their concern that they wanted to have a drop dead

12 date or they wanted to have finality. It wasn't in any way

13 meant to me, "I'm out of here, I'm not going to do it anymore",

14 so I think the Court should appreciate that.

15      The same is true with respect to the settlement

16 agreement, Your Honor. In no way are we trying to get out of

17 the settlement agreement. Obviously we have set forth in every

18 pleading and every time we argue that we think that that number

19 is a number that should be achieved and should be approved by

20 the Court. And, as Ms. Kelley pointed out that was an

21 alternative argument. I do recall, Your Honor, and my first

22 involvement in this case that when we talked about assuming a

23 settlement agreement Your Honor actually made a comment about,

24 "Not so fast, I'm the Judge, there may be fraudulent

25 conveyances out there." So, I think that's really where that

1    came from.  And, again, it's not any attempt to try to get out

2    of those obligations.

3          Your Honor, this is really -- what we're here for

4    today is really very simple as the Court knows.  It's an issue

5    about control.  And, the Court's already made sort of its

6    ruling in the sense that the Court's going to appoint somebody.

7    So, the only issue that we need to talk about is, is it a

8    trustee or is it a responsible officer or chief restructuring

9    officer?  And, Your Honor, I think what I'd like to do briefly

10   is point out why the debtors believe and why Mr. Prosser

11   believes there would be down sides, in addition to what Ms.

12   Kelley's already gone through with respect to appointing United

13   States -- a Chapter 11 Trustee.  Your Honor, it would result in

14   potentially certainly Mr. Prosser leaving and potentially the

15   management leaving.  And, Your Honor has heard enough and has

16   seen enough in this court to know that it's really subterfuge

17   for the creditors sitting on that side of the table to suggest

18   that they would now be perfectly okay and that the Chapter 11

19   Trustee would retain Mr. Prosser.  Though there has been

20   acrimony they've been trying to get rid of him, they want him

21   to get out of control, and, Your Honor, the reality of it is

22   that if a Chapter 11 Trustee was appointed it is highly likely

23   that Mr. Prosser would not be involved in the process, and he

24   testified that key management might leave, too.  And, we think

25   that's a severe down side.  Now, we don't know that that would

1    happen, Your Honor, but the undisputed testimony before the

2    Court -- and I think the Court should take that into

3    consideration -- that's a potential dire consequence.

4         If a Chapter 11 Trustee is appointed and Mr.

5    Prosser's gone you now have somebody who needs to get up to

6    speed who knows potentially nothing about the Virgin Islands

7    because these creditors have argued that it doesn't necessarily

8    have to be anybody who knows anything about telecommunications

9    or the Virgin Islands.  And, that learning curve, Your Honor, I

10   think would just further the Court's concern to the extent

11   there has been a lack of progress that's sufficiently quick.

12   Which, everybody would like to do.  So, Your Honor, I would

13   submit that appointing a Chapter 11 Trustee is just going to

14   delay it even further.

15        Your Honor, if this Court were to appoint a chief

16   restructuring officer as Ms. Kelley suggested, or a chief

17   restructuring officer or a responsible officer and Mr. Prosser

18   believes as to the corporate debtors that the Court does have

19   that authority under 105 and under the cases that have been

20   cited.  Then, Your Honor, that would provide transparency, the

21   creditor said that they don't want Mr. Prosser to be making

22   ultimate decision, he will be not in that position anymore.

23   This responsible officer would make that ultimate decision with

24   respect to the sale of the companies, but at the same time

25   would have the benefit of Mr. Prosser's knowledge.  And, let's

1   keep in mind, Your Honor, Mr. Prosser testified that he started

2   these companies 20 or 30 years ago, he's got lots of contacts

3   in the Virgin Islands, and clearly that would expedite the

4   process.

5          Your Honor, as this Court knows it is a high burden,

6   clear and convincing evidence, that the United States Trustee

7   who filed this motion and the two creditors who joined in would

8   have to demonstrate to this Court and we would submit

9   respectfully, Your Honor, they have not met that burden.  And,

10  we would ask this Court not to throw out the baby with the bath

11  water, but rather in allowing these cases to go forward have

12  some controls over Mr. Prosser in the form of a responsible

13  officer or a chief restructuring officer, and that would allow

14  the company to move forward.  Thank you, Your Honor.

15         THE COURT:  In the Virgin Islands, anyone wish to add

16  any comments?

17         MS. RICH:  Yes, Your Honor.  Carol Rich on behalf of

18  the corporate debtors.  And, I promise also to be brief.  But,

19  there are just two areas that I think it might be helpful if I

20  add some (indiscernible).  Of course, from the point of view of

21  issue had been raised or suggested by Greenlight and the RTFC

22  regarding fraudulent conveyances and issues like that.  I

23  understand that the Court already indicated that that is not

24  your main concern but I think it's important to point out, as

25  Ms. Kelley already did, that the structure of what's happening

1  here really makes that argument one that's really just a red

2  herring here, Your Honor.  As the Court knows, the settlement

3  agreement was an agreement between the RTFC Greenlight and a

4  group identified therein as the Prosser Parties, which included

5  Mr. Prosser, the corporate debtors, and new ICC, and old ICC,

6  which is something you haven't heard for awhile but that is the

7  former dissolved ICC.  And, the structure of that agreement had

8  always been that all of the Prosser parties, including new ICC,

9  would be using joint efforts in order to raise the 402 and pay

10 it to RTFC and Greenlight in exchange for complete satisfaction

11 of all of their claims and an end to years and years of

12 contentious litigation.

13         All of the efforts that have been going on since that

14 time, for which money has been upstreamed from new ICC -- and

15 I'm not getting into right now what you call it -- but, all of

16 those efforts have been towards achieving that goal.  The

17 professionals involved in this case have filed fee applications

18 detailing the time that they've spent and no one has objected

19 to that time or indicated that the efforts were inappropriate,

20 that the time was not well spent, or that the efforts were not

21 being made in good faith.  And so, for that reason the idea

22 that there's some sort of fraudulent conveyance problem here is

23 really a complete red herring because the Virgin Islands

24 Fraudulent Conveyance Act, which is drawn from the Uniform Law,

25 indicates not just that you look at whether the entity, new

132

1  ICC, making the conveyance may or may not be insolvent, but

2  whether or not more importantly fair consideration was received

3  for the conveyances.  And, fair consideration, which is defined

4  in 28 Virgin Islands Code, Section 203(a) includes fair

5  consideration is given when in exchange for such property or

6  obligation as a fair equivalent therefore and in good faith

7  property is conveyed or an antecedent debt is satisfied.  The

8  efforts that have been made, the funds that have been

9  upstreamed are a good faith attempt to satisfy a debt pursuant

10 to the settlement agreement.  And, that alone indicates that

11 the entire fraudulent conveyance argument will fall of its own

12 weight.  And so, that need not concern the Court.

13      The funding is not the issue.  RTFC suggested that

14 one of the reasons the Court should pick a trustee over a

15 responsible officer is that RTFC would agree to fund the

16 trustee but not a responsible officer.  And, that is why, Your

17 Honor, I have raised -- I mentioned the fraudulent conveyance

18 issue because I think it is important that this case not be

19 governed by what RTFC or the creditors indicate they're willing

20 to fund.  That is not the necessary element for making this

21 decision.  The funding motions are not yet before the Court.

22 They have been filed as Your Honor requested and I believe are

23 at this point scheduled for hearing on March 7th.  But, Your

24 Honor, the funding for this is available through the new ICC

25 and there is an obvious and substantial benefit to new ICC

1  through being involved in this process.  And, the idea that new

2  ICC would not look to upstream the money if we were able to

3  come to a conclusion of the transaction is also a red herring.

4  The agreement, to which RTFC and Greenlight are parties,

5  contemplates exactly that occurring and the only parties which

6  would object to that upstreaming are parties to the agreement.

7  And so, if the agreement can be assumed then those issues by

8  definition would no longer be issues.

9       Your Honor, the other thing that I wanted to add to

10  this that I think might be important is in response to the

11  Court's second question regarding how the deal changed and why

12  the deal changed.  As someone who was involved in the

13  negotiations from the beginning that resulted in the settlement

14  agreement, and in the negotiations in preparation of the

15  definitive documentation for that agreement which was not

16  completed until June 9th of 2006 I can tell the Court that what

17  the transaction that was originally contemplated was, and in

18  fact the paperwork that was drawn up for that transaction, was

19  essentially that a third party lender would be identified that

20  would step into the shoes of the RTFC and, in fact,

21  documentation contemplating such a transaction was prepared.

