**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**
**BANKRUPTCY DIVISION**
**DIVISION OF ST. THOMAS AND ST. JOHN**

| | |
|---|---|
| In re: | Case No. 06-30009 |
| JEFFREY J. PROSSER, | Chapter 7 |
| Debtor. | |
| STAN SPRINGEL, CHAPTER 11 TRUSTEE OF THE BANKRUPTCY ESTATES OF INNOVATIVE COMMUNICATIONS CORPORATION, EMERGING COMMUNICATIONS, INC., AND INNOVATIVE COMMUNICATION COMPANY, LLC; JAMES P. CARROLL, CHAPTER 7 TRUSTEE OF THE BANKRUPTCY ESTATE OF JEFFREY J. PROSSER; GREENLIGHT CAPITAL QUALIFIED, L.P.; GREENLIGHT CAPITAL, L.P.; AND GREENLIGHT CAPITAL OFFSHORE, LTD., | Related to Doc. Nos. 1143, 1178, 1236, 1237, 1338, 1343, 1344, 2225, 2226, 2227, 2229, 2230, 2233, 2305, 2309, 2310, 2312, 2316, 2350, 2352, 2354 |
| Movants, | |
| v. | |
| JEFFREY J. PROSSER, | |
| Respondent. | |

**MEMORANDUM OPINION REGARDING EXEMPTIONS CLAIMED BY DEBTOR**[1]

---

[1] This Memorandum Opinion constitutes the court's findings of fact and conclusions of law.

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................................4

PROCEDURAL AND FACTUAL BACKGROUND.................................................................6

OBJECTIONS TO EXEMPTIONS...........................................................................................15

FINDINGS OF FACT............................................................................................................21

1. Mr. Prosser failed to produce material documents, failed to provide necessary access, and failed to cooperate with the court appointed Examiner, the Chapter 7 Trustee, and the Chapter 11 Trustee for the ICC Debtors........................................................................21

2. Mr. Prosser failed to disclose the existence of storage space in West Palm Beach, Florida, containing records and personal property relevant to the bankruptcy................25

3. Mr. Prosser ordered the destruction of computer hard drives located at the Palm Beach Property in an effort to conceal information, records, and documents from the Trustees...................................................................................................................29

4. Mr. Prosser failed to disclose and/or continuously delayed disclosure of various assets and liabilities.......................................................................................................35

    a. Mr. Prosser failed to disclose hundreds of bottles of wine with an aggregate value in the millions of dollars until after they were discovered by the Chapter 7 Trustee........................................................................................................ 37

    b. Mr. Prosser failed to disclose a cigar collection with an aggregate value in the thousands of dollars.....................................................................................38

    c. Mr. Prosser failed to disclose valuable watches, jewelry, and a Bernard Passman chalice....................................................................................................39

    d. Mr. Prosser failed to disclose a life insurance policy for which New ICC paid at least $85,000 per year.............................................................................43

    e. Mr. Prosser failed to disclose his interest as an officer in AMJ, Inc...............43

    f. Mr. Prosser failed to disclose a $5.65 million obligation he owed to New ICC for the Palm Beach Property..............................................................................44

5. Prepetition and postpetition, Mr. Prosser caused the ICC Debtors and/or their

operating entities to pay for millions of dollars of personal items and services utilized or possessed by Mr. Prosser and/or his family.  These payments were not disclosed in the Debtors Monthly Operating Reports and were not included as gross income in his Statement of Financial Affairs..........................................................................................46

6.  Mr.  Prosser significantly undervalued assets in his Schedules.................................50

7.  Mr. Prosser concealed a marital asset division agreement, a will, and other estate planning documents from the Trustees...........................................................................54

8.  Mr. Prosser failed to disclose $480,000 he transferred to Dawn Prosser on the day of and the day after the filing of his bankruptcy petition.................................................58

9.  The Palm Beach Property...........................................................................................62

10.  Contentions the Objecting Parties Failed to Prove.....................................................63

     a.  The Objecting parties did not prove their contention that Jeffrey Prosser failed to identify gifts, purchased during the year preceding his bankruptcy, to Dawn Prosser in his Statement of Financial Affairs.......................................................63

     b.  The Objecting Parties did not prove their contention that Jeffrey Prosser should have and failed to disclose a Regent Bank Account opened in the name of Adrian Prosser and Linda Hirsch.......................................................................64

CONCLUSIONS OF LAW.......................................................................................................65

## INTRODUCTION

The matters before this court are the objections filed by James P. Carroll, the Chapter 7

Trustee of the Estate of Jeffrey Prosser (the "Chapter 7 Trustee" or "Trustee Carroll"), Stan

Springel, the Chapter 11 Trustee (the "Chapter 11 Trustee" or "Trustee Springel") of the Estates

of Innovative Communication Corporation, Emerging Communications, Inc., and Innovative

Communication Company, LLC (collectively, the "ICC Debtors"), and Greenlight Capital

Qualified, L.P., Greenlight Capital, L.P., and Greenlight Capital Offshore, Ltd. (collectively,

"Greenlight"), to the exemptions claimed by chapter 7 debtor Jeffrey J. Prosser ("Mr. Prosser" or

"Debtor") pursuant to section 522 of the Bankruptcy Code in the following property:

> (1) real property located at 252 El Bravo Way, Palm Beach, Florida (the "Palm Beach Property");
> (2) real property located at Hermon Hill, Plots 96, 97A, Christiansted, St. Croix, U.S. Virgin Islands (the "Hermon Hill Property");
> (3) real property located at Estate Shoys, Plot Numbers 4, 4A, 5, 10A, and 10AA, Christiansted, St. Croix, U.S. Virgin Islands (the "Estate Shoys Property");
> (4) real property known as the Shoys Plot (Anna's Hope Plot) numbers 168, 169, 170, and 171 Christiansted, St. Croix, U.S. Virgin Islands (the "Anna's Hope Property").[2]

---

[2]  Jeffrey J. Prosser's Amended Schedule C - Property Claimed Exempt, Doc. No. 1226, filed on January 11, 2008, listed these properties as follows:

| DESCRIPTION OF PROPERTY | SPECIFY LAW PROVIDING EACH EXEMPTION | VALUE OF CLAIMED EXEMPTION | CURRENT VALUE OF PROPERTY WITHOUT DEDUCTING EXEMPTION |
|---|---|---|---|
| Shoys Plot (Anna's Hope Plot) Numbers 168, 169, 170, and 171 Christiansted, St. Croix, U.S.V.I. | 11 U.S.C. §522(b)(3)(B) | Unlimited | $100,000.00 each $400,000.00 total (continued...) |

4

[2](...continued)

| | | | |
|---|---|---|---|
| 252 El Bravo Way Palm Beach, FL | 11 U.S.C. §522(b)(3)(B) | Unlimited | $8,714,808.00 |
| Hermon Hill, Plots 96, 97A Christiansted, St. Croix, U.S.V.I. | 11 U.S.C. §522(b)(3)(B) | Unlimited | $50,000.00 |
| Estate Shoys Plot Numbers 4, 4A, 5, 10A, 10AA Christiansted, St. Croix, U.S.V.I. | V.I.C.A. 5 §478(a) | $30,000.00 | $2,070,000.00 |

Jeffrey J. Prosser's Amended Schedule A - Real Property, Doc. No. 1226, filed on January 11, 2008, listed these properties as follows:

| DESCRIPTION AND LOCATION OF PROPERTY | NATURE OF DEBTOR'S INTEREST IN PROPERTY | HUSBWIFE JOINT COM. | CURRENT VALUE OF PROPERTY WITHOUT DEDUCTING EXEMPTION | AMOUNT OF SECURED CLAIM |
|---|---|---|---|---|
| Shoys Plot #'s 168, 169, 170, and 171 St. Croix, USVI | Fee Simple | T by E | $100,000.00 each $400,000.00 total | None |
| 252 El Bravo Way Palm Beach, FL | Fee Simple | T by E | $8,714,808.00 | $5,000,000 (approximately) |
| Hermon Hill Plot 96 and 97A Christiansted, St. Croix | Fee Simple | T by E | $50,000.00 | None |
| 4, 4A, 5, 10A and 10AA Estate Shoys St. Croix, USVI | Possessory Interest | n/a | Undetermined | $2,070,000 (approximately) |

5

## PROCEDURAL AND FACTUAL BACKGROUND

Although the matters before the court are the objections to exemptions claimed in the
chapter 7 proceeding of Jeffrey J. Prosser, the complex relationships between Mr. Prosser and
the companies formerly under the control of Mr. Prosser, several of which are also in bankruptcy
proceedings before this court, are relevant.  The financial history of the corporate debtors in
which Mr. Prosser has an interest, Innovative Communication Company, LLC ("ICC-LLC"),
Emerging Communications, Inc. ("Emerging"), Innovative Communication Corporation ("New
ICC"), explains much of Debtor's personal liability.

At this time, the three companies are also debtors in bankruptcy.  As of the date the
Prosser bankruptcy was filed, the relationship of the debtors can be described as follows.[3]  ICC-
LLC is a Delaware limited liability company having its principal place of business in the United
States Virgin Islands.  It  is wholly owned by Mr.  Prosser.  ICC-LLC is a holding company
which owns 52% of Emerging and 100% of Innovative Communication Subsidiary Company,
LLC ("ICSC-LLC"), which owns the other 48% of Emerging.  Emerging is a Delaware
corporation having its principal place of business in the U.S. Virgin Islands.  Emerging's direct,
wholly owned subsidiary is Innovative Communication Corporation ("New ICC").[4]  New ICC is

---

[3]  Sales of various operating entities and/or their assets have occurred postpetition.

[4]  For purposes of this Memorandum Opinion we will refer to the current Innovative
Communication Corporation as "New ICC."  Although the company itself and the parties hereto
also use the terms "ICC," "Innovative," and "Innovative New."  As a result of a reorganization
effected on December 23, 1989, Innovative Communication Corporation ("Old ICC") was
dissolved and liquidated and its assets and liabilities transferred to Atlantic TeleNetwork Co.
("ATN Co."), a subsidiary of Emerging, in exchange for preferred stock, which was transferred
to ICC-LLC in the liquidation.  ATN Co. changed its name to Innovative Communication
Corporation, referred to as "New ICC."

6

a management and holding company that owned, directly or indirectly, 100% of the common

stock of various operating subsidiaries that provide telephone, newspaper and other services in

the U.S. Virgin Islands, the Caribbean, and abroad.  Among these operating entities are the

Virgin Islands Telephone Corporation ("Vitelco"),[5] the U.S. Virgin Islands telephone company;

St. Croix Cable TV, Inc. and Caribbean Communications Corporation, cable companies which

own and operate the cable television system in the U.S. Virgin Islands; Vitelcom Cellular, Inc., a

cellular wireless company in the U.S. Virgin Islands; Daily Publishing Co., Inc., which owns and

operates the largest daily newspaper in the U.S.V.I; and several other operating companies in the

U.S. Virgin Islands, St. Martin, Martinique, and Guadeloupe of the French West Indies, St.

Maarten of the Netherlands Antilles, the British Virgin Islands, and France.  Exhibit A to this

memorandum opinion is an organizational chart of the entire corporate structure for all the

related entities under the control of Mr. Prosser through the ultimate corporate parent, ICC-LLC,

as of May 5, 2006.[6]

   Mr. Prosser was Chairman of the Board, President, and CEO of New ICC and sole

member of its ultimate parent company, ICC-LLC.[7]

---

[5]  Vitelco is a public utility of the U.S. Virgin Islands and operates under a franchise granted by the U.S. Virgin Islands government.  That franchise may be terminated on two years' notice without cause and immediately for cause.  By statute, the Public Service Commission ("PSC") is the regulatory body.

[6]  Supplement to Examiners Final Report [Docket No. 1035], Case No. 06-30009, Doc. No. 1037.

[7]  Mr. Prosser's control of the parent debtors, Emerging and ICC-LLC, was severed when a trustee was appointed in both cases on March 15, 2007.  Thereafter, on September 28, 2007, Mr. Prosser was removed from the Board of Directors of New ICC and a trustee was appointed for New ICC on October 4, 2007.  On October 3, 2007, with the conversion of Mr. Prosser's case to chapter 7, all authority to act on behalf of Mr. Prosser's individual bankruptcy estate

(continued...)

7

For years prepetition, Debtor and the two largest creditors of the estate, the Rural

Telephone Finance Cooperative ("RTFC") and Greenlight disputed and litigated, in various fora,

the amount owed by debtors to the creditors.[8]  The RTFC's claim derives from over $500 million

lent to Old ICC and New ICC by the RTFC between December 30, 1987, and August 27, 2001.

It is undisputed that the RTFC loans are secured by virtually all of New ICC's assets.

Greenlight's claims derive from two judgments entered in the Delaware Chancery Court: a

judgment for $56,341,843 (plus interest) against ICC-LLC, Old ICC, and Prosser, and a separate

judgment against Emerging in the amount of $28,548,915 (plus interest). These judgments both

arose out of Mr. Prosser's privatization of Emerging.

On February 10, 2006, Greenlight filed involuntary petitions for relief under chapter 11

of the Bankruptcy Code for ICC-LLC, Case No. 06-10133,  Emerging, Case No. 06-10134, and

Mr. Prosser, Case No. 06-10135,  in the United States Bankruptcy Court for the District of

Delaware.

On April 26, 2006, during the pendency of the involuntary cases, the parties (ICC-LLC,

Emerging, Mr. Prosser, New ICC, Greenlight, and RTFC) executed the Terms and Conditions of

Settlement of Claims of RTFC, the National Rural Utilities Cooperative Finance Corporation

("CFC"), Prosser Parties (as defined therein), and Greenlight ("Terms and Conditions"), which

settled the numerous lawsuits and other disputes by and between parties and additionally

provided Mr. Prosser and other ICC-related parties the option to discharge their obligations on

---

[7](...continued)
transferred to the Chapter 7 Trustee.

[8]  *See* Case No. 06-30009, Doc. No. 26, listing RTFC and Greenlight as "subject to
Settlement Agreement" on Schedule F.  *See also* Schedule G.

8

the RTFC and Greenlight judgments (which, by then, totaled more than $650 million) on or before July 31, 2006, the Payment Deadline, for $402 million.[9] Mr. Prosser's several liability was limited to $100 million.

On July 31, 2006, due to their inability to comply with their obligations under the Terms and Conditions, Mr. Prosser, Case No. 06-30009, Emerging, Case No. 06-30007, and ICC-LLC, Case No. 06-30008, filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in District Court of the Virgin Islands, Bankruptcy Division.  The involuntary proceedings in the District of Delaware were subsequently transferred to this Bankruptcy Court and consolidated with the voluntary proceedings.[10]

On December 19, 2006, the United States Trustee ("UST") filed its Motion for the Entry of an Order Appointing a Chapter 11 Trustee in the Emerging and ICC-LLC bankruptcy cases.[11] Greenlight and the RTFC both filed joinders in support of the UST's Motion.[12]  On February 13, 2007, after full evidentiary hearings, briefing, and argument, this court entered its Memorandum

---

[9]  This court eventually ruled that the Payment Deadline in the Terms and Conditions had expired without the payment having been made.  Case No. 06-30008, Doc. No. 787.

[10]  Memorandum Opinion and Order Determining That Venue Is Proper in the District Court for the District of the Virgin Islands Bankruptcy Division, Doc. Nos. 202 and 203 in Case No. 06-30007;  Doc. Nos. 192 and 193 in Case No. 06-30008; Doc. Nos. 164 and 165 in Case No. 06-30009.  At the time the order was entered, both the involuntary cases in the District of Delaware and the voluntary cases in the District of the Virgin Islands were assigned to the undersigned, sitting by designation in both jurisdictions.

[11]  Case No. 06-30008, Doc. No. 199; Case No. 06-30007, Doc. No. 209.

[12]  Case No. 06-30008, Doc. Nos. 202 and 311; Case No. 06-30007, Doc. No. 212 and 256.

Opinion[13] and Order[14] granting the UST's motion and directing the UST to designate a chapter

11 trustee for ICC-LLC and Emerging.  The UST did so.  On March 15, 2007, the court

approved the appointment of Stan Springel of Alvarez & Marsal as the Chapter 11 Trustee in

ICC-LLC and Emerging.[15]

     The Memorandum Opinion entered by this court on February 13, 2007,[16] also addressed

the RTFC's Amended Motion to Convert Mr. Prosser's individual bankruptcy from chapter 11 to

chapter 7.[17]  This court denied the motion to convert without prejudice, in favor of appointing an

examiner, and instructed the UST to recommend an examiner to be appointed by the court.[18]  The

court also ordered Prosser's full and complete cooperation with the Examiner.[19]  The UST

recommended , and on April 5, 2007, the court appointed, former U.S. Bankruptcy Judge Steven

A. Felsenthal of Stutzman, Bromberg, Esserman & Plifka as Examiner in the chapter 11 case of

Mr. Prosser and granted the Examiner "all powers necessary to investigate and report on all areas

---

[13]  Case No. 06-30008, Doc. No. 428; Case No. 06-30007, Doc. No. 448.

[14]  Case No. 06-30008, Doc. No. 430; Case No. 06-30007, Doc. No. 450.

[15]  Order Appointing Stan Springel as Chapter 11 Trustee, Doc. No. 523 in Case No. 06-30008; Doc. No. 543 in Case No. 30007.

[16]  Case No. 06-30009, Doc. No. 371.

[17]  Case No. 06-30009, Doc. No. 184.

[18]  Order of Court Denying Motion to Convert and Extending Time to File Objections to Exemptions and Ordering Appointment of an Examiner, Case No. 06-30009, Doc. No. 372.

