**UNITED STATES DISTRICT COURT OF THE VIRGIN ISLANDS**
**BANKRUPTCY DIVISION**

| | | |
|---|---|---|
| OAKLAND BENTA, JEFFREY J. PROSSER, AND DAWN E. PROSSER, | ) ) ) | COMPLAINT |
| PLAINTIFFS. | ) ) | Bankr. Case No. 06-30009 (MFW) |
| vs. | ) ) | Chapter 7 |
| CHRISTIE'S INC., CHARLES ANTIN, FOX ROTHSCHILD LLP, YANN GERON, WILLIAM H. STASSEN, DAVID M. NISSMAN, JAMES P. CARROLL, | ) ) ) ) ) | Adv. Pro. No. Related to Adv. Pro. No. 07-ap-03010 |
| DEFENDANTS. | ) ) | **<u>JURY TRIAL DEMANDED</u>** |

**COMPLAINT**

**FOR CIVIL RACKETEERING, CIVIL VIOLATIONS OF THE CRIMINALLY
INFLUENCED AND CORRUPT ORGANIZATIONS ACT, FOR DEPRIVATION OF
CIVIL RIGHTS UNDER THE COLOR OF LAW AND FOR OTHER RELIEF**

# Complaint
## Table of Contents

page

Claims ------------------------------------------------------------------------------------ 1

Jurisdiction ------------------------------------------------------------------------------ 1

Supplemental Jurisdictional Statement ----------------------------------------- 2

Introduction & Background ------------------------------------------------------- 3

Part One: The Defendant Persons ----------------------------------------------- 7

Part Two: Plaintiffs ----------------------------------------------------------------- 10

Part Three: Other Material Parties -------------------------------------------- 12

Part Four: St. Croix Wine Incident -------------------------------------------- 12

    *No Previous Wine Specialists Examination of the Shoys Wine* --------------------- 20

    *No Establishment of Historical Suitability Standards for the Shoys Wines* -------- 20

    *Immediacy of Purported On-Site Rejection of the Shoys Wines* --------------------- 20

    *The False 55°F Ceiling Auction Prerequisite* ------------------------------------------- 21

    *Perjury - the Unplugging* ------------------------------------------------------------------- 22

    *The Implausible "Green" Excuse* ---------------------------------------------------------- 23

    *Perjury - the Storage Room Temperature* ------------------------------------------------ 24

    *The False Narrative of Broken Bottles* ---------------------------------------------------- 25

    *The Sanction/Criminal Charges End Game* ----------------------------------------------- 26

Part Five: The Shoys Wine Criminal Investigation ------------------------- 31

Part Six: VIDC's Affirmation of the Bankruptcy Judge's Sanctions ----------------------- 42

Part Seven: Pattern of Unlawful Acts ----------------------------------------- 44

Part Eight: Actions Taken Since The 2017 Amended Complaint --------------------------- 47

Part Nine: The Causes of Action ------------------------------------------------ 49

    *First Cause of Action – RICO Act § 1962(c)* --------------------------------------------- 49

    *Second Cause of Action – RICO Act § 1962(d)* ----------------------------------------- 51

    *Third Cause of Action – CICO Act § 605(a)* --------------------------------------------- 52

    *Fourth Cause of Action – CICO Act § 605(d)* -------------------------------------------- 54

    *Fifth Cause of Action – Violation of Constitutional And Civil Rights* re: 42
    U.S.C. § 1985 (Defamation Pl Benta) ------------------------------------------------------- 59

    *Sixth Cause of Action – Violation of Constitutional And Civil Rights re: 42
    U.S.C. § 1985* (Defamation Pl Prossers) -------------------------------------------------- 58

## GLOSSARY OF SELECTED DEFINED TERMS

Compromised VIPO - - -
> Refers to public officials who, upon information and belief, accepted bribes and are identified in the Sealed Records in the case of *USA v Williams*, Virgin Islands District Court ("VIDC") Case No. 3:12-cr-00033-CVG-RM-1.

Continental Wines - - -
> Refers to the Prossers' Wines (wines owned by the Prossers at the time of the commencement of the JJP BK Estate) other than the Shoys Wines.

Court-Appointed 7 Professionals - - -
> Refers to the Court-Appointed Trustee and Court-Appointed Counsel for the JJP BK Estate as defined hereinbelow. The term as used herein excludes the Court-Appointed Accountant and Christie's.

JJP BK Estate - - -
> Refers to the Jeffrey J. Prosser Chapter 7 Bankruptcy Estate, VIBC Case No. 09-30009.

Rogue VIPD Investigation Theory & the Rogue VIPD Investigation Theory Implementation - -
> Refers to the alleged obstruction and suppression of the VIPD Shoys Wines Criminal Investigation as well as actions taken to present the VIPD Shoys Wines Criminal Investigation as an unauthorized criminal investigation.

Shoys Wines
> Refers to the Prosser Wines (*i.e.* wines owned by the Prossers at the time of the commencement of the JJP BK Estate) which were then located at Estate Shoys, St. Croix, U.S. Virgin Islands.

Shoys Wines Fraud - - -
> Refers to the alleged plan to reject all of the Shoys Wines, declare the Shoys Wines spoiled, and have the Court impose sanctions against the Prossers.

St. Croix Wine Incident - - -
> Refers to the events of surrounding the implementation of the Shoys Wine Fraud and efforts to obtain sanctions but does not include the Rogue VIPD Investigation Theory Implementation.

VIPD Shoys Wines Criminal Investigation - - -
> Refers to the criminal investigation undertaken by the Virgin Islands Police Department with respect to Defendant Christie's attempt to destroy the Shoys Wines.

iv

## COMPLAINT

**COME NOW** Plaintiffs, Oakland Benta, appearing *pro se* ("Benta"), Dawn E. Prosser, appearing *pro se* ("DProsser"), and Jeffrey J. Prosser, by and through his undersigned counsel ("JProsser"), (JProsser and DProsser are hereinafter referred to collectively as "Prossers") (the Prossers and Benta are collectively referred to as "Plaintiffs" or individually referred to as "Pl."), and file their Complaint against Defendants Christie's, Inc. ("Christie's"), Charles Antin ("Antin"), Fox Rothschild LLP ("Fox LLP"), Yann Geron ("Geron"), William H. Stassen ("Stassen"), David M. Nissman ("Nissman"), and James P. Carroll ("Carroll") (Christie's, Antin, Fox LLP, Geron, Stassen, Nissman and Carroll are collectively referred to as the "Defendants" or "Defendant-Persons" and each party may be referred to as "Def." or "Defendant").

Plaintiffs allege the following:

## CLAIMS

Plaintiffs seek damages from the Defendants by reason of:

(i)     torts committed pursuant to 18 U.S.C. § 1983;

(ii)    civil violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO" or the "RICO Act"); and

(iii)   civil violations of the Virgin Islands Criminally Influenced and Corrupt Organizations Act ("CICO" or the "CICO Act"), 14 V.I.C. § 600, *et. seq*.

## JURISDICTION

Pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(a), this Court has original, non-exclusive jurisdiction of all civil proceedings arising under Title 11 or arising in or related to cases under Title 11. By reason of 18 U.S.C. § 1964 and 28 U.S.C. § 157(a), this Court has

jurisdiction over actions arising under the RICO Act. Additionally, this Court has pendent jurisdiction over actions arising under the CICO Act, 14 V.I.C. § 600, *et seq*. The exercise of pendent jurisdiction over CICO actions is supported by the CICO Act itself which defines prohibited activity broadly to encompass violations of any Federal law which is a felony,[1] thereby making the interpretation of Federal law necessary to the adjudication of the CICO claim. Additionally, 14 V.I.C. § 607(a) of the CICO Act and 28 U.S.C. § 157(a), taken together, authorizes this Court to exercise jurisdiction over this action.

## SUPPLEMENTAL JURISDICTIONAL STATEMENT

The gravamen of this controversy centers on allegations of an extensive pattern of criminal acts violating both Federal law[2] and Virgin Islands Territorial law[3] for which the Codes authorize civil remedies.

This case was originally filed in the Virgin Islands District Court on July 29, 2013, and has been commonly referenced as *Benta et al v. Christies et al*, Case No. 2013-0080 (WAL-

---

[1]    14 V.I.C. § 605(e) provides: "'Criminal activity' means engaging in … the crimes, offenses, violations or the prohibited conduct as variously described in the laws governing this jurisdiction including any Federal criminal law, the violation of which is a felony …."

[2]    [B]ankruptcy crimes are not concerned with individual loss or even whether certain acts caused anyone particularized harm. Instead, the statutes establishing the **federal bankruptcy crimes seek to prevent and redress abuses of the bankruptcy** *system*." 1-7 Collier on Bankruptcy P 7.01 (16th 2016) (Footnotes omitted & Emphasis added).

[3]    Per emails produced, after Christie's had unplugged the air conditioner unit cooling the Shoys Wines, it appears that the Chapter 7 Trustee filed a criminal complaint with the United States Attorney alleging that Prossers intentional "cooked" the Shoys Wine relying upon the intentional unplugging of the air conditioner unit. Subsequently, under oath, the Christie's employee admitted it was the Christies' employee who had unplugged the air conditioner unit. The air conditioner unit was unplugged by Christies' employee *after* a telephone call with the Trustee.

2

GWC). Applying the "Barton Doctrine,[4]" the District Court dismissed the Complaint, *without prejudice*, on March 17, 2017, for want of subject matter jurisdiction. (Case No. 2013-0080, Dkt. No. 55 at 22-23). Plaintiffs filed an amended complaint on March 24, 2017. (Case No. 2013-0080, Dkt. No. 56). On June 21, 2021, the District Court found "… the Barton doctrine undisputedly applies in this case. Plaintiffs' failure to comply therewith leaves this Court without subject matter jurisdiction over this matter." (Case No. 2013-0080, Dkt. No. 84 at 22). This Complaint essentially mirrors the Complaint recently dismissed in the District Court adjusted for events occurring after the amended complaint was filed.

## INTRODUCTION & BACKGROUND

*Preliminary Statement*

Plaintiff JProsser has been, and continues to be, subjected to unlawful retaliation within the meaning 18 U.S.C. § 1513(e). This is because he learned of the racketeering activities of one of several related enterprises and tried to alert appropriate authorities about it. This pattern of racketeering involves multiple "enterprises," as defined by 18 U.S.C. § 1961(4), that are implicated or affected by various levels of racketeering activities.

This litigation centers on only one of those enterprises and the events revolving around a single asset grouping:  the St. Croix wine (the "**Shoys Wines**"). The events surrounding the Shoys Wines constitute a violation of the RICO Act and CICO Act and are hereinafter referred to the "**St. Croix Wine Incident**." Standing alone, the St. Croix Wine Incident satisfies all the elements necessary to sustain a RICO/CICO judgment.

*Overview of the Myriad Racketeering Enterprises*

---

[4]    The jurisdictional doctrine emanates from the case of *Barton v. Barbour*, 104 U.S. 126 (1881).

3

The National Rural Utilities Cooperative Finance Corporation ("CFC") is at the top of a hierarchy of enterprises. CFC is a financing cooperative for rural electric cooperatives ("RE Coops"). In 1969, CFC was formed by National Rural Electric Cooperative Associations ("NRECA") and NRECA Members, *i.e.,* RE Coops which became members of CFC. NRECA and RE Coops which are members of CFC are hereinafter collectively referred to as "**CFC's Control Persons**."

In 1987, CFC formed and commenced lending to rural telephone companies ("RT Cos") through the Rural Telephone Finance Cooperative ("RTFC"). RTFC is ***distinct and separate line of CFC's business*** which is conducted by CFC through RTFC. RTFC is also separately owned by the RT Cos with CFC having no ownership interest in RTFC since October of 2001[5] and limited ownership from 1987 until October of 2001. CFC's management operates and functions as RTFC's management. The Control Persons for racketeering activities conducted through the RTFC Enterprise are CFC, its management, and CFC's Control Persons (the "**RTFC Control Persons**").

CFC operates to protect its racketeering activities though retaliation designed to suppress and discredit anyone, like JProsser, that seeks to hold CFC accountable for its racketeering activities. Plaintiff JProsser became a target of the retaliation when he raised issues that implicated the Racketeering Activities. CFC commenced additional unlawful retaliatory acts (or lawful acts that served an unlawful purpose) directed at Plaintiff JProsser for the purpose of suppressing JProsser and discrediting JProsser ("**Retaliatory Acts**"). The Retaliatory Acts were

---

[5]    CFC' s ownership interest in RTFC from 1987 to October 2001 was unlawful (*See* SDCL § 47-16-10) and violated coop principles which CFC claims to promote and honor.

also directed at associates of JProsser (the "**Prosser Associate**") including Plaintiff Oakland

Benta. Pl Benta is a Prosser Associate by reason of his former employment with Innovative

Communication Corporation ("**ICC**") and his willingness to periodically assist the Prossers.

The RTFC Control Persons' Retaliatory Acts first involved the unlawful[6] loan

foreclosure directed at ICC *without any payment default*. After a series of Retaliatory Acts,

many of which constitute separate racketeering[7] offenses, it was discovered that the unlawful

foreclosure involved a Loan Document *unilaterally altered* by RTFC in violation of, *inter alia,*

18 U.S.C. § 1001. In response to that discovery, the RTFC Control Persons compromised three

hedge funds, under common control, hereinafter collectively referred to as Greenlight.[8]

Greenlight entered into a joint venture[9] with the RTFC Control Persons to pursue the retaliatory

foreclosure against JProsser ("**RTFC/Greenlight Retaliatory JV**"). Greenlight was used by the

RTFC Control Persons to circumvent the foreclosure litigation by forcing JProsser and the

entities under his control into bankruptcy.

---

[6]     The foreclosure was unlawful because the motivation behind it was an unlawful
retaliation within the meaning of 18 U.S.C. § 1513(e) and 18 U.S.C. § 1961(1)(B). As a
telecommunications entity, the entirety of the retaliatory foreclosure affected interstate
commerce and thus, constitutes a violation of 18 U.S.C. § 1951(a) and 18 U.S.C. § 1961(1)(B).

[7]     For instance, CFC/RTFC used their influence to cut-off RUS Funding of the Virgin
Islands Telephone Corporation projects which had been pre-approved. This conduct is a
violation of 18 U.S.C. § 1951(a) and 18 U.S.C. § 1961(1)(B).

[8]     "**Greenlight**" means the following three hedge funds: Greenlight Capital Qualified, L.P.;
Greenlight Capital Offshore, Ltd.; and Greenlight Capital, L.P.