22  With that kind of transaction, if a lender could be found who

23  would loan 402 million in order to step into the shoes of the

24  RTFC, then none of the regulatory approvals would be required

25  and the senior liens that have always been ahead of the RTFC of

1  the RUS and preferred shareholders would have simply been left

2  undisturbed.

3        MR. GERBER:  Your Honor, may I interrupt just a

4  moment to -- Ms. Carol Rich seems to be testifying now about

5  the intent and meaning of an agreement that is -- she's not in

6  a position to testify as to evidence.  She's giving something

7  beyond argument.  I don't know if the Court wants but if she's

8  going to do this it's going to require us to stand up and say

9  why she's wrong and why the agreement says what it says.  And,

10 I just don't think that that's proper argument.

11       THE COURT:  Yes.  If there's some evidence of record

12 that tells me, that's fine, I'm happy to hear the argument.

13 But, what I was really looking for was where on the record

14 there was some evidence as to why the debtors had undergone

15 this transformation.

16       MR. GERBER:  Okay.  I don't think any of what Ms.

17 Rich is arguing about now is in the record.

18       THE COURT:  Ms. Rich, I --

19       MS. RICH:  Your Honor, I would beg -- I'm sorry, Your

20 Honor, go ahead.

21       THE COURT:  Go ahead.

22       MS. RICH:  I would beg to differ, Your Honor.  I

23 think it is in the record because the Court held a series of

24 hearings at which parties provided the Court with updates and

25 statements about what was happening with the financing, and,

1  Your Honor, all I was going to say is that to add to what Mr.

2  Bartner was saying, is that shortly after the payment

3  documentation was completed -- and this is in the record, Your

4  Honor, in the form of the variety of different pleadings that

5  have been filed -- there was a lawsuit filed by the preferred

6  shareholders, that's no secret, and they became a part of this

7  case.  And, the transaction changed because at that point it

8  became clear that the only way to fund was for somebody to also

9  be able to satisfy the RUS and the preferred shareholders.

10  And, I think, Your Honor, all I was doing was reminding the

11  Court that that is what had happened which changed the

12  transaction in terms of the amount that had to be raised and

13  the types of approvals that were necessary.

14         MR. GERBER:  Okay.

15         MS. RICH:  And, my only point, Your Honor, was that

16  is something that has been reported numerous times to the

17  Court, I don't think any of this is even in dispute in terms of

18  the fact that these things occurred, and that that simply made

19  the transaction more complicated.  And, it wasn't something the

20  debtors chose or wanted, it's what happened.  And, that was my

21  only point, Your Honor.  And, I do believe that there is

22  information in the record in terms of pleadings that have been

23  filed and declarations that have been filed that set forth that

24  history.

25         MR. GERBER:  Your Honor, I'll come back later but not

1 only is that factually incorrect but it directly contradicts

2 debtors' counsel's representations to this Court in early July

3 and on July 26th, long after the preferred shareholder lawsuit

4 was filed.

5      THE COURT:  Okay.  Ms. Rich, what I'm going to do,

6 Mr. Bartner was summarizing the witness' testimony for me, Mr.

7 Michaelis, if there is actually testimony that supports that

8 view then, you know, I will take it under advisement.  If there

9 is no testimony I will reread the December 11th transcript.  If

10 it is not the December 11th transcript I'm not going to assume

11 that information that's in the pleadings is accurate.

12 Pleadings are pleadings.  I've had four or five day's worth of

13 trial over this now, I'm going to accept the evidence that's of

14 record not the pleadings.  So, although I will accept, you

15 know, historical recitation for purposes of information, I'm

16 not going to accept it by way of making findings of fact, I'm

17 going to rely on the evidence for that purpose.  So, if you can

18 show me a transcript cite I'll be happy to look at it,

19 otherwise I'll just rely on the transcript.  Okay.

20      MS. RICH:  That's fine, Your Honor, I was just trying

21 to assist in responding to the Court's question about sort of

22 the background of this from the perspective of somebody that

23 had been involved from the earlier days.  But, Your Honor, my

24 main point was simply that the decision on whether to appoint a

25 trustee or responsible officer I believe is not governed by how

1  it is funded.  That issue will be addressed by the funding

2  motions later, but as I said before the arguments which are not

3  presently before the Court but which have been suggested that

4  the funding by new ICC is somehow illegal or a fraudulent

5  conveyance, I think, Your Honor, will prove to be not

6  supportable and that that is not what should drive the Court

7  today.

8        In fact, the only thing I wanted to add to that, Your

9  Honor, is Your Honor already indicated that the Court

10 understands that if the GERS decides to do this deal then the

11 GERS probably can find a way to do this deal, the real issue is

12 whether they're going to do so and how that moves forward.

13 And, I would simply support what has already been said that a

14 responsible officer drawn from someone who is familiar with the

15 players here would be far more useful to making that progress

16 move along quickly than imposing a Chapter 11 trustee as has

17 been suggested.  And, to the extent that it was pointed out

18 that we have not heard testimony from anyone from the

19 Government so far, I would note that the hearings so far have

20 been taking place in locations other than the Virgin Islands

21 and as a practical matter having someone from the Governor's

22 Officer or the GERS appear in Pittsburgh may have been

23 something that -- was something that could be arranged or would

24 have been appropriate at this time.  Of course, there is a

25 hearing that is going to take place in the Virgin Islands in

1  February at which such information could probably be brought

2  forward if that would be helpful to the Court.

3       THE COURT:  Okay.  Actually, the hearings are taking

4  place in the Virgin Islands.  My physical presence isn't there

5  but these hearings are centered in the Virgin Islands, and

6  frankly, I think with the use of the video conference

7  facilities they seem to be working fine.  I prefer to have

8  witnesses where I am so that I can actually see the witnesses

9  on the stand.  To the extent that we're going to have make some

10 accommodation because of weather and fire drills and whatever

11 else is going to come up, we're going to have to figure out a

12 process by which to make those accommodations.

13      I will attempt in all instances to do evidentiary

14 hearings in the Virgin Islands when I can do that, but you know

15 it simply may not always be possible.  So, to the extent that

16 we need to use the video facilities for that purpose that

17 should not preclude anybody from having a witness available in

18 the Virgin Islands.  I can see you quite clearly, Ms. Rich, and

19 Mr. Dodson as well.  So, to the extent that there is a need to

20 have a witness in the Virgin Islands the use of the video

21 conference will, you know, assist when I can't be there for

22 whatever reason, and we'll simply make that accommodation.

23      MS. RICH:  Thank you, Your Honor.  We appreciate

24 that.

25      THE COURT:  All right.  Mr. Moorehead, do you -- I'm

1  sorry, Mr. Dodson, why don't I speak to you first.  Do you have

2  any comments that you wish to make, sir?

3         MR. DODSON:  No, Your Honor, thank you.

4         THE COURT:  Okay.  Mr. Moorehead, does the PSC have

5  anything it wants to argue?

6         MR. MOOREHEAD:  Your Honor, we certainly do.

7         THE COURT:  Go ahead, sir.

8         MR. MOOREHEAD:  Everyone hear me fine?

9         THE COURT:  Yes, sir.

10         MR. MOOREHEAD:  Thank you, Your Honor.  Well, first

11  I'd like to say that I hope everyone -- hope no one is

12  confusing the PSC silence for ignorance.  We've been quiet for

13  a long time but we've been monitoring these proceedings quite

14  carefully because this is an extremely important matter which

15  deals with a regulated utility in the Virgin Islands which is

16  not even a party to this action.  Having said that I will try

17  and keep my comments to areas that have not been discussed

18  before because there are several material issues which have not

19  been discussed.

20         Section 43(a) of the Virgin Islands Code which speaks

21  to indirect changes of control.  With all the briefs that have

22  been submitted to the Court, Your Honor, primarily with the

23  RTFC and Greenlight's briefs which cites to cases from

24  California, Florida, Kentucky, and New Jersey, none of those

25  statutes interpret Virgin Islands Code.  More specifically,

1 none of those statutes deals with indirect changes of controls.

2 That term, Your Honor, is a material term to these proceedings

3 and it's also a term which has not been defined.  It's a term

4 which is not defined anywhere in the Virgin Islands Code.

5 Therefore, it is up to the Public Services Commission which is

6 a regulatory body to interpret what that statute means.  The

7 PSC has never had an opportunity to do that.  And, when it does

8 that and whenever time that is done this Court and all the

9 parties should give deference to the PSCs in how they interpret

10 that statute.  I believe that that deference, that term is

11 called _Chevron_ deference after a Supreme Court case dealing

12 with _Chevron_.  I think that is a very, very important term to

13 make.  Everyone's throwing that term around, this is an

14 indirect change of control, that is not yet, no one can define

15 it.  Up to the PSC to define it.