[19]  ". . .  ORDERED that the Debtor shall cooperate with the examiner.  In the event Debtor fails to do so, all parties, including the examiner, may seek relief from the court."  Doc. No. 372.  *See also*, Memorandum Opinion, Doc. No. 371 at 26.

set forth by the court in its Memorandum Opinion and Order entered on February 13, 2007."[20]

The Memorandum provided that the Examiner was:  (1) to examine the income and expenses of

the Debtor; (2) to examine the assets of the bankruptcy estate of the Debtor and the claims that

have been or may be filed against the bankruptcy estate; (3) to examine a case neutral plan or

reorganization for the Debtor; and (4) to examine matters pertaining to the administration of the

estate.[21]

At a May 16, 2007, hearing, the Examiner notified the court that Mr. Prosser failed to

make his records and personnel available to the Examiner.[22]  A significant portion of the records

and personnel that the Examiner needed to access were located at the corporate offices of New

ICC, of which Mr. Prosser was then Chairman of the Board, President, and CEO, and at the

private residences of the Prosser family, then occupied by Mr. Prosser.  At the hearing, Mr.

Prosser's counsel indicated to the court that the required records were unavailable due to

continued due diligence being conducted in an effort to refinance at the New ICC level.[23]  This

court permitted a delay, but ordered the Debtor to have his records and personnel available to the

Examiner no later than two weeks from the date of the hearing.[24]   On June 20, 2007, three weeks

past the two week deadline imposed by this court on May 16, 2007, the Examiner filed a Motion

to Compel Debtor to Provide Examiner Access to Certain Personnel and Records because Mr.

---

[20]  Order Approving Appointment of Examiner, Case No. 06-30009, Doc. No. 465.

[21]  Memorandum Opinion, Doc. No. 371 at 29-35.

[22]  May 16, 2007, Transcript, Doc. No. 593 at 44-50.

[23]  May 16, 2007, Transcript, Doc. No. 593 at 46-49.

[24]  May 16, 2007, Transcript, Doc. No. 593 at 49.

Prosser had yet to grant the Examiner access to his records and personnel.  On August 31, 2007,

the court entered an order granting the Examiner's motion ("Order Compelling Cooperation")

which directed Mr. Prosser, and any entities directly or indirectly controlled or affiliated with

him, to fully cooperate with the Examiner and Trustee and provide immediate and unfettered

access to all documents, information, and personnel requested by the Examiner and the Trustee

in ICC-LLC and Emerging.[25]  This court also ordered "that upon the filing by the Examiner or

the Trustee of an affidavit of Debtor's failure to comply with this Order, the court may

immediately enter an order converting this Case No. 06-30009 to one under Chapter 7 of the

Bankruptcy Code or may enter an order to show cause why the Debtor should not be held in

contempt of Court."[26]

On July 5, 2007, Greenlight filed an involuntary petition for relief under chapter 11 of the

Bankruptcy Code for New ICC.  As stated above, New ICC is a wholly-owned subsidiary of

Emerging.  ICC-LLC directly owns 52% of Emerging, the sole owner of New ICC, and

indirectly owns the other 48% of Emerging through its wholly-owned subsidiary, ICSC-LLC.

On September 7, 2007, the court entered an order in ICC-LLC which gave the Trustee in that

case authority to vote the shares of Emerging, thereby confirming the Trustee's control of New

---

[25]  Order Granting the Examiner's Motion to Compel Debtor to Provide Examiner Access
to Certain Personnel and Records, Doc. No. 729 in Case No. 06-30009.  The order required Mr.
Prosser to give the Examiner and the Trustee "immediate, full, complete and unfettered access to
any and all personnel, books, records, documents and accounts, including bank accounts, of (I)
the Debtor, (ii) any entity or organization . . . in which the Debtor has any interest . . . or any
entity or organization over which the Debtor either directly or indirectly, exercises any influence
or any degree of control . . . and (iii) any entity or organization . . . which is owned or under the
direction or control of any entity or organization in which the Debtor has any interest or over
which the Debtor, either directly or indirectly exercises any influence or control . . .."

[26]  *Id.*

ICC through his capacity as Trustee of Emerging.[27]   The court found, for reasons stated on the

record on September 6 and 7, 2007,[28] that the Trustee's control of New ICC was necessary to

manage a fair and independent sale process.  Trustee Springel voted the shares of stock held by

Emerging to remove Mr. Prosser from New ICC's board of directors effective as of September

24, 2007.  Under Virgin Islands corporate law, Mr. Prosser's removal from the board renders

him ineligible to serve as President and CEO of New ICC.

On September 26, 2007, the RTFC and the UST filed motions to appoint an interim

chapter 11 trustee in New ICC.[29]  On October 3, 2007, the court entered an order requiring the

UST to immediately appoint a Chapter 11 Trustee in New ICC.[30]  On October 4, 2007, the court

approved the appointment of Stan Springel as trustee in New ICC.[31]

On July 18, 2009, Greenlight filed a renewed motion to convert Mr. Prosser's individual

---

[27]   Order Approving Trustee's Use of Property of the Emerging Communications, Inc. Estate Outside the Ordinary Course of Business, Doc. No.870 in Case No. 06-30008. "The Trustee is authorized and directed to vote ECI's [Emerging] shares of stock in [New ICC], a wholly-owned subsidiary of ECI, to remove the current board of directors and officers of New ICC if necessary, to take any related corporate action to effectuate the Trustee's control over New ICC in order to facilitate a transaction for the refinancing or sale of the Debtors and their Operating Subsidiaries and, if necessary, to file a voluntary bankruptcy petition on behalf of New ICC."

[28]   September 6, 2007, Transcript, Case No. 06-30009, Doc. No. 884; September 7, 2007, Transcript, Case No. 06-30009, Doc. No. 883;  September 7, 2007, Sealed Transcript, Case No. 06-30009, Doc. No. 882.

[29]   RTFC's Emergency Motion to Appoint Interim Chapter 11 Trustee, Case No. 07-30012, Doc. No. 67;  United States Trustee's Motion for Appointment of a Chapter 11 Trustee, Case No. 07-30012, Doc. No. 85; United States Trustee's Response to the Emergency Motion of the Rural Telephone Finance Cooperative for Appointment of an Interim Chapter 11 Trustee, Case No. 07-30012, Doc. No. 96.

[30]   Case No. 07-30012, Doc. No. 112.

[31]   Case No. 07-30012, Doc. No. 125.

bankruptcy case from a case under chapter 11 to a case under chapter 7.[32]  On September 4,

2007, the Examiner submitted his Fourth Interim Report[33] in which he recommended that the

court grant Greenlight's renewed motion to convert.[34]  As stated above, the Order Compelling

Cooperation entered by this court on October 3, 2007,[35] provided that upon filing by the Trustee

or Examiner of an affidavit of Debtor's failure to comply with that Order, the court "may

immediately" convert the case to a chapter 7 case.  On September 19, 2007, the Trustee filed

such an affidavit reporting the Mr. Prosser's failure to comply with that Order.[36]  On September

21, 2007, the court heard additional arguments on the motion to convert.[37]  On October 3, 2007,

having reviewed and considered the transcripts, the evidentiary record, the parties' briefs and

arguments, and the Examiner's Report(s), this court entered an order converting the chapter 11

case of Mr. Prosser to a chapter 7 case and directing the UST to immediately appoint a chapter 7

---

[32]  Filed under seal with Doc. No. 684, Case No. 06-30009.

[33]  The Fourth Interim Report was submitted to the court and the parties on September 4,
2007, but was not filed on the public record at that time.  The report is now reported on the
public record as Tab G to the Examiner's Final Report, Case No. 06-30009, Doc. No. 1035.

[34]  Among the many considerations influencing the Examiner's decision to recommend
conversion was that "[t]he Debtor has failed to consistently, adequately, and timely cooperate
with the Examiner's investigation."  Fourth Interim Report, Case No. 06-30009, Doc. No. 1035,
Tab G at 47.

[35]  Case No. 06-30009, Doc. No. 729.

[36]  Case No. 06-30009, Doc. No. 832.

[37]  September 21, 2007, Transcript, Case No. 06-30009, Doc. No. 863.  The matter was
continued from the September 6, 2007, Hearing.  September 6, 2007, Transcript, Case No. 06-
30009, Doc. No. 829.

trustee.[38]

John Ellis was initially appointed as the chapter 7 trustee.[39]  Mr. Ellis resigned[40] and

Trustee Carroll was appointed as the chapter 7 trustee on October 31, 2007.[41]

## OBJECTIONS TO EXEMPTIONS

Mr. Prosser filed his original schedules, Doc. No. 26, and Statement of Financial Affairs,

Doc. No. 27, on September 25, 2006.  Mr. Prosser filed the following amendments to the original

schedules:

- First Amendment, Doc. No. 359, filed on February 5, 2007;
- Second Amendment, Doc. No. 368, filed on February 13, 2007;
- Third Amendment, Doc. No. 1062, filed on November 30, 2007;
- Fourth Amendment, Doc. No. 1226, filed on January 11, 2008.
- Fifth Amendment, Doc. No. 2468, filed on May 7, 2009.[42]

In Schedule C of the original schedule, First Amendment, and Second Amendment,[43] Mr. Prosser

checked the box stating that he was electing federal exemptions under §522(b)(2), but also

---

[38]  Order Converting Case to Chapter 7, Case No. 06-30009, Doc. No. 865.

[39]  Notice of Appointment of Trustee John Ellis, Case No. 06-30009, Doc. No. 868.

[40]  Trustee's Rejection of Appointment, Case No. 06-30009, Doc. No. 926.

[41]  Order Resolving Trustee Election Dispute, Case No. 06-30009, Doc. No. 948.

[42]  Filed after the close of evidence on the exemptions trial while this matter was under advisement by the court.  The Fifth Amendment to the Schedules does not change exemptions. Doc. No. 2468.

[43]  Schedule C (Property Claimed As Exempt) was not among the schedules included in the Third Amendment.  Doc. No. 1062.

15

specified exemptions pursuant to §522(b)(3), contradicting his §522(b)(2) election.[44]  On January

7, 2008, in response to the request of the creditors and other parties in interest, Mr. Prosser filed

a declaration which stated that §522(b)(2) was the statutory basis for his claimed exemptions.

Declaration Concerning Prosser's Claimed Exemptions, Doc. No. 1200.  At a hearing on January

11, 2008, counsel for Mr. Prosser stated that despite the clear election of §522(b)(2), he had

intended to claim exemptions under §522(b)(3) and requested that the court permit him to amend

the schedules again.  The court granted the request.  The Fourth Amendment was filed on

January 11, 2008.

The Chapter 7 Trustee, the Chapter 11 Trustee, and Greenlight ("Objecting Parties") each

filed objections to the exemptions claimed by Mr. Prosser.[45]  The court held a non-evidentiary

hearing on certain of the grounds for objection on February 28, 2008, at which time it ruled on a

number of the objections and entered an Order Regarding Objections to Debtor's Claimed

Exemptions and Granting Related Relief, Doc. No. 1458, ("Exemptions Order") reflecting those

rulings on March 20, 2008.  The property which the court ruled may not be exempted includes,

but is not limited to the following:  (1) the Alexander Popivic Frescos; (2) Mr.  Prosser's

interests in any jewelry; (3) Mr. Prosser's interest in wines, champagne, liquors, and other

spirits; (4) the Lake Placid Property; and (5) certain wearing apparel.  In response to Prosser's

Emergency Motion for Stay Pending Appeal of Order on Objections to Claimed Exemptions

based on Irreparable Harm, Doc. No. 1460, this court entered its Order Granting in Part and

---

[44]  ". . .an individual debtor may exempt from property of the estate the property listed in *either paragraph (2) or, in the alternative, paragraph (3)* of this subsection." [emphasis added] 11 U.S.C. §522(b)(1) (2006).

[45]  Doc. Nos.  1143, 1178, 1236, 1237, 1338, 1343, 1344.

Denying in Part the Motion for Stay Pending Appeal, Amending in Part Order of March 20, 2008, and Scheduling Hearing, Doc. No. 1463.  This order modified the Exemptions Order to permit Prosser additional time to inventory and turn over his non-exempt wearing apparel and stayed the enforcement of the Exemptions Order until the April 16, 2008, omnibus hearing to permit the parties to inform the court as to whether the Frescos could be removed without causing substantial harm to the residences.  Following the April 16, 2008, omnibus hearing, the parties agreed that the Frescos were indeed fixtures which had to remain with the property.  Thus, there is no basis to exempt the Frescos as personal property.

The remaining objections to exemptions were tried by the court on June 9-12, 2008, August 25-28, 2008, September 8-9, 2008, and October 2-3, 2008.  After the close of evidence, the parties submitted the following proposed findings of fact and conclusions of law and post-trial briefs:

> - Jeffrey J. Prosser's Proposed Findings of Fact and Conclusions of Law and Brief, Doc. No. 2225, filed on Nov. 14, 2008;
> - Trustee Springel's Proposed Findings of Fact and Conclusions of Law, Doc. No. 2226, filed on Nov. 14, 2008;
> - Trustee Springel's Brief in Support of Proposed Findings of Fact and Conclusions of Law, Doc. No. 2227, filed on Nov. 14, 2008;
> - Trustee Carroll's Proposed Findings of Fact and Conclusions of Law, Doc. No. 2229, filed on Nov. 14, 2008;
> - Trustee Carroll's Post Trial Brief Regarding Exemptions Claimed by Debtor, Doc. No. 2230, filed on Nov. 14, 2008;
> - Joinder of Greenlight in Chapter 7 Trustee's (A) Proposed Findings of Fact and Conclusions of Law and (B) Post Trial Brief With Respect to the Exemptions Proceedings, Doc. No. 2233, filed on Nov. 14, 2008.

On December 1, 2008, the court held closing arguments.  Thereafter, the parties filed the following post-argument briefs:

> - Jeffrey J. Prosser's Supplementary Trial Brief on Objections to Exemptions, Doc. No. 2305, filed on January 15, 2009;

- Chapter 11 Trustee's Objection to Jeff Prosser's Proposed Findings of Fact and
Conclusions of Law, Doc. No. 2309, filed on January 15, 2009;
- Chapter 11 Trustee's Supplemental Post-Trial Brief (Exemptions Contested Matter),
Doc. No. 2310, filed on January 15, 2009;
- Chapter 7 Trustee's Supplemental Post-Trial Brief Regarding Exemptions Claimed by
the Debtor, Doc. No. 2312, filed on January 15, 2009;
- Joinder of Greenlight in (A) Chapter 11 Trustee's Supplemental Post-Trial Brief
(Exemptions Contested Matter) and (B) Chapter 7 Trustee's Supplemental Post Closing
Brief Regarding Exemptions Claimed by the Debtor, Doc. No. 2316, filed on January 15,
2009;
- Jeffrey J. Prosser's Reply Trial Brief on Exemptions to Exemptions, Doc. No. 2350,
filed on January 26, 2009;
- Chapter 11 Trustee's Response to Jeff Prosser's Supplementary Trial Brief on
Objections to Exemptions, Doc. No. 2352, filed on January 26, 2009;
- Chapter 7 Trustee's Reply Brief to Jeffrey J. Prosser's Supplementary Trial Brief on
Objections to Exemptions, Doc. No. 2354, filed on January 26, 2009.

The most prominent subject in the briefs and over the course of the trial were the

allegations of and evidence regarding bad faith, misconduct, and fraudulent intent on the part of

Mr. Prosser.  The Objecting Parties allege that, in the time leading up to the voluntary petition

filing and throughout the bankruptcy process, Mr. Prosser conducted himself in bad faith and in

an effort to thwart the bankruptcy process.  The Objecting Parties ask the court to conclude that,

based on the totality of the evidence and circumstances, Mr. Prosser has abused the bankruptcy

process in an effort to defraud his creditors and the creditors of the entities that he controlled.

Because of the alleged bad faith conduct of Mr. Prosser, the Objecting Parties suggest that it is

proper for the court to deny all claimed exemptions on the grounds of Mr. Prosser's bad faith and

fraudulent conduct alone.

As set forth in this court's findings of facts and conclusions of law, in the time leading up

to the filing of the involuntary petition and throughout the bankruptcy proceedings, Mr. Prosser

conducted himself in bad faith and, postpetition, in abuse of the bankruptcy process.  The court

finds, based on the totality of the evidence, that the degree of Mr. Prosser's misconduct during

his bankruptcy and abuse of the bankruptcy process was such that a sweeping denial of

exemptions is appropriate.  More specificity follows.  Therefore, as explained herein, the

exemptions claimed by Mr. Prosser under 11 U.S.C. §522(b)(3) of the Bankruptcy Code will be

denied.

In addition to bad faith and fraudulent conduct as grounds for the denial of the entirety of

Mr. Prosser's claimed exemptions, the Objecting Parties cited additional grounds for the denial

or limitation of the specific exemptions claimed by Mr. Prosser in the Palm Beach Property,

Hermon Hill Property, Estate Shoys Property, and Anna's Hope Property:

(1) <u>Palm Beach Property</u>.  The Objecting Parties argue that any exemptions claimed for

the Palm Beach Property would be capped under §522(q) because Mr. Prosser owes

debt[46] arising from "fraud, deceit or manipulation in a fiduciary capacity."  The Objecting

Parties also assert that the Palm Beach Property is not exempt because Florida law does

not allow an exemption for property held in the tenancy by the entirety when a creditor

holds joint debts against both spouses.[47]  The Chapter 11 Trustee also argues that the

Palm Beach Property is not exempt because it is the subject of a fraudulent transfer.[48]

---

[46]  The debt at issue is the judgment against Mr. Prosser in favor of Greenlight in *In re Emerging Communications, Inc. Shareholders Litigation*, Civil Action No. 16415, and alleged fraudulent transfers from the ICC Debtors to or for the benefit of the Prosser family.  The Objecting Parties allege that both debts arose from fraud, deceit or manipulation by Jeffrey Prosser in a fiduciary capacity at Emerging and New ICC.

[47]  There is a mortgage against the property titled in the name of Jeffrey and Dawn Prosser.  Dawn Prosser is Jeffrey Prosser's wife.