[9]     The Agreement between CFC/RTFC and Greenlight, the Intercreditor Agreement, was
found by the Delaware Bankruptcy Court to be a ***joint venture***, to wit: "… RTFC and the
Greenlight Entities entered into a joint venture under an intercreditor agreement." The
Bankruptcy Court's Memorandum Op., the Venue holding, VIBC Case No. 06-30009, DE 164 at
p. 8.

On July 31, 2006, as a direct consequence of the Retaliatory Acts, involuntary Chapter 11 Bankruptcies were filed by Innovative Communication Company, LLC ("ICC-LLC") [VIBC No. 06-30008], a Delaware limited liability company controlled by JProsser; Emerging Communications, Inc. ("ECI" or "ECM") [VIBC No. 06-30007], a Delaware corporation controlled by JProsser; and JProsser personally [VIBC No. 06-30009]. ICC was forced into involuntary Chapter 11 Bankruptcy on September 21, 2007 [VIBC No. 07-30012, DE 60]. The Chapter 11 Estate of JProsser was converted into a Chapter 7 Estate of JProsser on October 3, 2007.

The RTFC/Greenlight Retaliatory JV's Racketeering Acts resulted in the creation of four (4) new enterprises within the meaning of 18 U.S.C. § 1961(4); that is:

(i)     ICC Chapter 11 Bankruptcy Estate hereinafter referred to as the "**ICC BK Estate**;"

(ii)    ECI Chapter 11 Bankruptcy Estate hereinafter referred to as the "**ECI BK Estate**;"

(iii)   ICC-LLC Chapter 11 Bankruptcy Estate hereinafter referred to as the "**ICC-LLC BK Estate**;" and

(iv)    the Jeffrey J. Prosser Chapter 7 Bankruptcy Estate hereinafter referred to as the "**JJP BK Estate**."

The ICC BK Estate, the ECI BK Estate, and the ICC-LLC BK Estate are collectively referred to as the "**Chapter 11 Estates**."

The Court-Appointed Trustee, the Court-Appointed Accountants, and the Court-Appointed Counsel for the ECI BK Estate served in the same position for all the Chapter 11

6

Estates and are hereinafter referred to as the "**Court-Appointed 11 Professionals**." In the case of the JJP BK Estate, the Court-Appointed Trustee and the Court-Appointed Counsel (the Court-Appointed Accountants[10] are not included) are hereinafter referred to as the "**Court-Appointed 7 Professionals**."

This case addresses the racketeering activities of association-in-fact defendants consisting of Court-Appointed 7 Professionals:  Christie's, Charles Antin (a Christie's employee), and Attorney David Nissman who was Christie's agent with respect to the St. Croix Wine Incident.      The association-in-fact defendants were acting under the color of official right or under the color of law since all were acting as or on behalf of Court-Appointed Professionals for the JJP BK Estate under the color of a Bankruptcy Court Order. JProsser and the other Plaintiffs are seeking compensation and recovery for the pattern of racketeering committed *only* with respect to the St. Croix Wine Incident.

### PART ONE

### THE DEFENDANT-PERSONS

1.    Defendant-Person CHRISTIE'S, INC. ("Christie's" or "Def Christie's") is an auction house that conducts approximately 350 auctions annually in over 80 categories including all areas of fine and decorative arts, jewelry, photographs, collectibles, wine, and more. Def Christie's is located at 20 Rockefeller Plaza, New York, NY 10020.

2.    On March 18, 2008, the JJP BK Estate was authorized by the Bankruptcy Court to engage Def Christie's as an auctioneer for the property of the Estate (the "Christie's Order").

---

[10]    The Court-Appointed Accountants for the Chapter 11 Estates were the Chapter 11 Trustee's firm. They played an active role in the commission of retaliatory acts directed at Pl. Prosser. The JJP BK Estate Court-Appointed accountants played a more traditional, though not independent, role in affairs of the Chapter 7 Estate.

Christie's was engaged by the JJP BK Estate shortly thereafter.

3.     With respect to the St. Croix Wine Incident, Defendant Christie's is a member of the association-in-fact group that acted in concert with a common purpose whose acts were perpetrated through and on behalf of the JJP BK Estate, the Enterprise.

4.     At the time of the St. Croix Wine Incident, Defendant-Person CHARLES ANTIN ("Antin" or "Def Antin") was an Associate Vice President of Christies and a "wine specialist associate.". He has been employed by Christies since 2006 and shares the same business address as Christie's.

5.     With respect to the St. Croix Wine Incident, Def Antin is a member of the association-in-fact group that acted in concert with a common purpose whose acts were perpetrated through and on behalf of the JJP BK Estate and the Enterprise.

6.     Defendant Person FOX ROTHSCHILD LLP ("Fox LLP" or "Def Fox LLP") is a national law firm with approximately 750 attorneys practicing in 22 offices coast to coast.

7.     On March 18, 2008, Def Fox LLP was appointed counsel to the Trustee for the JJP BK Estate effective as of February 25, 2008. VIBC Case No. 06-30009, DE 1453. Def Fox LLP's main business office is 2000 Market St., 20th Floor, Philadelphia PA 19103-3222 ("Fox LLP's Office").

8.     With respect to the St. Croix Wine Incident, Def Fox LLP is a member of the association-in-fact group that acted in concert with a common purpose whose acts were perpetrated through and on behalf of the JJP BK Estate and the Enterprise.

9.     At the time of the St. Croix Wine Incident, Defendant-Person YANN GERON ("Geron" or "Def Geron") was a litigator and trial attorney with extensive experience in complex

bankruptcy litigation matters. Def Geron was a partner of Def Fox LLP and was Def Fox LLP's co-chair of the firm's Financial Restructuring & Bankruptcy Department. Def Geron's and Def Fox LLP's relationship ended in April 2017.

10.     Def Geron was admitted to practice *pro hac vice* before the Virgin Islands Bankruptcy Court on March 18, 2008. VIBC Case No. 06-30009, DE 1446.

11.     Def Geron was an agent acting on behalf of Def Fox LLP as counsel to the Trustee for the JJP BK Estate. Whenever Def Fox LLP is cited hereinbelow, such references include Def Geron who was charged with managing Def Fox LLP's services to the JPP BK Estate. At the time of the St. Croix Wine Incident, Def Geron practiced out of Def Fox LLP's Office.

12.     With respect to the St. Croix Wine Incident, Def Geron is a member of the association-in-fact group that acted in concert with a common purpose whose acts were perpetrated through and on behalf of the JJP BK Estate and the Enterprise.

13.     Defendant-Person WILLIAM H. STASSEN ("Stassen" or "Def Stassen") is a litigator and trial attorney with extensive experience in complex bankruptcy litigation matters. Def Stassen was, at all times relevant to this Complaint, a partner of Def Fox LLP.

14.     Def Stassen was admitted to practice law *pro hac vice* before the Virgin Islands Bankruptcy Court on May 16, 2008. VIBC Case No. 06-30009, DE 1647.

15.     Def Stassen was an agent acting on behalf of Fox LLP as counsel to the Trustee for the JJP BK Estate. Whenever Def Fox LLP is cited hereinbelow, such references include Def Stassen because he was working in concert with Def Geron, the person then in charged with managing Def Fox LLP's services to the JPP BK Estate. Def Stassen practices out of Def Fox LLP's Office.

9

16.     With respect to the St. Croix Wine Incident, Def Stassen is a member of the association-in-fact group that acted in concert with a common purpose whose acts were perpetrated through and on behalf of the JJP BK Estate, the Enterprise.

17.     Defendant-Person DAVID M. NISSMAN ("Nissman" or "Def Nissman") was, at all times relevant to this Complaint, an attorney licensed to practice in the United States Virgin Islands and a former *Acting* Virgin Islands United States Attorney.

18.     Defendant Nissman acknowledged that he was engaged by Christie's with respect to the St. Croix Wine Incident. In December 2011, Defendant Nissman was engaged by the JJP BK Estate.

19.     With respect to the St. Croix Wine Incident, Defendant Nissman is a member of the association-in-fact group that acted in concert with a common purpose whose acts were perpetrated through and on behalf of the JJP BK Estate and the Enterprise.

20.     On **October 31, 2007**, Defendant Person JAMES P. CARROLL ("Carroll" or "Def/Trustee Carroll") was appointed Chapter 7 Trustee of the JJP BK Estate. VIBC Case No. 06-30009, DE 948.

21.     RTFC and Greenlight were two of the three creditors that voted for Trustee Carroll. VIBC Case No. 06-30009, DE 938.

22.     Def/Trustee Carroll was financially beholden to Greenlight's bankruptcy counsel,[11] Skadden, Arps, Slate, Meagher & Flom, LLP ("Skadden LLP").

23.     Skadden LLP also advised Greenlight before, during, and after the RTFC Control

---

[11] "He [Carroll] testified that I think five out of the six current assignments he has, either he's hiring Galardi's firm [Greenlight's firm] or Galardi [Greenlight's bankruptcy counsel] has hired his firm [Carroll's firm]. I think that impacts on his credibility." BK Case No. 06-30009, DE 338, Transcript at p. 22, L13-15.

Persons and Greenlight entered into the RTFC/Greenlight Retaliatory JV.

24.     With respect to the St. Croix Wine Incident, Def/Trustee Carroll is a member of the association-in-fact group that acted in concert with a common purpose whose acts were perpetrated through and on behalf of the JJP BK Estate, the Enterprise.

25.     Defendants Christie's, Antin, Fox LLP, Geron, Stassen, Nissman and Carroll are hereinafter collectively referred to as the "Defendants." As noted above, Def/Trustee Carroll and Def Fox LLP, including Def Geron and Def Stassen, are collectively referred to as the "**Court-Appointed 7 Professionals**." For purposes of this action, the defined term of Court-Appointed 7 Professionals does not include JJP BK Estate Court-Appointed Accountants or Def. Christie's.

26.     The Court-Appointed 7 Professionals were agents for and acting on behalf of the RTFC/Greenlight Retaliatory JV.

## PART TWO

## PLAINTIFFS

27.     From 1998 through 2007, Plaintiff Oakland Benta ("Benta" or "Pl Benta") was an employee of ICC. He was dismissed from his employment by ICC's Chapter 11 Trustee.

28.     In June 2008, Pl Benta rejoined the Virgin Islands Police Department. Pl Benta served as a Senator for the Virgin Islands Legislature from January 2019 until January 2021.

29.     Because of his status as a former ICC employee, Pl Benta is considered a Prosser Associate by the RTFC/Greenlight Retaliatory JV and thus, was a target of the RTFC/Greenlight Retaliatory JV.

30.     Plaintiff JEFFREY J. PROSSER ("JProsser" or "Pl JProsser") was an owner or

beneficial owner of the Chapter 11 Estates and the Debtor in the JJP BK Estate. Pl JProsser was a target of the RTFC/Greenlight Retaliatory JV.

31.    Plaintiff DAWN E. PROSSER ("DProsser" or "Pl DProsser") was an owner or beneficial owner of the Chapter 11 Estates and wife of the Chapter 7 Debtor in the JJP BK Estate.

32.    DProsser was a target of the RTFC/Greenlight Retaliatory JV.

**PART THREE**

**OTHER MATERIAL PARTIES**

33.    Former Judge Judith K. Fitzgerald (the "Bankruptcy Court") was the former Bankruptcy Judge for the Western District of Pennsylvania from October 30, 1987, until her abrupt resignation effective as of May 31, 2013. At the time of her resignation there remained nearly two years on her term as a federal judge.

34.    The Bankruptcy Judge sat by designation as the Bankruptcy Court for the Virgin Islands for nine (9) years ending May 31, 2013. The Bankruptcy Judge functioned as the Bankruptcy Court for the JJP BK Estate as well as for the Chapter 11 Estates until May 31, 2013.

35.    Various unnamed Virgin Islands Public Officials (the "**Compromised VIPO**") who had accepted financial inducements (ultimately funded by CFC/RTFC) to obtain their assistance in the furthering of the retaliatory agenda of the target of the RTFC/Greenlight Retaliatory JV directed at the Prossers and the Prosser Associates (the "**ICC Bribery**"). **Exhibit 11**, Pl JProsser's Nov. 17, 2014 is an Affidavit documenting admissions made about the ICC Bribery. The names of the Compromised VIPO are currently under seal in the case of *USA v Williams*, Virgin Islands District Court ("VIDC") Case No. 3:12-cr-00033-CVG-RM-1. Pl JProsser has

12

made an effort to obtain the Sealed Records but to date, his Motion to unseal those records remains pending.

**PART FOUR**

**ST. CROIX WINE INCIDENT**

36.     On February 9, 2011, the Bankruptcy Court entered a Turnover Order which, *inter alia*, directed the Prossers to turn over the Prossers' collection of fine wines to the Chapter 7 Trustee, Def/Trustee Carroll, of the JJP BK Estate.[12] VIBC, Case No. 07-03010, DE 728. This Court order included the fine wines (the "Shoys Wines") located at Estate Shoys ("Shoys") of the Virgin Islands. The Chapter 7 Professionals were authorized by the Turnover Order to *only* pick-up and secure all the Shoys Wines (the "**Lawful Charge**").

37.     By July 29, 2011, Def/Trustee Carroll with the assistance of his counsel, Def Fox LLP[13], and Def Christie's had collected and secured the Prossers' collection of "state-side" wines to the extent such wine was located within the continental United States (the "**Continental Wines**"). The Shoys Wines located in St. Croix are at the center of this matter.

38.     The Continental Wines were auctioned by Christie's and generated over $1.2 Million in "Net Auction Proceeds." Net Auction Proceeds refers to cash proceeds after all expenses have been paid, including Christie's expenses and auction fees.

39.     With respect to the Continental Wines, Christie's auctioned the Continental Wines

---

[12]     The Turnover Order was simple and direct: "Defendants [the Prossers] shall turnover the following property to the Chapter 7 Trustee: (1) wines …." VIBC Case No. 3:07-ap-03010-JKF, Doc No. 728, 2/9/2011.

[13]     For purposes of this Complaint, a reference to Fox LLP should be deemed and should be treated as a reference to Defendants Geron and Stassen. Further, a reference to Defendant Geron or Defendant Stassen should be deemed a reference to Fox LLP, the principal that had the legal relationship with JJP BK Estate.

13

without:

 a. Inquiry of Pl JProsser or Pl DProsser of the Continental Wines acquisition history;

 b. Inquiry of Pl JProsser or Pl DProsser of the Continental Wines storage history;

 c. Inquiry of Pl JProsser or Pl DProsser of the Continental Wines temperature storage history; and

 d. Inquiry of Pl JProsser or Pl DProsser of the Continental Wines transportation history including the mode of transportation.