16          Secondly, Your Honor, --

17          THE COURT:  Mr. Moorehead?

18          MR. MOOREHEAD:  Yes, Your Honor.

19          THE COURT:  Oh, I'm sorry, you faded out for a

20 minute.  Sorry.

21          MR. MOOREHEAD:  I'm still hear, I'm trying to speak

22 directly into the speaker phone.  Secondly, Your Honor, it's

23 apparent from Section 43(a) that the legislature envisioned the

24 possibility that a transfer of control may be achieved through

25 some other mechanism other than the conventional willing buyer

1  or willing seller agreement.  And, some effort may be made to

2  circumvent the PSC's role in reviewing such a transaction.

3  That's what lawyers do.  And, that's why we have an indirect

4  change of control in our statute.  That's my guess.  But, then

5  again I don't know, it's not for me to determine what it is,

6  and it's not for the PSC to determine what that term means.

7  And, that's why we've been urging the parties to settle.

8  Urging this Court to refrain from appointing a trustee and not

9  move so fast, Your Honor.  We're in uncharted waters.

10      THE COURT:  Well, I can assure you of one thing, Mr.

11  Moorehead, this Court has absolutely no intent of attempting to

12  circumvent the PSC's oversight and monitoring of its public

13  utility function.  In fact, this Court would assume that it's

14  obligation is to assist the PSC in its oversight and monitoring

15  functions and the problem that I'm facing in this case is I'm

16  not convinced at this point in time that the PSC is able to

17  conduct those monitoring functions because I don't know that I

18  have anybody who is on behalf of these estates able to keep the

19  PSC in the loop when the parties seem in some respects, and I

20  don't mean this -- I'm not making findings, I'm just attempting

21  to articulate a problem at the moment.  The parties seem at

22  some points to get loggerheads over some matters.  And,

23  sometimes those loggerheads I think are not helpful to the PSC

24  in ascertaining information.  And, the difficulty I have, of

25  course, is that these debtors are, in fact, not the utilities

1  that the PSC monitors, they're several levels different from

2  those utilities.  So, the obligations of this Court to the

3  creditors of this estate are a little different from the PSC's

4  regulatory obligations with respect to its utilities, but I can

5  not in any way disagree that at some point the rulings of this

6  Court and the actions of the PSC are going to have to be

7  copasetic and I take it my obligation to make sure that to the

8  extent that there is any way that those bodies can cooperate

9  that cooperation is achieved.  So, I don't in any manner see

10  that whatever entity is appointed, a responsible officer, a

11  CRO, a trustee, that in any way there would be a lack of effort

12  on behalf of that entity to do anything other than cooperate to

13  the fullest extent with the PSC.  And, I also think it would

14  behoove the PSC to be in touch with the United States Trustee's

15  Office if it's a trustee that's appointed, in talking to the

16  U.S. Trustee's Office about who that entity ought to be that

17  would satisfy the PSC's concerns, and if it's somebody that the

18  debtors are going to hire to do the same thing.  Because I

19  think the cooperation level for whoever this person and the

20  person's professionals will be with the PSC will certainly help

21  to expedite this process.  So, I don't know whether that is

22  some, you know, assurance level for you and your client but

23  certainly I do not see this Court is interfering with the PSC's

24  monitoring function.  If anything, I would think that the Court

25  would in all effort make every effort to assist in that

1  monitoring function.

2          MR. MOOREHEAD:  Well, we appreciate that, Your Honor.

3  The PSC certainly respects the Court's authority.  We just feel

4  that before the Court appoints a trustee -- because once a

5  trustee gets appointed it's our position that an indirect

6  change of control of Vitelco occurs.  And, before the Court

7  appoints that trustee we think it would be more appropriate for

8  a representative from the Court and a representative from the

9  PSC to get together and discuss ground rules or protocol and

10 how to go about that.  We're not trying to infringe on the

11 Court's authority.  We --

12         THE COURT:  Mr. Moorehead, I'm sorry, I have to ask

13 you to pick up your headset because you keep fading out and I

14 get about three words and then I lose you.

15         MR. MOOREHEAD:  Very well, Your Honor.  Very well.

16 It's when I turn my head, I was speaking directly into the

17 monitor on the speaker phone.  I have the receiver now.  I

18 apologize to everyone.

19         THE COURT:  Okay.  And, you were saying that you

20 think that there should be some protocol.  The problem I have

21 with the protocol with respect to the appointment of the

22 trustee is that that's not within the Court's prerogative.  By

23 statute the United States Trustee's Office is, in fact, the

24 entity that negotiates the appointment of that trustee.

25 They're the representative of the United States Department of

1  Justice and they contact all of the parties in interest in the

2  case and do exactly what you're suggesting, they get everyone

3  -- they don't necessarily get everyone together in a room but

4  they contact everyone and make sure that everyone's interests

5  are fairly heard and I'm sure that one of the interests that

6  they would be most concerned with would be that of the PSC.

7       With respect to the legal argument, Mr. Moorehead, I

8  think my concern is that the only way that I can understand the

9  PSC's arguments to say that the appointment of a Chapter 11

10 Trustee in these cases would somehow effectuate a change in

11 control is because it would essentially put a different entity

12 at the helm of the debtors' estates.  But, the reality is in

13 the Third Circuit, by virtue of the West Electronics case, that

14 already happened when the debtors filed bankruptcy because the

15 debtors-in-possession are, in fact, a different entity from the

16 debtors.  So, the fact is that if there was a change in control

17 it happened already when the debtors filed bankruptcy and

18 appointing a trustee isn't going to make any further change.

19 So, I would commend that case to you for perhaps your reading

20 to see whether that may help satisfy your client that there is

21 no further indirect change in control over the operating entity

22 by virtue of the appointment of a trustee than there was by

23 virtue of the filing of the case.

24       MR. MOOREHEAD:  Very well.  We take exception to

25 that, but very well, Your Honor.  Additionally, Your Honor, the

1  collateralization and the right to foreclose, in our opinion,

2  is limited to physical assets that are secured by the loans.

3  And, the operating licenses are not part of any loan agreement

4  between the parties.  The commission can not and has not

5  permitted operating licenses and franchises to be secured by

6  any loan agreement and to be transferred without its authority.

7       THE COURT:  And, I have no doubt, no dispute about

8  that in this case.  There is not even a franchise that's an

9  asset of this estate.  So, there is no dispute and --

10       MR. MOOREHEAD:  I just wanted --

11       THE COURT:  -- no assertion by this Court of

12  jurisdiction over the franchise agreement or the licenses.  So,

13  I don't think we're in disagreement there.

14       MR. MOOREHEAD:  Very well.  Very well.  I just wanted

15  to put that in the record and to make that clear, Your Honor.

16       THE COURT:  All right.

17       MR. MOOREHEAD:  Our main concern, Your Honor, and I

18  think it's obvious that we are concerned that whoever's

19  appointed the trustee since they're going to be dealing with a

20  public utility that we're concerned that they have the

21  managerial competence, technical ability and the financial

22  wherewithal, those things are very, very important because

23  we're dealing with a public utility, not just a regular

24  corporation, Your Honor.  And, while I don't want to address

25  things that are not in evidence, for instance, whoever's going

1 to be appointed the trustee has to know the effect heavy

2 rainstorms have on Estate A with Estate B.  The trustee's not

3 going to have that but the people who are currently managing

4 the utility, they know that.  That might not be a good example

5 but I think you get my point, Your Honor.

6          THE COURT:  I do get your point.

7          MR. MOOREHEAD:  Those concerns are --

8          THE COURT:  And, I think that's a point that the

9 United States Trustee or the debtor, whoever it is who's going

10 to have the control over this person, should have some heart to

11 heart talk with your enterprise about, Mr. Moorehead, because,

12 you know, that's a point well taken that the debtors do need to

13 have an operational management staff in place that is very

14 familiar with what a telecommunications company that's

15 operating this type of enterprise needs.  And, that is in my

16 view one reason why neither a responsible officer nor a trustee

17 is going to come in and attempt to make wholesale changes of

18 any sort because it just, you know, that would be shooting

19 yourself in the foot.  And, no one wants these cases not to

20 succeed, no one wants the people in the Virgin Islands not to

21 have public utility service.  The whole purpose is to make sure

22 that they do have public utility service and that it is in

23 accord with the PSC's regulatory authority.

24          So, whatever assurances you need along those lines

25 I'm sure all parties will work to attempt to achieve.

1          MR. MOOREHEAD:  Well, it's our hope that the parties

2 will seek authority from the PSC rather than just be providing

3 us with notice as to what they intend to do.  We think there's

4 a distinct difference and our statute is clear as to when you

5 need authority and when you don't.  And, the parties seem to be

6 taking the position of, "We will notify the PSC", as opposed to

7 seeking authority which the Code clearly requires.  I think --

8          THE COURT:  Well, Mr. Moorehead, I'm sorry, for what

9 action?  You mean if they actually contemplate a sale or

10 something?