[48]  Innovative Communication Corporation commenced an adversary proceeding, Adv. No. 08-3002, seeking to recover property transferred by New ICC to Mr. and Mrs. Prosser.

(2) <u>Hermon Hill Property</u>.  The Objecting Parties argue that the Hermon Hill Property is

not exempt because it is held in joint tenancy, not tenancy by the entirety.  Additionally,

the Objecting Parties assert that, even assuming that the property was held in tenancy by

the entirety, the Hermon Hill Property is not exempt because there is no exemption for

property held in tenancy by the entirety when a creditor holds joint debt against both

spouses under U.S. Virgin Islands law.

(3) <u>Estate Shoys Property</u>.  The Chapter 11 Trustee argues that the Estate Shoys Property,

which is titled in the name of Jeff Prosser's wife, Dawn Prosser, alone,[49] cannot be used

as a residence or claimed as a homestead because the home, which is under construction,

is unfinished and uninhabitable.   The Chapter 11 Trustee also asserts that §522(q) would

cap exemptions relating to the Estate Shoys Property.

(4) <u>Anna's Hope Property</u>.  The Objecting Parties argue that the Anna's Hope Property is

not exempt because there is no exemption for property held in tenancy by the entirety

when a creditor holds joint debt against both spouses under U.S. Virgin Islands law.

Given the court's ruling regarding a sweeping denial of all exemptions due to the bad faith

conduct of Mr. Prosser, it is unnecessary to address the specific objections at this time.  The

outcome as to any specific item will not change the overall result based on the court's ruling

denying entitlement to all exemptions.

---

[49]  This property consists, inter alia, of a very large home under construction and related
buildings across the various lots.

# FINDINGS OF FACT[50]

**1.  Mr. Prosser failed to produce material documents, failed to provide necessary access, and failed to cooperate with the court appointed Examiner, the Chapter 7 Trustee, and the Chapter 11 Trustee for the ICC Debtors.**

As noted above, Judge Steven A. Felsenthal was appointed as Examiner in the individual bankruptcy case of Mr. Prosser on April 5, 2007.[51]  On May 16, 2007, Judge Felsenthal notified the court that Mr. Prosser had failed to make his records and personnel available and this court set a two week deadline for Mr. Prosser provide access.  On August 31, 2007, in response to Mr. Prosser's continued failure to provide the necessary access to the Examiner, this court entered the Order Compelling Cooperation which directed Mr. Prosser, and any entities directly or indirectly controlled by or affiliated with him, to fully cooperate with the Examiner and Trustee and provide immediate and unfettered access to all documents, information, and personnel requested by the Examiner and the Trustee in ICC-LLC and Emerging.[52]  On October 3, 2007, this court converted the Chapter 11 case of Mr. Prosser to a Chapter 7[53] and appointed a Chapter 7 Trustee. The order recited that "as of the hearing on September 21, 2007, Debtor still had not released to the Examiner his personal checking account statement and had not requested, or only recently requested, records from his bank and, although information was sought by the Trustee

---

[50]  The exhibits presented to the court by the parties were labeled with either TE, TT, JP, or DP and are cited in this memorandum opinion accordingly.

[51]  Doc. No. 465 in Case No. 06-30009.

[52]  Doc. No. 729 in Case No. 06-30009.

[53]  Order Converting Case to Chapter 7, Case No. 06-30009, Doc. No. 865.

for a time period of 10 years, no effort was made by Debtor to provide recent information."[54]  As

confirmed by the testimony, the Examiner never obtained the requested bank statements from the

Debtor.  Trial Testimony of James P. Carroll, TR 6/9/08 at 13:15-19, Doc. No. 1791.

James Patrick Carroll was appointed as the Chapter 7 Trustee on October 31, 2007.

Trial Testimony of James P. Carroll, TR 6/9/08 at 12:6-8, Doc. No. 1791.  Mr. Carroll, through

his company Carroll Services, LLC, has been retained by courts as a chapter 11 trustee,

liquidator, and independent consultant.  Trial Testimony of James P. Carroll, TR 6/9/08 at 10:1-

5, Doc. No. 1791.  In pursuing his duties as the Trustee under 11 U.S.C. §704, Mr. Carroll talked

with and reviewed the reports of the Chapter 11 Examiner.  Trial Testimony of James P. Carroll,

TR 6/9/08 at 13:8-10, Doc. No. 1791.  He made efforts to investigate the financial affairs of the

Debtor.  He testified that, continuing the pattern begun during the Examiner's tenure, as of the

date of this trial, the level of cooperation from Mr. Prosser to the Chapter 7 Trustee was poor.

Trial Testimony of James P. Carroll, TR 6/10/08 at 95:18-23, Doc. No. 1792.  Despite repeated

requests from the Chapter 7 Trustee, the Debtor never provided bank statements to the Chapter 7

Trustee.[55]  Trial Testimony of James P. Carroll, TR 6/9/08 at 80:16-20, Doc. No. 1791.  Mr.

Prosser failed to disclose or provide all of the bank statements and credit card statements

requested by the Chapter 7 Trustee.  Trial Testimony of James P. Carroll, TR 8/27/08 at 100:1-

19, Doc. No. 2096.  The Chapter 7 Trustee was required to secure bank statements for Mr.

---

[54]  Case No. 06-30009, Doc. No. 865 at 5.

[55]  *See also* Fed. R. Bankr. P. 4002(a)(4)("In addition to performing other duties
prescribed by the Code and rules, the debtor shall: . . . (4)  cooperate with the trustee in the
preparation of an inventory, the examination of proofs of claim, and the administration of the
estate.").

Prosser from Trustee Springel because he was unable to get those statements from Mr. Prosser.

Trial Testimony of James P. Carroll, TR 6/9/08 at 137:5-14, Doc. No. 1791.  Indeed, during the

time from July 31, 2006, the date Mr. Prosser filed his voluntary bankruptcy petition, until

January 2008, when Mr. Prosser pled the Fifth Amendment for the first time at the §341 meeting,

Mr. Prosser did not deliver a single bank statement to the Chapter 7 Trustee.  Trial Testimony of

James P. Carroll, TR 6/9/08 at 137:23-25, 138:1-13, Doc. No. 1791.

The Chapter 7 Trustee did not receive the Debtor's cooperation regarding gaining access

to the Debtor's records.  Trial Testimony of James P. Carroll, TR 6/10/08 at 34:24-25, 35:1-5,

Doc. No. 1792.  The Chapter 7 Trustee was denied access to records that were located in Prosser

homes.  Trial Testimony of James P. Carroll, TR 6/10/08 at 46:10-12, Doc. No. 1792.

Prior to September 28, 2007, when he was removed from the Board of Directors of New

ICC, Mr. Prosser controlled New ICC.  In order to access information regarding the operating

entities ultimately owned by ICC-LLC and Emerging, Trustee Springel had to access the offices

and personnel of New ICC.  Byron Syml is a Managing Director from Alvares & Marsal in the

North American restructuring practice based out of Miami.  Trial Testimony of Byron P. Smyl,

TR 6/10/08 at 116:10-13, Doc. No. 1792.  Mr. Smyl worked on the ICC-LLC case with Trustee

Springel, the Chapter 11 Trustee.  Trial Testimony of Byron P. Smyl, TR 6/10/08 at 118:1-6,

Doc. No. 1792.  His first day working with ICC-LLC and its management was either March 19

or March 20, 2007.  Trial Testimony of Byron P. Smyl, TR 6/10/08 at 118:18-20, Doc. No. 1792.

In the spring of 2007, Mr. Syml requested documents relating to ICC-LLC and New ICC

including financial information, cash flow information and bank accounts to gain an

understanding of how operations ran.  Trial Testimony of Byron P. Smyl, TR 6/10/08 at 125:3-8,

23

Doc. No. 1792.  Mr. Smyl understood through discussions with Bobby Lubana, Vice President of

Finance of New ICC and Dennis Kanai, CFO of New ICC, that decisions and direction regarding

what documents to provide Mr. Smyl were made by Mr. Prosser and conveyed though Mr.

Lubana.  Trial Testimony of Byron P. Smyl, TR 6/10/08 at 125:9-25, 126:1-17, Doc. No. 1792.

The documents were not produced.  As a result of the failure to produce the requested documents

to the Chapter 11 Trustee, the court issued an Order to Compel that production.  TE 11 (Order

Granting the Examiner's Motion to Compel Debtor to Provide Examiner Access to Certain

Personnel and Records, Doc. No. 729).  Notwithstanding the entry of the Order to Compel, and

despite its clear statement regarding Debtor's duty to do so, Mr. Prosser did not provide

immediate, full, complete and unfettered access to the records of New ICC as required by the

Order.  Trial Testimony of Byron P. Smyl, TR 6/10/08 at 132:4-9, Doc. No. 1792.  Once a

trustee was appointed for New ICC (and Mr. Prosser was removed from control), the documents

which had been sought for several months were very easily obtained.  Trial Testimony of Byron

P. Smyl, TR 6/10/08 at 137:13-16, Doc. No. 1792.

        In addition to the facts listed above, Mr. Prosser impeded the work of the Examiner and

Trustees in a number of other ways.  As discussed in full in section 4 of the court's findings of

fact and despite the mandate of 11 U.S.C. §521 and Fed. R. Bankr. P. 4002, Mr. Prosser failed to

disclose and/or continuously delayed disclosure of numerous other assets, liabilities, and records,

such as, but not limited to: estate planning documents; corporate interests; insurance policies;

wine, cigars, and jewelry worth millions of dollars; $480,000 he transferred in two transactions

to Dawn Prosser's bank account on the day of and the day after the filing of his voluntary

bankruptcy petition; and a liability he had of $5.65 million.  As discussed in full in sections 2

and 3 of the court's findings of fact, Mr. Prosser also attempted to limit the Trustees' access to records, documents, and information by failing to disclose the existence of rented storage space in West Palm Beach and ordering the destruction of computer hard drives located in the Palm Beach Property.

Mr. Prosser's failure to produce material documents, provide necessary access and cooperate with the Examiner and Trustees, we find, was established by the credible evidence, was inconsistent with Mr. Prosser's duties as a debtor, such as those enumerated in 11 U.S.C. §521 and Fed. R. Bankr. P. 4002,[56] and was intended to, and did, impede the bankruptcy process.

## 2.  Mr. Prosser failed to disclose the existence of storage space in West Palm Beach, Florida, containing records and personal property relevant to the bankruptcy.

A storage unit was rented by New ICC from Extra Space Storage, previously known as Storage USA in West Palm Beach, FL.  TE 75 (Extra Space Storage Documents Produced in Response to Chapter 7 Trustee's Subpoena for Production of Documents) at TE200609.  The Extra Space Storage Unit was rented to store "household property," and Mr. Prosser was listed

---

[56]  *See* 11 U.S.C. §521(a)(3) and (4)("The debtor shall– . . . (3) if a trustee is serving in a case or an auditor serving under section 586(f) or title 28, cooperate with the trustee as necessary to enable the trustee to perform the trustee's duties under this title; (4) if a trustee is serving in the case or an auditor serving under section 586(f) of title 28, surrender to the trustee all property of the estate and any recorded information, including books, documents, records, and papers, relating to property of the estate, whether or not immunity is granted under section 344 of this title . . . .");  Fed. R. Bankr. P. 4002(a)(4)("In addition to performing other duties prescribed by the Code and rules, the debtor shall: . . . (4)  cooperate with the trustee in the preparation of an inventory, the examination of proofs of claim, and the administration of the estate . . . .").  Other duties of the debtor are set forth elsewhere in the Bankruptcy Code and Federal Rules of Bankruptcy Procedure.

on Extra Space Storage's documentation as authorized to access the unit.  Trial Testimony of

Jeffrey J. Prosser, TR 8/25/08 72:17-73:8, Doc. No. 2096; TE 75 (Extra Space Storage

Documents Produced in Response to Chapter 7 Trustee's Subpoena for Production of

Documents).  The storage units were originally leased at Mr.  Prosser's direction for storage of

household goods and a Porsche registered in the name of Debtor's wife, Dawn Prosser, but

driven by Mr.  Prosser.  A Porsche was stored at the Extra Space Storage facility.  Trial

Testimony of Stan Springel, TR 8/28/08 at 71:19-25, 72:1-12, Doc. No. 2096; TE 75 (Extra

Space Storage Documents Produced in Response to Chapter 7 Trustee's Subpoena for

Production of Documents) at TE2 00613).  Oakland Benta, who was an employee of New ICC

and handled security for the Prossers, testified that the storage unit was "acquired to house one

of the vehicles of Mr. Prosser" sometime in 2001.  Trial Testimony of Oakland Benta, TR

8/28/08 at 104:23-105:8, 108:12-24, Doc. No. 2096.  In addition, these storage units were

continuously used by the Prossers for years for storage of undisclosed personal property,

including, but not limited to glassware, Christmas decorations and the aforementioned records

relevant to the bankruptcy cases of Mr.  Prosser and the ICC Debtors.  The rent for the storage

units was paid for initially by New ICC on Mr. Prosser's behalf and later out of a Regent bank

account in the name of Adrian Prosser (Mr. Prosser's son) and Linda Hirsch.  TE 75 (Extra

Space Storage Documents Produced in Response to Chapter 7 Trustee's Subpoena for

Production of Documents); TE 76 (Custodian of Record Declarations from Regent Bank and

Corresponding Document Productions).

    In May 2008, nearly two years after Debtor filed his voluntary bankruptcy, the storage

units were identified, located, and found to contain at least eleven large boxes of undisclosed

documents that should have been turned over to one or both of the Trustees and which were responsive to previously propounded discovery requests. When Mr. Carroll visited the Extra Space Storage unit, which itself was undisclosed, he discovered that boxes of documents containing these records were stored there. Trial Testimony of James P. Carroll, TR 8/27/08 at 141:16-21, Doc. No. 2096; Trial Testimony of James P. Carroll, TR 6/9/08 at 89:24-90:1, Doc. No. 1791; TE 58 (Photographs of storage locker in West Palm Beach, Florida) at TE200390-92. The boxes contained, *inter alia*, cancelled checks in the name of Mr. Prosser. Trial Testimony of James P. Carroll, TR 6/9/08 at 94:17-22, Doc. No. 1791.

Mr. Prosser claims that he never knew of the storage space utilized in Extra Space Storage facility in West Palm Beach despite the fact that payments were made to the facility by New ICC and later by his son, Adrian Prosser. Trial Testimony of Jeffrey J. Prosser, TR 8/25/08 at 56:14-57:9, 71:20-25, Doc. No. 2096; TE 47 (Regent Bank Account Statements, Account No. 6100130906); TE 75 (Extra Space Storage Documents Produced in Response to Chapter 7 Trustee's Subpoena for Production of Documents). Rent for the Extra Space Storage facility was paid in December, 2007, and January, 2008, by checks from a Regent bank account of Adrian Prosser and Linda Hirsch and signed by Mr. Prosser's son, Adrian Prosser. Trial Testimony of Stan Springel, TR 8/28 at 84:24-87:7, Doc. No. 2096; TE 75 (Extra Space Storage Documents Produced in Response to Chapter 7 Trustee's Subpoena for Production of Documents) at TE2 00567, 71. Moreover, Mr. Prosser, Innovative Communication Corporation, Cordell Johnson, and Anthony Elskoe (employees of New ICC) were listed as contacts for Extra Space Storage. Trial Testimony of Stan Springel, TR 8/28/08 at 70:24-25, 71:1-18, Doc. No. 2096; TE 75 (Extra Space Storage Documents Produced in Response to Chapter 7 Trustee's Subpoena for

Production of Documents) TE 200613.  Further, the key to the storage units was kept in the

Prossers' home and keyed to the lock of the Prossers' personal residence at 252 El Bravo Way,

Palm Beach, Florida. Trial Testimony of Cordell Johnson, TR 10/2/2008 at 102:24-106:2, Doc.

No. 2170.

　　　The credible evidence established and the court finds that Mr. Prosser knowingly failed

to disclose the existence of two large storage units in West Palm Beach, Florida, and the contents

thereof.  The storage units contained at least eleven large boxes of undisclosed documents that

were Mr. Prosser's or were controlled by him that should have been turned over to one or both of

the Trustees and which were responsive to previously propounded discovery requests.  The

storage units also contained undisclosed personal property of the Prossers.  The nondisclosure,

we find, was established by the credible evidence, was inconsistent with Mr. Prosser's duties as a

debtor and was intended to, and did, impede the bankruptcy process.  *See* Fed. R. Bankr. P.

4002; 11 U.S.C. §521(a)(3),(4); 11 U.S.C. §521(a)(1)(B).[57]

---

[57] *See* 11 U.S.C. §521(a)(1)("Debtor's duties.  (a) The Debtor shall– (1) file– . . . (B) unless the court orders otherwise,– (i) a schedule of assets and liabilities; (ii) a schedule of current income and current expenditures; (iii) a statement of the debtor's financial affairs, . . . (iv) copies of all payments advices or other evidence of payment received within 60 days before the date of filing of the petition, but the debtor from any employer of the debtor; (v) a statement of the amount of monthly net income itemized to show how the amount is calculated; and (vi) a statement disclosing any reasonably anticipated increase in income or expenditures over the 12-month period following the date of filing of the petition . . . .);  Fed. Rule Bankr. Proc. 1007(b)(1)(A)("(b) Schedules, Statements, and Other Documents Required.  (1) Except in a chapter 9 municipality case, the debtor, unless the court orders otherwise, shall file the following schedules, statements, and other documents, prepared as prescribed by the appropriate Official Forms, if any: (A) schedules of assets and liabilities; (B) a schedule of current income and expenditures; (C) a schedule of executory contracts and unexpired leases; (D) a statement of financial affairs; (E)  copies of all payment advices or other evidence of payment, if any, with all but the last four digits of the debtor's social security number redacted, received by the debtor from an employer within 60 days before the filing of the petition; and (F) a record of any interest

(continued...)