The above inquiries have established the historical care for the wines while owned by the Prossers and its suitability for auction by Def Christie's (the "**Historical Suitability Standards**").

40. The Shoys Wines were materially and substantially less in number of bottles (Shoys Wines was less than 1,000 bottles in contrast to 6,686 bottles of Continental Wines). Thus, the projected Net Auction Proceeds of the Shoys Wines (the "**Expected Net Auction Proceeds**") were substantially less than the Net Auction Proceeds of the Continental Wines.

41. Based upon the Net Auction Proceeds of the Continental Wines, the Expected Net Auction Proceeds of the Shoys Wines (after disposition cost) would be expected to generate less than $200,000.

42. The Shoys Wines by reason of its location alone were also substantially and materially more expensive to transport to the United States for auction than the Continental Wines. Further, the additional handling made the Shoys Wines more susceptible to breakage.

43. The Expected Net Auction Proceeds of the Shoys Wines would have decreased substantially and materially by this incremental expense, including custom taxes.

14

44.    In an email dated February 25, 2011, without understanding issues involving U.S. Customs, Def Antin noted with respect to shipping the Shoys Wines: "It's going to be really, really expensive, but so it goes. Client is paying."

45.    The Shoys Wines were "outside the custom zone" (the "**VI Customs Problem**"). 46 U.S.C. § 55101(b)(3). The Chapter 7 Trustee and his attorneys failed to consider the VI Customs Problem in the Turnover Order and thus, the Chapter 7 Professionals' Lawful Charge.

46.    The VI Customs Problem makes commercial shipping of the Shoys Wines to NYC expensive and complex particularly when shipping to New York for auction. As such, the Trustee (who was uninformed of the VI Customs Problem) should have – and did – reasonably expected that a New York-based auction of the Shoys Wines would have decreased substantially and materially the ultimate value of the Shoys wines.

47.    As late as April 1, 2011, Defendants Carroll, Fox LLP, and Christie's failed to anticipate the additional logistical and other costs associated with auctioning the Shoys Wines in NYC which was made more difficult and expensive due to the VI Customs Problem.

48.    The Prossers and Def/Trustee Carroll agreed to a pickup date of July 29, 2011, for all the Shoys Wines.

49.    In anticipation of the July 29, 2011 pickup date for of the Shoys Wines in St. Croix, the Defendants Carroll and Christie's began to realize the expense and logistics entailed by the fact that the Shoys Wines were located *outside the customs zone*. In communications relevant to the Shoys Wines before July 29, 2011, the Defendants wrote:

   a.    Before even fully understanding the VI Customs Problem, Christie's was concerned about cost and the Expected Net Auction Proceeds: "It's [Shipping Shoys Wines] going to be really, really expensive, but so it goes. Client is paying." Def Antin's February 25, 2011 email.

15

b. Christie's noted that "[g]etting wines from St. Croix that seems crazy." Def Antin's July 6, 2011 email.

c. Sight unseen, there was a recognition that the net proceeds from the Shoys Wines was quickly becoming unjustified, to wit: "…They are keeping the Erte, which brings it down to $82-114k." Def Christie's agents, Moser to Antin in a July 6, 2011 email.

d. Warehouse changes at Def Christie's encourage the ***early rejection*** of Shoys Wines: "It is easier to reject on site, than to take property in-house and be exposed to later rejection and further insurance risk should bottles break/go missing while in our possession …. As we [Christie's] are considering a potential warehouse move these issues are foremost on my mind as these were the major headaches (i.e. claims) we experienced when we moved from Zachy's warehouse." Def Christie's agent/employee Scott to Antin in a July 8, 2011 email.

e. In an email to Def/Trustee Carroll, Def Christie's acknowledged a $300,000 threshold necessary to make the undertaking economically justifiable: "Wanted to reach out to you because getting the supplies down there is a large undertaking-due to customs-and will likely cost a few thousand dollars. This won't be an issue if there is the $300k worth of wine there we expect, but in a 'worst case scenario' where there is no saleable wine, there would still be this charge. Just want to make sure you're OK with this." Defendant Christie's agent, Antin to Def. /Trustee Carroll in a July 18, 2011 email.

f. The Sale Order restricted Def/Trustee Carroll's authority causing him to reply to Antin's July 18, 2011 email stating: "[y]es, we really have no other choice at this point." July 18, 2011 Email. Def/Trustee Carroll's acknowledges the Lawful Charge.

g. In documents less than a day later, Def Christie's – without inspection of the Shoys Wines or modification of their Lawful Charge – decided not to take the California Wines. Def Christie's employee Seltzer's July 19, 2011 email to Def Antin. The California Wines constituted approximately twenty percent (20%) of the Shoys Wines. This was a violation of the Lawful Charge.

h. On July 20, 2011, Christie's discovered that "… [A]mercian airlines won't take pallets, only loose packages." Christie's email Moser to Mostero. This implicated both the transportation of packing materials and the transportation of the Shoys Wines.

50. Clearly, by July 18, 2011, the Expected Net Auction Proceeds of the Shoys Wines had become highly questionable. The Expected Net Auction Proceeds were already expected to be less than $200,000 or $100,000, clearly less than the $300,000 economic threshold mentioned

by Def Antin to Def/Trustee Carroll on July 18, 2011.

51.    By also rejecting the California Wines (in St. Croix), Christie's had already reduced the Expected Net Auction Proceeds to $160,000 or less – without consideration of the extraordinary cost associated with moving the Shoys Wines from St. Croix to NYC.

52.    Further, the rejection of the California Wines is contrary to the Lawful Charge of the Turnover Order to collect ALL of the Shoys Wines.

53.    The July 18, 2011 email of Def/Trustee Carroll should be read *we really have no other choice at this point*. [*See* subparagraph 25 (f) and (g) immediately above]. Of course, Def/Trusee Carroll had another choice:  the Court-Appointed 7 Professionals could have – and should have – petitioned the Bankruptcy Court to modify the Lawful Charge. However, no motion was filed nor was other similar relief sought. Rather, Defendants seized upon a solution that was unlawful and which was a breach of their Fiduciary duties.

54.     Clearly, Defendants decided to reject all of the Shoys Wines, declare the Shoys Wines spoiled, and blame the Prossers for the loss. By doing so Defendants could seek onerous sanctions against the Prossers (the "**Shoys Wines Fraud**"). Trustee Carroll planned on charging proceeds due Pl DProsser, to wit: "Jim [Carroll] … does plan to hold the Pissarro he has on consignment hostage." July 29, 2011 Antin's Team Email[14] (Antin's reference that the email was to his team).

55.    The Shoys Wines Fraud is established by a simple comparison of two Christie's emails,

---

[14]    The Team email was sent *less than one hour* after arriving on-site at the Shoys Estate. Besides knowingly and intentionally publishing false statements, Def/Trustee plan of action, *i.e.*, affidavit for Contempt Motion, indicates the implementation of a pre-determined plan.

17

one from July 14, 2011, the other July 27, 2011[15] referencing 'wine packing materials.'

56.    In that two-week period, without ever having any inspection of the Shoys Wines, Christies determined that it no longer needed (packing materials) of "100/12 bottle Styrofoam boxes loaded on 3 to 4 pallets of a size of 40 inches by 45 inches by 57 inches." Instead, Christies decided it needed only "knock down boxes with inserts" to transport the Shoys wines.

57.    The mode of transportation for the packing materials also changed from a FedEx shipment of Styrofoam boxes which would "likely cost a few thousand dollars" per a July 14, 2011 email to "knock-down boxes with inserts" transported as luggage of the Christie's agents purportedly traveling to pack the Shoys Wines.

58.    Remarkably, this change in the type of packing need for transportation of the Shoys Wines occurred *only after* a series of emails emphasizing the extreme care necessary in packing the Shoys Wines – to insure there would be no breakage during shipment.[16]

59.    All along, Christie's wine specialists were personally intending to pack the Shoys Wines because of these handling concerns, to wit: "All will need to be **packed by us [Christie's]** so I will be sending boxes to the area or a spot and the specialists will probably need to pick up from there." Christie's Ron Mostero (Wine Warehouse Manager) email, dated April 11, 2011 (Emphasis added).

---

[15]    The following occurred in rapid fire secession:  July 18th, we have no other choice; July 19th rejection of the California Wines; and July 20th discovery American Airlines will not take pallets.

[16]    "My counsel is if two or more specialists are required for such consignments that my participation be near the top of the on-site list (**high risk being the salient issue**). It is easier to reject on site, than to take property in-house and be exposed to later rejection and further insurance risk should bottles break/go missing while in our possession (62 Ponsot for instance)." Christie's Scott Torrence email, dated July 8, 2011 Email (Emphasis added).

60.     The substitution of Styrofoam Boxes for Knock-Down Boxes without any intervening site visit to inspect the wine, any development of the Historical Suitability Standards, or any other intervening event (other than the dwindling prospect for financial recovery) supports the existence of the Shoys Wines Fraud:  an elaborate fraud to blame the Prossers and thereby harm them through Court sanctions.[17]

61.     Also, supporting the Shoys Wines Fraud is the sudden adoption of a "Kill Fee." Christie's was using Ambrosia Fine Foods, Inc. ("Ambrosia") of Puerto Rico to facilitate the shipping of the Shoys Wines.

62.     On July 22, 2011, without prior notice to the Prossers or the Court, Ambrosia and Def Christie's agreed to a "Kill Fee" should none of the Shoys Wines be shipped. The Kill Fee was inconsistent with the Lawful Charge.

63.     It was imperative that the Shoys Wines be declared spoiled. Once such a declaration was made, Christies would no longer bear the possibility of, and the responsibility for, a financial loss of potentially hundreds of thousands of dollars. Also, if sanctions could be imposed against the Prossers it would falsely and unfairly blame the Prossers.

64.     Sanctions against the Prossers would allow the JJP BK Estate to recover **more than the Expected Net Auction Proceeds** because costs (including attorney fees) could be charged to the Prossers. Pursuit of the unlawful retaliation through the Shoys Wines Fraud displaced the potential recovery when customs, including taxation, and costs of auctioning the Shoys Wines

---

[17]     Defendant Stassen stated to the Court on Aug. 30, 2011 that: "Well, what the trustee wants, Your Honor, quite frankly is, we want the value of the wines that they would've been in the condition as they would've been kept according to the Court's orders." 8/30/2011 HT at 66, L16:19. The Shoys Wines Fraud was intended to reach the Prossers exempt property through sanctions; thus, selling the Shoys Wines as spoiled would be at the expense of the Prossers exempt property.

19

made any material financial recovery – the Expected Auction Proceeds from the Shoys Wines –
a matter of conjecture and speculation.

65.     The Shoys Wines Fraud was undertaken through parties acting in a quasi-judicial
capacity under the color of law b y and through the Bankruptcy Court Orders. Christies, acting
as agents for the Court-Appointed 7 Professionals, were thus acting under the color of official
right. Their actions were outside their Lawful Charge to collect and transport the Shoys Wines.
The Shoys Wines Fraud is unlawful and violated 18 U.S.C. § 153.

66.     The events surrounding the July 29, 2011 "pick-up" of the Shoys Wines (the "**July 29th
EVENTS**") are established by the evidence as follows:

*No Previous Wine Specialists Examination of the Shoys Wines.*

    a.  No Christie's wine specialist had ever previously examined the Shoys Wines before
July 29, 2011. Antin's 12/18/2011 deposition.

*No Establishment of Historical Suitability Standards for the Shoys Wines.*

    b.  Def Christie's operated under a false assumption that the Shoys Wines had not been
subjected to temperature control. As with the Continental Wines, at no time did any
Christie's representative inquire of the Prossers with respect to the Historical Suitability
Standards of the Shoys Wines. The Historical Suitability Standards are of no relevance
in fact, but rather, was window-dressing used as a façade for hidden motives, *i.e.*, May
10, 2011 email to Christie's employee Mostero included the following
acknowledgment: "I must say upfront these wines [Shoys Wines] did not get to St.
Croix by temp control." This email was sent more than two months *before* July 29,
2011, the pickup date for the Shoys Wines.

*Immediacy of Purported On-Site Rejection of the Shoys Wines.*

    c.  The California Wines were rejected on July 19, 2011 without thorough inspection.

    d.  At approximately 9:15 a.m. Defendant Antin, Mike Moser (a Christie's junior wine
specialist) and a non-lawyer associate of Attorney Bernard Pattie (the "Christie's
Party") arrived at Shoys Estate. Pl Benta's Affidavit filed 8/29/2011 VIBC Case No 08-
30009, DE 3329 ("Pl Benta's 8/29/2011 Affidavit") filed as **Exhibit 1**. Antin testified:
"…just after breakfast, I don't know the time." Antin's 12/18/2011 deposition at 88.

20

e.  The Christie's Party was met by and was interacting with Pl Benta who served as the Prossers' representative while The Christie's Party was on the Shoys Estate. Pl Benta's 8/29/2011 Affidavit.

f.  The decision to not take the Shoys Wines was made almost immediately. Antin admitted such, testifying: "We were there for a little bit longer, but, you know, upon seeing the conditions, my evaluation in my mind was **pretty much immediate**." Antin's 12/18/2011 deposition at 60:61 (Emphasis added); Pl Benta's 8/29/2011 Affidavit.[18]

g.  By 10:30 a.m. the Christie's Party had left the premises. Pl Benta's 8/29/2011 Affidavit. Antin testified: "… I really can't approximate when I left. … I mean a short period of time, an hour, I don't know." Antin's 12/18/2011 deposition at 88.

h.  The hour or so the Christie's Party spent at the Shoys Estate was drawn out because of a heavy rain. "I don't recall exactly in the chronology when the downpour started, but I remember it not raining when I came, it rained for a portion, stopped raining and then we left." Antin's testimony, the 12/18/2011 deposition at 54.

i.  The on-site time at Shoys Estate by the Christie's Party would have been less than a half-hour including telephonic conferences with Def/Trustee Carroll *but for* a heavy rain shower.

*The False 55°F Temperature Prerequisite for Auction.*

j.  Antin's decision was based entirely upon the Shoys Wines being located in a room with a temperature above 55 degrees Fahrenheit (°F) opining that "... it's a Christie's requirement that the wine has been maintained at 55 degrees" Antin's 12/18/2011 Deposition at 24, 57, & 86[19]; Antin's 8/4/2011 Declaration at ¶ 8, VIBC Case No 08-

---

[18]    In testimony, Pl. Benta discussed the immediacy of the decision in context of explaining the reason for filing a police report "… And the **first initial conversation** on the entry was that the room was too hot, the wine is no good. Being an expert in the field of wine and uttering those words that the wine was no good, because the room was too hot, I find it very suspicious, being an expert, that they would unplug the only unit that's keeping it a little cool …" 12/16/2011 Deposition at 38:39 (Emphasis added).