11          MR. MOOREHEAD:  A change, any indirect change of

12 control, Your Honor.  Any indirect change of control.

13          THE COURT:  Okay.  Well, I think we have a

14 disagreement on the law, perhaps, you and I with respect to

15 whether or not the appointment of another person is going to

16 represent a change in control.  But, so to the extent that you

17 want consulted, your client wants consulted, I assure you that

18 by order of this Court either the United States Trustee or the

19 debtor, whoever it is who is going to effectuate this new

20 person coming in to assist in the negotiations to refinance or

21 to entertain some sale, will be directed to consult with you

22 and your client with respect to whoever that person's going to

23 be.  You will have a consultive function.

24          MR. MOOREHEAD:  Will that be a pre-condition, Your

25 Honor?

1          THE COURT:  Oh, it will definitely be a pre-

2   condition, it is hereby a pre-condition.

3          MR. MOOREHEAD:  Thank you.

4          THE COURT:  But, it will not -- you do not have final

5   say so, I can not say that.

6          MR. MOOREHEAD:  I understand.

7          THE COURT:  But, you will have a consultive function.

8          MR. MOOREHEAD:  Thank you, Your Honor.  That's all I

9   have to say.

10          THE COURT:  Okay.  With respect to, you know, what

11   happens ultimately if there is a sale or a refinance negotiated

12   you clearly have monitoring functions, they've been laid out

13   not only in the statute but by certain cases that have gone up

14   at least as far as the Third Circuit and I'm sure all parties

15   will work to make sure that the functions are carried out in

16   that respect, Mr. Moorehead.

17          MR. MOOREHEAD:  Thank you, Your Honor.

18          THE COURT:  But, we're not nearly that far along yet.

19          MR. MOOREHEAD:  Thank you.

20          THE COURT:  Okay.  Why don't I try to go around the

21   table one more -- oh, Mr. Moorehead, I'm sorry, is there

22   anything further?  I really didn't want to cut your argument.

23          MR. MOOREHEAD:  No, that's fine.  We take no position

24   with the responsible officer because in our position that does

25   not appear to reach the point of indirect change of control as

1  a trustee would.  And so, we take no position with regard to

2  that, and that's our argument, Your Honor.

3           THE COURT:  All right.  Thank you.

4           MR. MOOREHEAD:  You're welcome.

5           THE COURT:  Okay.  Then why don't I go around the

6  room one more time to see if anybody has any closing comments

7  to make.  So, Mr. Gebhardt, I guess I'll start with you.  We'll

8  do it in the order in which we went before.

9           MR. GEBHARDT:  Just very briefly, Your Honor.  The

10 consideration of the appointment of a responsible officer, as

11 we have said, is an extremely important issue to the United

12 States Trustee.  We don't think there's authority under Section

13 105 for the Court to appoint a responsible officer.  We think

14 we have shown by the evidence that this case would benefit from

15 the appointment of a Chapter 11 trustee because cause exists

16 and because it would benefit creditors and parties in interest

17 in this case.  Not only the United States Trustee or just the

18 appointment of a Chapter 11 trustee, but the creditors and the

19 preferred shareholders want the appointment of a Chapter 11

20 trustee, representing well over 90 percent of the indebtedness

21 in this case.

22          And, I can assure the Court and Mr. Moorehead that

23 the United States Trust will take her appointment very

24 seriously in the event the Court orders the appointment of a

25 Chapter 11 trustee.  As Your Honor knows, the Court requires

1  the United States Trustee to consult with parties in interest

2  and we will certainly do that.  For these reasons --

3            THE COURT:  Including with the PSC?

4            MR. GEBHARDT:  Yes, Your Honor.  Including the Public

5  Service Commission.  And, for these reasons, Your Honor, we

6  urge the Court to grant the United States Trustee's motion and

7  order the appointment of a Chapter 11 trustee.

8            THE COURT:  Okay, well, does the U.S. Trustee have a

9  position with respect to whether or not this effectuates some

10 indirect change in control?

11           MR. GEBHARDT:  Your Honor, we have not briefed that

12 issue.  Thank you.

13           THE COURT:  All right.  Thank you.  Mr. Greendyke.

14           MR. GREENDYKE:  Thank you, Judge.  Much has been said

15 since the last time I stood here and I know I don't want to

16 reargue every single thing that I disagree with.  I disagree

17 with a lot of the comments and at some length I feel like,

18 almost like we're watching different cases transpire in front

19 of us.  One of the primary arguments Ms. Kelley made was that

20 there's no cause in the record with regard to appointing a

21 trustee.  And, both Mr. Lichenstein and Ms. Kelley said, you

22 know, it's a heavy burden, it's an extreme burden on our part

23 to show it.  And, I beg to differ.  I think the Court has

24 immense discretion in making factual determinations, there

25 doesn't need to be a smoking gun, there doesn't need to be a

1  confession of some type of impropriety.  Does that ever happen?

2  Sure, that happens.  You've seen it, I've seen it, we've all

3  seen it in various cases.  But, in some instances I think the

4  charge of the Court is to do what's best for the estate and

5  best for the creditors.  I think in your heart you know that

6  some change must occur because of what's already transpired and

7  a lack of progress and just really position of the parties and

8  the complexity of the matters with which we're dealing.

9          This is not a normal Chapter 11.  This is not a

10  normal Chapter 11 where the case gets filed by Shearman &

11  Sterling or Fulbright & Jaworski, or Skadden Arps, and you have

12  a committee that's well represented and there's sort of a

13  checks and balances as the case progresses with how to run the

14  data room and who to market it to, and the committee's not

15  bringing prospective buyers in.  The case has run completely

16  differently from the very start.  It's been contentious from

17  the start.  Everything's been sealed from the start.  The last

18  time we were here the argument Mr. Shelley made was, "This is a

19  private company and we want to keep our records private because

20  that's the way it's always been."  This has been a very

21  different case from the large cases you've dealt with that

22  we've all dealt with in our careers in the past, and for that

23  reason the extraordinary action of appointing a trustee is what

24  I think is necessary, what RTFC argues is necessary in order to

25  move the ball down the road.

1          The Court brought up in Ms. Kelley's arguments the

2     question about the claim objection and meeting yourself coming

3     in the door, if you will.  The conflict presented by the claim

4     objection.  The claim objection that's been filed against the

5     RTFC is kind of like the will with the interim clause stuck in

6     it, you either take what I leave you or you get nothing,

7     because that's the way it's going to work.  And, that -- pretty

8     much what the claim objection has done.  And, I find it as

9     incredible as the Court does that they can predicate the entire

10    case on the assumption of the terms and conditions and forcing

11    a discount option on us, and if that doesn't work then they're

12    going to undo the whole deal.  The Court's right, they never

13    answered your question.  What happens?  Who's the beneficiary

14    of a 547 or 548 action?  We are.  And, guess what?  We get life

15    breathed back into our entire claim.  There's nothing wrong

16    with our judgment.  Our judgment is for a debt amount that the

17    debtors stipulated to, 525 million dollars.  There's nothing

18    wrong with Greenlight's judgment, it's 130 million dollars

19    based upon the judgment of the Chancery Court in Delaware.

20    That's not going to change.  We are the beneficiaries of this

21    purported 547/ 548 action because we're the biggest creditors

22    in the case.  We're substantially all the creditors in the

23    case.  So, what we say needs to be listened to with regard to

24    Ms. Rich's fraudulent transfer arguments or anything else.

25    This is where it's all about.

1      They continue to confuse and throw up more issues

2 when we've tried to simplify.  What's simple is it's really a

3 very small, a three-party dispute, with a complex regulatory

4 issue that we'll address a little bit more fully later on.

5 But, what we need to do is to continue to simplify and not make

6 more difficult the legal issues that we're all confronted with.

7 The plan does the same thing.  The plan purports to discharge

8 all of our liens.  They want to pay us 402 million dollars and

9 they want to discharge everything which we think is not what

10 the law allows for.  Again, that's an indication as I argued

11 earlier of a conflict in interest that Prosser has, Mr. Prosser

12 has and the debtors have in making these proposals to you.