**3.  Mr. Prosser ordered the destruction of computer hard drives located at the Palm Beach
Property in an effort to conceal information, records, and documents from the Trustees**.

Arthur Stelzer was employed by New ICC but his duties were exclusively to act as Mr.

Prosser's valet and personal assistant.  Trial Testimony of Arthur Stelzer, TR 6/10/08 at 198:12-

14, Doc. No. 1792.  Mr. Stelzer began his employment with Mr. Prosser in September of 2002.

Trial Testimony of Arthur Stelzer, TR 6/10/08 at 199:21-23, Doc. No. 1792.  Mr. Stelzer's duties

included traveling with Mr. Prosser on almost all occasions, taking care of arrangements for

hotels, ground transportation and restaurants, assisting with Mr. Prosser's wardrobe, taking care

of his personal belongings, picking up prescriptions and whatever else was needed by Mr.

Prosser personally.  Trial Testimony of Arthur Stelzer, TR 6/10/08 at 200:9-21, Doc. No. 1792.

Mr. Stelzer also performed services for Dawn Prosser and the Prosser children.  Trial Testimony

of Arthur Stelzer, TR 6/10/08 at 200:20-25, 201:1-9, Doc. No. 1792.  Mr. Stelzer was paid by

New ICC. Trial Testimony of Arthur Stelzer, TR 6/10/08 at 199:5-12, Doc. No. 1792.  On

October 16, 2007, Mr. Stelzer's employment was terminated by the Chapter 11 Trustee.  Trial

Testimony of Arthur Stelzer, TR 6/10/08 at 205:7-14, Doc. No. 1792.  Mr. Prosser's wife, Dawn

Prosser, personally continued to pay Mr. Stelzer after his termination from New ICC by Trustee

Springel on at least one occasion, and possibly others.  TE 105 (Check from Dawn Prosser to

Arthur Stelzer for $1,500.00, Dated November 21, 2007); Trial Testimony of Jeffrey J. Prosser,

TR 10/3/08 at 145:25-147:2, Doc. No. 2170.

---

[57](...continued)
that the debtor has in an account or program of the type specified in §521(c) of the Code.");
Official Form 6: Schedules; Official Form 7: Statement of Financial Affairs.

In October 2007, Mr. Prosser directed Mr. Stelzer to erase the hard drive in both the laptop and desktop computers located in the Palm Beach Property.  Trial Testimony of Arthur Stelzer, TR 6/10/08 at 238:15-239:7, 248:12-15, Doc. No. 1792.  At the time of this request, Mr. Prosser was in bankruptcy.  Trial Testimony of Arthur Stelzer, TR 6/10/08 at 238:15-18, Doc. No. 1792.

On October 18, 2007, Mr. Stelzer called Eric Bergstedt of Audio Advisors to reformat the laptop and to clean the hard drive on the desktop computer so that it was in a like-new state.  Deposition of Eric Bergstedt, TR 7/9/08 at 11:2-18, Doc. No. 1989, TE 98.

Mr. Bergstedt was instructed to replace the hard drive in the desktop computer and return the original hard drive to Mr. Stelzer.  Deposition of Eric Bergstedt, TR 7/9/08 at 12:4-8, Doc. No. 1989, TE 98.  Mr. Stelzer requested that Audio Advisors make a duplicate copy of the new hard drive.  Deposition of Eric Bergstedt,  TR 7/9/08 at 16:5-9, Doc. No. 1989, TE 98.  According to Mr. Bergstedt, although Mr. Stelzer wanted the original hard drive returned, he told Mr. Bergstedt that he specifically did not want Audio Advisors to make a copy of the original hard drive and that he did not want Audio Advisors to back up any files from the original hard drive.  Deposition of Eric Bergstedt, TR 7/9/08 at 26:3-11, Doc. No. 1989, TE 98.

On October 19, 2007, Audio Advisors completed the replacement of the hard drive, copied the new hard drive and returned the desktop computer to the Prosser residence.  Deposition of Eric Bergstedt,  TR 7/9/08 at 17:16-18:5, Doc. No. 1989, TE 98.  Joab King, an Audio Advisors employee, handed a copy of the new hard drive directly to Mr. Prosser at his residence.  Deposition of Eric Bergstedt, TR 7/9/08 at 35:6-14, Doc. No. 1989, TE 98.  Audio Advisors did not replace the hard drive in the laptop and, as Mr. Stelzer also testified, told Mr.

30

Stelzer he would have to send it to Sony to get the work done.  Deposition of Eric Bergstedt,  TR

7/9/08 at 37:13-20, Doc. No. 1989, TE 98; Trial Testimony of Arthur Stelzer, TR 6/10/08 at

277:16 - 278:15, Doc. No. 1792.  The original hard drive from the desktop computer was picked

up by Mr. Stelzer on October 18, 2009.  Deposition of Eric Bergstedt, TR 7/9/08 at 22:8-10,

Doc. No. 1989, TE 98.  James Lee, attorney for the Chapter 11 Trustee, received the original

hard drive from Mr. Stelzer, when he was interviewed as a witness on December 19, 2007.  Trial

Testimony of Arthur Stelzer, TR 6/10/08 at 276:10-13, Doc. No. 1792.  The hard drive was

subsequently handed over to the Chapter 7 Trustee by Mr. Lee based upon the representation that

it was property of Mr. Prosser and therefore belonged to the chapter 7 estate.  TR 6/12/2009 at

76:19-23, Doc. No. 1794.

On October 17 , 2007, during an inspection of the Palm Beach Property by the Chapter 7

Trustee, Mark Eckard, an associate with the law firm representing Dawn Prosser at the time,

made an agreement with the Chapter 7 Trustee that he would have a copy made of the hard drive

in the desktop computer in the library of the Prossers' Plam Beach residence and would store it

in his office on St. Croix, U.S. Virgin Islands  Trial Testimony of Mark Eckard, TR 6/12/08 at

7:12-10:7, 26:21-29:18, 50:4-19, Doc. No. 1794.  Subsequent to this agreement, Mr. Eckard

instructed his client to make a copy of the hard drive.  Trial Testimony of Mark Eckard, TR

6/12/08 at 52:11-53:5, Doc. No. 1794.  On October 23, 2007, another attorney from the law firm

representing Dawn Prosser, Donovan Hamm, received the hard drive from Dawn Prosser and

transported it back to Mark Eckard in St. Croix.  Trial Testimony of Donovan Hamm, TR

8/26/08 at p. 65:18 to 69:16, Doc. No. 2096.  The hard drive remained in a drawer in the office

of Mark Eckard until it was mailed to Karin Bentz, a subsequent attorney for Mrs. Prosser.  Trial

Testimony of Mark Eckard, TR 6/12/08 at 31:8-40:18, Doc. No. 1794.

Mr. Prosser denied ever telling Mr. Stelzer to clean, destroy, or conceal any computer hard drives.[58]  Trial Testimony of Jeffrey J. Prosser, TR 10/3/08 at 140: 1-6; 143: 3-13, Doc. No. 2170.[59]

To determine whether the "old" and "new" drives were the same, with agreement of the parties, the court entered an order on August 11, 2008,[60] authorizing as a court expert the retention of Intelysis Corporation, a firm specializing in forensic computer analysis, to compare the electronically stored information on the hard drive in possession of Ms. Bentz (Drive 1) and the hard drive in possession of the Chapter 7 Trustee (Drive 2). Trial Testimony of Bruce Matolich, TR 9/8/08 at 9:21-25, 10:1-13, Doc. No. 2485; TE 87 (Intelysis Report Regarding Hard Drive Comparison) at 1.  Bruce Matolich served as a qualified expert for the forensic analysis of hard drives pursuant to the August 11, 2008, Order.  Trial Testimony of Bruce Matolich, TR 9/8/08 at 13:13-15, 13:25-14:22, Doc. No. 2485; TE 100 (Order Appointing Intelysis, Doc. No. 1946).

Mr. Matolich and Jeff Brenner, his superior at Intelysis, created a report on the forensic analysis of Drives 1 and 2 entitled "Computer Forensic Analyst Report:  Drives 1 and 2" dated August 18, 2008.  Trial Testimony of Bruce Matolich, TR 9/8/08 at 16:12-18, Doc. No. 2485;

---

[58]  Counsel for Mr. Prosser informed the court that part of Mr. Prosser's defense is that Mr. Stelzer's testimony regarding the computer hard drives is a fabrication and that Mr. Prosser never gave Mr. Stelzer instructions to clean, destroy, or conceal any computers or computer hard drives.  TR 10/2/08 at 15: 16-21, Doc. No. 2170.  *See also* Jeffrey J. Prosser's Proposed Findings of Fact and Conclusions of Law and Brief, Doc. No. 2225 at 2-7.

[59]  We do not credit Mr. Prosser's testimony on this matter.  Mr. Prosser personally received the new hard drive after the old one was "cleaned" as noted, *supra*.

[60]  Doc. No. 1946, Case No. 06-30009.

Main Document      Page 33 of 72

TE 87 (Intelysis Report Regarding Hard Drive Comparison).  The conclusion of their analysis

and report was that Drives 1 and 2 are not identical hard drives and are not copies of each other.

Trial Testimony of Bruce Matolich, TR 9/8/08 at 25:16-18, 100:23-101:1, Doc. No. 2485; TE 87

(Intelysis Report Regarding Hard Drive Comparison) at 1.  The only items of similarity on

Drives 1 and 2 are the operating system (Windows XP) and various basic Microsoft software

programs, such as Outlook Express, Windows Media Viewer, and Internet Explorer.  Trial

Testimony of Bruce Matolich, TR 9/8/08 at 34:5-20, Doc. No. 2485; TE 87 (Intelysis Report

Regarding Hard Drive Comparison) at 1.  None of the user-generated files on Drive 1 appear on

Drive 2, and none of the user generated files on Drive 2 appear on Drive 1.  Trial Testimony of

Bruce Matolich, TR 9/8/08 at 33:25-34:4, Doc. No. 2485; TE 87 (Intelysis Report Regarding

Hard Drive Comparison) at 1.

Drive 1's install date was October 10, 2007, and its last shutdown date was October 19,

2007.  Trial Testimony of Bruce Matolich, TR 9/8/08 at 28:8-12, Doc. No. 2485; TE 87

(Intelysis Report Regarding Hard Drive Comparison) at 3.  There was no access to files on Drive

1 after October 19, 2007.  Trial Testimony of Bruce Matolich, TR 9/8/08 at 26:13-16, Doc. No.

2485; TE 87  (Intelysis Report Regarding Hard Drive Comparison) at 2.  Drive 2's install date

was August 27, 2002, and its last shutdown date was October 3, 2007.  Trial Testimony of Bruce

Matolich, TR 9/8/08 at 28:22-23, 29:14-16, Doc. No. 2485; TE 87  (Intelysis Report Regarding

Hard Drive Comparison) at 3.  Files on Drive 2 were accessed on October 5, and 6, 2007, after

Drive 2's last shutdown date.  Trial Testimony of Bruce Matolich, TR 9/8/08 at 29:21-24, Doc.

No. 2485; TE 87  (Intelysis Report Regarding Hard Drive Comparison) at 2.  Based on the

foregoing, contrary to Jeffrey Prosser's assertions and consistent with Arthur Stelzer's testimony

that a drive had been destroyed, Mr. Matolich determined that it was not scientifically possible

that Drive 2 was a copy of Drive 1.  Trial Testimony of Bruce Matolich, TR 9/8/08 at 46:11-14,

Doc. No. 2485.

Intelysis created compact disc (CD) copies of Drive 1 and Drive 2 and made them

available to counsel for Mr. and Mrs. Prosser for privilege review.  Trial Testimony of Bruce

Matolich, TR 10/2/08 at 38:9-19, Doc. No. 2170.  Counsel for Mr. Prosser transmitted a log of

privileged files from Drive 1 and 2 to Mr. Matolich.  Trial Testimony of Bruce Matolich, TR

10/2/08 at 38:17-19, Doc. No. 2170; TE 103 (Jeff Prosser's Privilege Log for Hard Drive 2).

Mr. Matolich then redacted the privileged files and distributed to counsel two CDs that excluded

the redacted privilege files.  Trial Testimony of Bruce Matolich, TR 10/2/08 at 38:20-23, Doc.

No. 2170; TE 103 (Jeff Prosser's Privilege Log for Hard Drive 2).  The first CD accompanied

the "Computer Forensic Analyst Report:  Drives 1 and 2" and was produced to the parties on

August 22, 2008 (the "August 22 CD").  Trial Testimony of Bruce Matolich, TR 10/2/08 at 38:4-

16, 44:5-8, Doc. No. 2170; TE 87 (Intelysis Report Regarding Hard Drive Comparison).  The

second CD accompanied a supplemental Intelysis forensic analysis report dated September 19,

2008, and was produced to the parties on September 25, 2008 (the "September 25 CD").  Trial

Testimony of Bruce Matolich, TR 10/2/08 at 38:4-16, 44:5-8, Doc. No. 2170.

At trial, Mr. Matolich reviewed a portion of the CD produced on August 22, 2008, which

contained user generated files from Drive 2.  Trial Testimony of Bruce Matolich, TR 10/2/08 at

49:20-56:9, Doc. No. 2170; TE 104 (Disk of Files Produced by Intelysis on August 22, 2008).

Mr. Matolich identified several documents in which Mr. Prosser, individually or on behalf of

ICC Debtors, was the signatory on or recipient of various correspondence that contained

34

financial and business information.  Trial Testimony of Bruce Matolich, TR 10/2/08 at 49:20-

56:9, Doc. No. 2170; TE 104 (Disk of Files Produced by Intelysis on August 22, 2008).  Given

the repeated assertion from the Prossers and various employees of the ICC Debtors that Dawn

Prosser had no involvement with the ICC Debtors, the presence of the user generated files on

Drive 2 established Mr. Prosser's ownership, use, and knowledge of the relevant contents of

Drive 2.

　　　　For the foregoing reasons, the court finds that, as established by the credible evidence,

Mr. Prosser ordered the destruction of hard drives for computers located in the Palm Beach

Property and utilized by Mr. Prosser.  Based upon the financial and business information[61] on the

files that was not disclosed to the Trustees coupled with Mr. Prosser's failure to turnover

documents regarding that information, we find that the purpose for causing the destruction of the

drives was to hinder, delay, and impede the bankruptcy and was an abuse of the bankruptcy

process.  *See* 11 U.S.C. §521(a)(3),(4);  Fed. R. Bankr. P. 4002(a)(4).  Mr. Prosser acted

knowingly and with fraudulent intent.  Likewise, the action was inconsistent with Mr. Prosser's

duties to fully disclose his assets and liabilities.  *See* 11 U.S.C. §521;  Fed. Rule Bankr. Proc.

1007(b)(1).


**4.  Mr. Prosser failed to disclose and/or continuously delayed disclosure of various assets
and liabilities.**

　　　　Mr. Prosser amended his Schedules four times, always after another party in interest

---

[61]  As the sole owner of the ICC Debtors, much of the financial information related to the
companies ultimately affected Jeffrey Prosser's personal financial situation.  Mr. Prosser has
testified numerous times that he reports the income from the ICC Debtors on his tax returns
because the ultimate parent company which he owns, ICC-LLC, is a "check the box" company.

found something to be missing or inaccurate.  TE 2 (Schedule A-J, Doc. No. 26); TE 3

(Amended Schedules A-F, Doc. No. 359); TE 4 (Amended Schedule C, Doc. No. 368); TE 5

(Amended Schedule A, B, D, and F, Doc. No. 1062); TE 6 (Amended Schedules A-C, Doc. No.

1226).  The court entered its Order in Adv. 07-3010 on December 11, 2007, directing that Mr.

Prosser, Dawn Prosser, Justin Prosser, Michael J. Prosser, Sybil G. Prosser, Michele LaBennett,

and Lyndon A. Prosser "shall provide the Trustees with a complete and detailed inventory of all

Property of which they have knowledge, possession, custody or control . . . ."  *See* Order

Granting Application for Preliminary Injunction, 12/11/2007, Adv. Proc. No. 07-3010, Doc. No.

79, at 6.  Pursuant to the court's Order, schedules were filed on January 11, 2008, identifying

those assets claimed to be solely owned by the Debtor, those claimed as jointly owned assets and

assets claimed as owned solely by his wife, Dawn Prosser.  Trial Testimony of James P. Carroll,

TR 6/9/08 at 20:15-17, Doc. No. 1791; TE 2-6.  Thereafter, the Debtor sought again to amend

his schedules.  Trial Testimony of James P. Carroll, TR 6/9/08 at 20:1-22:5, Doc. No. 1791.

        In conscious disregard for his duties as a debtor, Mr.  Prosser filed schedules that

contained inadequate and incomplete disclosures and numerous inaccuracies.  The following

subcategories (a. to f.) are assets and liabilities that Mr. Prosser either has never included in his

schedules or has included only after having been confronted with facts that differed from the

information in his schedules.  The court notes that Mr. Prosser filed his voluntary petition on

July 31, 2006, but the majority of disclosures listed below did not occur until after Mr. Prosser's

chapter 11 case was converted to a chapter 7 and Trustee Carroll was appointed on Oct. 31,

2007.