[19]    "Q. … In paragraph seven of your declaration -- I'm sorry, in paragraph eight, you indicate: Christie's only sells wine that has been stored in a temperature-controlled environment, maintained at 55 degrees Fahrenheit. You wrote that, correct?
A.  [Antin] Yes.
Q.  You stand by that, correct?
A.  [Antin] To the best of our knowledge, yes ..." Antin's 12/18/2011 Deposition at 86.

21

30009, DE 3284 ("Antin's 8/4/2011 Declaration"). The Antin 8/4/2011 Declaration was made under penalties of perjury citing 28 U.S.C. § 1746.

k.  Antin himself specified the temperature above 55°F for purposes of shipping the Shoys Wines from St. Croix to New York City stating: "the specs from the requested job … [is] **55-60 degrees** constant temp." Antin's May 9, 2011 email. Christie's agent in Puerto Rico instructed the St. Croix trucking company that was expected to store the Shoys Wines for at least a day that the warehouse had to be maintained at 60°F and Def Christie's employees were copied on said email. Both instructions are above Antin's ceiling on maximum maintenance temperature for the Shoys Wines to be eligible for auction. Note the admission in the May 10, 2011 email to Christie's employee Mostero included the following acknowledgment: "I must say upfront these wines [Shoys Wines] did not get to St. Croix by temp control."

l.  The inherent shipping risk that wine, even in temperature-controlled containers, had to take into account that the Shoys Wines may sit on a tarmac somewhere for hours if not a day or more suggests that a temperature of 60°F mitigates such risk and thus, in a stable environment with temperatures higher than 60°F would be acceptable. Consider, the May 10, 2011 Email to Def Christie's employee: "… we must clear US Customs that could take half a day or a day to do …."

m.  The Continental Wines that were stored at the Prossers' Palm Beach and Lake Placid residences, respectively, were auctioned by Christie's even though not stored at 55°F. The Lake Placid wines were kept in a garage – and no suggestion was ever made that these wines were spoiled or otherwise unsuitable to consumption. Further, there was no Historical Suitability Standards inquiry of the Prossers regarding any of the Continental Wines.

n.  St. Croix merchants of wines routinely house wines at temperatures of 70°F or greater.

o.  All the above, including Christie's shipping specifications for the Shoys Wines and Christie's internal communications, directly *contradicts* Defendant Antin's prior sworn testimony and declaration that Shoys Wines were rejected because of a 55°F storage temperature is a prerequisite for Christie's.

*Perjury - Unplugging of the Wines' Temperature Controls.*

p.  Antin's 8/4/2011 Declaration intentionally misrepresented to the Bankruptcy Court that the window air conditioning unit cooling the room was unplugged, to wit: "… Although the House appeared to have two small, window-size air conditioners, one was ineffective and **the other was unplugged**." at ¶ 5.

q.  In an email sent at **10:10** a.m., Antin intentionally misrepresented to his team (his term)

22

that: "In what Jim Carroll calls an **intentionally malicious act, all the cooling units were turned off**. All the wine is ruined." Antin's 7/29/2011 Team Email (Emphasis added).

r.  Pl Benta's 8/29/2011 Affidavit established that it was **the Christie's Party who had turned off or unplugged the air conditioning** unit before the Christie's Party left Shoys Estate on July 29, 2011.

s.  Defendant Antin, in his 12/18/2011 Deposition, **contradicted** his own affidavit and established his perjury by **admitting** that  it was he who was solely responsible for the unplugging of the air conditioning unit [at p. 74], to wit:

> Q. "Did Mike Moser unplug the air conditioner?"

> A. [Antin] "Yes."

> Q. "He did that per your suggestion; is that correct?"

> A. [Antin] "Yes."

> Christie's employee Moser was sent back in to unplug the air conditioner *after* a telephone conversation with Def/Trustee Carroll. This admission of unplugging the air conditioner unit was made after Pl Benta insisted upon submitting himself to a polygraph examination.

t.  The unplugging of the wines's temperature controls was an intentional act undertaken at Antin's direction.[20]

u.  Defendant Antin knowingly and intentionally misrepresented in both his Declaration and his Team Email by suggesting that the air conditioning unit cooling the Shoys Wines was unplugged by others. In fact, it was Def Antin who had the air conditioning unit unplugged. The misrepresentation in his Declaration is a violation of 18 U.S.C. § 152(3) which, in deposition, has been admitted.

*The Implausible "Green" Excuse.*

v.  The Christie's Agents were leaving Estate Shoys but decided to unplugged the air conditioning unit because he was being "green" (the "Green Excuse"), to wit:

> Q. "Why were you concerned about the cost of electricity when you told Moser

---

[20] Antin's Testimony: "It was -- we were on the way out and I said, you know, let's go, turn off the lights, you might as well unplug that, save some electricity, you know. It wasn't an effective -- it wasn't doing anything, so . . ." 12/18/2011 Deposition at 74.

23

to unplug the electricity?"

A. [Antin] "It was . . . just a green guy, I guess, I wasn't hugely concerned."

Q. "Did you have any idea what the cost of electricity was?

A. [Antin] "No." Antin's 12/18/2011 Deposition at 105.

w.  Antin admitted that he had never before unplugged an air conditioning unit in a wine storage area. Antin's 12/18/2011 Deposition at 99:101.

x.  Antin's 'Green Excuse' for unplugging the air conditioning unit is inconsistent with his disposal of the knock-down boxes and shipping inserts. Pursuant to Dec. 18, 2011 testimony of Antin, after rejecting the Shoys Wines, the knock-down boxes with inserts were "left . . . in a dumpster" [p. 124] in St Croix **because it was cheaper**.

y.  Antin's 'Green Excuse' for unplugging the air conditioning unit is inconsistent with and cannot justify his perjury committed in paragraph 5 of Antin's 8/4/2011 Declaration, to wit: "… Although the House appeared to have two small, window-size air conditioners, one was ineffective and **the other was unplugged**."

*Perjury - the Storage Room Temperature.*

z.  Defendant Antin's 8/4/2011 Declaration in paragraph 7 states: "the temperature in the room was warm, almost equivalent to the temperature outdoors, which I estimated to be in the range of 80-85 degrees F."

aa. In his July 29, 2011 email, Antin states: "… all of the cooling units were turned off. All of the wine is ruined." 7/29/2011 Team Email sent at 10:10 a.m. Christie's representative Andrew Stelzer, based upon information from Defendant Antin stated: "It seems the coolers had been turned off and the wines completely cooked." 7/29/2011 Team Email sent at 10:43 a.m.

bb. In his 12/18/2011 Deposition, Defendant Antin explained that the **'outside'** temperature was in the 90°F range and the **'inside'** [storage room] temperature was 80-85°F. Deposition at 80:81. The deposition testimony clarifies Defendant Antin 8/4/2011 Declaration, paragraph 7, in that Antin meant the storage room temperature was 80-85°F. In fact, outside temperature when Antin arrived was around 81.0°F not in the 90°F range.

cc. The U.S. Government Weather Station reported the following official temperature readings for Christiansted, Hamilton Field on July 29, 2011: 81.0°F at 9 a.m.; 86.0°F at 10 a.m.; a maximum temperature of 89.1°F; a mean temperature of 83.0°F; and a

24

minimum temperature of 77.0°F. Antin arrived at Shoys Estate at 9:15 a.m.

dd. Pl Benta's 8/29/2011 Affidavit states that: (i) the Christie's Agents on July 29, 2011, complained that the temperature was 75.0°F when it should have been 55.0°F; (ii) that the non-lawyer associate, a member of the Christie's Party, stated to her colleagues that the wine should be ok because the room was cool and the wines were not exposed to the outside heat; and (iii) that the temperature was notably much cooler inside the room than the exterior of the building. Pl Benta in his 12/16/2011 Deposition testified that "[t]he temperature was very cool. The air conditioner was running." Deposition at p. 25.

ee. Plaintiff Benta returned to wine storage room at the Shoys Estate with a thermometer the next morning and found the room temperature to be 68.0°F. Pl Benta's 8/29/2011 Affidavit.[21]

ff. The Christie's Agents admitted they had no thermometer: Q. "Did you have a thermometer with you?" A. [Antin] "No." 12/18/2011 Deposition at p. 52. Antin admitted that he had no other device to measure temperature. 12/18/2011 Deposition at p. 53. The Christie's agents are either professionally incompetent to examine wine stored on St. Croix without a thermometer and/or consciously choose not to have a thermometer so they could arbitrarily claim the room in which the Shoys Wines were stored was too hot. Both are evidence of the Shoys Wines Fraud.

gg. The Christie's Agents failed to note that approximately fifty percent (50%) of the Shoys Wines, the collector's wines (*i.e.* the valuable wines), were in their original wooden cases with the original packing.

hh. Daniel Lawrence, the owner of Caribbean Cooling testified that his company has serviced refrigeration and air-conditioning systems located at the Prosser St. Croix residence "over the years." D. Lawrence Deposition, p. 12:2-6. Lawrence established that both air conditioning units were working after the July 29, 2011 visit. D. Lawrence Deposition, p. 17-18: 18-8. Lawrence also testified regarding the windows in the wine room; that they were closed and protected from direct sunlight by trees. D. Lawrence Deposition, p. 20:7-17.

*The False Narrative of Broken Bottles.*

ii. Pl Benta's 8/29/2011 Affidavit states "I conducted an inspection … after the Agents (Christie's Party) departed … with the assistance of Laurell Williams …" He further stated: "All the bottles were intact and none were broken. A thorough inspection was made of the floor and counter top and no leakage of wine was found coming from any of the cases of wines, individual bottles in the crates and from those in the open cooler."

---

[21] A supplemental Police Report dated October 10, 2011, measured the temperature of the storage room for the Shoys Wines at 61°F. *See* **Exhibit** 4, Officer Cuthbert Cyril's supplemental police report.

Antin in his 12/18/2011 Deposition described the room as in "complete disarray" [p. 112] but nowhere did Antin suggest there was leakage or seepage from any of the bottles composing the Shoys Wines not even in the July 29, 2011 Team Email.

jj. Without even the factual support of Def Christie's (who had previously unplugged the air conditioners), Def Fox LLP misrepresented to the Bankruptcy Court on August 4, 2011 that: "…the Chapter 7 Trustee's representatives found were Bottles of Wine stored haphazardly in an un-air-conditioned room with torn labels and **subject to seepage"** [Trustee's Contempt Motion (defined below), Introduction (Emphasis added] and ".. he [Def Antin] observed seepage from the bottles" [Trustee's Contempt Motion (defined below), ¶ 45].

kk. Contriving the seepage representation is a fraudulent and false account provided to the Bankruptcy Court in violation of 18 U.S.C. § 152(2).[22]

*The Sanction/Criminal Charges End Game.*

ll. On January 29, 2011, by 10:10 a.m., Antin emailed his team (the "Team Email") where he falsely represented that "All the cooling units were turned off" that: "Jim is taking this to the US Attorney General (really?) and [he] does plan to hold the Pissarro he has on consignment 'hostage.'"

mm. Antin had actual knowledge that Defendant Carroll was reporting as a crime, the destruction of the Shoys Wines by the Prossers as a consequence of an *intentionally malicious act* which Antin knew to be falsely reported; that is, *all of the cooling units were turned off*. 18 U.S.C. § 1001 is implicated, if indeed, a Criminal Complaint was filed with the Virgin Islands United States Attorney Office. Upon information and belief, a criminal complaint against the Prossers was, in fact, filed.

nn. Holding the Pissarro hostage is an acknowledgment that the Defendants believed the only consequences of destroying the Shoys Wines was the creation of an offset against other property – Pl DProsser's property or exempt property.

67. The July 29th EVENTS were totally outside the scope of the Court's authorization,[23] *i.e.,*

---

[22]     While 18 U.S.C. § 152(2) mirrors 18 U.S.C. § 1001; it does not have the judicial proceeding crave-out set forth in 18 U.S.C. § 1001(b). Bankruptcy Professionals – Court-appointed and others –are held to a higher standard than attorneys engaged in other federal litigation.

[23]     This would not be the first time Def. Geron violated a Court order. In 2008, Def. Geron paid more than $1,000,000 from the Lake Placid sales proceeds to Greenlight without any legal

their Lawful Charge, and the agreement by and between the Prossers and the Court-Appointed 7 Professionals. The Christie's Party was only authorized to enter Shoys Estate for the purpose of packing and removing the Shoys Wines; they had no authority to inspect and reject the wines.

68.    On July 29, 2011, Pl Benta was the Prossers' on-site representative to provide the Christie's Party access to the Shoys Wines and to facilitate the Christie's Party collection of the Shoys Wines.   Before the Christie's Party arrived at Estate Shoys, Pl Benta surveyed the property in anticipation of the events of the day.

69.    At the time of the July 29th EVENTS, Plaintiff Benta was a Virgin Islands Police Officer with the following employment history:

   a.  After a long leave of absence, on or about June 2008, Darryl Dean Donohue, Sr., a Judge of the Superior Court of the Virgin Islands, Division of St. Croix, administered to Oakland Benta the oath of office as a police officer of the U.S. Virgin Islands.

   b.  On or about June 2008, James H. McCall, then Police Commissioner of the Virgin Islands Police Department, appointed Oakland Benta to the position of "Acting District Police Chief-St. Croix" of the St. Croix Police Department.

   c.  On or about June 2008, Oakland Benta accepted the position of "Acting District Police Chief-St. Croix."

   d.  On or about January 30, 2009, James H. McCall, then Police Commissioner of the Virgin Islands Police Department, appointed Oakland Benta to the position of "District Police Chief-St. Croix."

---

authority to do so. In a hearing before the Bankruptcy Court about the matter the Court confronted Geron, to wit:

THE COURT: **It wasn't your decision to make. There was a Court order, Gerron. You acted in violation of the Court order**. You, as an officer, **acted in violation of the Court order**." November 18, 2008 Transcript, Case No. 06-30009, DE 2434, at P68:L1 - P69:L10 (Emphasis added).

There were no consequences to Def Geron in 2008 other than being admonished by the Bankruptcy Court.