13      One thing that was mentioned that I need to clarify,

14 the last time somebody from the debtors' side spoke and I

15 didn't clarify or correct what they said it came back to haunt

16 me.  They said that Emerging is a guarantor.  Emerging is not a

17 guarantor of RTFC. Emerging is a pledgor to RTFC.  They pledged

18 the stock of new ICC to support the debt that new ICC owes

19 RTFC.  ICC, LLC has some guarantees.  Mr. Prosser has some

20 guarantees.  It's funny talking about Mr. Prosser's guarantee

21 how he can be a part of this purported objection to our claim

22 because he was the beneficiary of the deal.  He went from being

23 a guarantor of 525 million dollars worth of debt to being a

24 judgment debtor for 100 million dollars.  And, we don't

25 understand how he plays into this mix of trying to avoid a 400

1  million dollar concession or trying to undo it.  It just --

2  it's so circuitous to us, it's just beyond belief.  The

3  evidence -- and I don't disagree largely with Mr. Bartner's

4  recitation of the progress of the deal and how the deal all

5  came about and his promise to recapitulate the testimony of Mr.

6  Michaelis and perhaps Mr. Prosser about how it all happened,

7  but the Court saw it happen and I think you realize intuitively

8  and circumstantially what you saw occur in front of you is

9  susceptible, could form the basis of making findings based upon

10 the lack of progress in this case.  And, the only person who

11 really knows the reason behind the closed doors is Mr. Prosser.

12 We don't know the reason because we were largely excluded,

13 sometimes at the hands of the debtors, sometimes voluntarily,

14 so that we wouldn't get involved in the claims that have

15 despariously been made against us in the sanctions' motion that

16 we in some how interfered.  We were worried that we would get

17 blamed for interfering so we didn't interfere, we stepped back,

18 we let them do what they want to do, we let them do what they

19 wanted to do a second time, we let them do what they wanted to

20 do a third time, we let them do what they want to do a fourth

21 time, and now we've finally said enough's enough.  The change

22 of control ought to occur.  And, I think the Court can look at

23 what's been said to you over the course of the last few

24 hearings and the record that's been made before you in the last

25 couple hearings, not what happened back in the spring because

1 there was no evidence offered in the springtime or in the early

2 summer.  The evidence has just occurred within the last couple

3 months.  And, I think the Court really needs to look and weigh

4 closely the question of what the appropriate third party would

5 be.  We continue to argue that it's the trustee.

6        The Court addressed a question to the U.S. Trustee's

7 counsel as to whether or not they had a position with regard to

8 change of control.  We do.  And, we have counsel here and I'd

9 like to defer to Mr. Bressie to comfort you about your position

10 I think as expressed to the PSC's counsel with regard to your

11 ability to make this appointment and not violate any change of

12 control position.

13        THE COURT:  All right.  Mr. Bressie.

14        MR. BRESSIE:  Thank you, Your Honor.  For the record,

15 my name is Kent Bressie, and I'm regulatory counsel for the

16 RTFC.  Your Honor, at the hearing last Friday, January 19th,

17 you noted that the change of control issue was, in fact, a red

18 herring, and the RTFC agrees.  The RTFC's position is that the

19 Court has unfettered legal authority under Section 1104 of the

20 Bankruptcy Code to appoint a trustee.

21        In taking this position we do not mean to trivialize

22 the concerns or views of the Public Services Commission of the

23 Virgin Islands.  The RTFC sympathizes with and respects the

24 PSC's desire to protect the interests of Virgin Islands

25 consumers and businesses.  But, the RTFC believes as a legal

1  matter that the Court can not accept the PSC's assertion of a

2  prior consent power for a Court appointed trustee.

3        The Court must also reject the debtors' attempt to

4  cast a regulatory shadow over the trustee proposal in order to

5  favor its own preferred but flawed responsible officer

6  solution.

7        I have four brief points to make.  As the Court

8  recognized last Friday there is no regulatory exception to the

9  Court's trustee appointment powers under Section 1104.  And,

10 the U.S. Supreme Court was very clear about where there are

11 regulatory exceptions to the Bankruptcy Code they must be

12 stated explicitly and should not be inferred where they are not

13 so stated.  There is no such caveat with respect to your power

14 to appoint a trustee.  So, for this reason we believe that the

15 Court need not even reach the change of control issue because

16 there is no permissible grounds on which the PSC could exercise

17 its police or regulatory powers in this case to assert a prior

18 consent power.

19       But, second, even if the Court did reach the change

20 of control issue the RTFC believes that the Court should find

21 that the appointment of a trustee would not, in fact,

22 constitute a direct or indirect transfer of control under

23 Virgin Islands Law but that it instead constitutes a pro forma

24 event.  As the Court recognized on Friday, the 1989 settlement

25 agreement between new ICC, Vitelco, the RTFC, and the PSC,

1 consented to the RTFC holding Vitelco stock as collateral.  It

2 also defined a transfer of control as the transfer of a 51

3 percent ownership interest in new ICC.  And, I would refer the

4 Court to Section 7(a)7 of that 1989 settlement agreement.

5        We think that the Court's focus on the 1989

6 settlement agreement is particularly appropriate in construing

7 what would constitute a transfer of control because, in fact,

8 the PSC has had notice since 1989 of the collateral that the

9 RTFC has held and of actions that the RTFC might take to

10 protect that collateral.  That's not to say that the PSC's

11 authority to grant prior consent for any ultimate sale is in

12 any way constrained.  The RTFC has consistently recognized and

13 certainly assured Judge Gomez in previous court hearings that

14 it would abide by those regulatory requirements, both in

15 Section 43(a)(a), the Virgin Islands Code, and in the

16 commitments in the 1989 settlement agreement.

17        The PSC has noted, including today, that somehow the

18 -- we have failed to address a scenario involving an indirect

19 transfer of control.  Certainly, we do agree with Mr. Moorehead

20 that there is no previous case involving this particular

21 statute.  But, we do believe that the 1989 agreement bears on

22 this.  And, also with respect -- well, I'll get to that in a

23 second.

24        Your Honor, third, on the question of precedent,

25 whether it's PUC or FCC precedent, again, we recognize as Mr.

158

Moorehead points out, that we have cited other state or
territorial PUC cases that are not interpreting Virgin Islands
Law.  But, the fact remains that we don't have any precedent in
the Virgin Islands to construe these statutes.  And, the reason
that we had cited to other state statutes is that they do
contain some more language and we respectfully disagree with
Mr. Moorehead.  I would direct the Court to Paragraphs 41
through 44 of our brief on the change of control issue.  Each
one of those state statutes that we stated was roughly
analogous to the Virgin Islands' one actually addresses
indirect or ultimate changes in control, so we do think that
they are useful in construing the Virgin Islands Statute.

          We also believe that the FCC's approach is relevant
here because not least of all ICC and its affiliates, including
Vitelco, hold dozens of FCC authorizations.  And, there was
discussion earlier this afternoon of, you know, actually it was
Your Honor who pointed out that actually the filing of the
cases and moving into debtor-in-possession status, in fact, was
some sort of event that had someone other than the debtor --
the original individual pre-debtor status in control of the
debtors.  And, that's certainly the FCC's view.  The FCC treats
the filing of a bankruptcy case and movement into debtor-in-
possession status or the appointment of a trustee or a receiver
as a pro forma event that does not constitute a direct or
indirect transfer of control.  And, certainly, we believe that

159

1  would be the case here and we've certainly not had any

2  objections from the FCC in this case.

3          I would also point out that with respect to the

4  existing PUC and FCC precedence that the idea of a responsible

5  officer is, in fact, a purple cow.  No one's ever seen it

6  before with respect to a regulated utility.  And, in fact,

7  that's not surprising given the number of very practical issues

8  that can arise, and my colleagues have already addressed some

9  of those so I won't go into that here.  But, there is very

10 clear precedent with respect to the trustee scenario, both at

11 the FCC level and involving other Bankruptcy Court cases

12 involving public utilities.  And, there is nothing of the sort

13 with respect to a responsible officer.  And, we think that

14 bears upon both the powers of the Court and also the utility of

15 the appointment of a trustee under Section 1104.

16         I did want briefly to rebut just a couple of other

17 points that were raised.  Counsel for the corporate debtors

18 mentioned that there was a threat of termination of the

19 franchise of Vitelco here.  And, we believe that that is also a

20 red herring.  Frankly, I'm not aware of anything in the briefs

21 or other submissions, certainly Mr. Moorehead did not raise it

22 today that such action was imminent as a factual matter or that

23 it was possible as a legal matter.  And, we believe that the

24 Court should discount such scare tactics as it's really not

25 been suggested that that is a possibility.

1          THE COURT:  Well, I don't have any evidence that

2    that's the case, so at this point, in fact, I don't think I can

3    accept that as a fact.  And, all sorts of horribles could

4    possibly happen, all kinds of good things could possibly come

5    out of it.  But, I don't have evidence necessarily of either,

6    so I'm going to base this on the facts as the evidence will

7    show me what the facts are.