**a. Mr. Prosser failed to disclose hundreds of bottles of wine with an aggregate value in the millions of dollars until after they were discovered by the Chapter 7 Trustee.[62]**

The Debtor failed to disclose on his schedules or his inventory that he had wine in storage at several New York locations.  Trial Testimony of James P. Carroll, TR 6/9/08 at 159, Doc. No. 1791:14-19; TE 2-6.  Mr. Prosser valued the wine in Palm Beach at $200,000, the wine located in St. Croix at $25,000, and the wine in Lake Placid at $10,000, for a total of $235,000 in all.  TE 55 (Updated Inventory of Assets Jointly Owned); Trial Testimony of James P. Carroll, TR 6/9/08, Doc. No. 1791:  p. 100, ll.24 - p. 101, 1. 7.  The Chapter 7 Trustee's investigation determined that there were hundreds of bottles of wine stored at Park Avenue Liquors in New York, NY for Mr. Prosser.  Trial Testimony of James P. Carroll, TR 6/9/08 at 159:20-25, 160:1-10, Doc. No. 1791.  The Chapter 7 Trustee also found 30 to 40 cases of wine stored at Zachys Wine & Liquor in Scarsdale, NY for Mr. Prosser.  Trial Testimony of James P. Carroll, TR 6/9/08 at 160:11-14, Doc. No. 1791.  The magnitude of this failure to disclose alone is in the millions of dollars of undisclosed property of the estate.  During the trial on this matter, Debtor admitted that his wine was worth "a couple million dollars."  Trial Testimony of Jeffrey J. Prosser, TR 8/25/08 at 132:1-136:11, Doc. No. 2096.  In the course of discharging his duties, the Chapter 7 Trustee retained Christie's to value Mr. Prosser's wine.  Trial Testimony of James P. Carroll, TR 6/9/08 at 103:12-24, Doc. No. 1791.  The Chapter 7 Trustee received a range for the total value of the wine from Christie's that was significantly higher than what was reported on the schedules by the Debtor.  Trial Testimony of James P. Carroll, TR 6/9/08 at 104:9-25, 105:1-

---

[62]  *See* Section 6, *infra*, regarding undervaluation of wine.

9, Doc. No. 1791.  The Chapter 7 Trustee is in the process of liquidating half of the wine

collection.  Because Mrs. Prosser claims ownership by the entireties of the wine collection, the

court ordered the Trustee to sell the undisputed half that is property of this estate.  Portions of the

estate's half of the wine collection were sold on March 28, 2009, April 26, 2009, and June 6,

2009, at Christie's New York, 20 Rockefeller Plaza, New York, NY, 10020, for a total of

$591,150.[63]  The other half, i.e., that claimed by Mrs. Prosser, has not been sold. The under-

reporting was a material misstatement of Debtor's assets.  *See* 11 U.S.C. §521; Fed. Rule Bankr.

Proc. 1007(b)(1); Official Form 6 Schedules.

### b.  Mr. Prosser failed to disclose a cigar collection with an aggregate value in the thousands of dollars.

Mr. Prosser failed to disclose his ownership of a cigar collection on his Schedules.  TE 6

(Amended Schedules A-C, Doc. No. 1226); Trial Testimony of James P. Carroll, TR 6/10/08 at

65:9-11, Doc. No. 1792.  During the Chapter 7 Trustee's walk-through of the Palm Beach

Property in January 2008, he observed hundreds of cigars.  Trial Testimony of James P. Carroll,

TR 6/10/08 at 64:2-11, Doc. No. 1792.  They were Cuban, Dominican, and various other kinds.

Trial Testimony of James P. Carroll, TR 6/10/08 at 64:10-14, Doc. No. 1792.  Mr. Prosser is a

cigar smoker.  Trial Testimony of James P. Carroll, TR 6/10/08 at 65:2-8, Doc. No. 1792; Trial

Testimony of Arthur Stelzer, TR 6/10/08 at 241:11-17, Doc. No. 1792.  Dawn Prosser did not

---

[63]  Chapter 7 Trustee's Report of Sale Regarding Certain of Debtor's Personal Property Assets Pursuant to 11 U.S.C. §363 and Court Approved Sale Procedures, Doc. No. 2523 in Case No. 06-30009.  *See also* Chapter 7 Trustee's Notice of Proposed Auction and Sale of Debtor's Personal Property Assets Pursuant to 11 U.S.C. §363 and Court Approved Sale Procedures, Doc. No. 2337, Case No. 06-30009.

smoke cigars.[64]  Trial Testimony of Arthur Stelzer, TR 6/10/08 at 241:9-10, Doc. No. 1792.  The

Chapter 7 Trustee obtained a value in the aggregate for the cigars which totaled in the thousands

of dollars.  Trial Testimony of James P. Carroll, TR 6/10/08 at 68:22-25, 69:1-4, Doc. No. 1792.

Mr Prosser's cigars were not listed on the schedules or inventories.  Trial Testimony of James P.

Carroll, TR 6/10/08 at 65:9-11, Doc. No. 1792.  This failure was a violation of 11 U.S.C.

§521(a)(1)(B)(I) and Fed. Rule Bankr. Proc. 1007(b)(1).


### c.  Mr. Prosser failed to disclose valuable watches, jewelry, and a Bernard Passman chalice.[65]

Schedule B (Personal Property) of Mr. Prosser's original schedules and First Amendment

listed "Various jewelry" with a current market value "Estimated at $20,000."  TE 2 (Schedule A-

J, Doc. No. 26); TE 3 (Amended Schedules A-F, Doc. No. 359).

Mr.  Prosser did not identify the following assets until after being confronted with their

discoveries by the Trustees, and only then provided after-the-fact amendments to list them:  (i)

two Patek Philippe watches; (ii) a Chopard rose gold Tourbillon watch; (iii) a Chopard white

gold watch with a blue band; (iv) a gold ring with round diamonds; and (v) a gold ID bracelet.

Trial Testimony of Arthur Stelzer, TR 6/10/08 at 226:14-22, Doc. No. 1792; TE 6 (Amended

Schedules A-C, Doc. No. 1226).   The Chopard rose gold watch alone was purchased for

$78,984 without taxes on or about April 13, 2004.  Trial Testimony of Jeffrey J. Prosser, TR

---

[64]  This point is relevant because Mrs. Prosser claims ownership by gift or as tenants by the entireties of virtually all assets of Mr.  Prosser, including, *inter alia*, furniture, antiques, wines, jewelry, stock, artwork, and real property.

[65]  *See* Section 6, *infra*, regarding undervaluation of watches, jewelry, and other valuables.

6/11/08 at 248:8-16, Doc. No. 1793; Trial Testimony of Jeffrey J. Prosser, TR 6/11/08 at 246:24-

247:9, Doc. No. 1793; TE 63 (Invoice and Documentation re: Men's Watch Serial No. 1071510).

Mr. Prosser testified that he paid approximately $12,000 for the Chopard white gold watch that

was discovered.  Trial Testimony of Jeffrey J. Prosser, TR 6/11/08 at 249:2-15, Doc. No. 1793.

One of the two Patek Phillippe watches discovered by the Trustee cost $54,160.  Trial Testimony

of Jeffrey J. Prosser, TR 6/11/08 at 250:25-251:3, Doc. No. 1793; TE 64 (Invoice and

Documentation re: Patek Phillippe - 5059 - 19K R/G Watch).

As Mr. Prosser's personal valet, Mr. Stelzer was generally aware of the personal

possessions of Mr. Prosser, including his jewelry.  Trial Testimony of Arthur Stelzer, TR 6/10/08

at 203:21-25, 204:1, Doc. No. 1792.  He had knowledge of the watches owned by Mr. Prosser.

Trial Testimony of Arthur Stelzer,  TR 6/10/08 at 204:17-21, Doc. No. 1792.  Mr. Stelzer

learned the brand names of the watches owned by Mr. Prosser and was involved in acquiring

watches for Mr. Prosser.  Trial Testimony of Arthur Stelzer, TR 6/10/08 at 204:17-25, 205:1,

Doc. No. 1792.

In addition to the above-described undisclosed items, in October of 2007 Mr. Prosser

gave jewelry to Mr. Stelzer, asking him to take certain pieces to get a price or a value for them.

Trial Testimony of Arthur Stelzer, TR 6/10/08 at 220:8-10, Doc. No. 1792.  Included with that

jewelry was a rose gold Chopard watch.  Trial Testimony of Arthur Stelzer, TR 6/10/08 at 220:3-

10, Doc. No. 1792.  Also included was a Breguet solid gold watch, a solid gold Parmagami

watch, an all gold ID bracelet, cufflinks, $20 fold piece money clip, a Tag Heuer stainless steel

watch and two men's rings, one a Passman black coral, 18 karat yellow gold ring, and the other a

2 carat diamond.  Trial Testimony of Arthur Stelzer, TR 6/10/08 at 220:13-25, 221:1-18, Doc.

No. 1792.  Mr. Prosser instructed Mr. Stelzer to obtain a low, low price on all of the jewelry.

Trial Testimony of Arthur Stelzer, TR 6/10/08 at 223:3-8, Doc. No. 1792.  All of the jewelry

provided by Mr. Prosser to Mr. Stelzer was jewelry which Mr. Stelzer knew to be Mr. Prosser's

jewelry.  Trial Testimony of Arthur Stelzer, TR 6/10/08 at 224:12-15, Doc. No. 1792.

Mr. Prosser's ownership of the two rings is corroborated by Eling Joseph's testimony that

Mr. Prosser owned and possessed rings matching the descriptions given by Mr. Stelzer.  Trial

Testimony of Eling S. Joseph, TR 6/12/08 at 99:3-99:10, Doc. No. 1794.  Eling Joseph was the

executive secretary for Mr. Prosser for 18 years.  Trial Testimony of Eling S. Joseph, TR 6/11/08

at 257:8 - 260:16, Doc. No. 1793.  She worked with Mr. Prosser and saw what he wore regularly

throughout that time.

Invoices from Tourneau reflect services provided relating to Breguet and Parmagani

watches.  TE 85 or TT 58 (Custodian of Records Declarations from Tourneau and Corresponding

Document Productions).[66]  These documents corroborate Mr. Prosser's ownership of the

undisclosed items.

The evidence clearly established that Mr. Prosser owned this jewelry when he filed

bankruptcy.  We find that Mr. Prosser failed to list on his schedules the Parmagami watch, the

Breguet watch, the Passman ring, and a diamond ring identified by Mr. Stelzer.  Trial Testimony

of Arthur Stelzer, TR 6/10/08 at 226:14-22, Doc. No. 1792; TE 6 (Amended Schedules A-C,

Doc. No. 1226).  The omission was material.

Mr. Stelzer testified that Mr. Prosser also owned and wore a Presidential Rolex watch,

---

[66]  Services related to Breguet and Parmagani watches were performed on September 10,
2003; February 1, 2005; March 26, 2005; November 2, 2005; March 31, 2006, and July 5, 2007.
The 2006 and 2007 dates were postpetition.

which he last recalled seeing in July of 2007 in Lake Placid.  Trial Testimony of Arthur Stelzer,

TR 6/10/08 at 235:9-246:1, Doc. No. 1792.  Although Mr. Prosser denies having owned any

Rolex, Eling Joseph testified that Mr. Prosser owned for years and possessed after July 31, 2006

(the voluntary petition filing date), a Rolex Presidential watch.  Trial Testimony of Eling S.

Joseph, TR 6/12/08 at 92:25-93:7, 94:16-97:5, Doc. No. 1794.  Dawn Prosser corroborated these

witnesses' testimonies.  She also testified that Jeff Prosser owned a Rolex watch.  Deposition

Testimony of Dawn Prosser, taken on July 21, 2008, and admitted on August 25, 2008, at

216:10-11.  No Rolex, including a Presidential Rolex, is listed on Mr. Prosser's Schedules.  TE 6

(Amended Schedules A-C, Doc. No. 1226).

Mr. Stelzer was involved in purchasing a Franck Muller watch for Mr. Prosser.  Trial

Testimony of Arthur Stelzer, TR 6/10/08 at 246:16-22, Doc. No. 1792.  Mr. Prosser wore the

Franck Muller watch and Mr. Stelzer last saw that watch at the end of July 2007 (a year after the

voluntary bankruptcy) at the Lake Placid residence.  Trial Testimony of Arthur Stelzer, TR

6/10/08 at 236:18-24, Doc. No. 1792.  The Franck Muller watch is not listed on Mr. Prosser's

Schedule.  TE 6 (Amended Schedules A-C, Doc. No. 1226).

In October 2007, Dawn Prosser gave a chalice designed by Bernard Passman and of

substantial value to Mr. Stelzer and asked him to remove it from the house.  Trial Testimony of

Arthur Stelzer, TR 6/10/08 at 215:12-226:22, 227:10-232:7, 286:6-25; 289:4-290:21, Doc. No.

1792; TE 5 (Amended Schedules A, B, D, and F, Doc. No. 1062).  This chalice also was not

disclosed on Mr.  Prosser's schedules until the November 30, 2007, amendment, after Mr.

Stelzer returned it to Mr.  Prosser.  TE 5 (Amended Schedules A, B, D, and F, Doc. No. 1062).

When he did amend the schedules to include it, Mr. Prosser listed its value as $200,000.

The court finds that Mr. Prosser concealed the existence of jewelry having substantial value by either failing to list it on his schedules or by listing it only when confronted by the Chapter 7 Trustee with the fact that he had discovered undisclosed assets.  This too, violated his duties as a debtor under 11 U.S.C. §521 and Fed. Rule Bankr. Proc. 1007(b)(1).

**d.  Mr. Prosser failed to disclose a life insurance policy for which New ICC paid at least $85,000 per year in premiums.**

Also missing from Mr. Prosser's initial schedules was his term life insurance policy, for which New ICC paid premiums of at least $85,000 per year and which was not disclosed until the Fourth Amendment in January 2008.  Trial Testimony of Jeffrey J. Prosser, TR 9/9/2009 at 189:4-191:5, Doc. No. 2486;  Fourth Amendment, Doc. No. 1226, filed on January 11, 2008, TE 6.  No reason has been advanced by Mr. Prosser for this glaring omission.  Again, the violation of 11 U.S.C. §521 has been established by the objecting parties.

**e.  Mr. Prosser failed to disclose his interest as an officer in AMJ, Inc.**

Mr. Prosser testified that he had no affiliation or involvement with AMJ, Inc., yet he signed a letter dated May 16, 2003, as the President of AMJ in which $150,000 was transferred to him as the President and officer of AMJ, Inc., through a credit to his personal Bank of America account.  Trial Testimony of Jeffrey J. Prosser, TR 8/25/08 at 101:1-8, 106: 23, 115: 5-10, Doc. No. 2096; TT 131 (AMJ, Inc. Documents).  There has been no evidence to establish a change in the officers since Mr. Prosser received this money in 2003.  Mr. Prosser failed to list his affiliation with AMJ, Inc., on his Statement of Financial Affairs, Official Form 7, which requires a debtor to list all the names, addresses, tax identification numbers, and nature of

43

business of any company in which the debtor was an officer, director, and/or partner in the six

years immediately preceding the commencement of this case.  Trial Testimony of Jeffrey J.

Prosser, TR 8/25/08 at 217: 10-25, 218, 219: 1-11, Doc. No. 2096; TE 1 (Statement of Financial

Affairs, Doc. No. 27).  His status as an officer of AMJ, Inc., existed within the 6 years

prepetition.  No credible explanation for this omission has been proffered.  See 11 U.S.C. §521;

Fed. Rule Bankr. Proc. 1007(b)(1); Official Form 7: Statement of Financial Affairs.


### f. Mr. Prosser failed to disclose a $5.65 million obligation he owed to New ICC for the Palm Beach Property.

In addition to his failure to list assets, Mr. Prosser also omitted a significant liability.  To

date, Mr. Prosser has not listed in his schedules his liability on the $5.65 million note he

executed in favor of New ICC for the Palm Beach Property, which was due in full in April of

2007.  On September 23, 1999, Jeffrey and Dawn Prosser entered into a contract for sale and

purchase of the property located at 252 El Bravo Way, Palm Beach, Florida ("the Palm Beach

property").  See Contract for Sale and Purchase, TE 27.  In December 1999, the Prossers

executed an assignment of that contract to New ICC.  See Assignment of Agreement for Sale and

Purchase, TE 28.  Jeffrey Prosser, in his capacity as New ICC's president, also signed the

agreement on behalf of New ICC.  Id.  On December 14, 1999, New ICC purchased the Palm

Beach property.  See Warranty Deed dated December 14, 1999, from Neal Andrews to New ICC,

TE 30.  On April 10, 2000, New ICC transferred title to Jeffrey and Dawn Prosser, as husband

and wife.  See Warranty Deed dated April 10, 2000, from New ICC to Jeff and Dawn Prosser,

TE 31.  The deed was signed by Jeffrey Prosser, as chairman of New ICC.  Id.  The Prossers

made no payment to New ICC at the time of the transfer or since.  Trial Testimony of Jeffrey J.

44

Prosser, TR 6/11/08 at 219:16-220:6, Doc. No. 1793.  Thirteen months after the conveyance of

the title, on May 1, 2001, Jeffrey Prosser, but not Dawn Prosser, executed an unsecured

promissory note in favor of New ICC in the principal amount of $5.65 million, the original

purchase price of the property.  *See* Promissory Note dated May 1, 2001, from Jeff Prosser to

New ICC, TE 32.  The note was made retroactive to April 10, 2000, the date that New ICC

transferred the property to the Prossers.  *Id.*  The Promissory Note provided for no payments

over its seven-year life, with all accrued interest and principal to be due only in one balloon

payment on the April 10, 2007, maturity date.  TE 32 (Promissory Note dated May 1, 2001, from

Jeff Prosser to New ICC); Trial Testimony of Ingrid Christian, TR 6/11/08 at 118:14-119:5, Doc.

No. 1793; Trial Testimony of Jeffrey J. Prosser, TR 6/11/08 at 219:13-220:6, 222:11-223:13,

Doc. No. 1793.  Jeff Prosser and Dawn Prosser did not grant a mortgage on the Palm Beach

Property in favor of New ICC to secure the Promissory Note.  TE33; Trial Testimony of Ingrid

Christian, TR 6/11/08 at 118:9-13; 121:11-122:20, Doc. No. 1793.  Thus, Mr. Prosser alone was

obligated to repay the note.  The failure to list his obligations was a material violation of 11

U.S.C. §521(a)(1)(B)(I).  *See also* Fed. Rule Bankr. Proc. 1007(b)(1); Official Form 6

Schedules.