27

e.  On or about February 10, 2009, Oakland Benta accepted the position of "District Police Chief-St. Croix."

f.  On or about February 14, 2012, Oakland Benta accepted the position of "Training Director, Training Bureau" of the Virgin Islands Police Department.

g.  At all times material herein, Oakland Benta has been a "Sworn Police Officer" of the Virgin Islands Police Department.

h.  At all times material herein, Oakland Benta has been a career service employee of the Government of the Virgin Islands.

i.  At all times material herein, Oakland Benta has had and continues to have a property interest in continued employment with the Government of the Virgin Islands.

j.  Excepting his former employment with ICC, Pl Benta has spent his career in law enforcement.

70.    After the July 29th EVENTS, the Court-Appointed 7 Professionals for the JJP BK Estate filed on August 4, 2011 (a mere 4 business days after the July 29th EVENTS) the *Chapter 7 Trustee's Motion To Enforce Turnover Order, For Contempt And For Sanctions* (the "**Trustee's Contempt Motion**") with the Virgin Islands Bankruptcy Court ("VIBC"). VIBC Case No. 06-30009, DE 3281.

71.    The Trustee's Contempt Motion was replete with intentionally false statements presented to the Court as facts which were material. The materially False Statements related to the July 29th EVENTS in the Contempt Motion were:

a.  The Shoys Wines was stored in an "un-air-conditioned room." Contempt Motion, Introduction.

b.  That the Shoys Wines were ruined. Contempt Motion at ¶ 45.

c.  "… that the temperature of the Storage Area (although it contained an air conditioner unit) was close to the ambient air temperature of approximately 90 degrees outside the building." Contempt Motion at ¶ 45 (reinforcing the "un-air-conditioned room" statement).

d.  That Antin "observed seepage from the bottles." Contempt Motion at ¶ 45 (the "False

28

Seepage Allegation").

Subparagraphs (a) through (d) above are collectively referred to as the "**Contempt Motion's
False Account**."

72.    The Trustee's Contempt Motion and the Contempt Motion's False Account rely largely
upon the Declaration of Defendant Antin which was discredited by his own December
deposition testimony, *i.e.,* the July 29th EVENTS.

73.    The False Seepage Allegation is a fiction which was unsupported by Antin's Affidavit or
Antin's Deposition. In fact, was directly contradicted both in Pl Benta's 8/29/2011 Affidavit and
his 12/16/2011 Deposition that there was no leakage.[24]

74.    The Trustee's Contempt Motion is a violation of 18 U.S.C. § 152(2) relying, in part,
upon false declarations of Def Antin submitted in violation of 18 U.S.C. § 152(3).

75.    The Contempt Motion parallels the false statements in the July 29, 2011, 10:10 a.m.
Antin email:  the Team Email.

76.    Coupling Antin's Team Email with his deposition admissions (made in Antin's
12/18/2011 Deposition) established indisputably that Trustee Carroll filed a criminal complaint
against the Prossers based entirely upon a false narrative of Antin; a narrative that Antin knew
to be false, that is, the *intentionally malicious act, i.e., "*all of the cooling units were turned off."

77.    On information and belief, Trustee Carroll filed a criminal complaint with the Office of
the Virgin Islands United States Attorney ("**VIUSA**") falsely alleging the substance of the facts
set forth in Antin's July 29, 2011 Team Email. It was based upon the fictional and contrived
*intentionally malicious act*. The filing of a criminal complaint relying upon the false air

---

[24]    "If you read the documents from James Carroll that speaks to leakage, **there was no
leakage**." Pl. Benta 12/16/2011 Deposition at 86 (Emphasis added).

conditioner unplugging narrative is itself a criminal act – a violation of 18 U.S.C. § 1001 - as well as a conspiracy.

78.     At the August 30, 2011 Omnibus Hearing before the Bankruptcy Court, Defendant Stassen repeated the False Seepage Allegation to the Court, to wit: "Not to mention the fact that the actual quality of the wine has dissipated, you have seepage coming out of the bottles." VIBC Case No. 06-30009, 8/30/2011 HT at 64. This false statement made at the August 30, 2011 Omnibus Hearing is a violation of 18 U.S.C. § 152(2).

79.     The July 29th EVENTS when coupled with the Trustee's Contempt Motion made the purpose and direction of the Shoys Wines Fraud abundantly evident.

80.     The DOJ's *Handbook for Chapter 7 Trustees* acknowledges that the Bankruptcy Reform Act of 1978 created the U.S. Trustee's Program because "Debtors, creditors, and third parties litigating against bankruptcy trustees were concerned that the court, which previously appointed and supervised the trustees, may not impartially adjudicate their rights as adversaries of the trustee." At pages 1-2 and 1-3.

81.     In response to the Trustee's Contempt Motion, knowing Pl Benta's account of the July 29th EVENTS, Pl JProsser moved in the Bankruptcy Court for an Evidentiary Hearing regarding the July 29th EVENTS because:

    (i)      those events were totally contested;

    (ii)     involved the destruction of property of the JJP BK Estate – the Shoys Wines – by the Court-Appointed Officers of the JJP BK Estate; and

    (iii)    by reason thereof implicated both criminal laws and the parties fitness to continue to serve as Court-Appointed Professionals (the "**Shoys Wines Evidentiary**

30

Hearing Request").

82.      **On August 29, 2011,** in response to the Trustee's Contempt Motion and in support of the

Shoys Wines Evidentiary Hearing Request, Pl Benta's filed an Affidavit with the Bankruptcy

Court. In that Affidavit Pl Benta set forth the events of July 29, 2011. Case No. 06-30009, DE

3329. Pl Benta has offered on numerous occasions to submit to a polygraph examination. *See*

12/18/2011 Deposition.


## PART FIVE

## THE SHOYS WINE CRIMINAL INVESTIGATION

83.      On September 3, 2011, Pl Benta filed a police report of the July 29th EVENTS with the

Virgin Islands Police Department ("VIPD") on behalf of Pl JProsser.[25] **Exhibit 2**, Police Report.

VIPD Officer Cuthbert Cyril commenced an criminal investigation (the "**VIPD Shoys Wines**

**Criminal Investigation**") because of Def Christie's attempt to destroy the Shoys Wines by

unplugging the air conditioning unit.

84.      Even after the filing of Pl Benta's Affidavit, Def Fox LLP continued to represent to the

Bankruptcy Court, with respect to unplugging of the air conditioning unit – that Antin's

---

[25]      Pl. Benta explained the lag of time between the incident and the police report in his
12/16/2011 Deposition [p. 84] as follows: "… **I trusted the District Court of the United States
Virgin Islands** or America that when I provided the affidavit, that the individuals mentioned in
the affidavit **would have been sanctioned in one form or the other**, where the judge or the
trustee, whom they were working for, would request that the FBI -- because this is not just about
unplugging, you know.   You have a court order that they're armed with, a federal court order
that they were armed with in order to gain entry into the property to provide a service for the
trustee…." (Emphasis added). Pl. Benta also testified in his 12/16/2011 Deposition [p. 33] as
follows: "…the report was filed to safeguard myself first and foremost and to challenge the
allegation of me not being truthful to the facts of the incidents which occurred, or the incident
which occurred on July 29th."

Declaration was correct and Benta's Affidavit was false, to wit: "We have assured ourselves *by discussing this with Christie's* that the allegation [of unplugging the air conditioner] certainly insofar as the trustee is concerned are (*sic)* wholly untrue and that will prove itself up in connection with the hearings that are currently set up." Def Geron, 9/9/2011 HT at 35 (Emphasis added). Each misrepresentation, because it was knowingly false, is a violation of 18 U.S.C. § 152(2).

85.     At the September 9, 2011 Omnibus Hearing, Def Geron made a knowingly false representation to the Bankruptcy Court, to wit:

> We have no evidence, none, not a single shred of evidence before the Court at this point of these disparaging remarks that both Abood and Moorhead continue to make **about the plugged, the unplugged**. **We have one affidavit by Chief Benta who as I said is on Prosser's payroll.**"

*See* 9/9/2011 Omnibus HT at 36.

86.     Def Geron's knowingly false representation - Pl Benta being on Prosser's payroll - was made to the Bankruptcy Court in violation of 18 U.S.C. § 152(2) and was made specifically to undermine the efficacy of Pl Benta's affidavit.

87.     Def Geron was present at Pl. Benta's testimony on August 28, 2008, at the Exemption Trial, and December 10, 2008, at the Turnover Trial, where Pl Benta testified extensively about his employment history including his employment history with ICC, his termination of employment with ICC in January of 2008, and his employment with the Virgin Islands Police Department following his ICC employment. Pl Benta's employment history was already well-known to Def Geron.

88.     The veracity of Pl Benta as well as his affidavit was evidence which provided strong support to the existence of the Shoys Wines Fraud; therefore, Pl Benta was subjected to constant

attack. It was not subject to reasonable and/or honest dispute.

89.    Under oath in his December 18, 2011 deposition, Def Antin admitted that _he instructed his associate to_ unplug the air conditioning unit[26] (an admission of perjury – a violation of 18 U.S.C. § 152(3) since his testimony established that his Declaration was false.

90.    A mere ten (10) days before Def Antin's admission, Def Stassen made the following representation to the Bankruptcy Court about the unplugging allegation: "There's no evidence, there is **no good faith basis**, for the Prossers to make the assertions that they have been asserting with regard to the trustee and the so-called desire to destroy the wine." 18/8/2011 Omnibus HT at 8.

91.    Amazingly, Def Stassen was asserting that Pl Benta's affidavit, made under oath by an active duty law enforcement officer, did not provide a good faith basis to believe that Def Antin had caused the unplugging the air conditioner unit – a fact ultimately acknowledged by Def Antin.

92.    VIPD Officer Cuthbert Cyril continued the investigation (the "**VIPD Shoys Wines Criminal Investigation**"). Two (2) "Forthwith" Subpoenas, each dated **September 27, 2011**, were issued by Assistant Attorney General Charlotte Poole Davis ("**VIAAG Davis**") of the Virgin Islands Office of the Virgin Islands Attorney General ("**VIAG's Office**") to employees of the Wine Department of Christie's, Inc.

93.    True and accurate copies of the two (2) subpoenas issued by the VIAG's Office to the employees of the Wine Department of Christie's Inc. were attached to the original complaint

---

[26]    This false account was repeatedly presented to the Bankruptcy Court from July 29, 2011 until December 18, 2011. It was also presented in a declaration filed August 4, 2011 and was a knowingly false statement.

33

(the "**September 27, 2011 Christie's Subpoenas**"). **Exhibit** 3, VIAAG's Subpoenas.

94.     VIAAG Davis was located in St. Croix office of the VIAG's Office. VIAAG Davis could not have legally issued the subpoenas unless she was vested with the personal power and authority to do so and the VIPD Shoys Wines Criminal Investigation was a duly authorized criminal investigation.

95.     The VIPD Shoys Wines Criminal Investigation is of importance to the office of the Virgin Islands Attorney General for two reasons:

   (i)     the violation of criminal statutes of the Virgin Island criminal statutes; and

   (ii)    Court-Appointed 7 Professionals were undermining the future efficacy[27] of Pl Benta by attempting to discredit the statements Pl Benta made in his Affidavit.

96.     VIPD Officer Cuthbert Cyril continued the VIPD Shoys Wines Criminal Investigation and filed a supplemental police report on Oct. 10, 2011, and another on December 9, 2010. **Exhibit** 4, and **Exhibit** 6.

97.     On November 3, 2011, Police Officer Cuthbert Cyril wrote to Mrs. Prosser detailing for her the status of the ongoing criminal investigation of the July 29, 2011 Incident, *i.e.*, the VIPD Shoys Wines Criminal Investigation. Officer Cyril requested Mrs. Prosser's assistance to obtain contact information for the Chapter 7 Trustee, James Carroll (the "**VIPD Correspondence**"). A true and accurate copy of Officer Cuthbert Cyril's November 3, 2011 correspondence was attached to the original complaint. Officer Cuthbert Cyril's November 3, 2011, correspondence. **Exhibit** 5.

98.     The VIPD Correspondence was **read into the record** of the November 3, 2011 Omnibus

---

[27]     Officers of the VIPD testify with the expectation of impeachment. The Bankruptcy Proceedings were undermining Pl. Banta's, then a VIPD Police Chief, reputation for veracity which had been heretofore unassailable.

Hearing. It's indisputable that the Bankruptcy Court had actual knowledge of the VIPD Shoys Wines Criminal Investigation.

99.    The Bankruptcy Court all but ignored the factual contest over the July 29th EVENTS and Pl JProsser's pending Shoys Wines Evidentiary Hearing Request.

100.    On November 7, 2011, notwithstanding the existence of on open and otherwise active criminal investigation, the Court appointed a *purported wine expert,* Mary Ewing-Mulligan, (the "**Purported Expert**") to determine whether the Shoys Wines were ruined, in total, as alleged by the Defendants.

101.    The miscarriage of justice was that the Bankruptcy Court was appointing an expert selected and advanced by the very parties that conceived and orchestrated the Shoys Wines Fraud. Those were the very people that had a vested interest in proving that the Shoys Wines had been ruined even though:

    a. Pl Benta's affidavit was filed with the Court; and

    b. The Bankruptcy Court was well aware that VIPD was engaged in a Virgin Islands Criminal Investigation regarding the unplugging incident which was targeting Def Christie's and Def/Trustee Carroll and are subjected to high fiduciary standards.

102.    On November 21, 2011, in furtherance of the VIPD Shoys Wines Criminal Investigation, the VIAG's Office issued a "Forthwith" subpoena to the Chapter 7 Trustee James Carroll for him to appear and give testimony regarding the July 29, 2011 Incident (the "**November 21, 2011 Forthwith Subpoena**"). **Exhibit 12**, Def/Trustee Carroll's Subpoena.

103.    At some point thereafter, Defendant Christie's engaged the services of Def Nissman following the issuance of the September 27, 2011 Christie's Subpoenas but before the issuance of the November 21, 2011 Forthwith Subpoena.

104.    Def Nissman's status as a former Virgin Islands United States Attorney offered the other Defendants his history of working with the parties engaged in the Virgin Islands local law enforcement.

105.    The ICC Bribery scheme had welded the Compromised VIPO to the ends of the RTFC/Greenlight Retaliatory JV. The Compromised VIPO wielded a tremendous amount of control and influence over policies and decisions of the VIAG's Office. The object of the Shoys Wines Fraud (implemented by the Trustee's Contempt Motion) coupled with Defendant Carroll's criminal complaint filed with the VIAG's Office, served the ends of the RTFC/Greenlight Retaliatory JV.

106.    The VIPD Shoys Wines Criminal Investigation jeopardized the RTFC/Greenlight Retaliatory JV. It was the interest of the Court-Appointed 7 Professionals and Def Christie's to use of the unlawfully-achieved influence (the ICC Bribery) over the Compromised VIPO to thwart and choke-off the VIPD Shoys Wines Criminal Investigation.