8          MR. BRESSIE:  Okay.  Okay.  Rather than take up the

9    Court's time, I certainly don't seek to regurgitate any of our

10   brief, which I think lays out very clearly the statutory

11   authority of the Court and useful precedence, both at the state

12   or territorial level, and at the federal level as to how a

13   trustee appointment would work in these cases.  But, I do want

14   to leave the Court with the reassurance that there is certainly

15   no regulatory impediment to the appointment of a trustee in

16   terms of a state or territorial level prior consent

17   requirement.  The statute simply doesn't allow for it and we

18   believe that you could rule on that basis alone without getting

19   into lengthy interpretations of Virgin Islands Law or the

20   various agreements.

21         THE COURT:  All right.  Anything?

22         MR. BRESSIE:  Your Honor, if you have no further

23   questions?

24         THE COURT:  No.  Thank you.

25         MR. BRESSIE:  Thank you.

161

1              THE COURT:  Mr. Galardi.

2              MR. GALARDI:  Yes, Your Honor.  Briefly.  First, Your

3    Honor, I'd like to just cite one case to Your Honor I've

4    referred to as the Supreme Court case, it's <u>Interstate Circuit</u>

5    <u>v. United States</u> 306 U.S. Reporter 208, 59 Supreme Court 467.

6    It happens to be one of my favorite cases but it isn't --

7              THE COURT:  I'm sorry, 306 U.S. what?

8              MR. GALARDI:  U.S. 208.

9              THE COURT:  Okay.

10             MR. GALARDI:  59 Supreme Court 467, it's a 1939 case.

11             THE COURT:  All right.

12             MR. GALARDI:  And, the relevance of that case, Your

13   Honor, again, is the debtors not coming forward with evidence

14   for whatever it's worth when Your Honor considers what the

15   transcripts actually say and what the evidence in.

16             Your Honor, first, with respect to further delays

17   Your Honor is absolutely right, there's going to be further

18   delays in this case and Your Honor is absolutely right.  We

19   have chosen that we think that the further delays will have

20   more competence with a trustee as opposed to a responsible

21   officer.

22             Your Honor, I don't want to get into the regulatory

23   issue but I do want to point out one thing about the

24   responsible officer which to me I've never understood from both

25   Mr. Moorehead's position is, no one has specified -- and I

162

1 think this is why Judge McCullough eventually went away from

2 the responsible officer is, what is the position, what is the

3 title, to whom do they report, and what is the control that is

4 actually being seated to this responsible officer?  We've

5 talked a lot about the financing but if this responsible

6 officer is someone who reports to the board we have exactly the

7 conflict issue we had before.  If the responsible officer is

8 someone in lieu of the board then I don't see much of a

9 difference between the change of control issue between that and

10 a trustee.  The debtors have simply said, "We want a

11 responsible officer to oversee the sale process and then he'll

12 report to the Court."  We have our objections to that as a

13 statutory matter.

14        Your Honor raised a question about the claims

15 objection.  First, Your Honor, it's a greater magic trick than

16 what I think has been understood.  First, there is litigation

17 on the claims objection and, indeed, as I reported to Your

18 Honor and asked Mr. Prosser about, there are two filings that

19 are of significance for the trustee and the discharge of the

20 fiduciary duties.  The claims objection was filed and there was

21 a complaints to subordinate the Greenlight claims.  Both have

22 deadlines to respond of February 16th.  So, let's not think

23 these are just in abeyance, this litigation is ongoing.  With

24 respect to the claims objection it's an interesting magic

25 trick.  It's alternative relief but here's how it works if I

163

1 understand it correctly and I may do it is, okay, if we don't

2 get the 402 we're going to undo the transaction as a fraudulent

3 conveyance.  But, as Your Honor knows if you are the recipient

4 of a fraudulent conveyance then even though we might have a

5 claim and even though the RTFC might have a claim you don't get

6 a distribution on that claim.  So, it's to zero us out and to

7 put us in a worst position than when we entered into the

8 settlement agreement in the first place because then we can't

9 even fight over our claim and how much our claim is if they're

10 right about the fraudulent conveyance.  So, they're going to

11 not only undo the transfer but to take a fraudulent conveyance

12 view and say, "We can't be paid."  So, it's an interesting

13 magic trick, we don't think it works, and, in fact, Your Honor,

14 when we first entered into these voluntary cases I raised the

15 exact concern that they would try to do this with Your Honor on

16 August 23rd, and Your Honor said, "I can't believe they're

17 going to try to do that."  And, 549(b) I think says they got

18 something of consideration.  And, Your Honor's recollection was

19 exactly correct.  We agreed, and the RTFC agreed to stand down,

20 for a period of time in consideration for their having an

21 opportunity to finance us out at a much reduced number.  We've

22 paid our consideration.  They've had that time.  So, we believe

23 there's consideration, Your Honor, and it's not something that

24 they can undo.  But, again, if they stay in control the claims

25 litigation, the subordination litigation will go forward.  Mr.

1  Prosser acknowledged that it's at least facially inconsistent

2  with the terms and conditions which require those to be in

3  Delaware.  Now, they have their legal arguments but our view is

4  that both the claims objection and the subordination complaint

5  should be transferred to Delaware.

6      Your Honor, with respect to the no explanation of the

7  lending, the lending equity, the sale, and the Government, I

8  think the testimony Mr. Bartner is absolutely correct, the

9  question though is the inference to be drawn from that.  And,

10 there's only one inference that I think can be drawn from that

11 is they have failed at each and every form or morphous or

12 metamorphous of the transaction and each time they have tried

13 to go forward to secure sufficient funds even at the 402,

14 they've not been able to do it.  So, on that basis we think

15 that the -- as you once described it -- the shifting sands are

16 explainable by the fact that the business just doesn't have the

17 value that they say it does.

18     Your Honor, again, I think we see shifting sands,

19 again, throughout this case.  Deloitte goes to Grant Thornton,

20 goes to BDO.  The MORs, we get them one week, we ask questions,

21 they're incorrect, they're modified.  The schedules and

22 statements and then Mr. Prossers, he makes statements, he

23 changes it.  Your Honor, there hasn't been -- this is not a

24 complicated case, it's got a lot of money at stake but as Your

25 Honor pointed out the creditors who really have the stake are

1 on this side.  The debtor is on that side.  They've had to file

2 schedules and statements.  They've had to file MORs.  And,

3 they've had to sell the company or refinance it.  And, each

4 time, every time they've done something and made a public

5 statement it's had to change a little bit.  So, Your Honor, we

6 would strongly urge that you appoint a trustee.

7 Finally, Your Honor, just again as a precaution, I

8 know that Ms. Rich made her statement about this is not a

9 fraudulent conveyance.  We do believe it's a fraudulent

10 conveyance.  I think she put the rabbit in the hat by saying if

11 the terms and conditions are assumed it's not a fraudulent

12 conveyance.  But, again, we contest the ability to assume those

13 terms and conditions.  Not that you have to rule on that.  And,

14 those are my final comments.

15 THE COURT:  Okay.  Thank you.  Ms. Rich.

16 MS. RICH:  Nothing further, Your Honor.

17 THE COURT:  Mr. Dodson.

18 MR. DODSON:  Nothing, Your Honor.  Thank you.

19 THE COURT:  Mr. Moorehead.

20 MR. MOOREHEAD:  Nothing further, Your Honor.

21 THE COURT:  Ms. Kelley.

22 MS. KELLEY:  Your Honor, I'll be very brief.  First,

23 I'll just say that in the further argument I still haven't

24 heard anything that sounded to me like clear and convincing

25 evidence that meets the standard for the appointment of the

1   trustee, so I will not go through and address all of the

2   additional things that were raised.  I still -- and the debtors

3   argue that that standard simply has not been met, it's a very

4   high standard, it's a substantial burden.  And, the facts that

5   are in the record before the Court do not meet that standard.

6        I would just like to give the Court a couple of

7   citations as well, earlier Ms. Rich was talking about the

8   preferred shareholder lawsuit.  There is some testimony from

9   Mr. Michaelis at the December 11th hearing on Page 20 regarding

10  that lawsuit and its effect on financing efforts.  So, we did

11  locate that in the record.

12       In addition, Mr. Moorehead mentioned the Chevron case

13  and I happen to have the cite to that, which is 467 U.S. 837,

14  and it's a 1984 case.  It's Chevron U.S.A, Inc. v. Natural

15  Resources.  And, although we understand RTFC disagrees with the

16  PSC's interpretation, Chevron does talk about deferring to the

17  administrators agency's construction of its own regulation.