Mr. Prosser's failure to disclose and delay of disclosure of various assets of significant

and material value and a liability of substantial amount, we find, was established by the credible

evidence, was inconsistent with Mr. Prosser's duties as a debtor and was intended to, and did,

impede the bankruptcy process and the ability of the Trustee to administer his estate.[67]

**5.  Prepetition and postpetition, Mr. Prosser caused the ICC Debtors and/or their operating entities to pay for millions of dollars of personal items and services utilized or possessed by Mr. Prosser and/or his family.  These payments were not disclosed in the Debtors Monthly Operating Reports and were not included as gross income in his Statement of Financial Affairs.**

Mr. Syml reviewed the records of the various individuals listed on the New ICC payroll and noticed that a number of parties and individuals listed on the payroll did not have line functions or any job functions for New ICC or other subsidiaries of ICC-LLC.  Trial Testimony of Byron P. Smyl, TR 6/10/08 at 178: 12-18, Doc. No. 1792.  Mr. Syml determined that certain of the individuals who were on the payroll were staff at Mr. Prosser's Palm Beach Property, including a cook, personal valet for Mr. Prosser, and gardeners.  Trial Testimony of Byron P. Smyl, TR 6/10/08 at 181:16-25, Doc. No. 1792.

Ingrid Mae Christian, a manager with the Dispute Analysis and Forensics Group of Alvarez and Marsal, is a certified public accountant and a certified fraud examiner.  Trial

---

[67]  Mr. Prosser is also obligated on a lease which he did not disclose in his bankruptcy petition.  That fact came to light after the close of evidence, when Mr. Prosser acquired Huntington National Bank's Proof of Claim No. 37 in New ICC's bankruptcy case, Case No. 07-30012, for payments due and owing under a Motor Vehicle Lease Agreement dated March 17, 2007, for the use of a 2004 Lexus GX470.  *See* Chapter 11 Trustee's Objection to (I) Proof of Claim filed by Huntington National Bank and Assigned to Jeffrey J. Prosser and (II) Standing of Jeffrey J. Prosser on Account of Such Claim, Doc. No. 1073 in Case No. 07-30012; Notice of Assignment of Claim Waiver Notice, Doc. No. 891 in Case No. 07-30012; Jeff Prosser's Opposition to Objection to (I) Proof of Claim filed by Huntington National Bank and Assigned to Jeffrey J. Prosser and (II) Standing of Jeffrey J. Prosser of Account of Such Claim, Doc. No. 1086 in Case No. 07-30012.  Mr. Prosser is the co-lessee of the Lexus.  The lease itself lists Mr. Prosser as a co-obligor with an unspecified Innovative (ICC) company.  The court takes judicial notice that this lease was never included in Mr. Prosser's Schedules or Statement of Financial Affairs.

Testimony of Ingrid Christian, TR 6/11/08 at 35:10-18, Doc. No. 1793.  She was called as a fact,

not an expert, witness.  Ms. Christian became involved with the ICC Debtors in late July, 2007,

when the Chapter 11 Trustee asked her to assist in identifying the flow of funds being paid out of

New ICC and its operating entities.  Trial Testimony of Ingrid Christian, TR 6/11/08 at 35:1-

36:3, Doc. No. 1793.  As part of her review of the flow of funds being paid out of New ICC and

operating entities, Ms. Christian had access to the books and records of New ICC and its

operating entities, including the MAS200 computerized accounts payable system through which

all payments made by New ICC were recorded.  Trial Testimony of Ingrid Christian, TR 6/11/08

to 36:25-37:3, Doc. No. 1793.  Since Alvarez and Marsal became involved on behalf of the

Chapter 11 Trustee, Alvarez and Marsal had custody of the books and records of ICC including

its electronic accounting system (*i.e.*, MAS200).  Trial Testimony of Ingrid Christian, TR

6/11/08 at 28:22-29:3, Doc. No. 1793.  At trial, Ms. Christian identified corporate records,

supporting invoices and records of payment from numerous sources that established payments

made by New ICC and/or Vitelco after the July 31, 2006, bankruptcy filing to (1) Mr. Prosser's

housing staff in the approximate amount of $500,000 and (2) various vendors for the

construction of the Estate Shoys Property, including Artisan Stone and Woodwork in the

approximate amount of $400,000 and Artistic Kitchen Design in the approximate amount of

$178,000.  Trial Testimony of Ingrid Christian, TR 6/11/08 at 54:12-17, 63:13-64:4, 71:10-

72:17, Doc. No. 1793.[68]

---

[68]  During the course of her review of the flow of funds being paid out of New ICC and
the operating entities, Ms. Christian compiled summaries of New ICC Non-Business Related
Expenses Paid on Behalf of Jeffrey J. Prosser for the following three time periods:  (1) January 1,
1997, through September 30, 2007, TE 15;  (2) February 10, 2006, (involuntary petition date)
(continued...)

The Debtor's Monthly Operating Reports from August 1, 2006, to October 3, 2007, do

not list the $500,000 in postpetition salaries, wages, or other compensation paid to Mr. Prosser's

---

[68](...continued)
through September 30, 2007, TE 72; and (3) July 31, 2006, (voluntary petition date) through September 30, 2007, TE 73.  The voluminous support details for these summaries (referenced as "Backup Binders" during the course of the trial) are contained at TE 16.  Over the objection of Mr. Prosser's counsel, the court admitted TE 73, "New ICC Non-Business Related Expenses Paid on Behalf of Jeffrey J. Prosser from 7/31/2006 through 9/30/2007 [Sorted by Payee]," with the restriction that the court would not consider the "Non-Business Related Expenses" portion of the title which Debtor's counsel considered conclusory.  In ruling herein, I do not consider the title.  July 31, 2006, was the date Mr. Prosser filed his voluntary bankruptcy.  September 30, 2007, was the last date of the data set.  The court admitted TE 73 with the additional reservation that it would consider the relevance as to the Chapter 11 Trustee's case only of payments made during the five month period between the filing of the involuntary and voluntary petition at the conclusion of the trial.  Having had the opportunity to review the entirety of the evidence, the court finds that the payments are relevant.  The bankruptcy schedules and statement of financial affairs requires disclosure of income and transfers for, *inter alia*, the year prepetition.  Mr. Prosser filed his voluntary bankruptcy within a year of the involuntary petition date.  Thus, payments to or for his benefit within the year prepetition, including the five months of the involuntary case, should have been disclosed in the voluntary filing.  Even if the five month period is not relevant, however, Mr. Prosser's failure to disclose and or inadequate disclosures of other material matters after that period ended would lead to the same result.  In TE 72 and her testimony, Ingrid Christian characterized approximately $10.6 million to or for the benefit of Mr. Prosser from the date of the involuntary petition, February 10, 2006, to September 30, 2007.  TE72 at TE2 00511, 00533;  Trial Testimony of Ingrid Christian, TR 6/11/08 at 50:16-51: 7, Doc. No. 1793.  In TE 73 and her testimony, Ingrid Christian identified approximately $5.3 million which she attributed as to or for the benefit of Mr. Prosser from the date of the voluntary petition, July 31, 2006, to September 30, 2007.  TE 73 at TE2 00536, 00550; Trial Testimony of Ingrid Christian, TR 6/11/08 at 51:11-21, Doc. No. 1793.  However, the court bases its opinion on the specific payments identified in this opinion, such as the payments made by New ICC to Artisan Stone and Woodwork and Artistic Kitchen Design for construction on the Estate Shoys Property, rather than the aggregate totals included in Ms. Christian's summaries and testimony.  Thus, the categorization utilized by Ms. Christian plays no part in the court's analysis.  Rather, her testimony regarding the fact that an item was paid for by New ICC and the documents substantiating those items is accepted and credited by this court.  Whether or not a specific item is attributed as a payment to or for the benefit of Mr. Prosser is a conclusion drawn by this court from all of the evidence produced at trial and not from Ms. Christian's determination of how to classify the entry on the summary she prepared.  The court finds that the items discussed herein which total more than $1 million are sufficiently egregious to compel the conclusion reached by the court without identifying in this opinion any other payments made to or for Mr. Prosser's benefit.

house staff, gardener, and other personal staff or the nearly $600,000 in postpetition payments to

vendors for the construction of the Estate Shoys Property as income to Mr. Prosser.  TE 60

(Jeffrey Prosser's Monthly Operating Reports for the period September 2006 through December

2006); Trial Testimony of Byron P. Smyl, TR 6/10/08 at 183:4-18, Doc. No. 1792; Case No 09-

30009, Doc. Nos. 251, 252, 253, 254, 255, 392, 434, 532, 586, 625, 691, 763, 856, and 897.

The failure to list payments of over $1 million postpetition was similar to Mr. Prosser's

failure regarding prepetition income.  Mr. Prosser did not accurately identify his gross income in

response to Items 1 and 2 of his Statements of Financial affairs.  Item 1 of the Statement of

Financial Affairs requires the following information:

> 1.  Income from employment or operation of business.  State the **gross amount of**
> income the debtor has received from employment, trade or profession, or from operation
> of the debtor's business from the beginning of this calendar year or the date this case was
> commenced.  State also the **gross amounts received** during the two years immediately
> preceding this calendar year. [emphasis added]

Jeffrey Prosser listed "$1,010,707 (Adjusted Gross Income)" for 2004, "$1 million

(approximately)" for 2005, and "$720,000 (approximately)" for 2006 Year to Date.  Item 1 of

the Statement of Financial Affairs requires the following information:

> 2.  Income other than from employment or operation of business.  State the amount of
> income received by the debtor other than from employment trade or profession, or
> operation of the debtor's business during the two years immediately preceding the
> commencement of the case.  Give particulars.

Mr. Prosser answered Item 2 with "N/A".

The Chapter 7 Trustee testified that the Debtor's Statement of Financial Affairs did not

list all of Mr. Prosser's gross income for the years 2004, 2005, and the portion of 2006 prior to

the petition date.  Trial Testimony of James P. Carroll, TR 6/9/08 at 139:14-147:23, Doc. No.

1791; TE 1 (Statement of Financial Affairs, Doc. No. 27).  The amounts omitted created a

material inaccuracy as the result of substantial transfers to Mr. Prosser from New ICC and

payments made by New ICC for the benefit of Mr. Prosser that were not properly reported on the

Schedule.  Trial Testimony of James P. Carroll, TR 6/9/08 at 147:5-10, Doc. No. 1791.  The

amounts omitted included, *inter alia*, "substantial transfers slash advances to the debtor, Jeffrey

J. Prosser, from [Emerging], from [New ICC]."  Trial Testimony of James P. Carroll, TR 6/9/08

at 146:20-147:23, Doc. No. 1791.

We find that Mr. Prosser failed to disclose his gross income (instead listing his adjusted

gross) and, even more significantly, by not listing the income he received by virtue of having

used his companies to pay his personal expenses through New ICC and its operating entities in

his Schedules or the Monthly Operating Reports he filed during the Chapter 11 phase of his case.

We find that this omission was established by the credible evidence , was inconsistent with Mr.

Prosser's duties as a debtor and was intended to, and did, impede the bankruptcy process.  *See* 11

U.S.C. §521; Fed. Rule Bankr. Proc. 1007(b)(1); Official Form 6: Schedules; Official Form 7:

Statement of Financial Affairs.


**6.  Mr.  Prosser significantly undervalued assets that were listed in his Schedules.**

According to the testimony of Trustee Carroll, on all of the Mr. Prosser's amended

schedules, Mr. Prosser listed the value of the Lake Placid Property, located at 45 Victor Herbert

Rd., Lake Placid, NY, as $1,391,000, a figure that was $2 million less than the market value of

the property as ascertained by the Trustee.  TE 6 (Amended Schedules A-C, Doc. No.1226);

Trial Testimony of James P. Carroll, TR 6/9/08 at 97:25-98:3, 98:16-20, Doc. No. 1791.  The

Chapter 7 Trustee retained a broker in Lake Placid who, after an analysis of comparable listings

in the area, listed the property for $3.5 million.  Trial Testimony of James P. Carroll, TR 6/9/08 at 98:7-13, Doc. No. 1791.  Trustee Carroll ultimately sold the property for $2.7 million.[69]  Clearly, based upon the sale price, Mr. Prosser's stated value of the property was materially deficient and the Court so finds.

Regarding what has turned out to be hundreds of bottles of wine, Debtor's Schedule B includes a bare description ("various wines") of wines located in each of the New York, St. Croix and Palm Beach homes.  TE 6 (Amended Schedules A-C, Doc. No.1226); Trial Testimony of James P. Carroll, TR 6/9/08 at 99:18-25, Doc. No. 1791.  Mr. Prosser contends that his wholly inadequate and insufficient disclosure was all that was required of him because it was enough to put the Trustee on notice that he owned wine.  We disagree.

In his Inventory, Mr. Prosser valued the wine in Palm Beach at $200,000, the wine located in St. Croix at $25,000, and the wine in Lake Placid at $10,000, for a total of $235,000 in all.  TE 55 (Updated Inventory of Assets Jointly Owned); Trial Testimony of James P. Carroll, TR 6/9/08:  p. 100, ll.24 - p. 101, l. 7, Doc. No. 1791.  Mr. Prosser also undervalued his wine collection by stating that it was worth approximately $140,000 at a §341 creditors' meeting.  Only after the Trustee began efforts to value the wine, and during the trial on this matter, Mr. Prosser admitted that his wine was more likely worth "a couple million dollars."  Trial Testimony of Jeffrey J. Prosser, TR 8/25/08 at 132:1- 36:11, Doc. No. 2096.

In the course of discharging his duties, the Chapter 7 Trustee retained Christie's to value

---

[69]   After a sale at $3.55 million failed to close, Trustee closed to another bidder at the $2.7 million price.  An adversary is pending against the allegedly defaulting buyer.  James P. Carroll, as Chapter 7 Trustee of the Estate of Jeffrey J. Prosser v. John D. Klingerman and Dawn Prosser,   Adv. Pro. No. 09-3001.

Mr. Prosser's wine.  Trial Testimony of James P. Carroll, TR 6/9/08 at 103:12-24, Doc. No.

1791.  The Chapter 7 Trustee received a range for the total value of the wine from Christie's that

was significantly higher than what was reported on the schedules by the Debtor.  Trial

Testimony of James P. Carroll, TR 6/9/08 at 104:9-25, 105:1-9, Doc. No. 1791.  As noted, the

portion of the estate's half of the wine collection that has been sold by Christie's New York, 20

Rockefeller Plaza, New York, NY, 10020, generated cash proceeds in the amount of $591,150.[70]

Even this amount, the Court finds, establishes a materially deficient disclosure by Mr. Prosser.

Because Mrs. Prosser claims ownership by the entireties of the wine collection, the court ordered

the Trustee to sell the undisputed half that is property of this estate.  The other half has not been

sold.

    The Chapter 7 Trustee also testified that Mr. Prosser undervalued the jewelry that was

disclosed based on an appraisal the Chapter 7 Trustee obtained.  Trial Testimony of James P.

Carroll, TR 6/9/08 at 106:8-15, Doc. No. 1791.  The debtor's amended schedules list the

following items under the category of furs and jewelry:  "Chopard watch rose, white gold

Chopard watch with blue band, Chopard ring, TAG watch, various cuff links, two Cruzian

bracelets, and Paterick (sic) Phillipe watch," which are collectively valued by Mr. Prosser at

$20,000.  TE 6 (Amended Schedules A-C, Doc. No. 1226) at TE 00052.  The court ordered

inventory also shows the total value of Mr. Prosser's jewelry as worth $20,000. TE 53 (Updated

Inventory of Jeffrey Prosser's Assets).  Based on Mr. Prosser's schedules and the Chapter 7

---

[70] Chapter 7 Trustee's Report of Sale Regarding Certain of Debtor's Personal Property
Assets Pursuant to 11 U.S.C. §363 and Court Approved Sale Procedures, Doc. No. 2523 in Case
No. 06-30009; *see also* Chapter 7 Trustee's Notice of Proposed Auction and Sale of Debtor's
Personal Property Assets Pursuant to 11 U.S.C. §363 and Court Approved Sale Procedures, Doc.
No. 2337, Case No. 06-30009.

Trustee's investigation, the Chapter 7 Trustee determined that Mr. Prosser substantially

undervalued his jewelry. Trial Testimony of James P. Carroll, TR 6/9/08 at 116:5-10, Doc. No.

1791. Based on the evidence at trial, the court agrees. One of the items on the schedule is a

Chopard rose colored gold watch purchased on or about April 13, 2004. Trial Testimony of

Jeffrey J. Prosser, TR 6/11/08 at 246:24-247:9, Doc. No. 1793. The Chopard rose gold watch

alone was purchased for $78,984 without taxes. Trial Testimony of Jeffrey J. Prosser, TR

6/11/08 at 248:8-16, Doc. No. 1793; TE 63 (Invoice and Documentation re: Men's Watch Serial

No. 1071510). Mr. Prosser testified that he paid approximately $12,000 for the Chopard white

gold watch that was disclosed. Trial Testimony of Jeffrey J. Prosser, TR 6/11/08 at 249:2-15,

Doc. No. 1793. The Patek Phillippe watch listed on Mr. Prosser's schedule cost approximately

$53,000. Trial Testimony of Jeffrey J. Prosser, TR 6/11/08 at 250: 22-251:3, Doc. No. 1793; TE

64 (Invoice and Documentation re: Patek Phillippe - 5059 - 19K R/G Watch). The independent

appraiser retained by the Chapter 7 Trustee valued the watches and jewelry disclosed by Mr.

Prosser at approximately $150,000 to $180,000. Trial Testimony of James P. Carroll, TR 6/9/08

at 106:8-108:24, Doc. No. 1791.