107.    Def Nissman voluntarily acted to thwart, choke-off and obstruct a duly authorized criminal investigation known by Def Nissman as such (*.ie.* the VIPD Shoys Wines Criminal Investigation).

108.    On information and belief, before December 5, 2011 Def Nissman, acting as Christie's counsel, and the Court-Appointed 7 Professionals had a plan, a product of a further conspiracy, to obstruct the VIPD Shoys Wines Criminal Investigation to facilitate the Shoys Wines Fraud.

109.    Def Nissman had enough contact and/or influence with one or more of the Compromised VIPO to know that they could successfully thwart, choke-off and obstruct the VIPD Shoys Wines Criminal Investigation.

36

110.    On December 5, 2011, the Court-Appointed 7 Professionals filed a *Motion For A Protective Order And To Quash (1) A Virgin Islands State Subpoena And (2) Notice Of Deposition [of Defendant/Trustee Carroll]* (the "**Protective Order Motion**"). The Protective Order Motion in paragraphs 8 and 9 stated:

> "8.    Simply put, there is no 'crime' being investigated in the Virgin Island to which the Trustee may testify or provide information. Nor is there any evidence or a good faith basis to assert that any crime was committed or is being investigated related to the Trustee, in connection with the dissipation of the estate's Wines stored at the Shoys Home. The dissipation of the Wines is a federal matter as it pertains to property under the custody of this Court, which has exclusive jurisdiction over property of the estate. The Virgin Island authorities, thus, have no jurisdiction with regard to the wine.

> 9.    To be clear, it is not apparent that the VIPD is aware of or sanctions the so-called 'investigation' that is being conducted by a police officer in the police training bureau who
> works with Benta, Prosser's agent."

*See* Protective Order Motion filed VIBC Case No. 06-30009, DE 3485. The "Rogue VIPD Investigation Theory," *i.e.*, the so-called investigation and had no legitimate purpose but to discredit the VIPD Shoys Wines Criminal Investigation.

111.    The Rogue VIPD Investigation Theory also sought to impeach and discredit not only Pl Benta, a VIPD Chief, but also:

> (i)    VIAAG Davis (who executed the September 27, 2011 Christie's Subpoenas and the November 21, 2011 Forthwith Subpoena) and

> (ii)    (ii) VIPD Officer Cuthbert Cyril.

112.    The Rogue VIPD Investigation Theory absolutely sought to close-down or completely obstruct a duly authorized criminal investigation for Defendants' illegitimate purposes.

113.    During the course of the VIPD Shoys Wines Criminal Investigation, Def Stassen stated to Pl JProsser in direct reference to Pl Benta that "your little friend [Pl Benta] has gotten himself

37

into trouble he cannot get out of." (Explanation added.) A true and accurate copy of Prosser's Affidavit in verification of this conversation was attached to the original filed complaint. **Exhibit** 7.

114.    VIPD Officer Cuthbert Cyril's last Police Report with respect to the VIPD Shoys Wines Criminal Investigation was dated December 13, 2011. **Exhibit** 8. The December 13, 2011, VIPD Report indicates confusion over the potential prosecution of Christie's employees.

115.    On information and belief, Glaser, the New York representative of the Christie's employees knew that there was an agreement to end the VIPD Shoys Wines Criminal Investigation but mistakenly did not know that VIPD Officer Cuthbert Cyril had not yet been given a stand-down order.

116.    The following acts occurred to obstruct the VIPD Shoys Wines Criminal Investigation in December 2011:

    a.   On December 8, 2011, Carol Thomas-Jacobs, an Assistant Attorney General of the Virgin Islands Department of Justice ("**VIAAG Thomas-Jacobs**"), appeared as a witness presented by Def Stassen on behalf of the Chapter 7 Trustee. Ms. Thomas-Jacobs represented to Bankruptcy Court that the Virgin Islands Attorney General's office had *no knowledge* of a criminal investigation of the July 29, 2011 incident, *i.e.*, to implement the Rogue VIPD Investigation Theory. This is a violation of 18 U.S.C. § 1001 (VIAAG Thomas-Jacobs is not protected by statutory exclusion afforded by 18 U.S.C. § 1001(b)) and a violation of 18 U.S.C. § 152(2).[28]

    b.   Pl Benta was approached by FBI Agent Ronald Ryniack and Def. Nissman who suggested Pl Benta act to cause the termination of the VIPD Shoys Wines Criminal Investigation. There is no explanation for FBI involvement to terminate the VIPD Shoys Wines Criminal Investigation other than the criminal complaint made by Def/Trustee Carroll based upon Def Antin's perjury that the Prossers maliciously and intentionally unplugged the air conditioning unit. Nevertheless, it is highly improper for the FBI to interject themselves into a local law enforcement investigation. Pl Benta was witness

---

[28]    18 U.S.C. § 152(2) does not have the 18 U.S.C. § 1001 carve-out (the judicial proceedings carve-out for parties) because the integrity of proceedings was such a concern to Congress. The U.S. Trustees Program was commenced over the same concern.

subject to protections afforded by 18 U.S.C. § 1512.

c.  VIPD Officer Cuthbert Cyril was confronted by St. Croix Chief of Police Christopher Howell and instructed to drop the VIPD Shoys Wines Criminal Investigation under the threat that if he did not comply VIPD Officer Cyril would never work again in the U.S. Virgin Islands. By reason of his investigation and its relevance to the Trustee's Contempt Motion, VIPD Officer Cyril was witness subject to protections afforded by 18 U.S.C. § 1512.

d.  On December 27, 2011, the Virgin Islands Police Department, Office of the Commissioner, Government of the Virgin Islands of the United States, under the signature of Henry W. White, Jr., Acting Police Commissioner, issued a correspondence to Pl Benta (hereinafter referred to as the "**Acting Commissioner's December 27, 2011 Correspondence**") indicating that a recommendation for Pl Benta's termination has been submitted to the Governor's office regarding his "actions of July 29, 2011 which led to an investigation of the alleged criminal act at the Estate Shoys home of Jeffrey Prosser." A true and accurate copy of Acting Commissioner White's December 27, 2011 Correspondence is attached as **Exhibit** 9. Pl Benta was subject to witness intimidation under the color of territorial law in violation of 18 U.S.C. § 1512.

e.  On December 27, 2011, Acting Police Commissioner White issued a "Directive" (hereinafter referred to as the "**Acting Commissioner's Directive**") notifying Oakland Benta that he was "immediately placed on administrative leave without pay pending the results of an investigation into your involvement in an incident which occurred on or about July 29, 2011 in Estate Shoys, St. Croix." The Acting Commissioner's Directive is attached as **Exhibit** 10.

f.  Effective December 27, 2011, Pl Benta was suspended without pay as a consequence of the Acting Commissioner's Directive. Pl Benta was subjected to unlawful retaliation in violation of 18 U.S.C. § 1513(e) under the color of territorial law.

g.  VIAAG Davis was forced to cease the VIPD Shoys Wines Criminal Investigation and did suffer personal harm from other retaliatory actions meant to cause her to resign. VIAAG Davis was subjected to unlawful retaliation in violation of 18 U.S.C. § 1513(e) under the color of territorial law.

The foregoing acts obstructing the VIPD Shoys Wines Criminal Investigation are collectively referred to as the "**Rogue VIPD Investigation Theory Implementation**."

117.  All the acts of the Rogue VIPD Investigation Theory Implementation were intentional acts relying upon false and misleading statements which were facilitated by or accomplished by

39

reason of the ICC Bribery. The purpose of the Rogue VIPD Investigation Theory Implementation was to act under the color of law and in the name of the Enterprise, the JJP BK Estate, to implement the Shoys Wines Fraud.

118. All the acts of Rogue VIPD Investigation Theory Implementation were a product of the conspiracy, a RICO Act conspiracy within the meaning of 18 U.S.C. § 1964(d), and a CICO Act conspiracy within the meaning of 14 V.I.C. § 605(d), by and between the Defendants all acting to implement Shoys Wines Fraud by suppressing and obstructing the VIPD Shoys Wines Criminal Investigation.

119. Under information and belief, Def. Nissman was critical to the implementation of the Rogue VIPD Investigation Theory Implementation including functioning as the liaison by and between Christie's and the Court-Appointed 7 Professions, and the Compromised VIPO.

120. The Shoys Wines Fraud concluded with the following proceedings:

a. After an administrative hearing involving extensive testimony under oath, Pl Benta was **reinstated as a Virgin Islands police officer** and **the false charges against Pl Benta were withdrawn by the Virgin Islands Government** (the "Benta Administrative Hearing").

b. Pursuant to the September 18, 2012 Memorandum Opinion [BK Case No 06-30009, DE 3290] in a proceeding shorn both of the benefit Pl Benta's testimony (other than the submission of his deposition) and the results of the VIPD Shoys Wines Criminal Investigation, the Purported Expert opinion that the Shoys Wines were ruined was accepted as fact by the Bankruptcy Court.

c. Pursuant to the September 18, 2012 Memorandum Opinion [BK Case No 06-30009, DE 3290] in a proceeding shorn both of the benefit Pl Benta's testimony and the results of the VIPD Shoys Wines Criminal Investigation, the Prossers were subjected to sanctions for the Shoys Wines of $351,296.00[29] plus fees and cost to be determined. Eventually, the Prossers were allowed an offset of $15,739.41 for the Shoys Wines which were illegally auctioned in St. Croix by Auction America, Inc. The Shoys Wines were

---

[29]    The $351,296.00 was premised upon a Gross Value of the Shoys Wines and not the Expected Net Proceeds had the Shoys Wines been transported to NYC and auction by Christie's.

auctioned under the cloud of the Purported Expert's conclusion that the Shoys Wines were ruined.

    d.   In addition to sanctions for the Shoys Wines, the Prossers were assessed costs and legal fees of $528,086.07 which are largely attributable to Shoys Wines Fraud.

82.   Twice in September 18, 2012 Memorandum Opinion [BK Case No 06-30009, DE 3290], the Bankruptcy Court, without any supporting evidence whatsoever, other than false representations by Def Fox LLP at the hearing, referred to PL Benta **as Prosser's employee**. Mem. Op. at p. 6 and in footnote 24 on p. 19. Such a finding is absolutely false and bereft of any evidentiary or factual support in the record. It is flatly contradicted by Pl Benta's deposition testimony which was admitted at trial and which included the following uncontroverted statements:

    **Q. [MS. Zavalkoff-Babej**] So there wasn't a specific lie which –

    **A. [Benta]** Yes.  The lie was that -- was that -- based on my affidavit, that my affidavit was a lie, and that I'm employed by Jeffrey Prosser, and he's paying me. That's a lie.

*See* Pl Benta's Deposition 12/16/2011 Testimony at P40:L3-7.

    **Q.  (Ms. Zavalkoff-Babej)** … Has Prosser promised you anything in the future for your loyalty, your current, you know, showing up and letting the trustees' representatives into the property? Has he made any promises for, you know, future employment? When this is all over, you know, he'll take care of you, something along those lines?

    **A. [Benta]** No.  And I'm taken aback with that statement. I can tell you, as chief of police, I waived my salary as chief of police to serve this community. And there isn't a man on the face of the earth that can offer me anything in advance to gigolo myself in any form or fashion….

*See* Pl Benta's Deposition 12/16/2011 Testimony at P69:L22-P70:L9.

121.   The above testimony was uncontroverted. As noted above, Pl Benta twice testified in 2008 – the Exemption Trial and the Turnover Trial – about his employment history before this Bankruptcy Court.

122.    Furthermore, Pl Benta has had, on several occasions when the Bankruptcy Court was in the Virgin Islands, unplanned encounters at the Federal Court when Pl Benta was discharging his official duties.

123.    In the Bankruptcy Court's Memorandum Opinion, footnote 24, the Bankruptcy Court acknowledged that it was Def Antin who unplugged the air conditioner unit but excused his act because the Purported Expert found the Shoys Wines ruined/destroyed and the unplugging incident lasted only approximately 15 minutes. This finding ignores Def. Antin's false declaration under oath and the fact that federal bankruptcy crimes seek to prevent and redress abuses of the bankruptcy system.

124.    The Bankruptcy Court's Memorandum Opinion was appealed to the Virgin Islands Federal District Court (the "VIDC").

## PART SIX

### VIDC'S AFFIRMATION OF THE SANCTIONS

125.    On February 23, 2017, the Virgin Islands District Court ("VIDC") affirmed the Bankruptcy Courts imposition of sanctions.

126.    The affirmation was premised upon a record corrupted by the Defendants, a record that does not reflect facts developed after the appeal was filed. There are two principle sources of evidence:

    (i)     the evidence deduced directly or indirectly from the Benta Administrative Hearing; and

    (ii)     (ii) the evidence deduced from the purchasers of the Shoys Wines.

127.    The after-appeal evidence, denoted as Admin Hearing or Other, includes but is not limited to:

a.  Other Evidence: VIAAG Thomas-Jacobs represented to the Bankruptcy Court that the Virgin Islands Atty. Gen.'s office had *no knowledge* of a criminal investigation of the July 29, 2011 incident. VIAAG Thomas-Jacobs acknowledged thereafter that she did not know at the time whether the statement was true or false but nevertheless made the statement because she was ordered to do so.

b.  Admin Hearing:  The Administrative Hearing evidence established that the VIPD Shoys Wines Criminal Investigation was a duly authorized criminal investigation and that VIPD Officer Cuthbert Cyril had the requisite power and authority to conduct.

c.  Admin Hearing:  The Administrative Hearing evidence established that VIAAG Davis was duly authorized to issue the Forthwith Subpoenas and the VIAAG Davis properly deployed or used the authority of the Virgin Islands Attorney General's office to support the VIPD Shoys Wines Criminal Investigation.

d.  Admin Hearing:  The Administrative Hearing evidence established that Pl Benta had violated no rule, policy, or regulation of the VIPD by assisting Pl Prosser in attempting to  facilitate the pick-up the Shoys Wines by Def Christie's.

e.  Admin Hearing:  The Administrative Hearing found that the criminal complaint filed by Pl Benta was just and proper because there was probable cause to believe that an investigation should be undertaken to determine whether the Virgin Islands Criminal Statutes had been violated and a felony committed by the attempt to destroy the Shoys Wines (valued by the Bankruptcy Court at $351,296.00).

f.  Other Evidence: VIAAG Davis was subjected to intimidation and retaliation for her support and involvement in the VIPD Shoys Wines Criminal Investigation which was unjust and unwarranted.

g.  Other Evidence: VIPD Officer Cuthbert Cyril was subject to intimidation for his undertaking the VIPD Shoys Wines Criminal Investigation which was unjust and unwarranted.

h.  Admin Hearing:  The Administrative Hearing found that placing Pl Benta on administrative leave was unjust and unwarranted.

i.  Admin Hearing:  The Administrative Hearing found that Pl Benta was not PL JProsser's employee.

j.  Other:  Best evidence – The purchasers of the Shoys Wines at the St Croix auction on April 6, 2013 who have consumed the Shoys Wines found that, in fact, the Shoys Wines were unspoiled.

k.  Other:  A private investigator has found that retailors of wines on St. Croix market the

43

wine in conditions where the air temperature is above 70°F.