18  So, that may be helpful to the Court.

19       Your Honor, there was some discussion, the RTFC was

20  arguing that if the settlement agreement is unwound the

21  creditors here at Greenlight and the RTFC would be the

22  beneficiaries of that unwinding.  And, I just wanted to point

23  out that that may or may not be the case.  Again, that is not

24  the direction that we are going in.  We intend to assume the

25  settlement agreements.  And, that is where we've been moving

1   all along.  This was an alternative argument that was raised in

2   the objection.  But, at the time that the settlement agreements

3   were entered into the judgments were -- you know, the

4   underlying litigation was all on appeal, and so if there is

5   some sort of unwinding it may or may not be the case that these

6   parties are beneficiaries of that.  If items are relitigated it

7   could come out in any number of ways.  We had what we believe

8   are meritorious appeals pending at the time that this was

9   entered into.  So, that is just one thing to keep in mind.

10  Again, this isn't a situation where the debtors are backing

11  away from it, we intend to move forward to assume the

12  settlement agreement.  But, you know, it may end up if we go

13  the other route much different than it is today.

14          With respect to the comment that they would not get a

15  distribution, I think this is, again, not some kind of trick

16  that we are doing.  I think it's clear that while it is in

17  dispute or if it is avoidable there would be no distribution

18  but if at the end of the day there is some resolution to that

19  and there is a claim, I mean that judgment would hold.  So, I

20  don't -- I'm not sure I followed that argument.  But, certainly

21  there is no attempt to be tricky here.  That's just an

22  alternative argument that we think is valid given that the

23  debtors have given up substantial consideration in the

24  settlement agreement.

25          I just wanted to comment on a couple of other things

1  very quickly.  The RTFC was making a distinction between being

2  a pledgor and a guarantor.  And, although Emerging did pledge

3  new ICC stock for the benefit -- did pledge stock for the

4  benefit of new ICC, this has the same practical effect as a

5  guarantee.  The point I was trying to make previously was that

6  there was consideration involved in the original transaction.

7  And so, whether they were a pledgor or a guarantor, I don't

8  think that makes a difference for the purpose for which I was

9  saying that.  I understand they were a pledgor and I misspoke.

10 But, I think my original point still holds.

11         And, I think that's really all, Your Honor.  Again, I

12 just don't think that the evidence presented supports the

13 appointment of the trustee.  On the other hand, we think that

14 the debtors and all the other parties would benefit from the

15 appointment of a responsible officer and we think the Court

16 does have authority and urge the Court to make that

17 appointment.

18         THE COURT:  All right.

19         MS. KELLEY:  Thank you.

20         THE COURT:  Mr. Lichenstein.

21         MR. LICHENSTEIN:  Nothing further, Your Honor.

22         THE COURT:  My goodness.

23         MR. LICHENSTEIN:  I'd like to go watch the snow at

24 the airport, Your Honor.

25         THE COURT:  Okay.  All right, all of you are content

1 that you do not want to any post-hearing briefing, is that

2 correct?

3          MR. BARTNER:  That would be fine, Your Honor.

4          MR. GREENDYKE:  Fine with the RTFC, Judge.

5          MR. MOOREHEAD:  Your Honor, the Public Service

6 Commission would like to submit something if it's okay?

7          THE COURT:  Sure.  How much time do you need?  Mr.

8 Moorehead, I'm sorry, how much time do you need?

9          MR. MOOREHEAD:  Four or five business days would be

10 fine, Your Honor.

11          THE COURT:  All right.  Mr. Gebhardt.

12          MR. GEBHARDT:  This is fine, we will not submit, Your

13 Honor.  Thank you.

14          THE COURT:  How about any post-trial submissions that

15 anyone wants?  Today is the 24th.  I'll expect to get them by

16 Tuesday, January 30th.  That should give me time to hopefully

17 read them before I get to the Virgin Islands on the 6th, so

18 that hopefully I can give you a ruling on the 6th?

19          MR. MOOREHEAD:  Thank you very much, Your Honor.

20          MR. GERBER:  Your Honor, if the PSC is going to file

21 something, you know, we might want to reserve the right to file

22 something promptly thereafter.  I worry about further delay.  I

23 think the parties other than the PSC have all agreed that there

24 shouldn't be any further delay through post-trial briefing, and

25 I just -- we're all anxious to get the ruling and you've got

1  statutory impositions, I believe, in terms of you issuing the

2  ruling.  So, we're in a position where the PSC files something

3  we'd like a day or two to respond.

4          THE COURT:  Okay.  By when?

5          MR. GERBER:  Well, Your Honor, we'd prefer that there

6  just not be any post-petition -- post --

7          THE COURT:  Well, I'm not -- I just don't deny

8  someone an opportunity to submit something after --

9          MR. GERBER:  We'll do it within 48 hours, Your Honor.

10          THE COURT:  All right.  Any response then is due by

11  February 1st.

12          MR. GERBER:  Your Honor, what we might do is just

13  advise the Court whether or not we're going to respond after we

14  look at, and we might just tell the Court we're not going to

15  respond.

16          THE COURT:  Okay, that's fine.  I mean, either way by

17  February 1st.  I'm still going to try to get this so that I

18  will be in a position to give you some rulings on the 6th.  I

19  don't know.  I'm going to do my best.  Even if I can't get

20  through all of the issues I'm going to try to get through at

21  least some of the issues by the 6th.  I'm going to try to get

22  through them all if I can.  Have all of the transcripts been

23  filed?  Is this the only hearing date for which the transcript

24  isn't filed yet?

25          MR. GALARDI:  Yes.

1          THE COURT:  Is somebody going to order this

2  transcript?

3          MR. GALARDI:  I'm sure we will, Your Honor.

4          MR. GERBER:  Your Honor, may I make two points about

5  the briefing schedule?  First is, is it my understanding that

6  the briefing is only on the trustee change of control issues?

7  So, all other issues can be addressed or not?

8          THE COURT:  Mr. Moorehead, I assume that your issue

9  is with respect to the change of control?

10          MR. MOOREHEAD:  That's the only issue that concerns

11  us at the moment, Your Honor, yes.

12          THE COURT:  Okay, so, yes, that will be briefing only

13  on the change of control issue.

14          MR. MOOREHEAD:  Yes.

15          MR. GALARDI:  Okay.  And then, two practical issues,

16  I know you know about our conversion motion and I know that's

17  all there.  The other practical issue is there is no motion

18  pending for exclusivity to go beyond January 28th.  We think

19  that the change of control issue being separate from that,

20  there is a plan and there is a solicitation period that would

21  take you out to March 18th.  We see no other motion.  So,

22  again, we do have that cross motion, we would like to have the

23  ruling on exclusivity --

24          THE COURT:  All right.

25          MR. GALARDI:  -- if that can be separated, done

172

1  sooner.

2          THE COURT:  Well, actually I think I can give you

3  that ruling now.

4          MR. GALARDI:  Okay.

5          THE COURT:  With respect to the exclusivity.  At

6  least with respect to the Rule 1014 part of that motion.  And

7  then, I think what I will do is continue the exclusivity until

8  I can make the rulings on the rest, which hopefully will be

9  February 6th.  I have tried to get through the standards on

10  1014 and frankly I think there is a lot of confusion in the

11  very few cases that have come up under 1014 as to exactly what

12  it covers under a circumstance like the Court's facing in this

13  case.  And, you know, the cases tend to suggest that Rule 1014

14  stops all substantive actions in the case but doesn't really

15  deal with deadlines because the case law seems to suggest that

16  where another deadline is employed in a specific section, that

17  that specific section governs.  But, the problem in a case like

18  this is, how you can say that exclusivity is terminated before

19  you even get to a 341 meeting, which is essentially what would

20  have happened in these cases, just doesn't make any logical

21  sense.  I can't see how Congress could have envisioned that

22  that would be the case in imposing Rule 1014 standards.  Now,

23  probably Congress didn't envision that it would take five

24  months or however long it took to get through the 1014 issues,

25  and in most circumstances it wouldn't have but for the fact

1  that I thought you folks might actually come to some negotiated

2  agreement and actually get the creditors paid and the debtors

3  on with its business.  And so, it would not have in this case

4  either, but nonetheless that's sort of water over the dam and

5  I'm faced with the circumstance as it exists as of the time the

6  motion was filed.  And as of that time the 341 meeting was not

7  scheduled.

8        I do not think in good faith this Court could

9  terminate exclusivity before the debtor in the voluntary case

10  has a good faith opportunity to present its plan to the Court

11  in an exclusive period.  So, although I don't know that I'd

12  want to say as a matter of precedent for all cases that I might

13  not want to look at this issue in a different context a

14  different way, I don't think in this case that 1014 could be

15  employed to bar the debtors' exclusivity period in the fashion

16  that Greenlight argued that it should bar the exclusive period.