    The Chapter 7 Trustee testified that the Debtor also undervalued his interest in the

Virgins Islands Community Bank stock at $4.7 million, the amount of his capital investment. TE

5 (Amended Schedules A, B, D, and F, Doc. No. 1062) at TE 00041; TE 6 (Amended Schedules

A-C, Doc. No. 1226) at TE 00052; Trial Testimony of James P. Carroll, TR 6/9/08 at 189:13-17,

Doc. No. 1791. At the time he listed the value of the bank stock at $4.7 million, however, it was

worth approximately $6.5 million. Trial Testimony of James P. Carroll, TR 6/9/08 at 189:22-25,

190:1-5, Doc. No. 1791. Subsequent to the filing of his schedules and while Mr. Prosser

53

controlled the bank, a defalcation occurred within the bank.  Trial Testimony of James P.

Carroll, TR 6/9/08 at 189:22 - 190:5, Doc. No. 1791.  The FDIC entered a cease and desist order

against Virgins Islands Community Bank.  Trial Testimony of James P. Carroll, TR 6/9/08 at

189:22 - 190:5, Doc. No. 1791.  Nonetheless, the Chapter 7 Trustee ultimately received $2.8

million in cash from the sale of the stock and approximately $3.6 million in interest-bearing

promissory notes from Vitelco and two other operating entities to repay the defalcation.  Trial

Testimony of James P. Carroll, TR 6/9/08 at 190:18-194:24, Doc. No. 1791.  The total value to

be received by the estate, therefore, is $6.4 million.  The court finds that the Trustee's valuation

was reasonable and Mr. Prosser's was unreasonably deficient.

        This significant undervaluation of assets, we find, was established by the credible

evidence, was inconsistent with Mr. Prosser's duties as a debtor and was intended to, and did,

impede the bankruptcy process. *See* 11 U.S.C. §521; Fed. Rule Bankr. Proc. 1007(b)(1); Official

Form 6: Schedules.


**7.  Mr. Prosser concealed a marital asset division agreement, a will, and other estate
planning documents from the Trustees.**

        Despite requests for it by the Trustees, Mr. Prosser failed to provide any documentation

regarding a will or trust he executed.  Trial Testimony of James P. Carroll, TR 8/27/08 at

100:20-23, Doc. No. 2096.  Yet, Donovan Hamm, an attorney, testified credibly that he prepared

a will, a revocable trust and some other estate planning documents for Mr. Prosser that were

executed, and the originals were returned to Mr. Prosser.[71]  Trial Testimony of Donovan Hamm,

--------

[71]  Mr. Hamm testified that these documents were prepared "a number of years ago."

TR 8/26/08 at 82:2-23, Doc. No. 2096; TE 102 (Jeff Prosser's Will).  Peter Weisman, an

attorney, testified that he, too, prepared estate planning documents for Mr. Prosser.  Deposition

Testimony of Peter Weisman, taken August 12, 2008, and read into the record on October 3,

2008, at 75:19-76:3.

Mr. Prosser also concealed an asset division agreement between himself and his wife

until the court compelled disclosure of same.  Trial Testimony of Jeffrey J. Prosser, TR 8/25/08

at 145:15-146:21, Doc. No. 2096; TE 90 (Agreement, Dated January 18, 2006).  The marital

asset division agreement was signed and executed by Mr. and Mrs. Prosser on January 18, 2006.

Trial Testimony of Jeffrey J. Prosser, TR 8/25/08 at 1487-150:16, Doc. No. 2096; TE 90

(Agreement, Dated January 18, 2006).  January 18, 2006, was a mere nine days after the Opinion

regarding the Greenlight litigation was issued by the Chancery Court in Delaware on January 9,

2006.[72]  Mr. Prosser learned about the Greenlight decision when it was issued by the Chancery

Court, "I learned about that the day the judgment was entered or shortly thereafter," and nine

days later, he entered into the written marital asset division agreement with Mrs. Prosser.  Trial

Testimony of Jeffrey J. Prosser, TR 8/25/08 at 275:21-276:9, Doc. No. 2096; TE 90 (Agreement,

Dated January 18, 2006); TE 51 (Final Order and Judgment, *In re Emerging Communications,*

*Inc. Shareholders Litigation*, Civ. A. No. 16415 (Del. Ch. Jan. 9, 2006)).  Mr. Prosser testified as

to the origin of this agreement.

> "[W]hat precipitated it [the marital asset division agreement, TE 90] is that Dawn was
> obviously very uptight and very stressed with that [Chancery Court Opinion], obviously
> we had spent 20-plus years building, you know.  No one knew what was going to be left.

---

[72] The final Court Order and Judgment for the Greenlight litigation, In re Emerging
Communications, Inc. Shareholders Litigation, Civ. A. No. 16415, was entered on January 9,
2006.  TE 51.

And she was obviously concerned about the home that was in her name and the
companies in the Virgin Islands. And I think that's all that it precipitated was to
document what our understanding was . . .[and that the] lawsuits that were in process
with RTFC already. All of that litigation and, of course, then it was compounded with
the Greenlight, what I call the Greenlight decision. And so it was without question a very
stressful time period for Dawn, and for me, but certainly more so for Dawn."

Trial Testimony of Jeffrey J. Prosser, TR 8/25/08 at 275:6-276:9, 278:17-270:25, 280:1-9, Doc.

No. 2096; TE 90 (Agreement, Dated January 18, 2006). Curiously, despite his detailed

description of the reason why the agreement was entered into, Mr. Prosser failed to disclose it

when asked and testified that he has no recollection of the existence of this agreement or of

having entered into it. Trial Testimony of Jeffrey J. Prosser, TR 8/25/08 at 277:10-19, 280:10-

13, Doc. No. 2096; TE 1 (Statement of Financial Affairs, Doc. No. 27); TE 90 (Agreement,

Dated January 18, 2006). This inconsistency cannot be reconciled. The Chapter 7 Trustee was

not aware of any written agreement between Mr. and Mrs. Prosser until June of 2008, when it

was uncovered by the Chapter 11 Trustee among the documents in the undisclosed storage shed.

Trial Testimony of James P. Carroll, TR 8/27/08 at 106:11-22, Doc. No. 2096.

The Agreement concerning marital property was executed on January 18, 2006, less than

two weeks before the filing of the involuntary petition against Mr. Prosser and only nine days

after Mr. Prosser learned about the Greenlight judgment having been entered against him. His

disavowal of its existence is disingenuous and lacks any semblance of credibility. Further, the

Agreement, as a document that purports to be "for the purpose of defining the separately owned

property of Dawn E. Prosser," is materially significant as the provisions of the Agreement

identify only a limited number of items that allegedly belong solely to Dawn Prosser. These

include real property titled in her name and recorded in St. Croix, bank accounts of which she is

the sole holder, bank and brokerage accounts "presently in her possession and the contents

56

thereof," "all the furniture, fixtures, *objects d'art* that are located within the real property described in Article 1, above [the St. Croix property]," a 50% membership interest in ICC LLC, a 50% interest in all of the common capital stock of the Virgin Islands Community Bank, retirement and/or deferred savings plans and employment benefits that were in her name as of the date of the agreement, life insurance policies in her name and her tangible personal effects such as clothing and jewelry.  TE 90 (Agreement, Dated January 18, 2006).[73]

The Agreement purportedly "defines [the] respective financial and property rights, together with all other rights, remedies, privileges and obligations arising out of [the] marriage." TE 90 (Agreement, Dated January 18, 2006).  It specifies with particularity the assets allegedly separately owned by Dawn Prosser, and those assets are not everything the Prossers own.  *Id.* Thus, it differs in material respects from the Debtor's trial testimony that he owned no furniture, no art work, and perhaps not even his own suitcase.  TR 3/26/09 at 147:20, 147:23, 150:10-152:8, Doc. No. 2446.  Thus, the Agreement supports the Objecting Parties' assertion that Mr. Prosser failed to list numerous assets in which he had an interest in his bankruptcy schedules.

The concealment of estate planning documents that set forth what assets the Debtor stated, in writing, were those of Dawn Prosser, we find, was established by the credible evidence, was inconsistent with Mr. Prosser's duties as a debtor and was intended to, and did, impede the process.

---

[73]  The marital asset agreement between Mr. and Mrs. Prosser does not refer to any gifts from Mr. Prosser to Mrs. Prosser.  Trial Testimony of Jeffrey J. Prosser, TR 8/25/08 at 156:6-16, Doc. No. 2096; TE 90 (Marital Agreement, Dated January 18, 2006).

**8.  Mr. Prosser failed to disclose $480,000 he transferred to Dawn Prosser on the day of and the day after the filing of his bankruptcy petition.**

Mr.  Prosser failed to identify in his Statements of Financial Affairs, monthly operating reports, or other bankruptcy filings two transfers made by him on July 31, 2006, and August 1, 2006, that totaled $480,000.

Mr. Prosser filed his voluntary bankruptcy petition on July 31, 2006.  Doc. No. 1.   Item 10 of the Statement of Financial Affairs requires the following information:

> 10.  Other Transfers.  List all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within one year immediately preceding the commencement of this case.

Mr. Prosser answered Item 10 with "None".  The Debtor's Statement of Financial Affairs did not disclose a number of transfers by the Debtor to Dawn Prosser.  TE-1; Trial Testimony of James P. Carroll, TR 6/9/08 at 52:4-23, Doc. No. 1791.  First, on the day he filed the bankruptcy petition, July 31, 2006, $250,000 was transferred from the Virgin Islands Community Bank ("VICB") account of Mr. and Mrs. Prosser to Account Number 182603908, an account in the name of Mrs. Prosser and her daughter, Michelle LaBennett.  TE 19 (Virgin Islands Bank of Commerce Statement dated August 10, 2006 for Account No. 0182606567 in the Names of Jeff and Dawn Prosser); TE 20 (Virgin Islands Bank of Commerce Statement dated August 10, 2006, for Account No. 0182603908 in the Names of Dawn Prosser and Michelle T. LaBennett); Trial Testimony of James P. Carroll, TR 6/9/08 at 69:18-70:11, 70:13-25, Doc. No. 1791.  Dawn and Michelle Labennett's bank statement dated August 10, 2006, Account No. 182603908, shows a credit of $250,000 on July 31, 2006.  TE 20 (Virgin Islands Bank of Commerce Statement dated August 10, 2006, for Account No. 0182603908 in the Names of Dawn Prosser and Michelle T.

LaBennett); TE 19 (Virgin Islands Bank of Commerce Statement dated August 10, 2006, for

Account No. 0182606567 in the Names of Jeff and Dawn Prosser); Trial Testimony of James P.

Carroll, TR 6/9/08 at 69:18-70:11, Doc. No. 1791.

Second, Exhibit TE 21 reveals a transfer of $230,000 from Mr. Prosser's individual Bank

of America account by wire on August 1, 2006, to the same account of Dawn Prosser and

Michelle LaBennett at VICB.  TE 20 (Virgin Islands Bank of Commerce Statement dated August

10, 2006, for Account No. 0182603908 in the names of Dawn Prosser and Michelle T.

LaBennett); Trial Testimony of James P. Carroll, TR 6/9/08 at 70:12-19, Doc. No. 1791; TE 21

(Bank of America Statement for Period July 13, 2006, through August 14, 2006, for Account No.

0034 4113 3533 in the Name of Jeff Prosser).  Neither the Debtor's schedules nor his Statement

of Financial Affairs disclosed either the transfer of $250,000 or of $230,000.  TE 2-6; TE 1; Trial

Testimony of James P. Carroll, TR 6/9/08 at 72:5-10, Doc. No. 1791.  The Debtor's Statement of

Financial Affairs did not note any transfers of $250,000 or $230,000 or of the total $480,000.

TE 1; Trial Testimony of James P. Carroll, TR 6/9/08 at 72:11-17, Doc. No. 1791.  The Debtor

also failed to disclose either transfer, particularly the transfer of $230,000, on his Monthly

Operating Report for the relevant time period, August 1 through 31, 2006.  TE 10 (Debtor's

Monthly Operating Report (Individual) for the Period August 1, 2006, to August 31, 2006, Doc.

No. 251); Trial Testimony of James P. Carroll, TR 6/9/08 at 73:23-74:1, Doc. No. 1791; Trial

Testimony of Stan Springel, TR 8/26/2008 at 253:12-23, Doc. No. 2096.[74]  The money was

---

[74]  With regard to the transfers of $250,000 and $230,000 that took place on the day of
and the day after the voluntary bankruptcy filing, the Chapter 7 Trustee testified that he would
seek to recover the cash transferred for the estate because the cash was in an account in the name
of the Debtor.  Trial Testimony of James P. Carroll, TR 6/10/08 at 38:14-25, 39:1-4, 40:8-12,

(continued...)

transferred by Mr. Prosser out of accounts that bore his name.  The individual Jeffrey Prosser account was an asset of the Chapter 7 estate and the Chapter 7 Trustee had at least a 50% interest in the joint account of Jeffrey and Dawn Prosser.

Mr. Prosser testified that the transfers of $250,000 and $230,000 related to a settlement check received from a contractor in the amount of $488,000, which he claims was deposited into the joint account, which Mr. Prosser held with his wife.  Trial Testimony of Jeffrey J. Prosser, TR 6/11/08 at 235:11-15, 236:3-17, Doc. No. 1793.  The testimony does not square with documents that establish that the total of the two transfers to Dawn Prosser and Michelle La Bennett was $480,000, not $488,000, and that the transfers came from separate accounts on separate days.  The $250,000 and $230,000 transfers came from two separate accounts.  Trial Testimony of Jeffrey J. Prosser, TR 6/11/08 at 238:6-14, Doc. No. 1793.  The transfer of the $250,000 was transferred from Mr. and Mrs. Prosser's joint account, and the $230,000 was transferred from an account in Mr. Prosser's name alone.  TE 19 (Virgin Islands Bank of Commerce Statement dated August 10, 2006, for Account No. 0182606567 in the Names of Jeff and Dawn Prosser); TE 21 (Bank of America Statement for Period July 13, 2006 through August 14, 2006 for Account No. 0034 4113 3533 in the Name of Jeff Prosser).  Even if the court could ignore the $250,000 transfer on the day Mr. Prosser filed his bankruptcy petition, which it cannot, the $230,000 postpetition transfer was clearly an act to remove property of the estate, held in Mr. Prosser's individual account, out of the estate and beyond the control of the Chapter 7 Trustee.

---

[74](...continued)
Doc. No. 1792.

The debtor filed Monthly Operating Reports for August, September, October, November and December of 2006 in January 2007.  TE 10 (Debtor's Monthly Operating Report (Individual) for the Period August 1, 2006 to August 31, 2006, Doc. No. 251); TE 60 (Jeffrey Prosser's Monthly Operating Reports for the period of September 2006 through December 2006);  Trial Testimony of James P. Carroll, TR 6/10/08 at 70:6-12, Doc. No. 1792.  Mr. Prosser never disclosed to the Chapter 7 Trustee, at any point in time, the transfers totaling $480,000 that took place on July 31, 2006, and August 1, 2006.  Trial Testimony of James P. Carroll, TR 6/9/08 at 78:7-11, Doc. No. 1791.  Mr. Prosser did not disclose either of the transfers on his bankruptcy schedules or any other pleading or filing despite the fact that the transfers were from accounts he controlled and in which the bankruptcy estate has an interest.  Trial Testimony of James P. Carroll, TR 8/27/08 at 120:22-122:4, Doc. No. 2096.

On May 7, 2009, after the conclusion of this trial and after a colloquy with the court during closing arguments regarding the failure to disclose the transfers,[75] Mr. Prosser filed an amendment to his Statement of Financial Affairs Question 10 which added a transfer of $480,000 on 7/31/06 to "Dawn Prosser, Wife***".[76]  Mr. Prosser included the following annotation with his amendment:

> ***$250,000 was transferred from the Virgin Islands Community Bank Account of Mr. and Mrs. Prosser.  $230,000 was transferred via a wire Transfer from the Debtor's Bank of America Account to an account held by Mrs. Prosser.  This is added solely to reflect the transfer of funds previously paid to Dawn Prosser in settlement of claims relating to her St. Croix residence from one account to 2 other accounts.  This is merely to complete

---

[75]  *See* TR 12/1/08 at 69:13 - 75:11, Doc. No. 2287.

[76]  Doc. No. 2469, Case No. 06-30009.

the record that money moved between accounts.[77]

Despite this recent and, once again, after-the-discovery-of-the-asset amendment and after the trial ended, the court finds that Jeffrey Prosser transferred property out of the bankruptcy estate. His act of transferring nearly half a million dollars and failing to disclose the transfers to the Chapter 7 Trustee was clearly in bad faith and in blatant disregard of his duties as a debtor.  We note that the amendment listing the transfers as taking place on July 31, 2006, still does not comport with the evidence that established one transfer on July 31, 2006, and one on August 1, 2006.

The undisclosed transfers of nearly half a million dollars on the day of and day after the petition date, we find, was established by the credible evidence, was inconsistent with Mr. Prosser's duties as a debtor and was intended to, and did, impede the bankruptcy process, in violation of 11 U.S.C. §521.

## 9.  The Palm Beach Property

The Objecting Parties contend that Jeffrey Prosser fraudulently caused the transfer of the Palm Beach Property and assert that such conduct should also stand to deny his exemptions. Whether the Palm Beach Property was fraudulently transferred is the subject of ongoing proceedings before this court. Thus we do not consider the transfer of the Palm Beach residence by New ICC to Jeffrey and Dawn Prosser in connection with our ruling on the objection to exemptions.

---

[77]  Doc. No. 2469, Case No. 06-30009.

**10. Contentions the Objecting Parties Failed to Prove**

As set forth below, the Objecting Parties submitted a number of other proposed findings

of fact for which they failed to provide sufficient evidence.