128.    Evidence now established the existence of the Shoys Wine Fraud; that is, before July 29, 2011 the Defendants had decided:

      a.   to reject all of the Shoys Wines;

      b.   declare the Shoys Wines spoiled, and

      c.   charge the Prossers through sanctions.

The Shoys Wines Fraud violates 18 U.S.C. § 153 and relied heavily upon multiple violations of 18 U.S.C. § 152.

129.    Evidence now established that the Shoys Wine Fraud was a success because of the Rogue VIPD Investigation Theory Implementation. The Rogue VIPD Investigation Theory Implementation is itself an unlawful act, *i.e.* obstruction of justice.

130.    The Rogue VIPD Investigation Theory Implementation was a product of the ICC Bribery, *i.e.* a racketeering act within the meaning of 18 U.S.C. § 1961(1)(A).

131.    Plaintiffs successful prosecution of this action will entitle the Prossers to post-judgment relief setting aside the Bankruptcy Court's sanctions.

## PART SEVEN

## PATTERN OF UNLAWFUL ACTS

132.    The Shoys Wines Fraud involved a pattern of racketeering activities committed in the name of the enterprise, the JJP BK Estate. The St. Croix Wine Fraud included numerous racketeering acts, including, but not limited to:

      a.   The Shoys Wine Fraud including the unplugging of the air conditioner is a violation 18 U.S.C. § 153 which is a racketeering act within the 18 U.S.C § 1961(1)(B) [Bankruptcy Embezzlement];

44

b. The Court-Appointed 7 Professionals knowingly and intentionally made numerous false statements to the Bankruptcy Court in the Trustee's Contempt Motion – the Contempt Motion's False Account – each of which is a separately punishable crime 18 U.S.C. § 151(2) and thereby, are racketeering acts within the meaning of 18 U.S.C § 1961(1)(D)[30] [the Contempt Motion's False Account];

c. Defendant Christies, acting through Defendant Antin, knowingly and intentionally made several false statements in his August 4, 2011 **Declaration** each of which is a separately punishable crime 18 U.S.C. § 151(3) and thereby, are racketeering acts within the meaning of 18 U.S.C § 1961(1)(D) [Def Antin's False Declaration];

d. The Court-Appointed 7 Professionals, knowingly and intentionally, made numerous false statements to the Bankruptcy Court in hearing after hearing after the filing of the Trustee's Contempt Motion, including repeating and reasserting the Contempt Motion's False Account and further, that Pl Benta was on Prosser's payroll, each of which is a separately punishable crime 18 U.S.C. § 151(2) and thereby, are racketeering acts within the meaning of 18 U.S.C § 1961(1)(D) [False Hearing Accounts and Statements – Contempt Motion];

e. The Court-Appointed 7 Professionals Protective Order Motion made false statements about the VIPD Shoys Wines Criminal Investigation as part and parcel of the Defendants Rogue VIPD Investigation Theory Implementation, which is a separate punishable crime under 18 U.S.C. § 151(2) and thereby, is a racketeering act within the meaning of 18 U.S.C § 1961(1)(D) [False Hearing Accounts and Statements – VIPD Shoys Wines Criminal Investigation];

f. Def Stassen, acting on behalf of all Defendants, presented VIAAG Thomas-Jacobs to knowingly make a false statement to support their Rogue VIPD Investigation Theory Implementation, which is a separate punishable crime under 18 U.S.C. § 151(2) and thereby, is a racketeering act within the meaning of 18 U.S.C § 1961(1)(D) [VIAAG's False Statement];

g. The obstruction and suppression of the VIPD Shoys Wines Criminal Investigation depended upon the ICC Bribery which is a racketeering act within the meaning of 18 U.S.C § 1961(1)(A) and additionally violates 18 U.S.C. § 1510 because the obstruction of the VIPD Shoys Wines Criminal Investigation prevented the presentation of evidence to the Bankruptcy Court related to criminal violations of 18 U.S.C. Chapter 9 in the foregoing motions and supporting declarations which would have mandated federal criminal referral pursuant to 18 U.S.C. § 3057 making such an obstruction a criminal racketeering act within the meaning of 18 U.S.C § 1961(1)(B) [Obstruction of Justice];

---

[30] 18 U.S.C § 1961(1)(D) makes "any offense involving fraud connected with a case under title 11 (except a case under section 157 of this <u>title</u>)" an racketeering act as long as the offense is separately punishable under 18 U.S.C. Chapter 9 other than 18 U.S.C. § 157.

45

h. The Trustee's Contempt Motion with the supporting exhibits and the Trustee's Protective Order each involved wire fraud within the meaning 18 U.S.C. § 1343 which are racketeering acts within the meaning of 18 U.S.C § 1961(1)(B) [Wire Fraud];

i. The Rogue VIPD Investigation Theory Implementation required the unlawful intimidation under the color of territorial law of witnesses and potential witnesses in the bankruptcy proceedings in violation of 18 U.S.C. § 1512(b) which are racketeering acts within the meaning of 18 U.S.C § 1961(1)(B) [Witness Intimidation];

j. The Defendants under the color of territorial law did unlawfully **retaliate** against Pl Benta and others within the meaning of 18 U.S.C. § 1513(e) which are racketeering acts within the meaning of 18 U.S.C § 1961(1)(B) [Retaliation];

k. Obtaining sanctions and attempting to collect an unlawfully obtained sanction award against the Prosser by reason of the Shoys Wines Fraud coupled with the Rogue Investigation Theory is extortion within the meaning of the Hobbs Act [18 U.S.C § 1951] and is a racketeering act within the meaning of 18 U.S.C § 1961(1)(B) [Extortion]; and

l. Each of the Defendants were conspirators with respect to the Shoys Wines Fraud or became conspirators with respect to the Shoys Wines Fraud which fraud succeeded by reason of their conspiracy related to the Rogue VIPD Investigation Theory Implementation [Conspiracy].

133.   The above subparagraphs, (a) through (k) are hereby collectively referred to as "**Shoys Wines Fraud Racketeering Acts**."

134.   The CICO Act is broader than the RICO Act. Therefore, a finding that this pattern of racketeering acts violates the RICO Act, as a matter of law, means the CICO Act has been violated because the acts occurred either in the Virgin Islands or in a Court functioning as the Virgin Islands Bankruptcy Court.

135.   The CICO Act violations include each and every Shoys Wines Fraud Racketeering Acts per 14 V.I.C. § 604(e) and the following violations of V.I.C.:

a. The Shoys Wines Fraud was Grand Larceny within the meaning of 14 V.I.C. § 1081 and thus a CICO Act violation within the meaning of 14 V.I.C. § 604(e);

46

b. The Shoys Wines Fraud was Embezzlement by fiduciaries within the meaning of 14 V.I.C. § 1091 and thus a CICO Act violation within the meaning of 14 V.I.C. § 604(e);

c. The Rogue VIPD Investigation Theory Implementation constituted obstruction of justice within the meaning of 14 V.I.C. § 1508 by suppressing/obstructing the VIPD Shoys Wines Criminal Investigation and thus a CICO Act violation within the meaning of 14 V.I.C. § 604(e);

d. The Rogue VIPD Investigation Theory Implementation constituted obstruction of justice within the meaning of 14 V.I.C. § 1510 by causing the December 27, 2011 forced leave without pay of Pl Benta and thus is a CICO Act violation within the meaning of 14 V.I.C. § 604(e);

e. Defendant Antin 8/4/2011 Declaration was submitted to a Virgin Islands Court with respect to events that have transpired within the Virgin Islands. The False Statements in Defendant Antin 8/4/2011 Declaration violated 18 U.S.C. § 1623 and thus is a CICO Act violation within the meaning of 14 V.I.C. § 604(e); and

f. The actions of the Defendants constituted a conspiracy to violate Virgin Islands Laws and thus, violated 14 V.I.C. § 604(e)(38).

## PART EIGHT

## ACTIONS TAKEN SINCE THE 2017 AMENDED COMPLAINT)

136.    On July 29, 2011, Antin stated: "Jim [Carroll] … does plan to hold the Pissarro he has on consignment hostage." At that time, the Court-Appointed 7 Professionals then anticipated that Pl DProsser's shares of the proceeds from the Pissarro sale would yield sufficient proceeds to recover the Sanctions (*See* above, ¶ 81(c) & (d)). Their anticipation was misplaced.

137.    On May 13, 2013, the Bankruptcy Court in response to the Chapter 7 Trustee Motion entered a "Compliance Order." The effect of the Compliance Order was to allow the collection of the Sanctions through the sale of the Prossers Exempt Property: Plots 168, 169, 170 and 171 of Estate Shoys—the "Anna's Hope Property."

138.    On June 19, 2018, the Compliance Order was reversed by the VI District Court. *See In*

*re Prosser*, 2018 U.S. Dist. LEXIS 101919 (D.V.I. June 19, 2018).

139.    The Court-Appointed 7 Professionals acted between *In re Prosser*, 2017 U.S. Dist. LEXIS 25167 at 4 (D.V.I. Feb. 23, 2017) ("*Prosser I*"), which validated the Sanctions, and *In re Prosser*, 2018 U.S. Dist. LEXIS 101919 at 26 (D.V.I. June 19, 2018) ("*Prosser II*"), which reversed the Compliance Order, to convert the Compliance Order into a judgment[31, 32] (the Sanction Judgment") and filed the judgment[33] against the Prossers' *bankruptcy-exempt* Anna's Hope Property.

140.    The Sanction Judgment prohibited the sale of Anna's Hope Property, Lot 171, unless the Prossers submitted to the Court-Appointed 7 Professionals' extortion.

141.    The Prossers have been deprived of the use and enjoyment of the Anna's Hope Property, Exempt Property since October of 2007.

142.    11 U.S.C. § 105(a) states "[Bankruptcy] court may issue any **order, process, or judgment** that is necessary or appropriate to carry out the provisions of this title." (Emphasis added). *Prosser II* found that the Bankruptcy Court lacked the power to enter the Compliance Order.

143.    Since the Judgment rests upon the Compliance Order and the same factual underpinnings, the Bankruptcy Court was not empowered under 11 U.S.C. § 105(a) to enter Judgment.

---

[31] On November 28, 2017, the Trustee filed with the Bankruptcy Court the *Chapter 7 Trustee's Motion to Convert Sanctions Orders to Judgment*. VIBC Case No. 06-30009, DE 4709.

[32] On February 16, 2018, the Bankruptcy Court entered the "Sanction Judgment."

[33] The Sanction Judgment has been stamped, indicating the filing, by the Virgin Islands Recorder of Deeds, as received on June 27, 2018.

48

144.   The failure to release the Judgment on the Exempt Property is extortion under the color of official right.[34]


# PART NINE

## THE CAUSES OF ACTION

### *FIRST CAUSE OF ACTION – RICO ACT § 1962(c)*

145.   Plaintiffs incorporate the foregoing paragraphs into this cause of action, including the Introduction.

146.   The Defendants, individually and collectively, have committed and continue to commit numerous racketeering acts within the meaning 18 U.S.C. § 1961(1) with respect to the Shoys Wines Fraud and the Rogue VIPD Investigation Theory Implementation.

147.   The Chapter 7 Estate, the JJP BK Estate, is an enterprise (the "Enterprise") within the meaning of 18 U.S.C. § 1961(4) whose affairs involve interstate commerce.

148.   The Defendants are an association-in-fact group that are employed by or associated with the Enterprise, the JJP BK Estate.

149.   The Defendants have conducted, participated, and continue to participate in the conduct of the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5). The racketeering activities to implement the Shoys Wines Fraud and the Rogue VIPD Investigation Theory Implementation were committed and continue to be

---

[34] Reference – DOJ's <u>Criminal Resource Manual 2405</u>, Hobbs Act -- Under Color Of Official Right.

committed under the color of official right or under the color of law through the Enterprise and in the name of the Enterprise.

150.    The Defendants activities with respect to the implementation of the Shoys Wines Fraud and the Rogue VIPD Investigation Theory Implementation which are prohibited activities within the meaning of 18 U.S.C. § 1962(c).

151.    The Prossers have been injured by reason of the violation of 18 U.S.C. § 1962(c) and, pursuant to 18 U.S.C. § 1964(c), are entitled to sue therefore.

152.    Pl. Oakland Benta has been injured by reason of the violation of 18 U.S.C. § 1962(c) and, pursuant to 18 U.S.C. § 1964(c), are entitled to sue therefore.

**WHEREFORE**, Plaintiffs pray for:

A.    Plaintiff Jeffrey Prosser, pursuant to 18 U.S.C. § 1964(c), seeks treble damages he has suffered as a result of the Shoys Wines Fraud coupled with the Rogue VIPD Investigation Theory Implementation; such damages may be determined by a jury and the Plaintiff further seeks the cost of the suit, including reasonable attorney's fees;

B.    Plaintiff Dawn Prosser, pursuant to 18 U.S.C. § 1964(c), seeks treble damages she has suffered and endured as a result of the Shoys Wines Fraud coupled with the Rogue VIPD Investigation Theory Implementation as such damages may be determined by a jury and the Plaintiff further seeks the cost of the suit, including reasonable attorney's fees;

C.    Plaintiff Oakland Benta, pursuant to 18 U.S.C. § 1964(c), seeks treble damages he has suffered and endured as a result of the Shoys Wines Fraud

50

coupled with the Rogue VIPD Investigation Theory Implementation as such damages may be determined by a jury and the Plaintiff further seeks the cost of the suit, including reasonable attorney's fees; and

D. Plaintiffs, pursuant to 18 U.S.C. § 1964(a), seek such other relief as the Court deems just and proper including, but not limited to, the removal of Defendant/Trustee Carroll for cause.

### SECOND CAUSE OF ACTION

### RICO ACT § 1962(d)

153.    Plaintiffs incorporate the foregoing paragraphs into this cause of action, including the Introduction and the pleadings supporting the first cause of action.