17  I don't think that it terminates those deadlines automatically.

18  So, I don't think the debtors' exclusive period did terminate

19  on November, whatever the date was, 28th or 29th, by operation

20  of 1014.

21        Having said that, I think that the debtors are

22  therefore still within their exclusive period because the Court

23  has been extending it, admittedly in little bits and drabs,

24  dips and drabs, as we get through this process, until I can see

25  what the overall lay of the land is going to look like.  And, I

1 really think until I get through the responsible officer/

2 trustee motion that the debtors' exclusive period should be

3 continued until then.  So, I am going to continue the debtors'

4 exclusivity period until those motions are decided.  And, I

5 agree with whoever argued that once the trustee motion is

6 decided, if it's a favorable decision, then the exclusivity

7 motion is essentially moot in any event, because at that point

8 although the debtors could file a plan the trustee can always

9 file a plan, too.  So, I think that at that point in time the

10 trustee will probably be the entity that everybody would be

11 looking for to file a plan.  If, however, the responsible

12 officer motion is the motion that is accepted by the Court then

13 I still need to look at the exclusivity motion and I would do

14 so in light of all of the other evidence in the case to see

15 whether even though a responsible officer is in place it's

16 still appropriate to carry through the exclusivity period.

17      So, the only ruling I'm prepared to give you today

18 is, I think under the circumstances of this case, based on

19 Number One the length of time that the venue motion was pending

20 for the reasons that the venue motion was pending for the

21 length of time that it was, that 1014 would not operate to

22 terminate the debtors' exclusivity period, that the debtors

23 therefore are still within that exclusivity period, that I will

24 continue that exclusivity period until I can address the

25 motions that are pending today.

1           I agree you don't have a motion that goes beyond

2    whatever the date you stated, Mr. Galardi, it doesn't get all

3    the way up to February 6.  But, I don't think anybody will be

4    prejudiced by that brief extension up to February 6.  Or,

5    whatever date I can get an order out.  If I can do it sooner I

6    will, but based on the fact that briefs are going to come in by

7    the 1st I have grave doubts that I'm going to get to it.  You

8    know, just to decisions before February 6th, I have a feeling

9    I'm going to be using my time on the plane on the way down, and

10   so forth, reading documents to try to get this done by February

11   6th, as it is.  So, I'm going to continue the debtors'

12   exclusivity until I get those motions decided, I will give it

13   every effort to try to do it on or before February 6th.

14           MR. GALARDI:  Your Honor, may I ask that you enter an

15   order to the effect that you've just done on the exclusivity?

16           THE COURT:  To do what?

17           MR. GALARDI:  Well, again, Your Honor, with all due

18   respect I think we disagree with your ruling and I think we can

19   take an appeal of that ruling.  So, I would ask you to put an

20   order to the effect, whatever it was that you just said on -- I

21   understand --

22           THE COURT:  That 1014 does not terminate --

23           MR. GALARDI:  Well, I don't think our argument was

24   that it -- I think the argument is, it extends the period so it

25   doesn't start to run until after the 1014 stay was evaporated,

1 so to speak.  Which I think the debtors have argued is as of

2 the day that Your Honor entered the venue order and dissolved

3 the 1014 stay, that would be the day one to 120.  If I'm not

4 mistaken.

5          THE COURT:  Oh, no.  I don't agree with that.  I

6 don't agree, I'm sorry.

7          MR. GALARDI:  So, I'm not sure I understand.  I

8 understand that we have exclusivity to February 6th.

9          THE COURT:  Yes.

10          MR. GALARDI:  That I got.  How we get there, I don't

11 know.  And, I --

12          THE COURT:  How we get there is because the the

13 debtors filed the motion to extend the exclusivity period

14 within their deadline.  Exclusivity had not terminated from the

15 day the order for relief in the case was entered, until the day

16 the debtors filed the motion to extend the exclusivity period.

17 In my view 1014 is an irrelevant.

18          MR. GALARDI:  And, that's fine, Your Honor.  And,

19 they did that within the day even that we counted, for example,

20 they filed it before the November the 18th.

21          THE COURT:  Correct.

22          MR. GALARDI:  The only issue there is they only asked

23 for a 60-day extension.

24          THE COURT:  Correct.

25          MR. GALARDI:  Which would have gone to January 26th.

1  There is no motion to go to February 6th.

2            THE COURT:  Okay.

3            MR. GALARDI:  They filed a plan within that period of

4  time which would automatically have kept the exclusivity and

5  given them --

6            THE COURT:  And got --

7            MR. GALARDI:  -- okay, and that's fine.  If it's

8  because of the plan I understand that because that starts the

9  solicitation 60 days.

10            THE COURT:  Correct.

11            MR. GALARDI:  That's all I -- then I understand what

12  I think.

13            THE COURT:  Okay.  All I was attempting to say is I

14  don't think 1014 fits into this mix.

15            MR. GALARDI:  We understand that.

16            THE COURT:  Okay.  And, you were -- you've been

17  asking me several times to give you a ruling on 1014 and I

18  haven't done that, and having looked at I just don't think

19  under the circumstances of this case that 1014 has terminated

20  or started the running of the exclusivity period.  I think the

21  exclusivity period started running the day the order for relief

22  was entered, which is the day that the voluntaries were filed.

23            MR. GALARDI:  Okay.  And, that's -- and my

24  understanding is that's it, they've been granted essentially

25  the extension to whatever it was and by filing the plan they

178

1  have essentially self extended that period for the

2  solicitation.

3      THE COURT:  That's right.  And, I'm going to look at

4  this issue as to whether or not that period should continue to

5  be extended after I get a ruling on these cases for even the

6  solicitation because everyone has acknowledged that this plan

7  is not confirmable.

8      MR. GALARDI:  And, that's fine.  Now, I understand

9  Your Honor.  Thank you.

10      THE COURT:  Okay.  So, I think, you know, the

11  exclusivity is for an unconfirmable plan and there's no point

12  to sending it out for solicitation.  So, on that basis it may

13  be appropriate to break exclusivity.  I'm going to look at that

14  issue.  I don't have a motion to that effect.  I'm doing it on

15  my own motion, I believe the Court has the authority to do

16  that.

17      MR. GALARDI:  Thank you, Your Honor.

18      THE COURT:  Mr. Lichenstein.

19      MR. LICHENSTEIN:  The second motion, Your Honor, was

20  the conversion motion.  Unless the Court's prepared to deny it

21  today, which we'd welcome, I think it needs to be extended to

22  -- or did you already?

23      THE COURT:  I am extending the conversion motion

24  because I need to review the transcripts and all of the

25  evidence.  That was the reason I continued the hearings and

**J&J COURT TRANSCRIBERS, INC.**

1  expedited the hearings so that they were not heard in the

2  Virgin Islands on the 6th.  So, and I believe Mr. Galardi

3  agreed that I could have that period of time to get through

4  this evidence.  Is that correct?

5         MR. GALARDI:  And, Your Honor, given the amount of

6  evidence I think the extra 10 days or whatever it is is fine.

7         THE COURT:  All right.  So, I will do my best to get

8  through that by February 6th.  And, that will be the first of

9  the motions that I will take under advisement.  Okay.  So now,

10 what sort of an order do you want on the exclusivity?

11        MR. GALARDI:  Your Honor, I think the record and what

12 you said is fine for this.  I think we're of a like mind.  I'll

13 live with this order for now.

14        THE COURT:  All right.  So, the debtors exclusivity

15 period is extended.  I will take a look at the conversion

16 motion.  I'm looking for a brief from the PSC by January 30th,

17 and from anybody who wants to respond to it by February 1st.

18 Okay.  Is there anything else that I need to address today?

19 Okay.  Safe travels home.  Try to get out before the really big

20 snowstorm hits.

21        MR. MOOREHEAD:  Thank you for accommodating us, Your

22 Honor.

23        MR. GALARDI:  Thank you.

24        UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

25        THE COURT:  Thank you.

1          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

2          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

3          UNIDENTIFIED ATTORNEY:  Would it be okay if we left

4  --

5                        * * * * *

6

7

8

9                C E R T I F I C A T I O N

10

11         We, Betsy Wolfe and Marlene Fattore, certify that the

12  foregoing is a correct transcript from the official electronic

13  sound recording of the proceedings in the above-entitled

14  matter, and to the best of our abilities.

15

16  /s/ Betsy Wolfe                Date:   January 28, 2007

17  BETSY WOLFE

18

19  /s/ Marlene A. Fattore

20  MARLENE A. FATTORE

21  J&J COURT TRANSCRIBERS, INC.

22

23

24

25


                    **J&J COURT TRANSCRIBERS, INC.**