**a. The Objecting parties did not prove their contention that Jeffrey Prosser failed
to identify gifts, purchased during the year preceding his bankruptcy, to Dawn
Prosser in his Statement of Financial Affairs.**

Mr. Prosser did not identify any gifts to his non-debtor wife, Dawn Prosser, including

anything purchased during the year preceding his bankruptcy, in his Statement of Financial

Affairs.  The Statement of Financial Affairs requires all gifts given within the year prepetition to

be listed.  *See* 11 U.S.C. §521;  Fed. Rule Bankr. Proc. 1007(b)(1); Official Form 7: Statement of

Financial Affairs.

The court makes no findings of fact at this time regarding the validity of alleged

substantial gifts from the Debtor to his wife, Dawn Prosser.  That issue is not before the court.

The issue at bench is whether Mr. Prosser was required, but failed, to disclose these gifts in his

bankruptcy filings.  A cursory review of the documents shows that although gifts made in the

one year prepetition are required to be listed, Mr. Prosser's Statement of Financial Affairs

contains no indication of any gifts from Mr. Prosser to Mrs. Prosser during the year immediately

preceding the bankruptcy.  TE 1 (Statement of Financial Affairs, Doc. No. 27); Trial Testimony

of James P. Carroll, TR 6/9/08 at 122:24-123:4, Doc. No. 1791.  Mrs. Prosser also claims that

she received multiple gifts, in fact, virtually everything she owns, from her husband.  TE 54

(Updated Inventory of Dawn Prosser's Assets).  None of the items Mrs. Prosser listed as gifts

from her husband are disclosed on Mr. Prosser's Statement of Financial Affairs as transfers or

gifts to Mrs. Prosser.  Trial Testimony of James P. Carroll, TR 6/9/08 at 125:4-8, Doc. No. 1791;

TE 1 (Statement of Financial Affairs, Doc. No. 27).

However, the Objecting Parties did not provide evidence sufficient to support a finding

that any of the numerous gifts from Jeffrey Prosser listed by Dawn Prosser in her inventory, TE

54, were purchased in the year preceding his bankruptcy.  Thus, there is insufficient proof that

Mr. Prosser made and failed to disclose gifts in the year preceding the bankruptcy.


**b.  The Objecting Parties did not prove their contention that Jeffrey Prosser should
have and failed to disclose a Regent Bank Account opened in the name of Adrian
Prosser and Linda Hirsch.**


The Objecting Parties allege that the Regent Bank Account at issue was opened with the

apparent intent to keep funds and the account activity hidden from the court, the Trustees, and

the creditors.  The account was opened in the names of Adrian Prosser and Linda Hirsch.  Adrian

Prosser is the son of the Debtor.  The Regent Bank account was used to pay various personal and

family expenses of the Debtor, including, but not limited to payments to Audio Advisors for the

replacement of the computer hard drive, payments to legal counsel, and payments for the Extra

Space Storage Unit discussed above.  TE 47 (Regent Bank Account Statements, Account No.

6100130906); TE 75 (Extra Space Storage Documents Produced in Response to Chapter 7

Trustee's Subpoena for Production of Documents); TE 76 (Custodian of Record Declarations

from Regent Bank and Corresponding Document Productions).

The initial deposit of $75,000 used to open the Regent Bank Account was from Dawn

Prosser's Bank of America Account. TE 47 (Regent Bank Account Statements, Account No.

6100130906); TE 76 (Custodian of Record Declarations from Regent Bank and Corresponding

64

Document Productions).  However, the Objecting Parties did not provide sufficient evidence to

support a finding that the Regent Bank account should have been disclosed by Mr. Prosser, as it

was funded by money from an account solely in the name of Dawn Prosser and opened in the

name of Adrian Prosser and Linda Hirsch.  While the Trustees were able to tie the funds used to

open the Regent Bank Account to funds deposited in Dawn Prosser's Bank of America Account

by Mr. Prosser,[78] they did not establish that the account was created at the instruction of Mr.

Prosser, or with his knowledge and consent.


## CONCLUSIONS OF LAW

Mr. Prosser ultimately elected to claim exemptions under 11 U.S.C. §522(b)(3), which

allows a debtor to claim exemptions available under applicable non-bankruptcy law

> that is applicable on the date of the filing of the petition at the place in which the debtor's
> domicile has been located for the 730 days immediately preceding the date of the filing of
> the petition or if the debtor's domicile has not been located at a single State for such
> 730-day period, the place in which the debtor's domicile was located for 180 days
> immediately preceding the 730-day period or for a longer portion of such 180-day period
> than in any other place.

11 U.S.C. §522(b)(3).

The Objecting Parties have alleged that the bad faith and fraudulent conduct of Mr.

Prosser during the course of the bankruptcy proceedings is sufficient grounds for the denial of

---

[78]  The initial deposit of $75,000 from Dawn Prosser's Bank of America Account used to
open the Regent Bank Account was specifically accumulated by Dawn Prosser from the $50,000
per month that she received from her husband.  TE 47 (Regent Bank Account Statements,
Account No. 6100130906); TE 76 (Custodian of Record Declarations from Regent Bank and
Corresponding Document Productions); Deposition Testimony of Dawn Prosser, taken on July
21, 2008, and admitted on August 25, 2008, at 67: 2-14 ("Would [the $75,000 dollars] be money
that you had accumulated in your fifty thousand a month you got from your husband?  A: Yes.").

the entirety of Mr. Prosser's claimed exemptions.  Rule 4003(c) of the Federal Rules of

Bankruptcy Procedure provides, in relevant part, "In any hearing under this rule, the objecting

party has the burden of proving that the exemptions are not properly claimed."  Fed. R. Bankr. P.

4003(c).   The burden of proof to be applied with respect to objections to exemptions claimed by

a debtor is preponderance of the evidence.  *See In re Jeffrey J. Prosser*, 2008 U.S. Dist. LEXIS

51641, *7-8 (D.V.I. Jul. 1, 2008) ("To overcome the presumption of exemption, the objecting

party must show by a preponderance of the evidence that the claimed exemption is improper").

*See also*, *In re Hodes*, 402 F.3d 1005, 1010 (10th Cir. 2005) ("Mr. Jenkins and Mr. Hood

[objectors] must therefore prove by a preponderance of the evidence that the exemption was

improper."); *In re Lebovitz*, 360 B.R. 612, 618 (6th Cir. B.A.P. 2007); *In re Holt*, 357 B.R. 917,

921 (Bankr. M.D. Ga. 2006).

> As the Bankruptcy Court for the Western District of Pennsylvania explained:

> The shield of exemption may be penetrated in extreme circumstances where there is
> fraudulent conduct or a clear showing of bad faith . . . .  In a bankruptcy proceeding . . . .
> the bankruptcy court is concerned with the rights of the creditors as well as the debtor
> (thus, the bankruptcy court may "tilt the scales" in favor of the creditors when the debtor
> has acted improperly).

*In re Bogan*, 302 B.R. 524, 529 (Bankr. W.D. Pa. 2003).  *See also In re Duncan*, 201 B.R. 889,

900 (Bankr. W.D. Pa. 1996)(stating that debtor's "errors, inaccuracies, and omissions" justified

setting aside debtor's exemption of interest in his residence "because not to do so would permit

respondent to abuse the bankruptcy process"); *In re Ballard*, 115 B.R. 190, 192 (Bankr. D. Minn.

1990)(stating that exemptions "are appropriately disallowed in providing a remedy to the estate,

for wrongful conduct or overreaching by a debtor that otherwise prejudices the estate or its

general creditors").   "Bad faith is generally determined from totality of circumstances."

*Sheehan v. Lincoln Nat. Life*, 257 B.R. 449 (N.D.W.Va. 2001), *affirmed sub nom. In re Morehead*, 283 F.3d 199 (4th Cir. 2002), citing *In re Hardy*, 234 B.R. 94, 95 (Bankr.W.D.Mo. 1999). *See also In re Bauer*, 298 B.R. 353, 356 (8th Cir. B.A.P. 2003). The Objecting Parties bear the burden of establishing bad faith by a preponderance of the evidence. Fed. R. Bankr. P. 4003(c); *In re Bauer*, 298 B.R. at 356.

A central purpose of the Bankruptcy Code is to provide a "fresh start" for the honest but unfortunate debtor. *See Grogan v. Garner*, 498 U.S. 279, 286 (1991). The exemptions provided by §522 are a fundamental means of effectuating an individual debtor's "fresh start." However, in order for the bankruptcy process to operate correctly, the court is dependent on the cooperation and good faith of the debtor. The court in *In re Barrows*, stated as such:

> The efficiency of the bankruptcy process depends upon the accuracy and reliability of the petition "without the necessity of digging out and conducting independent examinations to get the facts." *Mertz v. Rott*, 955 F.2d 596, 598 (8th Cir. 1992) (*citing In re Mascolo*, 505 F.2d 274, 278 (1st Cir. 1974) ("The successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make full disclosure.")). To that end, "[f]ull and accurate disclosure on bankruptcy schedules is incumbent on any debtor." *In re Soost*, 290 B.R. 116, 126 (Bankr. D. Minn. 2003) (citing 11 U.S.C. §521(1); *Mertz* at 598; *Cepelak v. Sears (In re Sears)*, 246 B.R. 341, 347 (B.A.P. 8th Cir. 2000).

*In re Barrows*, 399 B.R. 506, 510 (Bankr. D. Minn.), *affirmed* 408 B.R. 239 (8th Cir. B.A.P. 2009). Blatant dishonesty in the scheduling of assets, liabilities and property claimed as exempt – such as filing multiple, inconsistent amended schedules, failing to disclose some assets and inaccurately disclosing others of substantial value – is grounds for the denial of all claimed exemptions in and of itself. *See Ward v. Turner*, 150 B.R. 378 (E.D. La. 1993)(bad faith and superfluous exemptions claimed) and *Ward v. Turner*, 176 B.R. 424 (E.D. La 1994), *appeal dismissed* 66 F.3d 322 (5th Cir. 1995), *cert. denied* 516 U.S. 1151 (1996); *In re Koss*, 319 B.R.

317, 323 (Bankr. D. Mass. 2005)(undervaluation of assets); *In re Park*, 246 B.R. 837 (Bankr.

E.D. Tex. 2000)(inaccurate and inconsistent schedules).

Placing erroneous understated values on articles claimed exempt in schedules and failing

to make full and fair disclosure of all assets resulted in the denial of exemptions in circumstances

even less egregious than those in this case.  In *In re Bauer*, 298 B.R. 353 (B.A.P. 8th Cir. 2003),

the debtors initially concealed the true value of their home by listing it on their bankruptcy

schedules with a value of $80,000.  Following the destruction of the property by fire, the debtors

sought to amend their schedules to increase the stated value to $203,000, and to claim a state

homestead exemption of $200,000 in the insurance proceeds.  In view of the debtors' bad faith

attempt to amend their schedules only after the trustee had determined the true value of the

property following the fire, the court disallowed the exemption even though the property could

have been claimed as exempt at the outset of the case.

Other examples include *In re Ridner*, 102 B.R. 247 (Bankr. W.D. Okla. 1989), where  the

debtor's attorney was sanctioned under Fed. R. Bankr. P. 9011 for advising debtors to place

unreasonably low values on personal property being claimed as exempt, and *U.S. v. Allen*, 13

F.3d 105 (4th Cir. 1993), where the debtor was convicted of bankruptcy fraud, among other

things, when he concealed assets and later sought to recover from insurance companies for the

"losses" he suffered through theft of goods  that he had not reported in his bankruptcy schedules.

In *In re Park*, 246 B.R. at 838, the debtor filed five schedules of exemptions that were

substantially inconsistent.  The items of property listed, as well as the debtor's claims about who

owned various items, were different on each of those schedules; each subsequent schedule

contained claimed exemptions in property which the debtor had not disclosed in previous

schedules. *Id.* at 839-40. In addition, the debtor had demonstrated "blatant dishonesty in preparing his schedules from which may be inferred an attempt to hinder the Trustee's administration of the assets of the estate and any distribution to creditors." *Id.* at 840-41. The court concluded that "the Debtor has filed whatever appeared to him as being in his best interest as the case developed." *Id.* at 841. The court found that the debtor had disregarded his "paramount" duty to file complete and accurate schedules and instead "attempted 'to play fast and loose' with the disclosure requirements of the Code, th[e] Court and particularly, his creditors." *Id.* at 843. The court observed that even if it were to be persuaded that the debtor's amended schedules were accurate, subsequent amendments to false schedules "will not salvage an errant debtor's rights under the Bankruptcy Code." *Id.* at 844. Accordingly, the court concluded that inasmuch as the debtor had failed to meet his obligations to file accurate and complete schedules, it was obligated to deny the entirety of the debtor's claim of exemptions. *Id.*

As the overwhelming cumulative credible evidence presented at trial established, Mr. Prosser's schedules contained such inaccurate or insufficient information that the court finds blatant dishonesty and bad faith on Mr. Prosser's part. The schedules contain inadequate, incomplete and false disclosures, and numerous inaccuracies. Mr. Prosser amended his Schedules five times and, with each amendment, various assets were added and subtracted. On each occasion, Mr. Prosser would identify information responsive to the questions on the Schedules and Statement of Financial Affairs only after that information was brought to light by creditors or the Trustees. Mr. Prosser never came forward with information until he was confronted with undeniable evidence of an omission or deficiency.

69

In response to the allegations regarding the omissions and deficiencies in his schedules,

Mr. Prosser claims that his schedules were in full compliance with the applicable reporting

requirements.  Mr. Prosser asserts that he complied with Rule 1009 which "permits and requires

a debtor to amend his schedules as appropriate" and that the changes made to the schedules were

merely clarifications.  However, as established at trial, Mr. Prosser amended his schedules only

after being ordered to do so by the court and after the Trustees, through their own investigations,

determined that the schedules were not accurate.

The Debtor cited *In re Mohring*, 142 B.R. 389 (Bankr. E.D. Cal. 1992), 24 F.3d 247 (9th

Cir. 1994)*,* and *In re Schapiro*, 1997 Bankr. LEXIS 2328 (Bankr. E.D. Pa. June 6, 1997), for the

proposition that the degree of itemization and specificity in filing schedules is "reasonable

particularization under the circumstances."[79]  Applying that standard here does not save the day

for Mr. Prosser.  His failures with regard to his schedules were neither minor nor immaterial.

They fail the "reasonable particularization under the circumstances" test.  The record is replete

with instances of Mr. Prosser's failure to make appropriate disclosures of transactions material to

his financial affairs and administration of the estate on his statement of financial affairs,

schedules, and monthly operating reports as well as his substantial and material undervaluation

of many of the assets he did disclose.  As set forth in detail above, Mr. Prosser failed to disclose,

*inter alia*, thousands of bottles of wine worth over a million dollars; hundreds of thousands of

dollars collectively in assets such as watches, jewelry and cigars; life insurance policies; two

transfers of cash totaling $480,000; etc.  Mr. Prosser materially undervalued the Lake Placid

---

[79] *In re Mohring*, 142 B.R. at 395, citing *Payne v. Wood*, 775 F.2d 202, 205-07 (7th Cir.
1985), *cert. denied* 475 U.S. 1085 (1986).

Property, the wine, jewelry and watches that were disclosed, and his Virgin Islands Community

Bank stock.  He failed to disclose positions or interests in AMJ, Inc., a will, and a marital asset

agreement.  Moreover, he failed to disclose a $5.65 million plus interest liability that was due in

full less than nine months after he filed his voluntary bankruptcy.  These facts demonstrate that

Mr.  Prosser did not exercise good faith and candor in disclosing his assets and liabilities or in

completing his schedules.  Rather, he blatantly disregarded his duties.

   In addition to his disregard of his obligation to accurately and correctly file his schedules,

Mr.  Prosser consistently failed to cooperate with and make appropriate disclosures to the court,

the Examiner, or the Trustees.  As set forth in detail above, the Debtor concealed and failed to

produce documents and records related to his assets, liabilities, and financial condition.  In an

effort to avoid his obligation to disclose his assets, liabilities, and financial condition, Mr.

Prosser ordered the destruction of computer hard drives, failed to disclose the existence of

storage space that contained records and documents relevant to his bankruptcy, failed to disclose

or continuously delayed disclosure of various assets of substantial value, failed to disclose two

cash transfers totaling $480,000 on the day of and the day after he filed bankruptcy, and failed to

disclose substantial liabilities.  Mr. Prosser's actions continuously obstructed the efforts of the

Trustees in carrying out their duties and hindered the effective operation and administration of

the estates to the prejudice of the administration of the bankruptcy system.  Each of his failures

was material and collectively were of such a magnitude that the Chapter 7 estate's administration

was delayed and prejudiced to the detriment of the Chapter 7 Trustee and the creditors of the

estate.[80]

Mr. Prosser's conduct throughout his bankruptcy is clear and convincing evidence of his bad faith and is in blatant disregard of his obligations as a debtor. The evidence meets the preponderance standard and the Objecting Parties proved that Mr. Prosser's conduct was intended to and did delay and abuse the bankruptcy process. The evidence established that Mr. Prosser's conduct is an abuse of the bankruptcy process and calls into question the veracity and reliability of the entirety of the schedules he filed. *See In re Park*, 246 B.R. at 841, n. 6. The court finds that Mr. Prosser abused the bankruptcy process and acted in bad faith with conscious disregard of his duties as a debtor. "[T]his court sits in equity . . . and . . . the debtor is under a duty to do equity before he can claim his right in exemptions." *Matter of Dorricott*, 5 B.R. 192, 196 (Bankr. N.D. Ohio 1980), citing *Stewart v. Ganey*, 116 F.2d 1010, 1011 (5th Cir. 1940). The Objecting Parties have established convincingly that Mr. Prosser has not met his statutory duties as a debtor in bankruptcy.

Accordingly, the motion for denial of all exemptions claimed by Debtor Jeffrey J. Prosser will be granted.

An appropriate order will be entered.


**DATE: October 9, 2009**

Judith K. Fitzgerald
Judith K. Fitzgerald
United State Bankruptcy Judge

cjs

---

[80] His failures and lack of cooperation also impeded the Chapter 11 estates.