154.    The Defendants have conspired within the meaning of 18 U.S.C. § 1962(d) and have acted with a common purpose to accomplished the Shoys Wines Fraud and the Rogue VIPD Investigation Theory Implementation through a pattern (as defined by 18 U.S.C. § 1961(5)) of racketeering acts (as defined by 18 U.S.C. § 1961(1)) in violation 18 U.S.C. § 1962(c).

155.    Each Defendant has committed one or more overt racketeering act to advance the ends of the Shoys Wines Fraud and the Rogue VIPD Investigation Theory Implementation.

156.    The conspiracy of and among the members association-in-fact group involved racketeering acts committed under the color of law.

157.    The Defendants conspiracy with respect to the implementation of the Shoys Wines Fraud is prohibited activities within the meaning of 18 U.S.C. § 1962(d).

158.    The Prossers have been injured by reason of the violation of 18 U.S.C. § 1962(d) and, pursuant to 18 U.S.C. § 1964(c), are entitled to sue therefore.

159.    Pl. Oakland Benta has been injured by reason of the violation of 18 U.S.C. § 1962(d) and, pursuant to 18 U.S.C. § 1964(c), are entitled to sue therefore.

**WHEREFORE**, Plaintiffs pray for:

A.    Plaintiff Jeffrey Prosser, pursuant to 18 U.S.C. § 1964(c), seeks treble damages he has suffered and endured as a result of the Shoys Wines Fraud coupled with the Rogue VIPD Investigation Theory Implementation as such damages may be determined by a jury and the Plaintiff further seeks the cost of the suit, including reasonable attorney's fees;

B.    Plaintiff Dawn Prosser, pursuant to 18 U.S.C. § 1964(c), seeks treble damages she has suffered and endured as a result of the Shoys Wines Fraud coupled with the Rogue VIPD Investigation Theory Implementation as such damages may be determined by a jury and the Plaintiff further seeks the cost of the suit, including reasonable attorney's fees;

C.    Plaintiff Oakland Benta, pursuant to 18 U.S.C. § 1964(c), seeks treble damages he has suffered and endured as a result of the Shoys Wines Fraud coupled with the Rogue VIPD Investigation Theory Implementation as such damages may be determined by a jury and the Plaintiff further seeks the cost of the suit, including reasonable attorney's fees; and

D.    Plaintiffs, pursuant to 18 U.S.C. § 1964(a), seeks such other relief as the Court deems just and proper including, but not limited to, the removal of Defendant/Trustee Carroll for cause.

### THIRD CAUSE OF ACTION

52

*CICO ACT § 605(a)*

160.    Plaintiffs incorporate all the foregoing paragraphs into this cause of action, including the

Introduction, and the pleadings set forth in: (i) the First Cause of Action; and (ii) the Second

Cause of Action.

161.    The Defendants, individually and collectively, have committed and continue to commit

unlawful acts which are defined as "criminal activity" within the meaning 14 V.I.C. § 604(e)

with respect to Shoys Wines Fraud and the Rogue VIPD Investigation Theory Implementation.

162.    The Chapter 7 Estate, the JJP BK Estate, is an enterprise (the "Enterprise") within the

meaning of 14 V.I.C. § 604(h).

163.    The Defendants are association-in-fact group whom are employed by or associated with

the Enterprise, the JJP BK Estate.

164.    The Defendants have conducted, have participated, and continue to participate in the

conduct of the affairs of the Enterprise through a pattern of criminal activity within the meaning

of 14 V.I.C. § 604(j). The criminal activities to implement the Shoys Wines Fraud coupled with

the Rogue VIPD Investigation Theory Implementation were committed and continue to be

committed under the color of official right or under the color of law[35] through the Enterprise and

in the name of the Enterprise.

165.    The Defendants activities with respect to the implementation of the Shoys Wines Fraud

and the Rogue VIPD Investigation Theory Implementation are unlawful activities within the

meaning of 14 V.I.C. § 605(a).

166.    The Prossers have been injured by reason of the violation of 14 V.I.C. § 605(a) and,

---

[35] Court Orders cannot sanitize Defendants' action when the record is replete with and framed by
numerous racketeering activities

pursuant to 14 V.I.C. § 607(c), are entitled to sue therefore.

167.   Pl. Oakland Benta has been injured by reason of the violation of 14 V.I.C. § 605(a) and, pursuant to 14 V.I.C. § 607(c), are entitled to sue therefore.

**WHEREFORE**, Plaintiffs pray for:

A. Plaintiff Jeff Prosser, pursuant to 14 V.I.C. § 607(c), seeks treble damages he has suffered and endured as a result of the Shoys Wines Fraud coupled with the Rogue VIPD Investigation Theory Implementation as such damages may be determined by a jury and the Plaintiff further seeks the cost of the suit, including reasonable attorney's fees;

B. Plaintiff Dawn Prosser, pursuant to 14 V.I.C. § 607(c) seeks treble damages she has suffered and endured as a result of the Shoys Wines Fraud coupled with the Rogue VIPD Investigation Theory Implementation as such damages may be determined by a jury and the Plaintiff further seeks the cost of the suit, including reasonable attorney's fees;

C. Plaintiff Oakland Benta, pursuant to 14 V.I.C. § 607(c), seeks treble damages he has suffered and endured as a result of the Shoys Wines Fraud coupled with the Rogue VIPD Investigation Theory Implementation as such damages may be determined by a jury and the Plaintiff further seeks the cost of the suit, including reasonable attorney's fees; and

D. Plaintiffs, pursuant to 14 V.I.C. § 607(a), seeks such other relief as the Court deems just and proper.

*FOURTH CAUSE OF ACTION*

54

### *CICO ACT § 605(d)*

168.     Plaintiffs incorporate all the foregoing paragraphs into this cause of action, including the Introduction, and the pleadings set out in: (i) the First Cause of Action; (ii) the Second Cause of Action; and (iii) the Third Cause of Action.

169.     Defendants have conspired within the meaning of 14 V.I.C. § 605(d) and have acted with a common purpose to accomplish the Shoys Wines Fraud and the Rogue VIPD Investigation Theory Implementation through a pattern (as defined by 14 V.I.C. § 605(j)) of criminal activity (as defined by 14 V.I.C. § 605(e)) in violation 14 V.I.C. § 605(a).

170.     Each Defendant has committed one or more overt criminal act to advance the ends of the Shoys Wines Fraud and the Rogue VIPD Investigation Theory Implementation.

171.     The conspiracy of and among the members association-in-fact group involved criminal acts committed under the color of law.

172.     The Defendants conspiracy with respect to the implementation of the Shoys Wines Fraud and the Rogue VIPD Investigation Theory Implementation are prohibited activities within the meaning of 14 V.I.C. § 605(d).

173.     The Prossers have been injured by reason of the violation of 14 V.I.C. § 605(d) and, pursuant to 14 V.I.C. § 607(c), are entitled to sue therefore.

174.     Pl. Oakland Benta has been injured by reason of the violation of 14 V.I.C. § 605(d) and, pursuant to 14 V.I.C. § 607(c), is entitled to sue therefore.

**WHEREFORE**, Plaintiffs pray for:

A.   Plaintiff Jeff Prosser, pursuant to 14 V.I.C. § 607(c), seeks treble damages he has suffered and endured as a result of the Shoys Wines Fraud coupled with

the Rogue VIPD Investigation Theory Implementation as such damages may be determined by a jury and the Plaintiff further seeks the cost of the suit, including reasonable attorney's fees;

B. Plaintiff Dawn Prosser, pursuant to 14 V.I.C. § 607(c), seeks treble damages she has suffered and endured as a result of the Shoys Wines Fraud coupled with the Rogue VIPD Investigation Theory Implementation as such damages may be determined by a jury and the Plaintiff further seeks the cost of the suit, including reasonable attorney's fees;

C. Plaintiff Oakland Benta, pursuant to 14 V.I.C. § 607(c), seeks treble damages he has suffered and endured as a result of the Shoys Wines Fraud coupled with the Rogue VIPD Investigation Theory Implementation as such damages may be determined by a jury and the Plaintiff further seeks the cost of the suit, including reasonable attorney's fees; and

D.  Plaintiffs, pursuant to 14 V.I.C. § 607, seeks such other relief as the Court deems just and proper.

### *FIFTH CAUSE OF ACTION*

**VIOLATION OF CONSTITUTIONAL AND CIVIL RIGHTS**
**(First Amendment, 42 U.S.C. § 1985 (1) & (2), Defamation)**
**OAKLAND BENTA**

175.   Plaintiffs incorporate all the foregoing paragraphs into this cause of action, including the Introduction, and the pleadings set forth in the other causes of action.

176.   Defendants, jointly and/or individually and/or in conspiracy with others as aforesaid, have, by and through their actions intentionally deprived Plaintiff Benta of his

56

constitutional rights to free association and public speech by causing his termination from his position as a Virgin Islands Police Officer for no just cause. Such actions are tantamount to a common plan of design by the Defendants, and those working in concert with them to deprive Plaintiff Benta of his statutory and constitutional rights as a United States citizen.

177.    The actions of defendants Geron, Stassen, Nissman, Christie's, and Antin individually, and in conspiracy with each other and/or other unnamed co-conspirators as aforesaid, has injured Oakland Benta while he was engaged in and on account of his lawful discharge of duties as a Police Officer of the United States Virgin Islands in violation of 42 U.S.C. § 1985 (1) (Prohibition on Preventing Officer from Performing Duties).

178.    The actions of defendants Geron, Stassen, Nissman, Christie's, and Antin individually, and in conspiracy with each other and/or other unnamed co-conspirators as aforesaid, were undertaken for the purpose of deterring Oakland Benta through intimidation, from testifying freely as a witness in an ongoing court proceeding on behalf of both and Mrs. Prosser in violation of 42 U.S.C. § 1985 (2) (Obstructing Justice; Intimidating Party, Witness, or Juror).

179.    The actions of defendants Geron, Stassen, Nissman, Christie's, and Antin individually, and in conspiracy with each other and/or other unnamed co-conspirators as aforesaid, were undertaken for the purpose of defaming Plaintiff Benta and wrongfully and prematurely terminating the Virgin Islands investigation of the July 29, 2011 incident, the results of which, had it been allowed to go forward would have established the wrongful and criminal conduct of Christie's in attempting to destroy Mrs. Prosser's property, vindicating Benta as a truthful witness on behalf of both and Mrs. Prosser and would have assisted in the effective presentation of and Mrs. Prosser's case in the Virgin Islands Bankruptcy Court.

180.   As a direct and proximate result of the actions of defendants as aforesaid, Plaintiff Benta has suffered a temporary loss of employment, loss of employment opportunities, public embarrassment and humiliation in both his personal and professional life, pain and suffering all of which is reasonably anticipated to continue indefinitely into the future.

181.   The actions of defendants Geron, Stassen, Nissman, Christie's, and Antin individually, and in conspiracy with each other and/or other unnamed co-conspirators as aforesaid, were undertaken with the actual intent to injure Plaintiff Benta and with such malice as entitles Plaintiff Benta to an award of punitive damages and attorney fees.

**WHEREFORE**, Plaintiff Oakland Benta seeks a judgment against the Defendants, jointly and severally as follows:

A.   That this Court declare the actions of the Defendants were in violation of Plaintiffs' constitutional and civil rights;

B.   That this Court award Plaintiff Oakland Benta his actual and compensatory damages and other consequential damages for the injuries sustained in an amount in excess of $75,000 the full extent of which will be proven at trial upon the merits hereof;

C.   That this Court award Plaintiff Benta substantial punitive damages within the jurisdictional limits as may be set by the statutes applicable to this Court;

D.   That the Defendants be ordered to pay Plaintiff Benta's reasonable attorney fees in accord with 42 U.S.C. § 1988; and

E.   That this Court grant Plaintiff Benta such further and other relief as this Court deems just or equitable.

58

*SIXTH CAUSE OF ACTION*

**VIOLATION OF CONSTITUTIONAL AND CIVIL RIGHTS**
**(First Amendment, 42 U.S.C. § 1985 (1) & (2), Defamation)**
**JEFFREY J. PROSSER and DAWN E. PROSSER**

182.    Plaintiffs incorporate all the foregoing paragraphs into this cause of action, including the Introduction, and the pleadings set forth in the other causes of action.

183.    The actions of defendants Geron, Stassen, Nissman, Christie's, and Antin individually, and in conspiracy with each other and/or other unnamed co-conspirators as aforesaid, were undertaken for the purpose of deterring Oakland Benta through intimidation, from testifying freely as a witness in an ongoing court proceeding on behalf of both and Mrs. Prosser in violation of 42 U.S.C. § 1985 (2) (Obstructing Justice; Intimidating Party, Witness, or Juror).

184.    The actions of defendants Geron, Stassen, Nissman, Christie's, and Antin individually, and in conspiracy with each other and/or other unnamed co-conspirators as aforesaid, were undertaken with the actual intent to injure Jeffrey J. Prosser and Dawn E. Prosser and with such malice as entitle Prosser and Mrs. Prosser each independently to an award of punitive damages and attorney's fees.

**WHEREFORE**, Plaintiffs Jeffrey J. Prosser and Dawn E. Prosser seek a judgment against the Defendants, jointly and severally as follows:

A. That this Court declare the actions of the Defendants were in violation of Plaintiffs' constitutional and civil rights;

B. That this Court award Plaintiffs Jeffrey J. Prosser and Dawn E. Prosser actual and compensatory damages and other consequential damages for the injuries

59

sustained in an amount in excess of $75,000 the full extent of which will be

proven at trial upon the merits hereof;

C. That this Court award Plaintiffs Jeffrey J. Prosser and Dawn E. Prosser

substantial punitive damages within the jurisdictional limits as may be set by the

statutes applicable to this Court;

D. That the Defendants be ordered to pay Plaintiffs Jeffrey J. Prosser and Dawn

E. Prosser reasonable attorney fees in accord with 42 U.S.C. § 1988; and

E. That this Court grant Plaintiffs Jeffrey J. Prosser and Dawn E. Prosser such

further and other relief as this Court seems just or equitable.

**Jury Trial Demanded**

Each Plaintiff demands a jury trial on all issues so triable herein.

Dated:  July 19, 2021.

Respectfully Submitted,

/s/Lawrence H. Schoenbach
Lawrence H. Schoenbach, Esq.
Law Offices of Lawrence H. Schoenbach
111 Broadway, Suite 901
New York, New York 10006

And          /s/Norman A. Abood
Norman A. Abood, Esq.
Law Offices of Norman A. Abood
101 Broadcast Building
136 North Huron Street
Toledo, Ohio 43604

-   *Attorneys for Jeffrey J. Prosser*

And

60